IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RUZATULLAH, *et al.*, <br><br> Petitioners, <br><br> v. <br><br> DONALD RUMSFELD, <br> Secretary, United States Department of <br> Defense, *et al.,* <br><br> Respondents. | Civil Action No. 06-CV-01707 (GK) |

## RESPONDENTS' RESPONSE TO ORDER TO SHOW CAUSE AND MOTION TO DISMISS FOR LACK OF JURISDICTION

Respondents submit this response to this Court's October 16, 2006 order to show cause why a writ of habeas corpus should not be issued in this case. This proceeding should be dismissed because this Court lacks jurisdiction to hear it. Petitioners Ruzatullah and Haji Rohullah claim to be two Afghani citizens detained by the United States Department of Defense at Bagram Airfield, a United States military base in Afghanistan. They allege, through their purported next friends, that the detention violates their rights in several respects.

Even assuming the facts alleged in the petition to be true,[1] this Court lacks jurisdiction to review this petition. Aliens captured outside United States territory and held there as enemy

---

[1] This is a problematic assumption in light of unresolved difficulties in even identifying petitioners among the detainees at Bagram. Respondents are unable to identify Petitioner Haji Rohullah as a detainee at Bagram. *See* Declaration of Colonel Rose Miller ¶ 20. Although respondents also have no record of any individual with the exact name of Petitioner Ruzatullah, an individual with a very similar name is currently detained at the BTIF. *Id.* ¶ 18. Upon information and belief his name is a very common one in Afghanistan, and without additional information, the respondents are unable to conclude that this individual is the petitioner. *See id.* For purposes of this response and the motion to dismiss, however, respondents will assume that Petitioner Ruzatuallh is the same person as the Bagram detainee who has a similar name.

Dockets.Justia.com

combatants are not entitled to habeas relief in the United States courts.  Other than in the special circumstances presented by the Guantanamo Bay Naval Base discussed in *Rasul v. Bush*, 542 U.S. 466 (2004), the federal habeas statute has never been interpreted to apply to provide aliens held at military bases overseas a right to habeas relief.  *Rasul* held that the habeas statute conferred jurisdiction on federal courts to hear habeas petitions by detainees in the custody of the United States military at Guantanamo Bay.  *Rasul*, however, dealt with a military base over which, for more than a century, the foreign sovereign expressly has consented to the United States' "complete jurisdiction and control."  *Id.* at 480.  There is no such consent by the government of Afghanistan regarding Bagram Airfield, nor does the United State exercise "plenary and exclusive jurisdiction" over Bagram as is the case at Guantanamo Bay.  *Id.* at 475. Instead, the United States' use of Bagram Airfield, along with the significant presence of multinational forces there, is a wartime necessity subject to a rather typical lease with the host nation.  Thus, consistent with *Rasul*, the petitioners have no statutory habeas rights in the United States.

Further, the recently enacted Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-366, removes all doubt that aliens outside of the United States lack any statutory habeas rights.  The MCA explicitly divests this Court of jurisdiction to review habeas petitions filed by or on behalf of an alien detainee held by the United States as an enemy combatant.  *See* MCA § 7(a).  The MCA applies to all pending cases on the date of its enactment, such as the present petition.  *Id.* § 7(b).  Accordingly, because Petitioner Ruzatullah is an alien enemy combatant in the custody of the Department of Defense, this Court has no jurisdiction to review his habeas petition under the MCA.

Nor do the petitioners have an independent right to habeas relief under the Suspension Clause of the Constitution.  In light of the enactment of the MCA, petitioners are left with the extraordinary position that every enemy combatant detained by the United States military, anywhere in the world, has a constitutional right to petition the civilian courts of the United States for review of his detention.  This position is contrary to settled law that aliens who have no significant voluntary connection with this country and are detained by the United States outside its sovereign territory have no rights under the Constitution, and therefore none under the Suspension Clause.  *See Johnson v. Eisentrager*, 339 U.S. 763 (1950); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990).  The Supreme Court specifically held in *Eisentrager* that aliens captured and held abroad by the United States military have no constitutional right to habeas relief.  *See* 399 U.S. at 777, 784-85.  *Eisentrager* is the controlling law on this constitutional question.  Permitting alien enemy combatants abroad the privilege of seeking habeas relief in our civil courts now would require not only overruling controlling Supreme Court precedent but also upsetting the long-standing principle that the Constitution does not apply extraterritorially to aliens.  Moreover, the expansion of habeas jurisdiction to cover thousands, if not tens of thousands, of enemy combatants in both current and future armed conflicts would have a crippling effect on our war efforts and invite considerable practical difficulties in connection with such litigation.

