IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RUZATULLAH, *et al.*, ) | |
| ) | |
| Petitioners, ) | |
| ) | |
| v. ) | Civil Action No. 06-CV-01707 (GK) |
| ) | |
| DONALD RUMSFELD, ) | |
| Secretary, United States Department of ) | |
| Defense, *et al.*, ) | |
| ) | |
| Respondents. ) | |

**RESPONDENTS' RESPONSE TO ORDER TO SHOW CAUSE
AND MOTION TO DISMISS SECOND AMENDED PETITION
FOR LACK OF JURISDICTION**

Respondents submit this motion to dismiss Petitioners' Second Amendment Petition and

response to this Court's October 16, 2006 order to show cause why a writ of habeas corpus

should not be issued in this case.  Petitioners Ruzatullah and Haji Rohullah are two Afghani

citizens detained as enemy combatants by the United States Department of Defense ("DoD") at

Bagram Airfield, a United States military base in Afghanistan.  They allege, through their

purported next friends,[1] that the detention violates their rights in several respects.

---

[1] A person other than the detained person may file an application for a writ of habeas corpus and establish standing as a "next friend."  The putative "next friend" bears the burden of establishing his next friend status and justifying the exercise of the Court's jurisdiction over the action.  *See Whitmore v. Arkansas*, 495 U.S. 149, 163 (1990) ("'[N]ext friend' standing is by no means granted automatically to whomever seeks to pursue an action on behalf of another.").  The putative next friend must show that he has a significant relationship with the detainee on whose behalf he claims to file a petition for writ of habeas corpus, and that the detainee cannot challenge the legality of his detention.  *Id.* at 163-64.  The putative next friends in this case, however, have not at this point made this showing.

Assuming the facts in the Second Amended Petition to be true,[2] this Court should dismiss the petition because this Court has no jurisdiction to review it. Aliens captured outside United States territory and held there as enemy combatants are not entitled to habeas relief in the United States courts. Other than in the special circumstances presented by the Guantanamo Bay Naval Base discussed in *Rasul v. Bush*, 542 U.S. 466 (2004), the federal habeas statute has never been interpreted to apply to provide aliens held at military bases overseas a right to habeas relief. *Rasul* held that the habeas statute conferred jurisdiction on federal courts to hear habeas petitions by detainees in the custody of the United States military at Guantanamo Bay. *Rasul*, however, dealt with a military base over which, for more than a century, the foreign sovereign expressly has consented to the United States' "complete jurisdiction and control." *Id.* at 480. There is no such consent by the government of Afghanistan regarding Bagram Airfield, nor does the United State exercise "plenary and exclusive jurisdiction" over Bagram as is the case at Guantanamo Bay. *Id.* at 475. Instead, the United States' use of Bagram Airfield, along with the significant presence of multinational forces there, is a wartime necessity subject to an accommodation consignment agreement with the host nation. Thus, consistent with *Rasul*, the petitioners have no statutory habeas rights in the United States.

Further, the recently enacted Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-366, removes all doubt that aliens outside of the United States lack any statutory habeas rights. The MCA explicitly divests this Court of jurisdiction to review habeas petitions filed by or on behalf of an alien detainee held by the United States as an enemy combatant. *See* MCA

---

[2] DoD it is currently detaining at Bagram Airfield two Afghan citizens with the same or closely similar names to the two petitioners and whose fathers' names are the same or closely similar to the names of the two petitioners. *See* Declaration of Colonel James W. Gray ["Gray Decl."], ¶ 5. For purposes of this response and motion to dismiss, respondents will assume that these two Afghan detainees are Petitioners Ruzatuallh and Rohullah.

§ 7(a).  The MCA applies to all pending cases on the date of its enactment, such as the present

petition.  *Id.* § 7(b).  Accordingly, because petitioners Ruzatullah and Rohullah are alien enemy

combatants in the custody of the Department of Defense, this Court has no jurisdiction to review

their habeas petition under the MCA.

Nor do the petitioners have an independent right to habeas relief under the Suspension

Clause of the Constitution.  In light of the enactment of the MCA, petitioners are left with the

extraordinary position that every enemy combatant detained by the United States military,

anywhere in the world, has a constitutional right to petition the civilian courts of the United

States for review of his or her detention.  This position is contrary to settled law that aliens who

have no significant voluntary connection with this country and are detained by the United States

outside its sovereign territory have no rights under the Constitution, and therefore none under the

Suspension Clause.  *See Johnson v. Eisentrager*, 339 U.S. 763 (1950); *United States v. Verdugo-*

*Urquidez*, 494 U.S. 259, 271 (1990).  The Supreme Court specifically held in *Eisentrager* that

aliens captured and held abroad by the United States military have no constitutional right to

habeas relief.[3]  *See* 399 U.S. at 777, 784-85.  *Eisentrager* is the controlling law on this

constitutional question.  Permitting alien enemy combatants abroad the privilege of seeking

habeas relief in our civil courts now would require not only overruling controlling Supreme

Court precedent but also upsetting the long-standing principle that the Constitution does not

apply extraterritorially to aliens.  Moreover, the expansion of habeas jurisdiction to cover

thousands, if not tens of thousands, of enemy combatants in both current and future armed

---

[3]  Indeed, the detention of enemy combatants during an armed conflict is a necessary attribute and by-product of war.  *Hamdi v. Rumsfeld*, 542 U.S. 507, 518-19 (2004).