Should this Court nevertheless find that petitioners have a colorable claim, respondents respectfully request that this Court stay this proceeding pending resolution of *Al Odah, et al. v. United States,* 05-5064 (D.C. Cir.), and *Boumediene v. Bush, et al.*, No. 05-5062 (D.C. Cir.), by the Court of Appeals for the District of Columbia Circuit. [2]  Among the issues in those

---

[2]  At a minimum, the Court should allow respondents to wait to provide a further factual response to the petition until such time as the significant jurisdictional barriers to the claims raised here have been resolved.

Guantanamo detainees' appeals are whether alien combatants detained outside of the United States have any constitutional rights (including rights under the Fifth Amendment and the Suspension Clause), and whether the Geneva Convention creates any judicially enforceable rights. The Court of Appeals has ordered supplemental briefing, to be completed by November 20, 2006, regarding the significance of the MCA. Given the national significance of these issues, any grant of habeas relief now would be unwarranted.

## BACKGROUND

### I.    Bagram Airfield in Afghanistan

Bagram Airfield is located approximately 40 miles north of Kabul in the Parwan Province of the Islamic Republic of Afghanistan. The airbase played a key role during the Soviet occupation of Afghanistan, providing close air support for Soviet and Afghan troops in the field. Between at least 1999 and 2001, the Taliban and the Northern Alliance forces actively contested control over the airbase, with the base changing hands several times. In the military campaign against al Qaeda and the Taliban regime in Afghanistan, American troops were deployed to the Airfield starting in late 2001 and early 2002, along with multinational armed forces, and had priority use of the Airfield for coalition operations. *See* Declaration of Colonel Rose Miller ["Miller Decl."] ¶ 4. Today, the U.S. military force at Bagram Airfield is partnered with the Afghan National Security Forces, as well as other multinational forces, to conduct full spectrum operations to defeat al Qaeda, the Taliban, and associated movements. *See id.* ¶ 2. Its mission is to establish security, deter the re-emergence of terrorism, and enhance the sovereignty of Afghanistan. *See id.*

Since at least 2003 and consistent with Afghan sovereignty, the United States has entered into several lease agreements with the government of Afghanistan regarding the use of the land

and facilities at Bagram Airfield.  *Id.* ¶ 5.  The most recent agreement, which is similar to prior agreements, was executed on September 28, 2006.  *Id.;* Accommodation Consignment Agreement for Lands and Facilities at Bagram Airfield between the Islamic Republic of Afghanistan and the United States of America ["Consignment Agreement"], attached as Ex. 1 to Miller Decl.  Pursuant to that agreement, Afghanistan, as the "host nation," consigns all facilities and land located at Bagram Airfield "for use by the United States and Coalition Forces for military purposes."  Consignment Agreement at 1; Miller Decl. ¶ 5.  The United States, as the "lessee," has exclusive use and possession of the premises during the existence of the Agreement without rent or any other consideration.  Consignment Agreement at 1 and ¶¶ 5, 9.  The Agreement specifically warrants that Afghanistan is the sole owner of the premises or otherwise has the right, without any restrictions, to grant the "use" of the premises.  *Id.* ¶ 8.  It also includes a hold-harmless provision whereby Afghanistan agrees that all claims arising out of the United States' possession of the premises may be directed to Afghanistan for processing and payment, if any.  *See id.*  The Agreement is to continue in effect until the United States or its successor determines that it no longer needs the premises.  *Id.* ¶ 4; Miller Decl. ¶ 5.

Many different activities are conducted at Bagram Airfield, which has a significant multinational military presence.  Miller Decl. ¶ 6.  While the United States guards the Airfield, there are numerous national compounds located within the Airfield, with each nation separately controlling access to its respective compound.  *Id.*  Afghans also regularly have access to the Airfield.  *Id.* ¶ 7.  They range from local nationals performing contracted work to representatives of the Government of Afghanistan who assist in detainee citizenship interviews.  *Id.*  In addition, the United States operates a detention facility at Bagram Airfield known as the Bagram Theater Internment Facility ("BTIF") to hold some of the aliens (that is, non-Americans) believed to be either members or supporters of al Qaeda, the Taliban or associated movements.  *Id.* ¶ 8.  The

Department of Defense ("DoD") has registered these detainees with the International Committee of the Red Cross ("ICRC"), and the ICRC regularly accesses the facility to conduct private interviews with the detainees there. *Id.* ¶ 9. Additionally, representatives of the Government of Afghanistan have access to Afghan detainees at the BTIF. *Id.*