3

conflicts would have a crippling effect on our war efforts and invite considerable practical difficulties in connection with such litigation.

Should this Court nevertheless find that petitioners have a colorable claim, respondents respectfully request that this Court stay this proceeding pending resolution of *Al Odah, et al. v. United States,* 05-5064 (D.C. Cir.), and *Boumediene v. Bush, et al.*, No. 05-5062 (D.C. Cir.), by the Court of Appeals for the District of Columbia Circuit.[4]  Among the issues in those Guantanamo detainees' appeals are whether alien enemy combatants detained outside of the United States have any constitutional rights (including rights under the Fifth Amendment and the Suspension Clause), and whether the Geneva Convention creates any rights judicially enforceable in court by private individuals.  The Court of Appeals has ordered supplemental briefing, which was completed on November 20, 2006, regarding the significance of the MCA. Given the national significance of these issues, any grant of habeas relief now would be unwarranted.

## BACKGROUND

### I.     Bagram Airfield in Afghanistan

Bagram Airfield is located approximately 40 miles north of Kabul in the Parwan Province of the Islamic Republic of Afghanistan.  The airbase played a key role during the Soviet occupation of Afghanistan, providing close air support for Soviet and Afghan troops in the field. Between at least 1999 and 2001, the Taliban and the Northern Alliance forces actively contested control over the airbase, with the base changing hands several times.  In the military campaign against al Qaeda and the Taliban regime in Afghanistan, American troops were deployed to the

---

[4]  At a minimum, the Court should allow respondents to wait to provide a further factual response to the petition until such time as the significant jurisdictional barriers to the claims raised here have been resolved.

Airfield starting in late 2001 and early 2002, along with multinational armed forces, and had

priority use of the Airfield for coalition operations. *See* Declaration of Colonel Rose Miller,

attached to Respondents' Response to Order to Show Cause and Motion to Dismiss for Lack of

Jurisdiction (docket #5) ["Miller Decl."], ¶ 4. Today, the U.S. military force at Bagram Airfield

is partnered with the Afghan National Security Forces, as well as other multinational forces, to

conduct full spectrum operations to defeat al Qaeda, the Taliban, and associated movements. *See*

*id.* ¶ 2. Its mission is to establish security, deter the re-emergence of terrorism, and enhance the

sovereignty of Afghanistan. *See id.*

Since at least 2003 and consistent with Afghan sovereignty, the United States has entered

into several accommodation consignment agreements with the government of Afghanistan

regarding the use of the land and facilities at Bagram Airfield. *Id.* ¶ 5. The most recent

agreement, which is similar to prior agreements, was executed on September 28, 2006. *Id.;*

Accommodation Consignment Agreement for Lands and Facilities at Bagram Airfield between

the Islamic Republic of Afghanistan and the United States of America ["Accommodation

Agreement"], attached as Ex. 1 to Miller Decl. Pursuant to that agreement, Afghanistan, as the

"host nation," consigns all facilities and land located at Bagram Airfield "for use by the United

States and Coalition Forces for military purposes." Accommodation Agreement at 1; Miller

Decl. ¶ 5. The United States, as the "lessee," has exclusive use and possession of the premises

during the existence of the Agreement without rent or any other consideration. Accommodation

Agreement at 1 and ¶¶ 5, 9. The Agreement specifically warrants that Afghanistan is the sole

owner of the premises or otherwise has the right, without any restrictions, to grant the "use" of

the premises. *Id.* ¶ 8. It also includes a hold-harmless provision whereby Afghanistan agrees

that all claims arising out of the United States' possession of the premises may be directed to

Afghanistan for processing and payment, if any.  *See id.*  The Agreement is to continue in effect until the United States or its successor determines that it no longer needs the premises.  *Id.* ¶ 4; Miller Decl. ¶ 5.