The Secretary of Defense has issued guidelines regarding the assessment of DoD detainees' enemy combatant status in Afghanistan. *See id.* ¶ 11. In accordance with those guidelines, the detaining combatant commander, or his designee, must review the initial enemy combatant determination made in the field within 90 days of a detainee's capture. *Id.* This review is based on all relevant information available on the date of the review and may be subject to further review based upon newly discovered evidence or information. *Id.* If necessary for a proper review, the detaining combatant commander, or his designee, may interview witnesses, providing they are reasonably available and such interviews would not affect combat, intelligence gathering, law enforcement or support operations. *Id.* The detaining combatant commander may, at his discretion, convene a panel of commissioned officers to review the available evidence and reach a recommended determination regarding the detainee's status. *Id.* After the initial 90-day status review, the detaining combatant commander, or his designee, is required to reassess the detainee's status annually. *Id.* If the detaining combatant commander, or his designee, determines during any of the enemy combatant reviews that a detainee no longer meets the definition of an enemy combatant, the detainee is released. *Id.* Since the war began in Afghanistan, the United States has captured, screened and released many individuals. *Id.* ¶ 8.

At the BTIF, the detainees' enemy combatant status reviews are conducted within 75 days of capture and every six months thereafter. *Id.* ¶ 12. The commanding general in charge of Bagram Airfield has established an Enemy Combatant Review Board ("ECRB") to conduct these reviews. *See id.* The ECRB is a panel of five commissioned officers who evaluate the

detainees' status based on a variety of information, including classified intelligence and testimony from individuals involved in the capture and interrogation of the detainee. *Id.* The ECRB makes its recommendation regarding a detainee's status by a majority vote, and forwards that recommendation to the commanding general, or his designee, for final determination. *Id.*

Even if an Afghan detainee is determined to be an enemy combatant, that person may be transferred to the Government of Afghanistan pursuant to a national reconciliation program. *See id.* ¶¶ 13-14. Sponsored by the Government of Afghanistan, this reconciliation program is designed to allow combatants who are ready to put down their weapons to join in their country's progress by living peaceful and productive lives. *Id.* ¶ 14. DoD has released Afghan detainees from the BTIF pursuant to this program as part of the United States' ongoing effort to support the Government of Afghanistan in its program for strengthening peace. *Id.* These detainees are returned by the Government of Afghanistan to their village elders for reintegration into society. *Id.* In addition, pursuant to a diplomatic arrangement reached with the Government of Afghanistan, the United States anticipates transferring a significant percentage of the Afghan detainees at the BTIF to the Government of Afghanistan in the foreseeable future. *See id.* ¶ 15. To accomplish that arrangement, the United States is currently funding the renovation of an Afghan prison, known as the Afghan National Detention Center. *Id.* The United States is also providing other aid to the Government of Afghanistan regarding the operation of that prison, both to facilitate these transfers and to ensure that the detention facility would meet international standards. *Id.* Detainees who are nationals of third countries and some Afghan detainees, however, will remain in DoD custody either at BTIF or through a transfer to the Guantanamo Bay Naval Base. *Id.* ¶ 17.

Petitioner Ruzatullah was captured in Afghanistan and was determined to be an enemy combatant. *See id* ¶¶ 18-19. He is detained at the BTIF, and the Enemy Combatant Review

7

Board's most recent reevaluation of his status was on August 24, 2006. *See id.* Following that review, his status as an enemy combatant was again validated. *See id.* Petitioner Haji Rohulla is not believed to be a detainee at the BTIF. *See id.* ¶ 20.

## II.    The Statutory Background

Generally, federal district courts have authority "within their respective jurisdictions" to consider a request for habeas corpus relief made by petitioners claiming to be held in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2241(a), (c). Two years ago, the Supreme Court held in *Rasul v. Bush*, 542 U.S. 466 (2004), that the habeas statute could be invoked by aliens detained by the U.S. military as enemy combatants at the Guantanamo Bay Naval Base in Cuba. Although recognizing *Eisentrager*'s holding that enemy combatants captured and detained outside the United States lacked any constitutional right to habeas corpus, the Court held that the habeas statute provided the detainees with a statutory right to relief.

In response to *Rasul*, Congress amended the habeas statute specifically to preclude federal courts jurisdiction over habeas claims, except as provided by the judicial review provisions in the amendment itself. That amendment, the Detainee Treatment Act of 2005 ("DTA"), Pub. L. No. 109-148, tit. X, 119 Stat. 2680 (10 U.S.C. § 801 note) (2005), vested exclusive jurisdiction in the United States Court of Appeals for the District of Columbia Circuit to review the validity of any final determination of a Combatant Status Review Tribunal ("CSRT"), and of any final decision of a military commission, regarding detainees at Guantanamo Bay. *See* DTA § 1005(e)(2) (2005). Beyond those provisions, however, Congress provided that "no court, justice, or judge shall have jurisdiction to hear or consider . . . an application for a writ of habeas corpus filed by or on behalf of an alien detained by the Department of Defense at Guantanamo Bay, Cuba." DTA § 1005(e)(1) (2005).