Many different activities are conducted at Bagram Airfield, which has a significant multinational military presence.  Miller Decl. ¶ 6.  While the United States guards the Airfield, there are numerous national compounds located within the Airfield, with each nation separately controlling access to its respective compound.  *Id.*  Afghans also regularly have access to the Airfield.  *Id.* ¶ 7.  They range from local nationals performing contracted work to representatives of the Government of Afghanistan who assist in detainee citizenship interviews.  *Id.*  In addition, the United States operates a detention facility at Bagram Airfield known as the Bagram Theater Internment Facility ("BTIF") to hold some of the aliens (that is, non-Americans) believed to be either members or supporters of al Qaeda, the Taliban or associated movements.  *Id.* ¶ 8.  The Department of Defense ("DoD") has registered these detainees with the International Committee of the Red Cross ("ICRC"), and the ICRC regularly accesses the facility to conduct private interviews with the detainees there.  *Id.* ¶ 9.  Additionally, representatives of the Government of Afghanistan have access to Afghan detainees at the BTIF.  *Id.*

The Secretary of Defense has issued guidelines regarding the assessment of DoD detainees' enemy combatant status in Afghanistan.  *See id.* ¶ 11.  In accordance with those guidelines, the detaining combatant commander, or his designee, must review the initial enemy combatant determination made in the field within 90 days of a detainee's capture.  *Id.*  This review is based on all relevant information available on the date of the review and may be subject to further review based upon newly discovered evidence or information.  *Id.*  If necessary for a proper review, the detaining combatant commander, or his designee, may interview witnesses,

providing they are reasonably available and such interviews would not affect combat, intelligence gathering, law enforcement or support operations. *Id.* The detaining combatant commander may, at his discretion, convene a panel of commissioned officers to review the available evidence and reach a recommended determination regarding the detainee's status. *Id.* After the initial 90-day status review, the detaining combatant commander, or his designee, is required to reassess the detainee's status annually. *Id.* If the detaining combatant commander, or his designee, determines during any of the enemy combatant reviews that a detainee no longer meets the definition of an enemy combatant, the detainee is released. *Id.* Since the war began in Afghanistan, the United States has captured, screened and released many individuals. *Id.* ¶ 8.

At the BTIF, the detainees' enemy combatant status reviews are conducted within 75 days of capture and every six months thereafter. *Id.* ¶ 12. The commanding general in charge of Bagram Airfield has established an Enemy Combatant Review Board ("ECRB") to conduct these reviews. *See id.* The ECRB is a panel of five commissioned officers who evaluate the detainees' status based on a variety of information, including classified intelligence and testimony from individuals involved in the capture and interrogation of the detainee. *Id.* The ECRB makes its recommendation regarding a detainee's status by a majority vote, and forwards that recommendation to the commanding general, or his designee, for final determination. *Id.*

Even if an Afghan detainee is determined to be an enemy combatant, that person may be transferred to the Government of Afghanistan pursuant to a national reconciliation program. *See id.* ¶¶ 13-14. Sponsored by the Government of Afghanistan, this reconciliation program is designed to allow combatants who are ready to put down their weapons to join in their country's progress by living peaceful and productive lives. *Id.* ¶ 14. DoD has released Afghan detainees from the BTIF pursuant to this program as part of the United States' ongoing effort to support the

Government of Afghanistan in its program for strengthening peace. *Id.* These detainees are returned by the Government of Afghanistan to their village elders for reintegration into society. *Id.* In addition, pursuant to a diplomatic arrangement reached with the Government of Afghanistan, the United States anticipates transferring a significant percentage of the Afghan detainees at the BTIF to the Government of Afghanistan in the foreseeable future. *See id.* ¶ 15. To accomplish that arrangement, the United States is currently funding the renovation of an Afghan prison, known as the Afghan National Detention Center. *Id.* The United States is also providing other aid to the Government of Afghanistan regarding the operation of that prison, both to facilitate these transfers and to ensure that the detention facility would meet international standards. *Id.* Detainees who are nationals of third countries and some Afghan detainees, however, will remain in DoD custody. *Id.* ¶ 17.

Petitioners Ruzatullah and Rohullah were captured in Afghanistan and detained at the BTIF. *See* Gray Decl. ¶¶ 5. They were determined to be enemy combatants both at the time of the capture and in subsequent reviews. *See id.* The Enemy Combatant Review Board's most recent reevaluations of Ruzatuallh's and Rohullah's status were on August 24, 2006 and November 2, 2006, respectively. *See id.* Following those reviews, their status as enemy combatants were validated. *See id*.

## II.    The Statutory Background

Generally, federal district courts have authority "within their respective jurisdictions" to consider a request for habeas corpus relief made by petitioners claiming to be held in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2241(a), (c). Two years ago, the Supreme Court held in *Rasul v. Bush*, 542 U.S. 466 (2004), that the habeas statute could be invoked by aliens detained by the U.S. military as enemy combatants at the Guantanamo Bay

Naval Base in Cuba.  Although recognizing *Eisentrager*'s holding that enemy combatants captured and detained outside the United States lacked any constitutional right to habeas corpus, the Court held that the habeas statute provided the detainees with a statutory right to relief.