Although the DTA's provision withdrawing jurisdiction "t[ook] effect on the date of [its] enactment," *see* DTA § 1005(h)(1) (2005), the Supreme Court in *Hamdan v. Rumsfeld*, found no congressional intent to apply the provision retroactively, and thus, held the provision inapplicable to the habeas petition before it, which was filed prior to the enactment of the Act. 548 U.S. __, 126 S. Ct. 2749, 2762-69 (2006).

In response to this and other holdings in *Hamdan*, Congress enacted the Military Commissions Act of 2006 to clarify the jurisdictional restrictions on habeas petitions filed by alien enemy combatants. That statute specifies that the DTA's jurisdiction-limiting provision is applicable "to all cases, without exception, pending on or after the date of the enactment of this Act which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States since September 11, 2001." MCA § 7(b). The MCA also expanded the jurisdictional restrictions to cover habeas petitions filed by or on behalf of not only those alien enemy combatants detained at Guantanamo Bay, but all those in the custody of the United States anywhere in the world. *See id.* § 7(a).

Thus, the habeas statute now provides that "no court, justice, or judge shall have jurisdiction" to consider habeas petitions "filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination," except as provided in section 1005(e)(2) and (e)(3) of the Detainee Treatment Act. *See* MCA § 7(a). The latter provisions gave the D.C. Circuit exclusive jurisdiction to determine the validity of "any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant," and of "any

final decision rendered by a military commission," with regard to anyone held by the United States.[3]  *See* DTA § 1005(e)(2)(A), (e)(3)(A); MCA §§ 9, 10.

## ARGUMENT

## I.    THIS COURT LACKS JURISDICTION TO REVIEW THE PRESENT PETITION

### A.    The Law Is Settled That Aliens Outside the United States Are Outside the Scope of the Writ

This Court has no jurisdiction to grant the relief sought by petitioners, who are far outside the reach of the habeas statute.  Even before the enactment of the MCA, the habeas statute has never been interpreted to apply to aliens held in foreign territories by the United States, except under the unique circumstances relating to the United States' control over the Guantanamo Bay Naval Base.  The habeas statute, which authorizes federal courts to grant habeas corpus relief "within their respective jurisdictions," 28 U.S.C. § 2241(a), was not intended to allow foreign nationals taken captive during military operations overseas and held in foreign lands to have the military decision to hold them reviewed by federal district courts.  The territorial extension found in the unique circumstances of Guantanamo Bay does not similarly apply to the battlefield of Afghanistan.

---

[3]  There is no mandate in the DTA, or the MCA, that the military conduct CSRTs for enemy combatants that it captures.  As noted above, there are currently no CSRTs at Bagram, only an Enemy Combatant Review Board, which is charged with validating the detainees' enemy combatant status but is not the functional equivalent of a CSRT.  Indeed, Congress was aware that the procedures used for determining a detainee's enemy combatant status differ depending on whether the detainee is held at Guantanamo or in Afghanistan or Iraq, and that CSRTs are conducted at only Guantanamo.  *See* DTA § 1005 (a) (requiring the Secretary of Defense to submit a report setting forth procedures of "[CSRTs] and Administrative Review Boards . . . that are in operation at Guantanamo Bay" and for determination of the status of aliens in DoD custody in Afghanistan and Iraq).  Nevertheless, the MCA's jurisdiction-limiting provision is written broadly to cover all detainees who have been "determined by the United States" to be enemy combatants or are awaiting such determination.  *See* MCA § 7(a).

In *Rasul v. Bush*, 542 U.S. 466 (2004), the Supreme Court held that the federal habeas statute extended to aliens detained as enemy combatants at the U.S. military base at Guantanamo Bay, Cuba.  That holding rested on the unique agreement the United States had with Cuba regarding the Guantanamo Bay Naval Base, and Cuba's specific consent to the United States' "plenary and exclusive jurisdiction" over the base for more than a century.   542 U.S. at 471.  As the Court noted, the 1903 Lease Agreement between the two governments provided that "the United States shall exercise complete jurisdiction and control over and within [the Guantanamo Bay Naval Base]," *id.* at 471 (emphasis added); *see also* Lease of Lands for Coaling and Naval Stations, Feb. 23, 1903, U.S.-Cuba, T.S. No. 418 ("1903 Lease"); and according to the Court, the United States "may continue to exercise such control permanently if it so choose."  *Id.* at 480 (citing 1903 Lease, Art. III; Treaty on Relations with Cuba, May 29, 1934, U.S.-Cuba, 48 Stat. 1082, T.S. No. 866, Art. III).  As interpreted by the Supreme Court, *id.* at 480-81, that control brought Guantanamo Bay within the meaning of the habeas statute, particularly the phrase "within their respective jurisdictions."  22 U.S.C. § 2241.