In response to *Rasul*, Congress amended the habeas statute specifically to preclude federal courts' jurisdiction over habeas claims, except as provided by the judicial review provisions in the amendment itself.   That amendment, the Detainee Treatment Act of 2005 ("DTA"), Pub. L. No. 109-148, tit. X, 119 Stat. 2680 (10 U.S.C. § 801 note) (2005), vested exclusive jurisdiction in the United States Court of Appeals for the District of Columbia Circuit to review the validity of any final determination of a Combatant Status Review Tribunal ("CSRT"), and of any final decision of a military commission, regarding detainees at Guantanamo Bay.  *See* DTA § 1005(e)(2) (2005).  Beyond those provisions, however, Congress provided that "no court, justice, or judge shall have jurisdiction to hear or consider . . .  an application for a writ of habeas corpus filed by or on behalf of an alien detained by the Department of Defense at Guantanamo Bay, Cuba."  DTA § 1005(e)(1) (2005).

Although the DTA's provision withdrawing jurisdiction "t[ook] effect on the date of [its] enactment," *see* DTA § 1005(h)(1) (2005), the Supreme Court in *Hamdan v. Rumsfeld*, found no congressional intent to apply the provision retroactively, and thus, held the provision inapplicable to the habeas petition before it, which was filed prior to the enactment of the Act.   548 U.S. __, 126 S. Ct. 2749, 2762-69 (2006).

In response to this and other holdings in *Hamdan*, Congress enacted the Military Commissions Act of 2006 to clarify the jurisdictional restrictions on habeas petitions filed by alien enemy combatants.  That statute specifies that the DTA's jurisdiction-limiting provision is applicable "to all cases, without exception, pending on or after the date of the enactment of this

Act which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States since September 11, 2001."  MCA § 7(b). The MCA also expanded the jurisdictional restrictions to cover habeas petitions filed by or on behalf of not only those alien enemy combatants detained at Guantanamo Bay, but all those in the custody of the United States anywhere in the world.  *See id.* § 7(a).

Thus, the habeas statute now provides that "no court, justice, or judge shall have jurisdiction" to consider habeas petitions "filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination," except as provided in section 1005(e)(2) and (e)(3) of the Detainee Treatment Act.  *See* MCA § 7(a).  The latter provisions gave the D.C. Circuit exclusive jurisdiction to determine the validity of "any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant," and of "any final decision rendered by a military commission," with regard to anyone held by the United States.[5] *See* DTA § 1005(e)(2)(A), (e)(3)(A); MCA §§ 9, 10.

---

[5]  There is no mandate in the DTA, or the MCA, that the military conduct CSRTs for enemy combatants that it captures.  As noted above, there are currently no CSRTs at Bagram, only an Enemy Combatant Review Board, which is charged with validating the detainees' enemy combatant status but is not the functional equivalent of a CSRT.  Indeed, Congress was aware that the procedures used for determining a detainee's enemy combatant status differ depending on whether the detainee is held at Guantanamo or in Afghanistan or Iraq, and that CSRTs are conducted at only Guantanamo.  *See* DTA § 1005 (a) (requiring the Secretary of Defense to submit a report setting forth procedures of "[CSRTs] and Administrative Review Boards . . . that are in operation at Guantanamo Bay" and for determination of the status of aliens in DoD custody in Afghanistan and Iraq).  Nevertheless, the MCA's jurisdiction-limiting provision is written broadly to cover all detainees who have been "determined by the United States" to be enemy combatants or are awaiting such determination.  *See* MCA § 7(a).

**ARGUMENT**

**I.    THIS COURT LACKS JURISDICTION TO REVIEW THE PRESENT PETITION**

   **A.    The Law Is Settled That Aliens Outside the United States Are Outside the
         Scope of the Writ**

This Court has no jurisdiction to grant the relief sought by petitioners, who are far outside

the reach of the habeas statute.  Even before the enactment of the MCA, the habeas statute has

never been interpreted to apply to aliens held in foreign territories by the United States, except

under the unique circumstances relating to the United States' control over the Guantanamo Bay

Naval Base.  The habeas statute, which authorizes federal courts to grant habeas corpus relief

"within their respective jurisdictions," 28 U.S.C. § 2241(a), was not intended to allow foreign

nationals taken captive during military operations overseas and held in foreign lands to have the

military decision to hold them reviewed by federal district courts.  The territorial extension found

in the unique circumstances of Guantanamo Bay does not similarly apply to the battlefield of

Afghanistan.