As noted, petitioners cannot rely on *Rasul* because Congress subsequently amended the habeas statute through the MCA.  But even had Congress taken no action, the logic of *Rasul* would not extend toward conferring habeas jurisdiction to every military facility that the United States operates throughout the world.  In contrast to the "complete jurisdiction and control," which may be exercised by the United States, the United States enjoys no similar mandate regarding Bagram Airfield.  Nor does the current use of the base by the United States military and coalition forces for military operations render the airbase a jurisdictional territory of the United States.  The Accommodation Consignment Agreement between the United States and Afghanistan regarding Bagram Airfield – no different from any ordinary lease agreement – speaks of only "exclusive, peaceable, undisturbed and uninterrupted possession" and "use" of the

leased premises.  *See* Consignment Agreement ¶ 9.  The Agreement recognizes Afghanistan as a "host nation," and the United States as a "lessee."  *Id.* at 1.  Moreover, the United States' use of Bagram Airfield is necessitated by its war against the Taliban and al Qaeda.  Miller Decl. ¶ 4.  A military base on foreign soil in a zone of active military operations is hardly the type of territory that is under unchallenged and indefinite control of the United States like Guantanamo Bay such that it was within a federal court's jurisdiction.  Thus, petitioners could not rely on *Rasul* even if the MCA had not expressly made the jurisdictional issue clear in this case.

### B. The MCA Reaffirms the Well-Settled Principle That Aliens Outside of the United States Have No Habeas Rights and Removes All Doubt as to the Lack of Jurisdiction In This Case

Erasing any doubt that might exist about it, Congress has enacted the Military Commissions Act and thereby has made abundantly clear that this Court lacks jurisdiction over alien detainees' habeas corpus petitions.  The MCA provides, in relevant part, that "no court, justice, or judge shall have jurisdiction" to consider habeas petitions "filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination."  *See* MCA § 7(a).  The MCA expressly applies "to all cases, without exception, pending on or after the date of the enactment of this Act, which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States since September 11, 2001," *id.* § 7(b), which would include this case challenging petitioners' detention.

Petitioner Ruzatullah has been determined by the Department of Defense to be an enemy combatant, and his status was reconfirmed as recently as August 2006.  *See* Miller Decl. ¶¶ 18-19.  The plain language of the MCA therefore squarely forecloses this Court's review of Ruzatullah's habeas petition.  "Without jurisdiction [a] court cannot proceed at all in any cause."

*Steel Co v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree. It is to be presumed that a cause lies outside of this limited jurisdiction[.]" *Kokkonen v. Guardian Life Ins. Co of America*, 511 U.S. 375, 377 (1994). Accordingly, this Court should dismiss the petition for want of jurisdiction.

## II. PETITIONERS HAVE NO CONSTITUTIONAL RIGHTS UNDER THE SUSPENSION CLAUSE

### A. The Suspension Clause Has No Extraterritorial Application

Petitioners also allege that they have an independent right to habeas relief under the Suspension Clause of the Constitution, *see* Pet. ¶¶ 32-33, which provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const., art. I, § 9, cl. 2. This argument, however, is foreclosed by settled Supreme Court caselaw. *See Johnson v. Eisentrager*, 339 U.S. 763 (1950). In *Eisentrager*, a group of German nationals – who were captured in China by U.S. forces during World War II and imprisoned in a U.S. military base in Germany – sought habeas relief in federal court. Although the military base in Germany was controlled by the U.S. Army, *id.* at 766, the Supreme Court held these prisoners to have no constitutional right to habeas relief in federal court. This is so because the prisoners "at no relevant time were within any territory over which the United States is <u>sovereign</u>, and the scenes of their offense, their capture, their trial, and their punishment were all beyond the territorial jurisdiction of any court of the United States." *Id.* at 777-78 (emphasis added). The Court further held the Fifth Amendment inapplicable to these aliens because, in reasoning fully applicable to the Suspension Clause, there is no textual or historical support for "[s]uch extraterritorial application of organic law." *Id.* at 782-85; *see also id.* at 768. As the Court noted, such application "would have been so

13

significant an innovation in the practice of governments that, if intended or apprehended, it could scarcely have failed to excite contemporary comment.  Not one word can be cited.  No decision of this Court supports such a view. . . .  None of the learned commentators on our Constitution has ever hinted at it.  The practice of every modern government is opposed to it."  *Id.* at 784-85.