In *Rasul v. Bush*, 542 U.S. 466 (2004), the Supreme Court held that the federal habeas

statute extended to aliens detained as enemy combatants at the U.S. military base at Guantanamo

Bay, Cuba.  That holding rested on the unique agreement the United States had with Cuba

regarding the Guantanamo Bay Naval Base, and Cuba's specific consent to the United States'

"plenary and exclusive jurisdiction" over the base for more than a century.  *Id.*  at 471.  As the

Court noted, the 1903 Lease Agreement between the two governments provided that "the United

States shall exercise complete jurisdiction and control over and within [the Guantanamo Bay

Naval Base]," *id.* at 471 (emphasis added); *see also* Lease of Lands for Coaling and Naval

Stations, Feb. 23, 1903, U.S.-Cuba, T.S. No. 418 ("1903 Lease"); and according to the Court, the

United States "may continue to exercise such control permanently if it so chooses."  *Id.* at 480

11

(citing 1903 Lease, Art. III; Treaty on Relations with Cuba, May 29, 1934, U.S.-Cuba, 48 Stat. 1082, T.S. No. 866, Art. III). As interpreted by the Supreme Court, *id.* at 480-81, that control brought Guantanamo Bay within the meaning of the habeas statute, particularly its distinctive phrase relating to the power of courts to issue writs of habeas corpus "within their respective jurisdictions." 22 U.S.C. § 2241.

As noted, petitioners cannot rely on *Rasul* because Congress subsequently amended the habeas statute through the MCA. But even had Congress taken no action, the logic of *Rasul* would not extend toward conferring habeas jurisdiction to every military facility that the United States operates throughout the world. In contrast to the "complete jurisdiction and control," which may be exercised by the United States in Guantanamo, the United States enjoys no similar mandate regarding Bagram Airfield. Nor does the current use of the base by the United States military and coalition forces for military operations render the airbase a jurisdictional territory of the United States. The Accommodation Consignment Agreement between the United States and Afghanistan regarding Bagram Airfield, like any ordinary lease agreement, speaks of only "exclusive, peaceable, undisturbed and uninterrupted possession" and "use" of the leased premises. *See* Accommodation Agreement ¶ 9. The Agreement recognizes Afghanistan as a "host nation," and the United States as a "lessee." *Id.* at 1. Moreover, the United States' use of Bagram Airfield is necessitated by its war against the Taliban and al Qaeda. Miller Decl. ¶ 4. A military base on foreign soil in a zone of active military operations is hardly the type of territory that is under unchallenged and indefinite control of the United States like Guantanamo Bay such that it was within a federal court's jurisdiction. Thus, petitioners could not rely on *Rasul* even if the MCA had not expressly made the jurisdictional issue clear in this case.

**B.**    **The MCA Reaffirms the Well-Settled Principle That Aliens Outside of the United States Have No Habeas Rights and Removes All Doubt as to the Lack of Jurisdiction In This Case**

Erasing any doubt that might exist about it, Congress has enacted the Military Commissions Act and thereby has made abundantly clear that this Court lacks jurisdiction over alien detainees' habeas corpus petitions. The MCA provides, in relevant part, that "no court, justice, or judge shall have jurisdiction" to consider habeas petitions "filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination." *See* MCA § 7(a). The MCA expressly applies "to all cases, without exception, pending on or after the date of the enactment of this Act, which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States since September 11, 2001," *id.* § 7(b), which would include this case challenging petitioners' detention.

The petitioners have been determined by the Department of Defense to be enemy combatants and are held as such at BTIF. *See* Gray Decl. ¶ 5. Their petition was pending at the time of the MCA's enactment. The plain language of the MCA therefore squarely forecloses this Court's review of their habeas petition. *See Hamdan v. Rumsfeld*, No. 04-CV-1519 (JR), – F. Supp. 2d –; 2006 WL 3625015, *3  (D.D.C. Dec. 13, 2006) (holding that the plain language of the MCA clearly divests the district court of jurisdiction over pending habeas petitions filed by alien enemy combatants at Guantanamo). "Without jurisdiction [a] court cannot proceed at all in any cause." *Steel Co v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree. It is to be presumed that a cause lies

outside of this limited jurisdiction[.]" *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S.

375, 377 (1994).   Accordingly, this Court should dismiss the petition for want of jurisdiction.