As the Supreme Court later explained, *Eisentrager*'s rejection of constitutional claims by alien prisoners in U.S. custody at a military base abroad was emphatic because aliens have no constitutional rights outside United States sovereign territory.  *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990); *see also Haitian Refugee Center, Inc. v. Baker*, 953 F.2d 1498, 1513 (11th Cir. 1992) (Haitians interdicted by U.S. Coast Guard on the high seas "have no recognized substantive rights under the laws or Constitution of the United States."); *cf. United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936) ("Neither the Constitution nor the laws passed in pursuance of it have any force in foreign territory unless in respect of our own citizens.").  In *Zadvydas v. Davis*, the Court similarly confirmed the "well established" principle that "certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders."  533 U.S. 678, 693 (2001).

Like the *Eisentrager* prisoners, petitioner Ruzatullah is an alien captured abroad and at all relevant times detained at a U.S. military base outside the sovereign territory of the United States.  While the United States leases the military base from Afghanistan, the United States does not have sovereignty over that foreign territory.  To the contrary, the Accommodation Consignment Agreement between the United States and Afghanistan specifically recognizes that Afghanistan, as the "host nation," is merely consigning the "use" of the premises to the United States and the coalition forces for military purposes.  *See* Miller Decl. ¶5; Consignment Agreement at 1.  There is no agreement that in so doing Afghanistan is also ceding sovereignty over the premises to the

United States.  In fact, the very mission of the United States military force at Bagram is to enhance the sovereignty of Afghanistan, among other things.   *See* Miller Decl. ¶ 2.

Indeed, courts have repeatedly recognized that the establishment of a military base in foreign territory does not effect a transfer of sovereignty in the United States–and no court has ever held to the contrary.  *See United States v. Spelar*, 338 U.S. 217, 221-22 (1949) (lease for military air base in Newfoundland "effected no transfer of sovereignty with respect to the military bases concerned"); *Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 380-81 (1948) (U.S. naval base in Bermuda, controlled by the United States under lease with Great Britain, was outside United States sovereignty because the governing lease had "effected no transfer of sovereignty"); *Friedrich v. Friedrich*, 983 F.2d 1396, 1401 (6th Cir. 1993) ("[A] United States military base is not sovereign territory of the United States.");  *Holder v. Holder*, 392 F.3d 1009, 1020 n.10 (9th Cir. 2004) (recognizing U.S. air force base in Germany not under United States sovereignty). Were it otherwise, the court in *Eisentrager*, which also involved the detention of aliens in a U.S. military base abroad, would have been compelled to reach a different result.  In sum, under settled law, the lack of United States sovereignty over Bagram Airfield precludes the attachment of any constitutional rights.

**B.    *Rasul v. Bush* Is Not Relevant to the Constitutional Question**

Petitioners rely on *Rasul v. Bush* to contend that Bagram Airfield is "subject to U.S. constitutional . . . law" because it is allegedly under the "complete jurisdiction and control" of the United States military. Pet. ¶ 21.  *Rasul* does not support petitioners' constitutional argument because the Court emphasized that its holding addressed only the reach of the federal habeas statute.  *See* 542 U.S. at 476-79; *see also id.* at 489 (Scalia, J., dissenting) ("The petitioners do not argue that the Constitution independently requires jurisdiction here.").  Far from overruling

15

settled law under *Eisentrager* and its progeny ruling that the Constitution does not apply extraterritorially to aliens, *Rasul* expressly distinguished between the statutory and constitutional holdings of *Eisentrager* and limited its analysis to the proper interpretation of section 2241.  *See id.* at 476-79.  Specifically, it found that Cuba's express consent to the United States' "complete jurisdiction and control over and within [the Guantanamo Bay Naval Base]" brought the base within the meaning of the habeas statute's distinctive phrase "within their respective jurisdictions."  *Id.* at 471; *see* 28 U.S.C. § 2241(a).  Given the additional fact that "the <u>statute</u> dr[e]w[] no distinction between Americans and aliens held in federal custody," the Court held that "[a]liens held at the base, no less than American citizens, [were] entitled to invoke the federal courts' authority <u>under § 2241</u>."  *Rasul*, 542 U.S. at 484 (emphasis added).