## II.    PETITIONERS HAVE NO CONSTITUTIONAL RIGHTS UNDER THE SUSPENSION CLAUSE

### A.    The Suspension Clause Has No Extraterritorial Application

Petitioners also allege that they have an independent right to habeas relief under the

Suspension Clause of the Constitution, which provides that "[t]he Privilege of the Writ of

Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public

Safety may require it."   U.S. Const., art. I, § 9, cl. 2.   This argument, however, is foreclosed by

settled Supreme Court caselaw.   *See Johnson v. Eisentrager*, 339 U.S. 763 (1950).   In

*Eisentrager*, a group of German nationals – who were captured in China by U.S. forces during

World War II and imprisoned in a U.S. military base in Germany – sought habeas relief in federal

court.   Although the military base in Germany was controlled by the U.S. Army, *id.* at 766, the

Supreme Court held these prisoners to have no constitutional right to habeas relief in federal

court.   This is so because the prisoners "at no relevant time were within any territory over which

the United States is <u>sovereign</u>, and the scenes of their offense, their capture, their trial, and their

punishment were all beyond the territorial jurisdiction of any court of the United States."   *Id.* at

777-78 (emphasis added).   The Court further held the Fifth Amendment inapplicable to these

aliens because, in reasoning fully applicable to the Suspension Clause, there is no textual or

historical support for  "[s]uch extraterritorial application of organic law."   *Id.* at 782-85; *see also*

*id.* at 768.   As the Court noted, such application "would have been so significant an innovation in

the practice of governments that, if intended or apprehended, it could scarcely have failed to

14

excite contemporary comment.  Not one word can be cited.  No decision of this Court supports

such a view. . . .  None of the learned commentators on our Constitution has ever hinted at it.

The practice of every modern government is opposed to it."  *Id.* at 784-85.

As the Supreme Court later explained, *Eisentrager*'s rejection of constitutional claims by

alien prisoners in U.S. custody at a military base abroad was emphatic because aliens have no

constitutional rights outside United States sovereign territory.  *See United States v. Verdugo-*

*Urquidez*, 494 U.S. 259, 269 (1990); *see also Haitian Refugee Center, Inc. v. Baker*, 953 F.2d

1498, 1513 (11th Cir. 1992) (Haitians interdicted by U.S. Coast Guard on the high seas "have no

recognized substantive rights under the laws or Constitution of the United States."); *cf. United*

*States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936) ("Neither the Constitution nor

the laws passed in pursuance of it have any force in foreign territory unless in respect of our own

citizens.").  In *Zadvydas v. Davis*, the Court similarly confirmed the "well established" principle

that "certain constitutional protections available to persons inside the United States are

unavailable to aliens outside of our geographic borders."  533 U.S. 678, 693 (2001).

Like the *Eisentrager* prisoners, petitioners are aliens captured abroad and at all relevant

times detained at a U.S. military base outside the sovereign territory of the United States.  While

the United States leases the military base from Afghanistan, the United States does not have

sovereignty over that foreign territory.  To the contrary, the Accommodation Consignment

Agreement between the United States and Afghanistan specifically recognizes that Afghanistan,

as the "host nation," is merely consigning the "use" of the premises to the United States and the

coalition forces for military purposes.  *See* Miller Decl. ¶5; Accommodation Agreement at 1.

There is no agreement that in so doing Afghanistan is also ceding sovereignty over the premises to

15

the United States.  In fact, the very mission of the United States military force at Bagram is to enhance the sovereignty of Afghanistan, among other things.   *See* Miller Decl. ¶ 2.

Indeed, courts have repeatedly recognized that the establishment of a military base in foreign territory does not effect a transfer of sovereignty in the United States, and no court has ever held to the contrary.  *See United States v. Spelar*, 338 U.S. 217, 221-22 (1949) (lease for military air base in Newfoundland "effected no transfer of sovereignty with respect to the military bases concerned"); *Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 380-81 (1948) (U.S. naval base in Bermuda, controlled by the United States under lease with Great Britain, was outside United States sovereignty because the governing lease had "effected no transfer of sovereignty"); *Holder v. Holder*, 392 F.3d 1009, 1020 n.10 (9th Cir. 2004) (recognizing U.S. air force base in Germany not under United States sovereignty); *Friedrich v. Friedrich*, 983 F.2d 1396, 1401 (6th Cir. 1993) ("[A] United States military base is not sovereign territory of the United States.").  Were it otherwise, the court in *Eisentrager*, which also involved the detention of aliens in a U.S. military base abroad, would have been compelled to reach a different result.  In sum, under settled law, the lack of United States sovereignty over Bagram Airfield precludes the attachment of any constitutional rights.