To be sure, in interpreting the habeas statute, the Court in *Rasul* also examined "the historical reach of the writ," noting that at common law, courts exercised habeas jurisdiction over the claims of not only "aliens detained within sovereign territory of the realm," but also "persons detained in the so-called 'exempt jurisdictions,' where ordinary writs did not run, and all other dominions under the sovereign's control."  *Id.* at 481-82 & nn. 11-13.  This observation, however, is not about the application of the writ to aliens abroad because the "persons" cited by the Court to be in "exempt jurisdictions" or other dominions under the sovereign's control were all citizens (or subjects) of the sovereign that was holding them.  *See id.* at 481-82 nn. 12-13.  And as the Supreme Court long ago noted in *Eisentrager,* "[c]itizenship as a head of jurisdiction and a ground of protection was old when Paul invoked it in his appeal to Caesar."  339 U.S. at 770.  "Even by the most magnanimous view, our law does not abolish inherent distinctions recognized throughout the civilized world between citizens and aliens, . . . nor between resident enemy aliens who have submitted themselves to our laws and nonresident enemy aliens who at all times

have remained with, and adhered to, enemy governments." *Id.* at 769.  In other words, the reach

of the common law writ of habeas corpus as interpreted by the Supreme Court is not in conflict

with the undisputed, but irrelevant, proposition that <u>citizens</u> under the sovereignty's custody

abroad may invoke the privilege of the writ of habeas corpus.

Importantly, as the Supreme Court noted in *Eisentrager*, even "[a]t common law 'alien

enemies have no rights, no privileges, unless by the king's special favour, during the time of war.'

(1 Blackstone at 372, 373)." *Id.* at 775 (quoting *Citizens Protective League v. Clark*, 155 F.2d

290, 293 (D.C. Cir. 1946)); *see also Moxon v. The Fanny*, 17 F. Cas. 942 (D. Pa. 1793) (courts

"will not even grant a habeas corpus in the case of a prisoner of war, because such a decision on

this question is in another place, being part of the rights of sovereignty").  Any reliance on the

common law in interpreting the Suspension Clause must also account for this principle.  In any

event, *Rasul*'s common law discussion was in the context of interpreting congressional intent

under the statute.   After concluding that there was "little reason to think that Congress intended

the geographical coverage of [§ 2241] to vary depending on the detainee's citizenship," *Rasul,*

542 U.S. at 481, the Court then went on to note that such an interpretation would be consistent

with the historical reach of the writ.  *Id.* at 481-82.   The question before the Court consistently

was a statutory one, and as the Court's holding makes clear, "<u>§ 2241 </u>confers upon the Court

jurisdiction to hear petitioners' habeas corpus challenges . . . ."  *Id.* at 484 (emphasis added).

*Eisentrager* and its progeny remain the controlling law on whether the Constitution has

extraterritorial application to aliens, and the predicate for such application is sovereignty, not

control, over the territory.  Indeed, in *Rasul*, even as it framed the question for review, the Court

fully recognized a distinction between "ultimate sovereignty" and "plenary and exclusive

jurisdiction" at Guantanamo Bay.  542 U.S. at 475 ("The question now before us is whether the

habeas statute confers a right to judicial review of the legality of Executive detention of aliens in a territory over which the United States exercises 'plenary and exclusive jurisdiction,' but not 'ultimate sovereignty.'").  "[C]ontrol and jurisdiction" is not "equivalent to sovereignty."  *Cuban Am. Bar Ass'n v. Christopher*, 43 F.3d 1412, 1424-25, 1428 (11th Cir. 1995) (alien migrants located at Guantanamo Bay have no First Amendment rights).  Because the United States does not have sovereignty over Bagram Airfield, alien detainees at Bagram, such as Petitioner Ruzatullah, have no right to habeas relief in our civil courts.

### C.    *Rasul* Cannot be Read to Support the Extraterritorial Application of Constitutional Habeas Rights to Alien Detainees at Bagram Airfield

Even if *Rasul*'s statutory holding is read to support an extension of constitutional protections to aliens in territories not within the United State's sovereignty, that extension goes no farther than Guantanamo Bay.  As discussed above, Guantanamo Bay occupies a status that is unlike Bagram Airfield.  For over a century, the United States has exercised "complete jurisdiction and control" over the base with Cuba's consent, *Rasul*, 542 U.S. at 471, whereas Afghanistan's only consent regarding Bagram is that United States may use it for military operations.  *See* Consignment Agreement at 1.  Moreover, unlike Guantanamo Bay, Bagram Airfield is in the zone of war and there is also a significant multinational force there.  *See* Miller Decl. ¶ 6.  To provide alien enemy combatants captured at the battlefield and detained in a theater of war the privilege of access to our civil courts is unthinkable both legally and practically.  As the Supreme Court has observed,

> It would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home.  Nor is it unlikely that the result of such enemy litigiousness would be a conflict between judicial and military opinion highly comforting to enemies of the United States.

18

*Eisentrager*, 339 U.S. at 779.  Whether the meaning of the Suspension Clause could be thought to have expanded with the evolution in statutory habeas since the founding (*see INS v. St. Cyr*, 533 U.S. 289, 304-05 (2001) (reserving the question)), even a modern interpretation of the Clause would not encompass this scenario.  The logistical difficulty of providing thousands of alien enemy combatants – who have never reciprocally agreed to the societal obligations in our country – access to our civil courts alone would cripple even the administration of our judicial system, not to mention its effect on our war effort at a time of active hostilities.