**B.     *Rasul v. Bush* Is Not Relevant to the Constitutional Question**

Petitioners rely on *Rasul v. Bush* to contend that Bagram Airfield is "subject to U.S. constitutional . . . law" because it is allegedly under the "complete jurisdiction and control" of the United States military.  Second Amended Pet. ¶ 53.  *Rasul* does not support petitioners' constitutional argument because the Court emphasized that its holding addressed only the reach of the federal habeas <u>statute</u>.  *See* 542 U.S. at 476-79; *see also id.* at 489 (Scalia, J., dissenting) ("The

petitioners do not argue that the Constitution independently requires jurisdiction here."). Far from overruling settled law under *Eisentrager* and its progeny ruling that the Constitution does not apply extraterritorially to aliens, *Rasul* expressly distinguished between the statutory and constitutional holdings of *Eisentrager* and limited its analysis to the proper interpretation of section 2241. *See id.* at 476-79. Specifically, it found that Cuba's express consent to the United States' "complete jurisdiction and control over and within [the Guantanamo Bay Naval Base]" brought the base within the meaning of the habeas statute's distinctive phrase relating to the power of courts to issue writs of habeas corpus "within their respective jurisdictions." *Id.* at 471; *see* 28 U.S.C. § 2241(a). Given the additional fact that "the <u>statute</u> dr[e]w[] no distinction between Americans and aliens held in federal custody," the Court held that "[a]liens held at the base, no less than American citizens, [were] entitled to invoke the federal courts' authority <u>under § 2241</u>." *Rasul*, 542 U.S. at 484 (emphasis added). The Court did not, however, cast any doubt on *Eisentrager*'s ruling that the *Constitution* does not guarantee aliens held abroad a right to habeas corpus. *See id.* at 478. In fact, even as the Court in *Rasul* framed the question before it for review, it fully recognized a distinction between "'ultimate sovereignty'" and "plenary and exclusive jurisdiction" at Guantanamo. *Id.* at 475 ("The question now before us is whether the habeas statute confers a right to judicial review of the legality of Executive detention of aliens in a territory over which the United States exercises 'plenary and exclusive jurisdiction,' but not 'ultimate sovereignty.'").

To be sure, in interpreting the habeas statute, the Court in *Rasul* also examined "the historical reach of the writ," noting that at common law, courts exercised habeas jurisdiction over the claims of not only "aliens detained within sovereign territory of the realm," but also "persons

detained in the so-called 'exempt jurisdictions,' where ordinary writs did not run, and all other dominions under the sovereign's control." *Id.* at 481-82 & nn. 11-13. This observation, however, does not help petitioner because the "persons" cited by the Court to be in "exempt jurisdictions" or other dominions under the sovereign's control were all citizens (or subjects) of the sovereign that was holding them. *See id.* at 481-82 nn. 12-13. And "[c]itizenship as a head of jurisdiction and a ground of protection was old when Paul invoked it in his appeal to Caesar." *Eisentrager*, 339 U.S. at 770. "Even by the most magnanimous view, our law does not abolish inherent distinctions recognized throughout the civilized world between citizens and aliens," *id.* at 769, not to mention alien enemies. Indeed, even "[a]t common law 'alien enemies have no rights, no privileges, unless by the king's special favour, during the time of war.' (1 Blackstone at 372, 373)." *Id.* at 775 (quoting *Citizens Protective League v. Clark*, 155 F.2d 290, 293 (D.C. Cir. 1946)); *see also Case of the Three Spanish Sailors*, 96 Eng. Rep. 775, 776 (C.P. 1779) (petitioners, as prisoners of war, were "not entitled to any of the privileges of Englishmen; much less to be set at liberty on habeas corpus"); *Moxon v. The Fanny*, 17 F. Cas. 942 (D. Pa. 1793) (courts "will not even grant a habeas corpus in the case of a prisoner of war, because such a decision on this question is in another place, being part of the rights of sovereignty").

Moreover, *Rasul* discussed the common law in the context of interpreting congressional intent under the habeas statute. After concluding that there was "little reason to think that Congress intended the geographical coverage of [§ 2241] to vary depending on the detainee's citizenship," *Rasul*, 542 U.S. at 481, the Court then went on to note that such an interpretation would be consistent with the historical reach of the writ. *Id.* at 481-82. The question before the

Court consistently was a statutory one, and so was the Court's holding, which has now been legitimately superceded by the MCA.

Indeed, on December 13, 2006, recognizing that *Eisentrager* and its progeny provide the controlling precedent on the constitution question – precedent unaffected by *Rasul* – and rejecting the same arguments raised by petitioners here, Judge Robertson held that an alien detainee held at Guantanamo may not "claim entitlement to a constitutionally guaranteed writ [of habeas corpus]" because Guantanamo lies outside "the sovereign realm" and such a detainee lacks any voluntary connection with the United States "that would justify the invocation of a constitutional right to habeas corpus." *Hamdan v. Rumsfeld*, No. 04-CV-1519 (JR), 2006 WL 3625015 at *7-*9 (D.D.C. Dec. 13, 2006). The predicate for the Constitution's extraterritorial application to aliens is sovereignty, not control, over the territory. "[C]ontrol and jurisdiction" is not "equivalent to sovereignty." *Cuban Am. Bar Ass'n v. Christopher*, 43 F.3d 1412, 1424-25, 1428 (11th Cir. 1995) (alien migrants located at Guantanamo Bay have no First Amendment rights). Because the United States does not have sovereignty over Bagram Airfield, alien detainees at Bagram, such as petitioners, have no right to habeas relief in our civil courts.