**D.    Petitioners Lack Substantial Voluntary Connections to the United States Sufficient to Trigger Constitutional Protections**

Even if military installations such as Bagram Airfield can be considered to be like sovereign territory of the United States, Petitioner Ruzatullah's complete lack of connection to the United States would still deny him protections under the Constitution.   As the Supreme Court explained in *Eisentrager*, "the alien has been accorded an ascending scale of rights as he increases his identity with our society," 339 U.S. at 770, and the privilege of litigation has been extended to aliens "only because permitting their presence in the country implied protection." *Id.* at 777-78.   Thus, an alien seeking constitutional protections must establish not only that he has come within the territory over which the United States has sovereignty, but also that he had "developed substantial voluntary connections with this country."  *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271-72 (1990); *accord Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004); *32 County Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002) (a "foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise") (quoting *People's Mojahedin Org. of Iran v. Department of State*, 182 F.3d 17, 22 (D.C. Cir. 1999)).

In *Verdugo-Urquidez*, the Supreme Court held that a non-resident alien, who had no previous significant voluntary connection with the United States and was involuntarily transported to the United States and held against his will, had no Fourth Amendment right with respect to the search of his property abroad by U.S. agents. 494 U.S. at 271. The Court reasoned that presence in the United States that is "lawful but involuntary [] is not of the sort to indicate any substantial connection with our country." *Id.* Even more clearly here, petitioners – who do not allege to have any connections at all to the United States – cannot claim any constitutional protections.

### III.   THE PRESENT PETITION SHOULD BE DISMISSED BECAUSE IT IS NOT PROPERLY VERIFIED

This Court should dismiss the petition also because it is not properly verified. The habeas statute provides that an "[a]pplication for writ of habeas corpus shall be in writing signed and verified by the person for whose relief it is intended or by someone acting in his behalf." 28 U.S.C. § 2242. The present petition is purportedly brought by Invatullah on behalf of his brother Ruzatuallh and by Baz Mohammed on behalf of his cousin Haji Rohullah. A person other than the detained person may file an application for a writ of habeas corpus and establish standing as a "next friend." *See Whitmore v. Arkansas*, 495 U.S. 149, 163 (1990). Under section 2242, however, the purported "next friend" must verify the truth of his or her allegations on behalf of the detainee. Here, there is no such verification, other than the attorney's statement that the allegations are true to the best of her knowledge. Section 2242's procedural requirement is important particularly in cases such as this where the petition does not even "allege the facts concerning the applicant's commitment or detention," as required by § 2242, other than the fact of detention itself. The difficulty in identifying petitioners mentioned above further highlights the significance of this requirement. Thus, even assuming that Invatullah and Baz Mohammed

properly have next friend standing, this Court should dismiss the petition unless the defect can be cured.  *See Cox v. McBride*, 279 F.3d 492, 493 (7th Cir. 2002) ("The only authorized remedy [for the applicant's failure to comply with § 2242] is for the judge to return the unsigned petition to the applicant."); *see also In re Application of Hughes,* No. C 02-4275, 2002 WL 31430321, *1 (N.D. Cal. Oct. 25, 2002) (dismissing habeas petition because, among other things, the petition was not signed and verified by the petitioner).

## CONCLUSION

For the foregoing reasons, this Court should dismiss this petition for want of jurisdiction, or in the alternative, stay the proceeding pending resolution of *Al Odah, et al. v. United States,* 05-5064 (D.C. Cir.), and *Boumediene v. Bush, et al.*, No. 05-5062 (D.C. Cir.).  At a minimum, the respondents should not be required to provide a further response to the petition until after the serious jurisdictional issues raised here have been resolved.

Dated:  November 20, 2006                     Respectfully submitted,

                                              PETER D. KEISLER
                                              Assistant Attorney General

                                              DOUGLAS N. LETTER
                                              Terrorism Litigation Counsel

                                                  /s/   Jean Lin
                                              _____
                                              JOSEPH H. HUNT (D.C. Bar No. 431134)
                                              VINCENT M. GARVEY (D.C. Bar No. 127191)
                                              JUDRY L. SUBAR (D.C. Bar No. 347518)
                                              JEAN LIN
                                              JAMES LUH
                                              Attorneys
                                              United States Department of Justice
                                              Civil Division, Federal Programs Branch
                                              20 Massachusetts Ave., N.W.
                                              Washington, DC  20530

Tel:  (202) 514-3716
Fax:  (202) 616-8470

Attorneys for Respondents