### C.    *Rasul* Cannot be Read to Support the Extraterritorial Application of Constitutional Habeas Rights to Alien Detainees at Bagram Airfield

Even if *Rasul*'s statutory holding is read to support an extension of constitutional protections to aliens in territories not within the United State's sovereignty, that extension goes no farther than Guantanamo Bay. As discussed above, Guantanamo Bay occupies a status that is unlike Bagram Airfield. For over a century, the United States has exercised "complete jurisdiction and control" over the base with Cuba's consent, *Rasul*, 542 U.S. at 471, whereas

Afghanistan's only consent regarding Bagram is that the United States may use it for military operations.  *See* Accommodation Agreement at 1.  Moreover, unlike Guantanamo Bay, Bagram Airfield is in the zone of war and there is also a significant multinational force there.  *See* Miller Decl. ¶ 6.  To provide alien enemy combatants captured at the battlefield and detained in a theater of war the privilege of access to our civil courts is unthinkable both legally and practically.  As the Supreme Court has observed,

> It would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home.  Nor is it unlikely that the result of such enemy litigiousness would be a conflict between judicial and military opinion highly comforting to enemies of the United States.

*Eisentrager*, 339 U.S. at 779.  Whether the meaning of the Suspension Clause could be thought to have expanded with the evolution in statutory habeas since the founding (*see INS v. St. Cyr*, 533 U.S. 289, 304-05 (2001) (reserving the question)), even a modern interpretation of the Clause would not encompass this scenario.  The logistical difficulty of providing thousands of alien enemy combatants – who have never reciprocally agreed to the societal obligations in our country – access to our civil courts alone would cripple even the administration of our judicial system, not to mention its effect on our war effort at a time of active hostilities.

> **D.    Petitioners Lack Substantial Voluntary Connections to the United States Sufficient to Trigger Constitutional Protections**

Even if military installations such as Bagram Airfield can be considered to be like sovereign territory of the United States, the petitioners' complete lack of connection to the United States would still deny them protections under the Constitution.   As the Supreme Court explained

in *Eisentrager*, "the alien has been accorded an ascending scale of rights as he increases his identity with our society," 339 U.S. at 770, and the privilege of litigation has been extended to aliens "only because permitting their presence in the country implied protection." *Id.* at 777-78. Thus, an alien seeking constitutional protections must establish not only that he has come within the territory over which the United States has sovereignty, but also that he had "developed substantial voluntary connections with this country." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271-72 (1990); *accord Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004); *32 County Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002) (a "foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise") (quoting *People's Mojahedin Org. of Iran v. Department of State*, 182 F.3d 17, 22 (D.C. Cir. 1999)).

In *Verdugo-Urquidez*, the Supreme Court held that a non-resident alien, who had no previous significant voluntary connection with the United States and was involuntarily transported to the United States and held against his will, had no Fourth Amendment right with respect to the search of his property abroad by U.S. agents. 494 U.S. at 271. The Court reasoned that presence in the United States that is "lawful but involuntary [] is not of the sort to indicate any substantial connection with our country." *Id.* Even more clearly here, petitioners – who do not allege to have any connections at all to the United States – cannot claim any constitutional protections.

## CONCLUSION

For the foregoing reasons, this Court should dismiss this petition for want of jurisdiction, or in the alternative, stay the proceeding pending resolution of *Al Odah, et al. v. United States,* 05-5064 (D.C. Cir.), and *Boumediene v. Bush, et al.*, No. 05-5062 (D.C. Cir.). At a minimum, the

respondents should not be required to provide a further response to the petition until after the

serious jurisdictional issues raised here have been resolved.

Dated: January 29, 2007                    Respectfully submitted,

                                           PETER D. KEISLER
                                           Assistant Attorney General

                                           DOUGLAS N. LETTER
                                           Terrorism Litigation Counsel

                                              /s/   Jean Lin
                                           JOSEPH H. HUNT (D.C. Bar No. 431134)
                                           VINCENT M. GARVEY (D.C. Bar No. 127191)
                                           JUDRY L. SUBAR (D.C. Bar No. 347518)
                                           JEAN LIN
                                           JAMES LUH
                                           Attorneys
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           20 Massachusetts Ave., N.W.
                                           Washington, DC  20530
                                           Tel:  (202) 514-3716
                                           Fax:  (202) 616-8470

                                           Attorneys for Respondents