# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| RUZATULLAH, et al. | ) |
| | ) |
| Petitioners, | ) |
| | ) |
| v. | )    Civil Action No. 06-CV-01707 (GK) |
| | )    **Oral Argument Requested** |
| DONALD RUMSFELD, et al. | ) |
| | ) |
| | ) |
| Respondents. | ) |
| | ) |

## PETITIONERS' REPLY AND OPPOSITION TO RESPONDENTS' MOTION TO DISMISS THE SECOND AMENDED PETITION

Tina Foster
International Justice Network
P.O. Box 610119
Bayside, NY 11361-0119

Tel. (917) 442 9580
Fax.(917) 591 3353

Eric L. Lewis (394643)
Dwight P. Bostwick (427758)
Anne Katherine Toomey (426658)
Baach, Robinson & Lewis PLLC
1201 F Street, NW, Suite 500
Washington, DC 20004

Tel: (202) 833-8900
Fax: (202) 466-5738

Dated: March 30, 2007

Dockets.Justia.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... ii

BACKGROUND ................................................................................................ 3

ARGUMENT ................................................................................................... 12

I.      LEGAL STANDARD ............................................................................. 12

II.     PETITIONERS ARE ENTITLED TO RELIEF PURSUANT TO THE
        FEDERAL HABEAS STATUTE, 28 U.S.C. § 2241. ............................... 13

III.    THE PETITIONERS ARE ENTITLED TO HABEAS RELIEF UNDER THE
        COMMON LAW AS PROTECTED BY THE CONSTITUTION ..................... 31

IV.     RESPONDENTS' RELIANCE ON *EISENTRAGER* AND *VERDUGO-
        URQUIDEZ* IS MISPLACED. .................................................................. 40

CONCLUSION ................................................................................................ 45

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102 (1987) ...................................42

*Ex parte Bollman*, 8 U.S. (4 Cranch) 75 (1807) ..................................................38

*Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007) ................................................. *passim*

*Braden v. 30th Judicial Circuit Court*, 410 U.S. 484 (1973) ............................................35

*Brown v. Allen*, 344 U.S. 443 (1953)....................................................................33

*Crist v. Republic of Turkey*, 995 F. Supp. 5 (D.D.C. 1998).................................................16

*Davis v. Passman*, 442 U.S. 228 (1979) ................................................................39

*EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621 (D.C. Cir. 1997)....................13

*Felker v. Turpin*, 518 U.S. 651 (1996)..................................................................31

*Fonseca v. Blumenthal*, 620 F.2d 322 (2nd Cir. 1980).....................................................19

*Gonzales v. Oregon*, 126 S. Ct. 904 (2006)............................................................23

*In re Guantánamo Detainees*, 355 F. Supp. 2d 443 (D.D.C. 2005) ...................................12

*Haase v. Sessions*, 835 F.2d 902 (D.C. Cir. 1987) ......................................................13, 26

*Hamdan v. Rumsfeld*, 464 F. Supp. 2d 9 (D.D.C. 2006)....................................................31

*\*Hamdan v. Rumsfeld*, 126 S. Ct. at 2749 (2006)................................................6, 9, 30, 40

*\*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ............................................................. *passim*

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) ................12, 43

*\*INS v. St. Cyr*, 533 U.S. 289 (2001).......................................................................... *passim*

*Ignatiev v. United States*, 238 F.3d 464 (D. C. Cir. 2001)......................................13, 16, 26

*Ilan-Gat Engineers, Ltd. v. Antigua International Bank*, 659 F.2d 234 (D.C. Cir. 1981) ............................................................................................16

\* Cases on which Petitioners chiefly rely

*Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982) ................................................................................................43

*Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004) ...................19

*Jifry v. FAA*, 370 F.3d 1174 (D.C. Cir. 2004) ....................................................43

*Johnson v. Eisentrager*, 339 U.S. 763 (1950) ............................................. *passim*

*Kamen v. American Telephone & Telegraph Co.*, 791 F.2d 1006 (2d Cir. 1986) .............16

*Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005) .........................................8

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994) .......................................30

*In re Letters of Request to Examine Witnesses from the Queen's Bench for Manitoba, Canada*, 59 F.R.D. 625 (N.D. Cal. 1973) .................................19

*In re Letters Rogatory Issued by the Director of Inspection of the Government of India*, 385 F.2d 1017 (2d Cir. 1967) .............................................................19

*Macharia v. United States*, 334 F.3d 61 (D.C. Cir. 2003) ..................................13

*Metropolitan Washington Airports Authority v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252 (1991) ........................................................39

*\*Omar v. Harvey*, No. 06-5126, 2007 U.S. App. LEXIS 2891 (D.C. Cir. Feb. 9, 2007) ................................................................................................. *passim*

*Padilla v. Rumsfeld*, 352 F.3d 695 (2003) *rev'd on other grounds* 542 U.S. 426 (2004) ...................................................................................................6

*People's Mojahedin Organization of Iran v. Department of State*, 182 F.3d 17 (D.C. Cir. 1999) ........................................................................................43

*People's Mojahedin Organization of Iran v. Department of State*, 327 F.3d, 1238 (D.C. Cir. 2003) ........................................................................................43

*Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36 ...............13, 16, 26

*Rasul v. Bush*, 215 F. Supp. 2d 55 (D.D.C. 2002) ...........................................13

*\*Rasul v. Bush*, 542 U.S. 466 (2004) ......................................................... *passim*

*Reid v. Covert*, 354 U.S. 1 (1957) ...................................................41, 43, 44

*Republic of Kazakhstan v. Biedermann International*, 168 F.3d 880 (5th Cir. 1999) ................................................................................................19

*Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477 (1989)..............29

*In re Ross*, 140 U.S. 453 (1891)..................................................................................41

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ................................................................23

*Swain v. Pressley*, 430 U.S. 372 (1977)..................................................................36, 37

*U.S. Catholic Conf. v. Abortion Rights Mobilization*, 487 U.S. 72 (1988)........................16

*United States v. Dickey*, 20 C.M.R. 486 (Army Bd. Rev. 1956) .......................................30

*United States v. Finch*, 22 C.M.R. 698 (Navy Bd. Rev. 1956)..........................................30

*United States v. Hayman*, 342 U.S. 205 (1952) ...............................................................37

*United States v. Lee*, 25 M.J. 703 (Ct. Mil. Rev. 1987)....................................................30

*United States ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80 (D.D.C. 2004) ......................13

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990)........................................*passim*

*Warren v. District of Columbia*, 353 F.3d 36 (D.C. Cir. 2004) ........................................13

*Ex parte Watkins*, 28 U.S. (3 Pet) 193 (1830) ...............................................................33

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ..................................................................14

*Wilderness Society v. Griles*, 824 F.2d 4 (D.C. Cir. 1987).............................................16

*Williamson v. Tucker*, 645 F.2d 404 (5th Cir. 1981) .......................................................16

*Ex Parte Yerger*, 8 Wall. 85 (1869) ..............................................................................31

## FOREIGN CASES

*Ex parte Anderson*, 121 Eng. Rep. 525 (Q.B. 1861) .......................................................34

*R v. Cowle*, 97 Eng. Rep. 587 (K.B. 1759)....................................................................33

*R v. Hastings*, (Sup. Ct. Calcutta 1775) reported in
1 *The Indian Decisions* 1005 (T.A. Venkasa Row ed. 1911) ............................................34

*R v. Ramgovid Mitter*, (Sup. Ct. Calcutta 1781) reported in
1 *The Indian Decisions* 1008 (T.A. Venkasa Row ed. 1911) ...........................................34

*Ex parte Mwenya*, [1960] 1 Q.B. 241 (C.A.).............................................................34, 35

*Ex parte Sekgome*, [1910] 2 K.B. 576 (C.A.) ...............................................................34

## CONSTITUTIONS

Magna Carta, Art. 39 .............................................................................................2

U.S. Const. Art. 1 § 9, cl. 2........................................................................ *passim*

U.S. Const. amend. V cl. 3.....................................................................12, 23, 42

## TREATIES

Convention Relative to the Protection of Protection of Prisoners of War,
Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135.......................................................20, 29

Lease of Certain Areas for Naval of Coaling Stations, U.S.-Cuba,
July 2, 1903, T.S. No. 426 ...............................................................................24, 25

Lease of Lands for Coaling and Naval Stations, U.S.-Cuba,
Feb. 23, 1903, T.S. No. 418 .............................................................................24, 25

Treaty Defining Relations with Cuba, U.S.-Cuba,
May 29, 1934, T.S. No. 866..............................................................................24, 25

## FEDERAL STATUTES

28 U.S.C. § 1331.................................................................................................2

28 U.S.C. § 1332.........................................................................................2, 3, 32

28 U.S.C. § 1651.............................................................................................2, 32

28 U.S.C. § 1782...............................................................................................19

28 U.S.C. § 2241....................................................................................... *passim*

28 U.S.C. § 2254...............................................................................................13

28 U.S.C. § 2255.................................................................................................13

152 Cong. Rec. S10368 (daily ed. Sept. 28, 2006); 152 Cong. Rec. H7548 .......................8

Detainee Treatment Act, Pub. L. No. 109-148, 119 Stat. 2680 ................................ *passim*

Illegal Immigration Reform and Immigrant Responsibility Act, 8 U.S.C. § 1252
    *et seq.* ...................................................................................................32

Judiciary Act of 1789, 1 Stat. 73........................................................................31

Military Commissions Act of 2006, Pub. L. No. 109-366 ........................................ *passim*

Uniform Code of Military Justice, 10 U.S.C. § 801 *et seq.* ......................................20, 30

United States Constitution, the Administrative Procedures Act, 5 U.S.C. § 500 *et
    seq* .........................................................................................................2

## RULES

Fed. R. Civ. P. 12............................................................................................12

## CONGRESSIONAL RECORD

152 Cong. Rec. S10368 (daily ed. Sept. 28, 2006) (Statement of Sen. Specter)...............37

152 Cong. Rec. H7548 (daily ed. Sept. 27, 2006)
(Statement of Rep. Sensenbrenner).....................................................................37

## ARTICLES

Tim Golden, *Army Faltered in Investigating Detainee
Abuse*, N.Y. Times, May 22, 2005..................................................................3, 28

Gerald Neuman, *Closing the Guantanamo Loophole,*
50 Loyola L. Rev. 1 (2004)...............................................................................26

**MISCELLANEOUS**

Memorandum to the Sec'y of the Navy from Paul Wolfowitz,
Deputy Sec'y of Def. (Jul. 7, 2004) *available at*
http://www.defenselink.mil/news/Jul2004/d20040707review.pdf
(last viewed Mar. 23, 2007) ..................................................................................................8

*Rasul v. Bush*, 542 U.S. 481 (2004), *Brief for Respondents
on Writ of Certiorari to the United States Court of Appeals
for the District of Columbia* .............................................................................................29

Petitioners Ruzatullah and Haji Rohullah, through their next friends, Inavatullah and Baz Mohammad, by and through undersigned counsel, submit this reply and opposition to respondents' motion to dismiss, for want of jurisdiction, petitioners' Second Amended Petition.[1]

This is a case involving two men who were taken from their homes in Jalalabad, Afghanistan by the United States military, and imprisoned indefinitely without charges at a detention facility at Bagram Airfield ("Bagram"). The instant case thus raises the question whether the United States can create a modern-day Star Chamber, where it can affix the label "enemy combatant" to an individual who has no meaningful ability to challenge that label, and on that basis detain the individual indefinitely, essentially *incommunicado*, subject to interrogation and torture, without right of redress. The English Parliament dissolved the original Star Chamber in the *Habeas Corpus Act of 1640*. Here respondents argue that habeas corpus does not extend to Bagram because, unlike English Kings, they have deliberately chosen to locate their Star Chamber at a distant airfield outside their "realm." Respondents' position is deeply at odds with the fundamental legal and moral principles of American democracy as well as the historical grounding of habeas corpus. Freedom from arbitrary Executive detention dates to the Magna Carta, is not limited territorially, and is one of the most fundamental tenets of the

---

[1] Petitioners filed their initial petition for habeas relief on October 2, 2006. In response to this Court's Order to Show Cause why the writ should not issue, respondents moved to dismiss the petition on November 20, 2006, and in support of that motion, proffered the declaration of Colonel Rose M. Miller ("Miller Decl"), dated November 19, 2006. Petitioners amended their petition on December 22, 2006 and filed a Second Amended Petition on January 10, 2007. Respondents filed a superseding motion to dismiss the Second Amended Petition on January 29, 2007, which asserted arguments substantially identical to those contained in their initial motion. In support of their second motion to dismiss, respondents continued to rely on the Miller Declaration, and proffered an additional declaration by a different United States military officer, Colonel James W. Gray ("Gray Decl."). In this Opposition, petitioners will refer to respondents' January 29, 2007 motion to dismiss as "Resp. Mot. at ____."

rule of law.[2] Yet respondents ask this Court to conclude that it is without authority to lift the veil

of secrecy surrounding Bagram and to fulfill its essential role as a check on Executive power

simply because petitioners are aliens and are being held abroad.

The moral repugnance of respondents' position is manifest. But respondents' motion to

dismiss should also be denied as a matter of law. According to respondents, the Military

Commissions Act of 2006, Pub. L. No. 109-366 ("MCA"), forecloses any exercise of this

Court's jurisdiction under the federal habeas statute; the federal habeas statute, 28 U.S.C. § 2241

*et seq.*, does not extend to the prison at Bagram; and, petitioners have no constitutional or

common law entitlement to the writ. For the following reasons, these arguments are legally

untenable:

- This Court retains jurisdiction to consider the instant petition under the federal habeas statute because petitioners *have not been determined* to be enemy combatants by a "competent tribunal," as required by the MCA;

- In the alternative, this Court cannot decide whether petitioners have been "determined by the United States to have been properly detained" as enemy combatants without permitting petitioners to take discovery concerning the so-called Enemy Combatant Review Board and its procedures, on which respondents rely and as to which respondents have made factual representations to this Court;

- The MCA affects this Court's jurisdiction only under the federal habeas statute, 28 U.S.C. § 2241 *et seq.*, so this Court retains jurisdiction to consider petitioners' claims under other statutes, including 28 U.S.C. §§ 1331, 1332, and 1651;

- Petitioners' incarceration violates the Geneva Conventions, as well as the U.S. Constitution and the common law; and

- To the extent the MCA applies to the instant petition, it is an unconstitutional violation of the Suspension Clause because Congress did not validly suspend the writ and did not provide for an adequate alternative remedy.

---

[2] The Great Writ of habeas corpus descends from the Magna Carta signed by King John at Runnymede in 1215. *See* Art. 39 ("No free man shall be seized or imprisoned, or stripped of his rights or possessions, or outlawed or exiled, or deprived of his standing in any other way, nor will we proceed with force against him, or send others to do so, except by the lawful judgment of his equals or by the laws of the land.").

It is important not to lose sight of the context in which this case is presented. Bagram is not a temporary camp, housing enemy soldiers apprehended on the battlefield for the duration of a declared war, finite in time and space. Like the detention facilities at the U.S. Naval Station at Guantánamo Bay, Cuba ("Guantánamo"), it has become a permanent prison located, according to respondents, in a lawless enclave. Prisoners from numerous locations are being held indefinitely, often on the flimsiest of pretexts, and subjected to horrific conditions. Even the U.S. military has admitted that interrogators have tortured and killed at least two prisoners at Bagram. Second Amended Petition ("Pet.") at ¶ 61 (citing Tim Golden, *Army Faltered in Investigating Detainee Abuse*, N.Y. Times, May 22, 2005). The "war on terror" as conceived by respondents is unlimited in duration and global in scope, leading to the specter of innocent civilians being held indefinitely, without recourse, in legal "black holes." It is necessary and appropriate for this Court to exercise its constitutionally mandated function as a check on this unwarranted extension of Executive power. Respondents' motion to dismiss should be denied and the writ should be issued.

## BACKGROUND

### A.    Facts Alleged in the Petition

As alleged in their Second Amended Petition, petitioners are Afghan citizens who were taken from their homes and "disappeared" into the United States' prison at Bagram. Although they were taken into custody almost two years apart, their stories are similar.

Petitioner Ruzatullah is approximately 35 years old. Pet. at ¶ 21. He is a citizen of Afghanistan and a civilian. *Id.* at ¶¶ 9, 21, 27. In or around October 2004, while Ruzatullah was at home with his family in Jalalabad, U.S. soldiers forced their way into his residence and took Ruzatullah into custody. *Id.* at ¶¶ 22-25. Neither Ruzatullah nor his family attempted to resist,

but instead cooperated with the U.S. soldiers. The U.S. soldiers who took him into custody found no weapons or guns during their search of Ruzatullah's home. *Id.* at ¶ 23. At all times after being taken from his home, Ruzatullah has remained in the exclusive custody and control of the United States. *Id.* at ¶ 25. During his custody, Ruzatullah has been interrogated on numerous occasions by agents of the U.S. Departments of Defense and Justice and, despite requests for access to his family and legal counsel, he has been held *incommunicado*. *Id.* at ¶¶ 20, 25. He has never been charged with a crime or informed of any charges pending against him.

Petitioner Haji Rohullah is also a citizen of Afghanistan who is incarcerated in the respondents' custody at Bagram. *Id.* at ¶¶ 11, 40. He is approximately 40 years old. *Id.* at ¶ 33. Before his incarceration at Bagram, he worked as a driver to support his family. *Id.* at ¶ 34. In or around August 6, 2006, U.S. soldiers forced their way into Rohullah's family home in Jalalabad, where Rohullah and his family were visiting with guests. *Id.* at ¶ 35. Rohullah and his family did not resist; they attempted to cooperate with the U.S. soldiers. *Id.* at ¶ 36. The U.S. soldiers searched the home, and destroyed many of the family's possessions and took many other valuable items, including jewelry, electronics, and two cars (along with registration documents that serve as proof of ownership). *Id.* at ¶ 38. None of the family's property has been returned. *Id.* The soldiers did not find guns or weapons on the premises. *Id.* at ¶ 37.

Following the search, the U.S. soldiers took Rohullah into custody. He was initially held at a nearby military base in Jalalabad, *id.* at ¶ 39, and was later transferred to Bagram. *Id.* at ¶ 40. Before and during his transfer, Rohullah was interrogated many times. *Id.*

Neither Ruzatullah nor Rohullah is an enemy alien, belligerent, or combatant of any kind. *Id.* at ¶¶ 15-16, 43, 44. They are civilians who are citizens of Afghanistan – a United States ally. *Id.* at ¶¶ 27, 42. They had no involvement in the September 11 terrorist attacks on the United

State or any other terrorist attack. *Id.* at ¶¶ 17, 46. They are not now, nor have they ever been, members of the Taliban forces, Al Qaeda or any other terrorist organization. *Id.* at ¶¶ 28, 29, 43, 44. Although they remain in custody, Ruzatullah and Rohullah have never been charged with any crime or offense, nor have they been notified of any pending or contemplated charge. *Id.* at ¶¶ 3, 19, 32. Despite requests, they have been denied legal representation and visits from family members. *Id.* at ¶¶ 3, 19. They have been denied their rights under all sources of international law, including treaties such as the Geneva Conventions. *Id.* at ¶ 19. Ruzatullah and Rohullah are being arbitrarily and unlawfully detained. *Id.* at ¶¶ 49, 52.

Bagram is under the exclusive jurisdiction and control of the United States. *Id.* at ¶ 53. Conditions of detention at Bagram are significantly worse than at Guantánamo. *Id.* at ¶¶ 54-63. At Bagram, detainees are regularly crowded together in wire-mesh cages, similar to those used for animals. *Id.* at ¶ 55. They lack toilets or running water. *Id.* Detainees at Bagram are regularly tortured and abused, including being starved, severely beaten, forced into painful, contorted body positions, "water boarded," exposed to extremely cold temperatures, and sexually humiliated. *Id.* at ¶¶ 60-62. A number of detainees at Bagram have sustained horrific injuries and have died because of their mistreatment. *Id.* at ¶ 61. The average period of detention at Bagram is longer than 14 months. *Id.* at ¶ 59. The U.S. Military has publicly admitted that it detains individuals at Bagram solely for intelligence gathering and not because the detainees are enemy combatants. *Id.* at ¶ 57.

### B.     Legislative and Legal Background

Over the past three years, the Supreme Court has issued three decisions concerning the role of the federal courts in reviewing and, where necessary, invalidating, the acts of the Executive branch taken in the course of the "war on terror." *See Rasul v. Bush*, 542 U.S. 466,

487 (2004) ("there are circumstances in which the courts maintain the power and the responsibility to protect persons from unlawful detention even where military affairs are implicated"); *Hamdi v. Rumsfeld*, 542 U.S. 507, 535 (2004) ("It does not infringe on the core role of the military for the courts to exercise their own time-honored and constitutionally mandated roles of reviewing and resolving" claims related to Executive detention.); *Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2772 (2006) (*Ex parte Quirin* "provides a compelling historical precedent for the power of civilian courts to entertain challenges that seek to interrupt the processes of military commissions."). In the last two years, Congress has twice legislated to prohibit egregious conduct relating to interrogation and detention, like torture and cruelty, while simultaneously imposing structure and limits on the Courts' oversight role. And, in the last two months, the D.C. Circuit has issued two decisions concerning the rights of detainees to the writ of habeas corpus. *See Omar v. Harvey*, No. 06-5126, 2007 U.S. App. LEXIS 2891 (D.C. Cir. Feb. 9, 2007); *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007). This case is presented against the backdrop of this ongoing dialogue between the Courts and Congress, and, accordingly, petitioners briefly summarize the current status of both the legislation and the litigation.

Detainees from Guantánamo first filed habeas petitions seeking release from custody in 2002. In resisting these petitions, the United States took the position that aliens detained by the U.S. military were not entitled to the protection of the federal habeas statute or the Constitution. By June 2004, these cases had made their way to the Supreme Court and were decided *sub nom Rasul v. Bush*, 542 U.S. 466 (2004). In *Rasul*, the Supreme Court ruled that detainees at Guantánamo were protected under the federal habeas statute and could bring petitions to

challenge their detention. The Court based its reasoning on three findings that are directly relevant to the instant case:

- The United States exercises "exclusive jurisdiction and control" over the territory occupied by the Guantánamo Bay Naval Base, *id.* at 467;

- The Guantánamo detainees had "never been afforded access to any tribunal, much less charged with and convicted of wrongdoing," *id.* at 476; and

- The federal habeas statute makes no distinction between aliens and citizens and thus "[a]liens held at the base, no less than American citizens, are entitled to invoke the federal courts' authority under § 2241," *id.* at 481.

As a result of its determination that aliens held by the U.S. military at Guantanamo were within the ambit of the federal statutory writ of habeas corpus, the Supreme Court remanded the petitions for adjudication on the merits. *Id.* at 485.

In *Hamdi v. Rumsfeld*, a case decided the same day as *Rasul*, the Supreme Court addressed the role of the courts in considering the Executive's procedures for determining whether detainees are in fact "enemy combatants." 542 U.S. 507 (2004). *Hamdi* confirms that, "whatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake." *Id.* at 536 (plurality). In addition, the plurality in *Hamdi* held that a detainee "must receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker." *Id.* at 533. The plurality in *Hamdi* considered the possibility that "an appropriately authorized and properly constituted military tribunal," such as provided for by Army Regulation 190-8, ch. 1-6, might meet this minimum threshold. *Id.* at 537. In the wake of the *Hamdi* decision, the Department of Defense ("DoD") announced the creation of so-called Combatant Status Review Tribunals ("CSRTs") at Guantánamo, in order to provide prisoners

with a modicum of due process. Memorandum to the Sec'y of the Navy from Paul Wolfowitz, Deputy Sec'y of Def. (Jul. 7, 2004).[3] CSRTs are informal military hearings intended to review prisoners' status as enemy combatants, putatively "modeled after Army Regulation 190-8 which governs the determination of prisoner of war status." *In re Guantánamo Detainees*, 355 F. Supp. 2d 443, 467-68 (D.D.C. 2005).[4]

In the remand of the *Rasul* petitions, the respondents there immediately filed motions to dismiss, arguing that the Supreme Court's *Rasul* decision had decided only a jurisdictional question and left open the question whether constitutional and statutory rights actually applied to the detainees at Guantánamo. Two federal district courts reached conflicting decisions on the scope of *Rasul's* holding and whether petitioners were entitled to the writ. *Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005); *In re Guantánamo Detainees*, 355 F. Supp. 2d 443 (D.D.C. 2005). The two holdings were appealed almost simultaneously and consolidated before the D.C. Circuit. *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007).

While the *Boumediene* appeal was pending, in the fall of 2005, Congress passed the Detainee Treatment Act, Pub. L. No. 109-148, 119 Stat. 2680 ("DTA"), which authorized changes in detainee treatment in a number of ways:

- Setting minimal standards for treatment of detainees at U.S. facilities around the globe prohibiting torture and cruel treatment;

- Restricting court review of detention decisions by, in certain circumstances, stripping jurisdiction over habeas cases brought by Guantánamo detainees;

---

[3] http://www.defenselink.mil/news/Jul2004/d20040707review.pdf (last viewed Mar. 23, 2007).

[4] According to U.S. government documents, detainees before a CSRT have the opportunity to be present at their hearing and also, theoretically, have the opportunity to present evidence. Such detainees are assigned a personal representative, but the personal representative does not act as a lawyer in gathering evidence. http://www.defenselink.mil/news/Jul2004/d20040707review.pdf (last viewed Mar. 23, 2007).

- Providing a judicial review of CSRT determinations through appeal to the United States Court of Appeals for the District of Columbia Circuit; and

- Requiring the DoD to submit procedures to Congress for its detainee determinations and treatment, both in Guantánamo and elsewhere.

DTA §§ 1005 (a)(1) (A)-(B), (d)(i).[5]

The DTA was considered by the Supreme Court in *Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006), a case challenging the composition and procedures of a military commission created to hear the criminal prosecution of a detainee.  In *Hamdan*, the Supreme Court held that the DTA was not retroactive and therefore did not strip jurisdiction in pending cases; that Article 3 of the Geneva Conventions governed Hamdan's treatment in U.S. custody; and, that the military commission proposed to try him was unconstitutional because it was not authorized by Congress. *Id.*  Subsequently, in the fall of 2006, Congress passed the MCA, which, *inter alia*, authorized military commissions to try the few detainees actually charged with crimes.  (A copy of the MCA is included in petitioners' Addendum.)  The MCA also amended the federal habeas statute, 28 U.S.C. § 2241 *et seq.*, adding the following provisions:

> (e)(1) No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

> (2) Except as provided in paragraphs (2) and (3) of section 1005(e) of the Detainee Treatment Act of 2005 (10 U.S.C. §801 note), no court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

28 U.S.C. § 2241(e).  The instant petition was filed before the MCA was enacted.

---

[5]  For the Court's ease of reference, petitioners proffer herewith an Addendum which includes copies of sources that may not be readily available to the Court.  A copy of the DTA is included in petitioners' Addendum.

In the last two months, the D.C. Circuit has twice addressed the issue of habeas corpus protection for persons held by the U.S. military outside the United States. *See Omar v. Harvey*, No. 06-5126, 2007 U.S. App. LEXIS 2891 (D.C. Cir. Feb. 9, 2007); *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007). In *Omar*, the Court addressed whether the federal habeas statute protected a U.S. citizen held in Iraq from arbitrary detention by U.S. forces. Respondents in that proceeding argued, *inter alia*, "that federal courts lack[ed] jurisdiction to entertain habeas corpus petitions filed by individuals detained by American military officials operating as part of a multinational force." *Omar*, 2007 U.S. App. LEXIS at * 10. The Court disagreed, holding that it had authority to issue the writ because Omar was conceded to be in the custody of the U.S. military. The Court also concluded that, although Omar had been designated an "enemy combatant" and a "security internee" by the U.S. military, the case was not controlled by prior precedent denying habeas relief to war criminals convicted by international tribunals. In reaching this conclusion, the Court drew a sharp distinction between pre- and post-conviction habeas petitioners, and noted that military determinations "are a far cry from trial, judgment and sentencing." Accordingly, such determinations do not bar issuance of the writ, "given that challenging extrajudicial detention is among the most fundamental purposes of habeas." *Id.* at * 18.[6]

Approximately three weeks later, a divided panel of the D.C. Circuit issued its decision in *Boumediene*. Because of the passage of the MCA, the *Boumediene* Court was confronted with the limited question of whether the MCA could constitutionally deprive federal courts of jurisdiction to hear pending habeas corpus petitions from aliens detained at Guantánamo. *Boumediene*, 476 F.3d at 986. The *Boumediene* majority answered in the affirmative, holding that the MCA applies retroactively and that, because the Guantánamo detainees are aliens held

---

[6]    A suggestion of rehearing *en banc* was filed on March 26, 2007. No determination has been made as of this date.

outside the sovereign territory of the United States, they cannot assert any constitutional entitlement to the writ of habeas corpus.

Petitioners respectfully submit that this holding is in conflict with the Supreme Court's decision in *Rasul* and other Supreme Court precedent. The majority *Boumediene* decision is premised on an express holding that the writ of habeas corpus, as it existed in 1789, would not have been available to aliens held outside "U.S. sovereign territory." *Id.* at 990-91. This premise is demonstrably incorrect. In 1789, it was already clear that the touchstone of habeas corpus was not the location of the prisoner but the court's authority over his jailer. And, as discussed in further detail below, the Supreme Court's Suspension Clause jurisprudence recognizes that the writ, as it existed in 1789, provides the floor rather than the ceiling for the constitutional protections of habeas jurisdiction. *INS v. St. Cyr*, 533 U.S. 289, 301 (2001). More importantly, however, this key holding in *Boumediene* is in direct conflict with the Supreme Court's express statement in *Rasul* that "application of the habeas statute to persons detained at [Guantánamo] is *consistent with the historical reach* of the writ of habeas corpus." *Rasul,* 542 U.S. at 466, 481 (2004) (emphasis added). Surely, the historical reach of the writ is a constant. It does not narrow when the issue is a question of constitutional, rather than statutory, interpretation.

In addition to addressing the narrow questions before it, the *Boumediene* majority made findings in *dicta* that further conflict with *Rasul* and established law. The *Boumediene* majority construes the Supreme Court's decision in *Johnson v. Eisentrager,* 339 U.S. 763 (1950), as an absolute bar to extra-territorial detainee habeas petitions, ignoring *Rasul*'s statement that Guantánamo detainees "differ from the *Eisentrager* detainees in several important respects" relevant to the question of "the prisoners' constitutional entitlement to habeas review." *Rasul,*

542 U.S. at 467. It further finds that the MCA "quite clearly eliminates all jurisdiction to hear or consider an application for a writ of habeas corpus by a detainee, whatever the source of that jurisdiction," without making any examination of the bases for jurisdiction found in other statutes. *Boumediene*, 476 F.3d at 988 n.5 (internal quotations omitted). Moreover, the *Boumediene* majority's categorical conclusion that aliens outside the United States who have no voluntary presence or property here have no constitutional rights flies squarely in the face of the long-established line of jurisdictional cases that turn on the constitutional due process rights of aliens without property or presence in the United States. *See, e.g., Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) (holding that Due Process Clause required dismissal of suit against foreign corporation with insufficient U.S. contacts).

Petitioners respectfully submit that *Boumediene v. Bush* was wrongly decided. A petition for *certiorari* is currently pending, and the mandate has not issued. Petitioners respectfully submit, however, that *Boumediene* did not decide the principal issue before this Court, *i.e.*, whether petitioners received appropriate process under the MCA. This Court need not disagree with *Boumediene* to hold either that petitioners were not determined by the U.S. to be properly detained as enemy combatants or to order further discovery on this issue.

## ARGUMENT

## I. LEGAL STANDARD

On a motion to dismiss a habeas petition, the Court applies the standard mandated by Federal Rule of Civil Procedure 12.[7] *In re Guantánamo Detainees*, 355 F. Supp. 2d 443, 453

---

[7] The Federal Rules of Civil Procedure apply to habeas petitions to the extent the rules are not in conflict with the habeas statute or any applicable habeas rules. Fed. R. Civ. P. 81(a). Because this petition is brought under neither 28 U.S.C. § 2254 nor § 2255, the special habeas rules do not apply to this proceeding. It is accordingly governed by the Federal Rules. *United States ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80, 88 (D.D.C. 2004).

(D.D.C. 2005) (applying Fed. R. Civ. P. 12); *See also Rasul v. Bush*, 215 F. Supp. 2d 55, 61

(D.D.C. 2002). Applying Rule 12, the Court should not dismiss for failure to state a claim unless

respondents can show beyond doubt that petitioners can prove no set of facts in support of their

claims that would entitle them to relief. *Warren v. Dist. of Columbia*, 353 F.3d 36, 37 (D.C. Cir.

2004); *United States ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80, 88 (D.D.C. 2004). The Court

must treat the petition's allegations as true and draw all reasonable inferences in the petitioners'

favor. *Macharia v. United States*, 334 F.3d 61, 64, 67 (D.C. Cir. 2003); *EEOC v. St. Francis

Xavier Parochial Sch.*, 117 F.3d 621, 624-25 (D.C. Cir. 1997); *New*, 350 F. Supp. 2d at 88.

Where, as here, respondents contest the Court's jurisdiction and assert extrinsic facts

relevant to that jurisdiction, at the very least, the Court must permit petitioners to take discovery

in respect of those facts. *E.g., Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40-

41 (D.C. Cir. 2000); *Ignatiev v. United States*, 238 F.3d 464, 467 (D.C. Cir. 2001). Further, it is

well-settled that the Court cannot convert a motion to dismiss for want of jurisdiction into a

summary judgment proceeding through consideration of matters outside the pleadings. *Haase v.

Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).

## II.    PETITIONERS ARE ENTITLED TO RELIEF PURSUANT TO THE FEDERAL HABEAS STATUTE, 28 U.S.C. § 2241.

Respondents assert that the MCA bars this Court from taking jurisdiction to hear

petitioners' request for relief under the federal habeas statute, 28 U.S.C. § 2241 *et seq.* It does

not. Although the MCA purports to strip the courts of jurisdiction over a limited class of habeas

petitions, it does not apply in the instant case. Contrary to the requirements of the statute,

petitioners have had no proceeding to determine their status before a competent tribunal, nor are

they awaiting such a proceeding. To the extent that respondents' submission seeks to persuade

this Court that the procedures and decision-maker afforded to petitioners satisfy the requirements of the MCA, petitioners are entitled to discovery on these matters.  In any event, there is no basis to dismiss the petition at this juncture.[8]

### A.   This Court Has Jurisdiction to Hear a Petition brought under the Habeas Statute Notwithstanding the Military Commissions Act of 2006.

The MCA carves an exception out of this Court's historically broad jurisdiction to consider habeas corpus petitions.  As an exception, by definition, the MCA precludes an exercise of jurisdiction only in a limited category of habeas cases – where relief is sought under the habeas statute by a petitioner who either: a) has already been "determined by the United States to have been properly detained as an enemy combatant;" or b) "is awaiting such determination." MCA § 7(a).  In all other habeas cases, the Court's jurisdiction remains unaffected.  The MCA further mandates two procedures through which the United States can determine that a petitioner is an "enemy combatant."  Prisoners in Guantánamo are to receive a proceeding before a CSRT. Combatant status for prisoners in other detention facilities, including Bagram, is to be determined by another "competent tribunal."  MCA § 3(a)(1).  Congress also expected that the combatant status determination – whether before a CSRT or another "competent tribunal" – would be conducted in accordance with established, regular procedures.  The DTA specifically requires the DoD to make regular reports to Congress concerning the procedures being used in Iraq and Afghanistan in determining "enemy combatant" status.   DTA § 1005(a)(1)(B), § 1005(d)(1)(B).

---

[8] Respondents make a cursory argument that Inavatullah and Baz Mohammad have not properly established their "next friend" status in this matter.  A "next friend" must show 1) that he is properly situated to pursue the interests of the real party, and 2) that the real party cannot challenge the legality of his detention. *Whitmore v. Arkansas*, 495 U.S. 149, 163-64 (1990).  Inavatullah and Baz Mohammad easily meet this standard.  They have well-established, long-standing relationships with the detainees, which pre-date their detention.  Pet. ¶¶ 10 & 12.  This satisfies the first prong of this test.  *See Padilla v. Rumsfeld*, 352 F.3d 695 (2003) *rev'd on other grounds* 542 U.S. 426 (2004). The fact that petitioners Ruzatullah and Haji Rohullah are being held *incommunicado* without access to counsel at Bagram. Pet. ¶ 19, establishes the second prong. *See Id.*

In this case, petitioners have not been determined to be "enemy combatants" by either a CSRT or another "competent tribunal," nor are they awaiting such determination.[9] Respondents concede that there is no CSRT process applicable at Bagram.  Resp. Mot. at 10 n.5 ("there are currently no CSRTs at Bagram, only an Enemy Combatant Review Board ["ECRB"], which . . . is not the functional equivalent of a CSRT").  Respondents' description of the "process" afforded detainees at Bagram makes it clear that it is not a "competent tribunal," and its procedures do not satisfy the requirements of the MCA.  If respondents' motion is read to contend that the ECRB process meets the "competent tribunal" requirement of the MCA, petitioners should be permitted to take discovery on the procedures purportedly applied to the enemy combatant status determination of each of the petitioners.

1. **In light of Respondents' Submission of Extrinsic Evidence at the Motion to Dismiss Stage, Petitioners Are Entitled to Discovery on the "Process" Utilized to "Determine" their Combatant Status.**

This case is before the Court on a motion to dismiss.  The Second Amended Petition asserts subject matter jurisdiction in this Court, and respondents have contested this point by introducing factual representations from two military officers concerning the purported process by which detainees at Bagram are determined to be enemy combatants.  Resp. Mot. at 4-8; Miller Decl. at ¶¶ 10-12; Gray Decl. at ¶ 5a.  By introducing and relying on this extrinsic evidence, respondents implicitly concede two critically important points:

- *First,* that the petition is legally sufficient on its face and the Court cannot order dismissal based solely on the allegations of the petition; and

- *Second,* that the key jurisdictional question before this Court – whether petitioners are "properly detained" as enemy combatants – requires an examination of the United States' purported determination of petitioners' combatant status and the process that petitioners received.

---

[9] Because no procedure before a competent tribunal is available to any detainee at Bagram, petitioners cannot be said to be "awaiting" such a procedure.

But neither petitioners, nor the Court, must accept respondents' representations at face value, particularly where, as here, the information relied on is within the exclusive knowledge of respondents. *Crist v. Republic of Turkey*, 995 F. Supp. 5, 12 (D.D.C. 1998); *Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986).

When jurisdictional facts are contested, the Court must permit discovery on those facts. *E.g.*, *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40-41 (D.C. Cir. 2000); *Ignatiev v. United States*, 238 F.3d 464, 467 (D.C. Cir. 2001). As the D.C. Circuit has stated, where "the defendant's motion to dismiss raises factual issues, the plaintiff should have an opportunity to develop and argue the facts in a manner that is adequate in the context of the disputed issues and evidence." *Wilderness Soc. v. Griles*, 824 F.2d 4, 16 n.10 (D.C. Cir. 1987) (quoting *Williamson v. Tucker*, 645 F.2d 404, 414 (5th Cir. 1981)). Ordering jurisdictional discovery is well within the jurisdiction of this Court. It is long-settled that a court has the authority to consider its own jurisdiction, and where the Court's subject-matter jurisdiction turns on specific facts, the Court has jurisdiction to order discovery concerning those facts. *U.S. Catholic Conf. v. Abortion Rights Mobilization*, 487 U.S. 72, 79 (1988) (court may issue process and orders, including discovery orders, necessary for "court to determine and rule upon its own jurisdiction"); *Ilan-Gat Engineers, Ltd. v. Antigua International Bank*, 659 F.2d 234, 239 (D.C. Cir. 1981) ("The court has power to compel discovery on jurisdictional issues"); *Wilderness Soc.*, 824 F.2d at 16 n.10.

As set forth above, the jurisdictional question before this Court is whether petitioners' combatant status has been determined by a competent tribunal. If it has, then, to the extent the MCA is constitutional, this Court lacks jurisdiction to consider their statutory habeas petition. If it has not, then this Court retains jurisdiction to consider petitioners' statutory claim.

Respondents therefore must be contending that the "process" they describe at Bagram satisfies the "competent tribunal" standard. On this point, the Miller Declaration raises more questions than it answers. Reduced to its essentials, the Miller Declaration describes the following "process" by which persons captured are classified as "enemy combatants:"

1) *Initial Determination.* The only description of the initial determination is that the determination is made "at the place of capture." Miller Decl. at ¶ 10. This statement is limited to geography – *where* the decision may be made. The Miller Declaration provides no information at all concerning the procedure for making this determination, either in general or specifically as it relates to the petitioners. It does not state *by whom* the initial determination is made – either generally or with respect to the specific petitioners; nor does it specify the criteria, the burden of proof, or the evidence to be considered for such a decision.

2) *Review.* The Miller Declaration states that the initial determination is subject to review after 90 days and every six months after that. It also provides a vague description of steps that may be taken in such a review. According to the Miller Declaration, within 90 days after the detainees are taken into custody, the "detaining combatant commander" ("DCC"), or someone designated by the DCC, reviews the initial determination that the detainee is an enemy combatant. *Id.* at ¶ 11. The DCC may, but need not, consider evidence, provided it is "reasonably available" on the date of the review. *Id.* The DCC in his or her discretion may, but need not, interview witnesses, provided that they are also "reasonably available" and

interviewing them would not interfere with other routine functions of the military. *Id.* The DCC may, but need not, convene a panel of officers to make a recommendation to him or her concerning the detainee's status. *Id.* In the event new evidence or information is discovered, further review is permitted but not required. *Id.* at ¶¶ 11, 12.

As is evident from the above description, each of the steps described in the Miller Declaration is discretionary, and Colonel Miller makes no attempt to specify which steps were in fact applied to the petitioners at bar. Beyond that, the Declaration provides no discussion of the types of evidence to be considered. By respondents' own admission, no record is made of the initial determination or the purported review. The Miller Declaration also does not address one of the most fundamental questions: what definition of "enemy combatant" was applied in making the decision as to each of the petitioners. Miller does not assert whether petitioners were determined to be "lawful" or "unlawful" enemy combatants, or whether the definition applied in that determination is consistent with the definition set forth in the MCA, which was enacted *after* (in petitioner Ruzatullah's case, more than *two years* after) petitioners were taken into custody.

Determination of combatant status by a competent tribunal is required under the MCA. Even if this Court were required to accept as true the facts asserted by respondents (which it is not), those facts are insufficient to determine that such a process occurred. Thus, as discussed below, the motion to dismiss may be denied as a matter of law. At the very least, however, petitioners are entitled to discovery on all of these matters.

**2. Even Accepting at Face Value the Description in the Miller Declaration, the Enemy Combatant Review Board Is Not a "Competent Tribunal" and Thus the "Process" Utilized to Determine Petitioners' Combatant Status was Facially Inadequate.**

Even without discovery, however, this Court may rule that the decision-making vaguely described in the Miller Declaration does *not* constitute a determination by a "competent tribunal" that the petitioners are enemy combatants. Neither the DCC, nor the ECRB, is a "tribunal," let alone a "competent tribunal." "Tribunal" means a court or other adjudicative body that performs the functions of a court. Black's Law Dictionary defines "tribunal" as "[a] court or other adjudicatory body." *Black's Law Dictionary*, 1544 (8th ed. 2004). This definition of "tribunal" was confirmed recently by the Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004). In *Intel*, the Supreme Court interpreted the phrase, "foreign or international tribunal," in 28 U.S.C. § 1782(a), as requiring an adjudicative and dispositive proceeding. The Court held that a "tribunal" means a proceeding "that leads to a dispositive ruling, *i.e.*, a final administrative action both responsive to the complaint and reviewable in court." *Id.* at 255.

Other courts interpreting the term "tribunal" have concurred that the term implies a fact-finding body with both neutrality and adjudicative power. *See, e.g.*, *In re Letters Rogatory Issued by the Director of Inspection of the Government of India*, 385 F.2d 1017 (2d Cir. 1967) (hereinafter "*India*") ("tribunal" requires objective decision maker); *Fonseca v. Blumenthal*, 620 F.2d 322 (2nd Cir. 1980) (same); *Republic of Kazakhstan v. Biedermann Int'l*, 168 F.3d 880 (5th Cir. 1999) ("tribunal" requires "impartial adjudicative proceeding"); *In re Letters of Request to Examine Witnesses from the Queen's Bench for Manitoba, Canada*, 59 F.R.D. 625 (N.D. Cal. 1973) (adjudicative proceeding required). As Judge Friendly held in *India*, a tribunal requires a decision-maker that has no "institutional interest in a particular result." 385 F.2d at 1020. As in

*India*, respondents simply cannot meet this standard. The ECRB acts solely in an advisory capacity, and thus is not adjudicative, and the Army is itself acting as police, prosecutor, judge and jailer. Its "institutional interest" in the result of the combatant status review process is undeniable. There is no neutral decision-maker involved in this process.

Moreover, in drafting the MCA, Congress chose to use a term of art in military law. The term "competent tribunal" is used repeatedly in Army Regulation 190-8 to describe the battlefield tribunals required by the Uniform Code of Military Justice ("UCMJ") to decide the status of detained persons, specifically whether they are entitled to prisoner of war ("POW") status.[10] (A copy of Army Regulation 190-8 is included in petitioners' Addendum.) Regulation 190-8 implements Article 5 of the Geneva Convention Relative to the Treatment of Prisoners of War, which provides that when the status of detained persons is in doubt they shall be treated as POWs "until such time as their status has been determined by a *competent tribunal.*" Convention Relative to the Protection of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135, Art. 5 ("GCIII") (emphasis added). In this context, Congress' decision to use the precise language of "other competent tribunal" must be understood to reflect the intention that detainees receive at least the equivalent of a 190-8 tribunal.

Respondents' own submission demonstrates the obvious disparity between the procedures required by a 190-8 tribunal and the "process" that petitioners may have received in Bagram. Under Army Regulation 190-8, ch. 1-6, a "competent tribunal" consists of three commissioned officers, one of whom is field grade. *Id.* at (c). The members of a 190-8 tribunal

---

[10] Respondents have not suggested that they consider petitioners to be *lawful* enemy combatants – *i.e.*, POWs – and certainly have not treated them in accordance with the Geneva Convention governing POWs. But even if the question were whether petitioners had been determined by respondents to be properly detained as *lawful* enemy combatants, the same process and the same type of tribunal would be required. Pursuant to the Geneva Convention, a captured soldier is entitled to the presumption that he is POW unless and until a "competent tribunal" determines his status to be otherwise. Army Reg. 190-8, ch 1-6 (a); GCIII, Art. 5. Accordingly, whether applying the standards of the MCA, the standards of Army Reg. 190-8, or the standards of the Geneva Conventions, a determination of enemy combatant status requires a "competent tribunal."

must be sworn. *Id.* at (e)(1). A written record must be made. *Id.* at (e)(2). The person whose status is being determined must be advised of his rights at the beginning of the hearing and is entitled to attend all open sessions. *Id.* at (e)(4), (5). The detained person must be allowed to call witnesses, *id.* at (e)(6), and is allowed to address the tribunal. *Id.* at (e)(7). The tribunal must use a "preponderance of evidence" standard. *Id.* at (e)(9). The record of the proceeding must be forwarded within three days to the first Staff Judge Advocate in the internment facility's chain of command. *Id.* at (10)(f). Finally, the record of a hearing must be "reviewed for legal sufficiency" at the office of the Staff Judge Advocate for the convening authority. *Id.* at (10)(g). If the tribunal determines that the detainee is in fact a civilian who should be detained for security or criminal reasons, continued detention is governed by a separate chapter.

None of these requirements is satisfied by the procedures described in respondents' submission to this Court. The determination of the ECRB is not final or binding. It is merely a recommendation to be made to the combatant commander. Miller Decl. at ¶ 11. Thus, the ECRB is not adjudicative in any sense. No evidentiary standard is specified. The detainee is not present, is not allowed to call witnesses, or address the tribunal. A panel of sworn commissioned officers is not required. There is no record required, and no review by a Judge Advocate. All further review is purely discretionary. *Id.* at ¶¶ 11-12.

The vague descriptions of the Miller Declaration make clear that the process that may have been afforded to petitioners falls far short of the "competent tribunal" contemplated by Congress. Because petitioners have not been determined to be "properly detained" as required by the MCA, the limited exception to this Court's jurisdiction does not apply. This Court retains its ordinary jurisdiction to hear petitioners' habeas claims.

### 3.  The ECRBs Are Not Authorized by Congress.

In enacting the DTA and MCA, Congress required the United States to provide tribunals

for the determination of enemy combatant status and to promulgate specific, formal procedures

to be applied by those tribunals.  Specifically, the MCA mandates that the DoD submit to

Congress "the procedures in operation in Afghanistan and Iraq" for determining enemy

combatant status of "aliens detained in the custody or under the physical control of the

Department of Defense in those countries."  MCA § 1005(a)(1)(B).  The DTA further requires

the submission of an "annual report."

> (d) Annual Report –
>
> (1)    REPORT REQUIRED – The Secretary of Defense shall submit to
> Congress an annual report on the annual review process for aliens in the custody
> of the Department of Defense outside the United States.  Each such report shall be
> submitted in unclassified form, with a classified annex, if necessary.  The report
> shall be submitted not later than December 31 each year.
>
> (2)    ELEMENTS OF REPORT – Each such report shall include the following
> with respect to the year covered by the report:
>
> > (A)    The number of detainees whose status was reviewed.
> > (B)    The procedures used at each location.

DTA § 1005.

Undoubtedly, Congress granted the DoD broad latitude in developing the procedures in

question.  But this latitude does not constitute unfettered discretion.  Congress retained oversight

and the opportunity to review the procedures by requiring the procedures in question to be

reported formally to Congress for review.  The DoD, however, has failed to comply even with

Congress' minimal demands in developing regular procedures and reporting back.

Here, the optional procedures set forth in the Miller Declaration are not entitled to

deference because the DoD has failed to comply with even the *de minimis* procedural

requirement that Congress placed upon it – to report back concerning the procedures in place. Accordingly, they are not authorized under the MCA and this Court owes them no deference. Courts owe no deference to rules promulgated by an Executive actor – even a cabinet Officer – if the actor has not complied with the terms of the delegation to it to develop such rules. *See Gonzales v. Oregon*, 126 S. Ct. 904, 914-15 (2006). If the agency does not comply with the delegation, its actions are "entitled to respect only to the extent it has the power to persuade." *Id.* at 915 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

On a substantive level, the casual and discretionary procedures set forth in the Miller Declaration are inherently insufficient to justify indefinite detention without charge. As explained below, they fall far below the minimum standards of due process that the Constitution demands, and they cannot be justified, as respondents contend, on the ground that "Congress was aware that the procedures used for determining a detainee's enemy combatant status differ depending on whether the detainee is held at Guantánamo or in Afghanistan or Iraq." Resp. Mot. at 10. Respondents proffer no support for their implicit argument that "different" procedures can be materially less, or none at all. There is no reason to infer from the fact that different procedures were contemplated that Congress would have been satisfied with the illusory process set forth in the Miller Declaration. And as long as the DoD continues to withhold its reports on procedures from Congress, neither this Court, nor petitioners, is required to draw this conclusion.

**B.    Petitioners Have Substantive Rights Under the Habeas Statute.**

Respondents argue that, regardless of the Court's jurisdiction, petitioners lack substantive rights under the habeas statute. According to respondents, the Supreme Court's decision in *Rasul*, which held that the protections of the habeas statute apply to detainees at Guantánamo, does not apply to detainees at Bagram. Resp. Mot. at 11. Respondents' arguments are belied by

their own submissions to this Court, which make clear that the legal statuses of Guantánamo and Bagram are substantively identical. The Supreme Court's reasoning in *Rasul*, and the protections of the federal habeas statute, apply without question at Bagram.

### 1.    Detainees at Bagram are entitled to Invoke the Protections of Section 2241.

In *Rasul v. Bush*, the Supreme Court determined that the habeas statute applies at Guantánamo because "[a]liens . . . no less than American citizens, are entitled to invoke the federal courts' authority under § 2241," 542 U.S. at 481, and because the United States exercises "exclusive jurisdiction and control" over its base there. *Id.* at 476. The plain language of the habeas statute, which makes no distinction between alien and citizen, compels the former conclusion. The *Rasul* Court's conclusion as to the United States' control over Guantánamo was based on the terms of the United States' leases with Cuba.[11] Although respondents' motion offers a host of reasons why Bagram is not like Guantánamo for the purposes of § 2241, their proffered exhibits make clear that the United States' control over Bagram equals or exceeds its control over Guantánamo. *See* Accommodation Consignment Agreement, Miller Decl. Ex. 1 ("Bagram Lease"). This is illustrated in the simple table below.

---

[11] The U.S. executed three operative leases with Cuba: Lease of Lands for Coaling and Naval Stations, U.S.-Cuba, Feb. 23, 1903, T.S. No. 418, Lease of Certain Areas for Naval or Coaling Stations, U.S.-Cuba, July 2, 1903, T.S. No. 426, Treaty Defining Relations with Cuba, U.S.-Cuba, May 29, 1934, T.S. No. 866. (Copies of the United States' leases with Cuba are included in petitioners' Addendum).

| Indicia of Control | Guantánamo Leases | Bagram Lease |
|---|---|---|
| Exclusive use of the premises | "the Republic of Cuba consents that during this period of the occupation by the United States…the United States shall exercise complete jurisdiction and control over and within said areas." T.S. 418 (Feb. 23, 1903), Art. III. | • Afghanistan "hereby consigns to the UNITED STATES to have and to hold for the *exclusive use* of the UNITED STATES Forces land, facilities, and appurtances currently owned by or otherwise under the control of" Afghanistan (italics added, caps in original). Miller Decl., Exh. 1 at ¶ 1<br><br>• Afghanistan warrants that the United States "shall have exclusive, peaceable, undisturbed and uninterrupted possession" without "any interruption whatsoever by [Afghanistan] or its agents." *Id.* at ¶ 9. |
| Right to assign use of the property to another party without the consent of the host nation. | None. | "The UNITED STATES shall have the right to assign this agreement to a successor nation or organization." *Id.* at ¶ 2. |
| Right of reversion | None | "The UNITED STATES shall have sixty (60) days from the date the Successor surrenders the Premises to give notice of its intent to resume its use…" *Id.* at ¶ 12. |
| Perpetual possession at the United States' discretion | "So long as the United States of America shall not abandon the said naval station of Guantánamo Bay…" T.S. 866 (June 1934), Art. III. | The lease continues in effect "until the UNITED STATES or its successors determine that the Premises are no longer required for its use." *Id.* at ¶ 4. |
| *De minimis* or no rental obligation | "annual sum of two thousand dollars, in gold coin." T.S. 426 (Jul. 2, 1903), Art. I. | Afghanistan "makes the Premises available to the UNITED STATES without rental or any other consideration for use of the Premises." *Id.* at ¶5 |

Thus, the terms of the operative leases evidence that the United States' control over Bagram is *at least* as comprehensive and exclusive as its control over Guantánamo. Indeed, a strong argument can be made that U.S. control over Bagram is *greater* than it is over Guantánamo, because the United States can not only occupy the land (*id.* at ¶¶ 1, 9), rent free (*id.* at ¶ 5), for as long as it wishes (*id.* at ¶ 4), without any interference from Afghanistan (*id.* at ¶ 9), but can also assign the property, on the same terms, to a successor entity (*id.* at ¶ 2), and, if and when the successor chooses to abandon the property, exercise a right of reverter to take back possession (*id.* at ¶ 12) – all in derogation of any rights of Afghanistan to the property.[12]

Bagram and Guantánamo are also similar in that the host countries exercise no legal jurisdiction at either base. Ordinarily, the concurrent jurisdiction of the United States and a host nation in respect of a military base is authorized in a Status of Forces Agreement ("SOFA") negotiated between the two countries. Respondents have proffered no SOFA between the United States and Afghanistan, and to petitioners' knowledge, no such agreement exists. In the absence of a SOFA, the unconditional language of the lease strongly supports the conclusion that Afghanistan has no right to exercise jurisdiction of any nature at Bagram. Until September 11th, Guantánamo was the only overseas military base without a SOFA. *See* Gerald Neuman, *Closing the Guantánamo Loophole*, 50 Loyola L. Rev. 1, 39 (2004).

Respondents have represented to this Court as a factual matter that there are parts of Bagram that are used by foreign military forces. Miller Decl. at ¶ 6. Again, this assertion merely raises a material issue of fact as to which petitioners are entitled to discovery. But even as

---

[12] As set forth above, a motion to dismiss for want of jurisdiction cannot be converted to a summary judgment through consideration of extrinsic evidence. *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987). Where, as here, facts are in dispute, the motion cannot be granted. *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40-41; *Ignatiev v. United States*, 238 F.3d 464, 467 (D. C. Cir. 2001). If the Court is in any doubt as to the degree of control exercised by the United States at Bagram, and its comparison with the United States' control of Guantánamo, petitioners respectfully submit that, at the least, the issue is a disputed question of fact. Petitioners have had no opportunity to take discovery concerning the facts asserted in the Miller and Gray Declarations. They should be permitted to do so before this Court can decide any motion to dismiss.

presented by respondents, these purported foreign enclaves within Bagram do not suggest that the United States exercises something less than "exclusive jurisdiction and control" over the base. Respondents do not suggest that the foreign military enclaves are subject to separate leases with the Afghan government, giving foreign governments separate and independent jurisdiction and control within Bagram. Respondents certainly have proffered no such leases. Rather, the single lease submitted by respondents suggests that any use of the Bagram property, by any person, entity, or country, is solely at the discretion of the United States. *See* Miller Decl. Ex. 1 at ¶ 1 (consigning Bagram to United States for its "exclusive use"); ¶ 9 (giving United States "exclusive, peaceable, undisturbed, and uninterrupted possession" of the Bagram base). Contrary to the respondents' suggestion, Resp. Mot. at 6; Miller Decl. at ¶ 6, the power to grant another country the right to use part of Bagram does not undermine the United States' control over the property; it confirms it.

Finally, respondents seek to distinguish Guantánamo and the Supreme Court's decision in *Rasul* by invoking the exigencies of the battlefield. Resp. Mot. at 20. This effort fails as well. First, as alleged in the petition, petitioners were not captured on the battlefield. They were each in their own homes when they were taken into custody and "disappeared" by U.S. military forces. Pet. at ¶¶ 22, 35. Second, as asserted in the petition, Bagram is not a battlefield and the United States does not treat Bagram as a temporary, battlefield facility. The Bagram prison is clearly a long-term detention facility. *Id.* at ¶ 58. Petitioner Ruzatullah has been there more than two years. As Justice Kennedy noted in his concurrence in *Rasul*, the longer the detention, the weaker the case for military necessity – "Perhaps, where detainees are taken from a zone of hostilities, detention without proceedings or trial would be justified by military necessity for a matter of weeks; but as the period of detention stretches from months to years, the case for

continued detention to meet military exigencies becomes weaker." 542 U.S. at 488. *Accord Hamdi,* 542 U.S. at 534 (plurality) (battlefield determination may not require process, but continued detention requires at least basic procedural safeguards). The United States also uses Bagram to hold detainees who were rounded up in other countries and transported to Afghanistan, specifically to be incarcerated. Pet. at ¶ 61 (citing Golden, *Army Faltered in Investigating Detainee Abuse*, N.Y. Times, May 22, 2005). This is not consistent with its position, asserted here, that Bagram is in a zone of combat.[13]

### 2. Petitioners' Detention is in Violation of the Constitution, Laws and Treaties of the United States.

As the Supreme Court held in *Rasul*, "detention for more than two years in territory subject to the long-term, exclusive jurisdiction and control of the United States, without access to counsel and without being charged with any wrongdoing - unquestionably describe[s] 'custody in violation of the Constitution or laws or treaties of the United States.'" *Rasul*, 542 U.S. at 484 n.15 (quoting 28 U.S.C. § 2241 (c)(3)). No less so here.

Respondents argue that this Court should not follow this clear language of *Rasul* because, respondents assert, it conflicts with the Supreme Court's reasoning in *Johnson v. Eisentrager*, 339 U.S. 763 (1950) and *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990). Petitioners discuss the holdings of these cases in detail, below. But regardless of what these cases may say about the rights of aliens in other circumstances, *Rasul* controls here. The facts of *Rasul* and the facts of the instant case are identical in all relevant respects. In both cases, petitioners are innocent civilians, citizens of countries allied with the United States, not enemy aliens, taken into custody and held *incommunicado* by U.S. forces at military bases outside the United States,

---

[13] If the Bagram prison is in the theatre of war, the United States is in violation of the Geneva Convention which calls for the movement of POWs "as soon as possible after their capture, to camps situated in an area far enough from the combat zone for them to be out of danger." GCIII, Art. 19.

28

without charges and without a meaningful ability to challenge their detention. The one

distinction that respondents point to – that petitioners Ruzatullah and Rohullah are held at

Bagram, while the petitioners in *Rasul* were held at Guantánamo – is, as set forth above, a

distinction without a difference. Bagram and Guantánamo are identical as to the United States'

jurisdiction and control.[14]  As this Circuit has recently cautioned, "[i]f a precedent of [the

Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some

other line of decisions, the Court of Appeals should follow the case which directly controls,

leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Omar*, 2007

U.S. App. LEXIS 2891 at *13 (quoting *Rodriguez de Quijas v. Shearson/American Express,*

*Inc.*, 490 U.S. 477, 484 (1989)). Thus, this Court should apply the direct, recent precedent of

*Rasul*, rather than the inapposite precedent of *Eisentrager*.

Equally, petitioners' detention violates U.S. law and treaties. For example, the Supreme

Court has recently made clear that detainees are entitled to the protection of Common Article 3

to the Geneva Conventions, which guarantees minimal protections against torture, cruel

treatment, and outrages on personal dignity, in addition to certain procedural rights. *Hamdan,*

---

[14]  Indeed, respondents have previously acknowledged that the United States exerts identical control over Bagram and Guantánamo. In its brief before the Supreme Court in *Rasul v. Bush*, 542 U.S. 481 (2004), the United States stated as follows:

> But there is no manageable and defensible basis, other than sovereignty . . . for limiting the reach of the arguments that petitioners advance. Certainly, a "de facto control and jurisdiction" test would serve no limiting function at all, because the U.S. military exercises control over the detainees at Bagram Air Force Base as well - *and would not detain prisoners in a facility that it did not control.*

> Moreover, drawing an arbitrary legal distinction between aliens held at a facility, such as the Bagram Air Force Base in Afghanistan, which is controlled by the U.S. military and located outside the sovereign territory of the United States, and aliens held at a facility, such as the Guantánamo Naval Base in Cuba, which is controlled by the U.S. military and located outside the sovereign territory of the United States, would create a perverse incentive to detain large numbers of captured combatants in close proximity to the hostilities where both American soldiers and the detainees themselves are more likely to be in harm's way.

*See Brief for Respondents on Writ of Certiorari to the United States Court of Appeals for the District of Columbia,* at 56-57 (emphasis added). (A copy of this Brief is included in petitioners' Addendum.)

126 S. Ct. at 2749, 2757 (2006). Petitioners' allegations – that they have been held in wire-mesh cages like animals, sometimes with dozens of other detainees, without sanitation, subject to repeated interrogation and mistreatment – state valid claims under Common Article 3, under non-derogable norms of international law, and under federal common law.[15]

This conduct also violates numerous U.S. laws and regulations, including the DTA, Army Regulation 190-8, and Article 93 of the UCMJ, *codified at* 10 U.S.C. § 893 ("Article 93"). The DTA states that "[n]o individual in the custody or under the physical control of the United States Government, regardless of nationality or physical location, shall be subject to cruel, inhuman or degrading treatment or punishment." DTA § 1003(a). Article 93 prohibits oppression, mistreatment and cruelty toward anyone subject to military command. Military courts have long held that the protections of Article 93 extend to non-military persons subject to the orders of military personnel. *United States v. Dickey*, 20 C.M.R. 486, 488-89 (Army Bd. Rev. 1956). Abuse and torture of prisoners is simply unlawful. *Dickey*, 20 C.M.R. at 488-89; *United States v. Lee*, 25 M.J. 703, 704-05 (Ct. Mil. Rev. 1987); *United States v. Finch*, 22 C.M.R. 698, 700-01 (Navy Bd. Rev. 1956).

Because Bagram, like Guantánamo, is under the exclusive jurisdiction and control of the United States, detainees at Bagram, like the detainees at Guantánamo, are entitled to the protection of the federal habeas statute. The habeas statute itself contains no geographic limitation and makes no distinction between alien and citizen. And the detention of the petitioners is "unquestionably. . . custody in violation of the Constitution or laws or treaties of

---

[15] Although one provision of the MCA purports to prohibit use of the Geneva Conventions as "a source of rights" by private parties, this provision, in contrast to other provisions of the MCA, contains no effective date or retroactivity provision. Because the instant petition was filed prior to the enactment of the MCA, the MCA's preclusion concerning the Geneva Conventions is not applicable here. *See Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994); *St. Cyr*, 533 U.S. at 316 (statute does not affect pending claims "absent a clear indication from Congress that it intended such a result").

the United States." *Rasul*, 542 U.S. at 484 n.15. Petitioners' habeas corpus petitions are plainly meritorious and should be granted.[16]

## III.  THE PETITIONERS ARE ENTITLED TO HABEAS RELIEF UNDER THE COMMON LAW AS PROTECTED BY THE CONSTITUTION

Petitioners are also entitled to habeas relief under the common law as protected by the Constitution.  Especially in the habeas context, provisions that strip jurisdiction are disfavored and accordingly are narrowly construed. *See, e.g., Felker v. Turpin*, 518 U.S. 651, 660 (1996) (statute precluding review of second habeas petition by appeal or by writ of certiori did not affect right of Court to entertain an original habeas petition); *Ex Parte Yerger*, 8 Wall 85 (1869) (repeal of portion of 1867 amendment to § 14 of Judiciary Act of 1789 authorizing appeal to Supreme Court of habeas petitions did not strip Court of power to hear an original writ); *INS v. St. Cyr*, 533 U.S. 289 299 (2001) (long-standing rule requires clear statement of congressional intent to repeal habeas jurisdiction).  Since the jurisdiction-stripping provisions of the MCA are codified as part of § 2241, the most natural application of the MCA is that the MCA strips the federal courts of jurisdiction to hear habeas and related conditions of confinement petitions brought under the federal habeas statute, leaving other bases for jurisdiction unaffected.[17]  A comparison between the MCA's jurisdictional provisions and those of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"),  8 U.S.C. § 1252(a)(2)(A), demonstrates that when

---

[16] The Second Amended Petition asserts claims for habeas, declaratory and injunctive relief pursuant to the federal habeas statute, the United States Constitution, the Administrative Procedures Act, 5 U.S.C. § 500 *et seq.*, international law, and the Geneva Conventions.  Respondents' motion to dismiss argues solely that the Court lacks jurisdiction pursuant to the MCA and that the petitioners are not entitled to rights under the Constitution.  Thus, the motion to dismiss does not substantively address the non-Constitutional claims asserted in the petition, and, if the Court finds that it has jurisdiction in this matter, they cannot be dismissed at this juncture

[17] Jurisdiction for a habeas petition under the Constitution or the common law would be proper under 28 U.S.C. §§ 1331, 1332, and 1651.  To the extent the Court of Appeals' decision in *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007), holds otherwise, it conflicts with the Supreme Court's decision in *Rasul*, and ignores the fact that a statute precluding all courts from exercising jurisdiction in constitutional habeas cases would unquestionably violate the Suspension Clause of the Constitution. *See Hamdan v. Rumsfeld*, 464 F. Supp. 2d 9 (D.D.C. 2006).

Congress wishes to strip the courts of jurisdiction under all potential sources of jurisdiction, it crafts specific language manifesting that intent. Thus, in IIRIRA, Congress specifically stated:

> *Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, any other habeas corpus provision, and section 1361 and 1651 of such title*, no court shall have jurisdiction to review—

8 U.S.C. § 1252(a)(2)(A) (emphasis added). Where, as here, Congress does not include such specific language modifying the scope of other jurisdictional statutes, abrogation of those statutes should not be inferred.

Respondents' argument that petitioners are not entitled to the writ under the Constitution because "[t]he Suspension Clause has no extraterritorial application," Resp. Mot. at 14, entirely misperceives the origin of the writ and the operation of the Suspension Clause. The Suspension Clause is a structural limitation on Congress that protects a right that has always been understood to inhere in the common law. "In England prior to 1789, in the Colonies, and in this Nation during the formative years of our Government, the writ of habeas corpus was available to non-enemy aliens as well as to citizens." *St. Cyr*, 533 U.S. at 301-2. This Court has jurisdiction under multiple statutes, including 28 U.S.C. §§ 1332 and 1651, to consider a writ of habeas corpus asserted under the common law. In the context of this proceeding, the Court may consider whether the MCA is an unconstitutional attempt to suspend the writ, and whether petitioners have the right to challenge the MCA's application to their petition on that ground. Petitioners submit that this Court should answer both questions in the affirmative.

**A. Petitioners Are Entitled to the Protection of Common Law Habeas.**

Historically, the common law writ of habeas corpus was the preeminent safeguard of individual liberty and a primary check on Executive power. *See, e.g., St. Cyr.*, 533 U.S. at 301; *Brown v. Allen*, 344 U.S. 443, 533 (1953). As described by Chief Justice Marshall, "*habeas corpus* is a high prerogative writ . . . the great object of which is the liberation of those who may be imprisoned without sufficient cause." *Ex parte Watkins*, 28 U.S. (3 Pet) 193, 202 (1830). Although the federal habeas statute provides one means of asserting the writ's protections, it does not pre-empt common law habeas corpus. *See St. Cyr.*, 533 U.S. at 301. At the very least, Congress is constitutionally constrained from suspending the writ "as it existed in 1789." *Id.* The Supreme Court noted in *Rasul* that common laws habeas corpus has an "extraordinary territorial ambit," and its "historical reach" extends to aliens detained by the U.S. military at Guantánamo. 542 U.S. at 482, n.12. Petitioners, aliens detained in Afghanistan by the U.S. military, are likewise within the ambit of the writ as it is existed in 1789.

For 250 years, English courts have recognized that the writ reaches any place "under the subjection of the Crown," and its issuance turned on whether the court "could give relief upon it." *R. v. Cowle,* 97 Eng. Rep. 587 (K.B. 1759) (Mansfield J.).[18] The linchpin of common law habeas corpus is the government's control over a prisoner – regardless of citizenship or location of detention. Indeed, in the 18th century, English courts had the undisputed power to issue the writ to the American colonies, the West Indies and other overseas territories of the Crown, *see id.* at 600, and courts in both England and the United States heard habeas petitions from aliens. *See Rasul,* 542 U.S. at 481-82 & n.11 (cases cited). Exercising habeas jurisdiction over aliens detained by the United States at Bagram does not require the Court to go outside these bounds.

---

[18]  Copies of the foreign authorities cited in this section are included in petitioners' Addendum.

The fact that the United States lacks "titular sovereignty" over Bagram is immaterial. English judges issued writs of habeas corpus in India, not only to citizens of the Crown but also to non-subjects, as early as 1775, well before England claimed sovereignty over India. *R. v. Hastings* (Sup. Ct. Calcutta 1775) reported in *The Indian Decisions* 1005, 1007 (T.A. Venkasa Row ed. 1911); *R. v Ramgovid Mitter*, (Sup. Ct. Calcutta 1781), reported in *The Indian Decisions*, 1008 (T. A. Ventura Row ed. 1911); *see also Boumediene*, 476 F.3d at 1003 (Rogers, J. dissenting) (collecting cases).

More recent English cases have followed suit. For example, the English High Court issued a writ to a jailer in Canada on behalf of an American fugitive slave, even though the colony had both legislative and judicial independence, and the petitioner was not an English or Canadian citizen. *Ex parte Anderson*, 121 Eng. Rep. 525 (Q.B. 1861). In *Ex parte Sekgome*, the English Court's jurisdiction to issue a writ to the Protectorate of Bechuanaland (now Botswana), which was not part of the Crown's dominions, was questioned. [1910] 2 K.B. 576 (C.A.). In opposing the writ, the Secretary of State for the Colonies conceded that it was immaterial whether the applicant was a British subject and the court confirmed that this was an accurate reflection of the law. *See id.* at 606, 620. The Court ultimately determined that the writ was properly issued because "the King [had] every means of enforcing obedience." *Id.* at 606.

The English Court of Appeal applied the same reasoning in *Ex parte Mwenya*, [1960] 1 Q.B. 241 (C.A.), an action challenging the jurisdiction of the High Court in England to issue a writ of habeas corpus to the Protectorate of Northern Rhodesia "a foreign country within which Her Majesty has power and jurisdiction by treaty, grant, usage, sufferance and other lawful means." *Id.* at 244. The Crown argued that the only factor relevant to the availability of the writ

was territorial sovereignty. *Every* member of the Court of Appeal rejected this contention. As one judge noted:

> As a matter of history and logic, the availability of the "most efficient protection ever invented for the liberty of the subject" should not depend upon a mere label or on matters of convenience. . . the jurisdiction ought not to be limited to territories, outside England, which are strictly labeled "colonies or foreign dominions," but will extend to territories which, having regard to the extent of the dominion *in fact* exercised, can be said to be under the subjection of the Crown.

*Id.* at 303 (Lord Evershed, M.R. (emphasis added)).

This is entirely consistent with the Supreme Court's approach in *Rasul*. In distinguishing *Eisentrager*, the Court pointed to the fact that *Eisentrager* was decided before the Court's decision in *Braden v. 30th Judicial Circuit Court,* 410 U.S. 484, 495 (1973), where it held that the key to the exercise of the Court's power in a habeas case is jurisdiction over the custodian, not the location of the prisoner. *Rasul*, 542 U.S. at 477; *accord Omar,* 2007 U.S. App. LEXIS 2891 at *21 (finding habeas jurisdiction because detainee held by U.S. forces in Iraq was in U.S. custody). Where the Court has authority over the jailer, the writ is available. Here, the Court's jurisdiction over the custodian is undisputed.

### B. To The Extent That The MCA Precludes This Court From Considering Petitioners' Rights Of Common Law And Constitutional Habeas, It Is Unconstitutional.

The Supreme Court has held that, at the very least, the Constitution protects the common law writ of habeas corpus as it existed in 1789. *St. Cyr*, 533 U.S. at 301. As set forth above, the reach of the common law in 1789 was not limited to citizens inside the sovereign territory. It also protected the rights of aliens held extra-territorially to be free of such invasions of liberty. The common law writ cannot be suspended, except in conformance with the requirements of the Suspension Clause. To the extent that the MCA suspends the writ, by stripping all jurisdiction to

hear petitions for common law writs of habeas corpus, it violates the Suspension Clause and is unconstitutional.

### 1.    The Military Commissions Act Does Not Validly Suspend Habeas Corpus.

The MCA provides, in part, that "[n]o court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus ... [or except as provided in the DTA] any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination." MCA §7(e)(1)-(2). Read literally, this language purports to strip all courts of jurisdiction to adjudicate habeas claims and claims concerning conditions of confinement, regardless of the source of rights invoked by the petitioner.[19]

Because the literal language of the MCA strips jurisdiction from all courts even to hear constitutional and common law habeas claims, it plainly exceeds Congress's Article I powers. The Suspension Clause prohibits Congress from suspending habeas corpus "unless when in Cases of Rebellion or Invasion the public Safety may require it." Const. Art. 1, § 9, cl. 2. To avoid violating the Suspension Clause, absent rebellion or invasion, Congress must provide an adequate and effective alternative remedy. *E.g., St. Cyr*, 533 U.S. at 319; *Swain v. Pressley*, 430 U.S. 372, 381-82 (1977). As is clear on the face of the MCA, Congress has neither met the

---

[19] The absence of any mechanism for judicial review opens the door to many potential abuses. Even if an alien were properly determined to be an enemy combatant, such a person would have no remedy if she were unlawfully detained after the hostilities that previously justified her detention had ended; nor would an alien whom the government refused to release after she was exonerated by a subsequent status review have recourse to the courts. Similarly, an enemy combatant who was being tortured, which is expressly prohibited by the DTA, would have no recourse. Such circumstances, all of which would justify the grant of habeas relief, could not be raised under the construction of the MCA urged by respondents.

conditions for a valid suspension of the writ, nor has it provided a sufficient alternative remedy.

The MCA nowhere mentions suspension, and the respondents do not argue that the factual predicates of "Rebellion" or "Invasion" existed when Congress passed the MCA. Indeed, respondents cannot make such an argument because – as was absolutely clear to Congress in considering the MCA – there has been no rebellion or invasion. *See, e.g.*, 152 Cong. Rec. S10368 (daily ed. Sept. 28, 2006) (Statement of Sen. Specter) ("Fact No. 3, uncontested. We do not have a rebellion or an invasion."); 152 Cong. Rec. H7548 (daily ed. Sept. 27, 2006) (Statement of Rep. Sensenbrenner) (The MCA does not suspend habeas because Congress lacks the power to do so; instead the MCA redefines the statutory writ).

### 2.   The MCA Creates No Adequate Or Effective Substitute For Habeas.

It is equally clear that Congress has provided no adequate, effective alternative remedy to aliens who fall within the sweep of § 7(e)(1) of the MCA, that is, aliens detained by the United States anywhere in the world who have been determined – legally or not – to be enemy combatants. Where Congress substantially limits the right of habeas corpus absent rebellion or invasion, it must either provide a judicial remedy that is "commensurate with habeas corpus" or preserve access to the writ where the new remedy is "inadequate or ineffective." *Pressley*, 430 U.S. at 381-82; *see also United States v. Hayman*, 342 U.S. 205, 223 (1952). There is no question that the principle enunciated in *Pressley* remains vital. *See St. Cyr*, 533 U.S. at 314 (preclusion of habeas relief might be permissible if it were clear that petitioner's challenge could be raised in another judicial forum).

Section 7 of the MCA provides no adequate substitute process. The procedures set forth in the MCA for detainees at Guantánamo are themselves constitutionally deficient. More importantly, the MCA provides no mechanism *at all* for judicial review of the determination that

an alien held outside Guantánamo is an enemy combatant.[20]  Section 7(e)(2) of the MCA limits

judicial review of any suit "against the United States or its agents relating to any aspect of the

detention, transfer, treatment, trial or conditions of confinement" by aliens, such as Rohullah and

Ruzatullah, to what is provided by the DTA; The DTA limits judicial review to the D.C. Circuit,

and only to those instances in which an alien was determined to be an enemy combatant by a

CSRT (a procedure in use only at Guantánamo).  DTA § 1005 (2)(A).  The DTA provides no

mechanism whatsoever for review of determinations that an alien is an enemy combatant if, as

here, the determination is made by anything other than a CSRT.  Under the scheme of the DTA,

as amended by the MCA, such an alien has no recourse to any independent judicial authority –

"[n]o court, justice, or judge," MCA § 7(e)(2), anywhere may inquire into the propriety of the

determination at all.  "No process" cannot be "adequate" or "effective" process.

The law is clear that Congress may strip courts of the jurisdiction to hear habeas claims

only if it acts in conformity with the requirements of the Suspension Clause or substitutes "a

collateral remedy which is neither inadequate nor ineffective to test the legality of a person's

detention" *St. Cyr*, 533 U.S. at 314 n.38 (internal citations omitted).  In enacting the MCA, as

construed by respondents, Congress has done neither.

### 3.    Petitioners Have Standing To Assert That The MCA Violates The Suspension Clause

Respondents contend that petitioners cannot challenge the constitutionality of the MCA

because they have no rights under the Suspension Clause.  *See Boumediene v. Bush*, 476 F.3d

981 (D.C. Cir. 2007).  Such a position fundamentally misconstrues the nature of the Suspension

---

[20] Although not directly at issue here because the respondents have conceded that Ruzatullah and Rohullah are not entitled to (and have not received) the CSRT process, the CSRTs also are plainly deficient, and fall below the standards required by the Supreme Court in *Hamdi*, 542 U.S. 507.  For instance, a detainee has no right to counsel before a CSRT.  Moreover, the limited scope of review of CSRT determinations is not an adequate or effective substitute for habeas.  For instance, the DTA and MCA do not grant the power to the D.C. Circuit, when reviewing a CSRT determination, to order the petitioner's release.  *See* DTA § 1005(2)(C).  Such authority lies at the very heart of a court's authority in issuing a writ of habeas corpus.  *E.g., Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 136 (1807).

Clause and collapses the separate legal questions of jurisdiction, standing, and a cause of action, which the Supreme Court has clearly held to be distinct. *See Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979).

The Suspension Clause is a limitation on the powers of Congress. *See Boumediene*, 476 F.3d at 998 (Rogers, J. dissenting) ("the court must treat the Suspension Clause's placement in Article I, section 9, as a conscious determination of a limit on Congress's powers"). The question is not whether petitioners may assert a right under it, but rather whether they have standing to invoke it as a bar to the unconstitutional enforcement of the MCA against them. Ruzatullah and Rohullah undoubtedly have standing to assert such a bar.

The doctrine of standing has long permitted persons to challenge acts of Congress, even where the Constitutional provision under which the challenge is made itself does not obviously serve as a source of rights. *See Metro. Washington Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 264-65 (1991) (holding that plaintiffs may challenge Congressional delegation of power as violating principle of separation of powers). The Supreme Court in *Metro Washington* did not require the plaintiffs to prove that they had *rights* under the doctrine of separation of powers before holding that the doctrine voided the Congressional act in question. The Court merely asked whether the plaintiffs could *allege* an injury from the fact that Congress had made the delegation at issue.

Here, petitioners allege that they are entitled to habeas relief. Respondents contend that they are not entitled to the writ in part because the MCA stripped this Court's jurisdiction. At the least, where respondents argue that the MCA is an independent bar to relief, petitioners may fairly trace an injury to the application of the MCA to their case, and the Court may consider whether the MCA can be applied without violating the Constitution. Accordingly, the petitioners

may invoke the power of this Court to determine that the jurisdiction stripping provisions of the MCA are unconstitutional.

## IV.    RESPONDENTS' RELIANCE ON *EISENTRAGER* AND *VERDUGO-URQUIDEZ* IS MISPLACED.

Relying on *Johnson v. Eisentrager*, 339 U.S. 763 (1950) and *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), respondents assert that petitioners have no rights under the Constitution. This argument ignores the Supreme Court's recent pronouncements concerning the rights of detainees in U.S. custody. *E.g.*, *Rasul v. Bush*, 542 U.S. 466 (2004); *Hamdi v. Bush*, 542 U.S. 507 (2004); *Hamdan v. Rumsfeld*, 126 S.Ct. 2749 (2006). As discussed above, *Rasul* states specifically that the confinement of the petitioners in that case was "unquestionably" in violation of the Constitution and laws of the United States. Such a statement would be nonsensical if, as respondents assert here, Constitutional protections did not apply to aliens detained in U.S. custody at military bases abroad.

In *Eisentrager*, the Supreme Court denied relief to a group of German prisoners in U. S custody at Landsberg Prison, Germany, who had been tried and convicted of war crimes by a military tribunal and who sought post-conviction relief in the United States District Court for the District of Columbia. *Eisentrager*, 339 U.S. at 766-68. Respondents assert that *Eisentrager* stands for the proposition that the reach and protections of the Constitution end at the United States' borders. But, even if, at the time it was decided, *Eisentrager* stood for such a broad proposition, the Supreme Court's subsequent decisions and their subsequent analysis of the rights of aliens in different contexts have narrowed it so that it no longer can be construed to bar Rohullah's and Ruzatullah's claims here.

In *Eisentrager*, the Supreme Court itself recognized that it was applying an evolving legal standard. *Id.* at 768-69 ("Modern American law has come a long way since the time when

outbreak of war made every enemy national an outlaw, subject to both public and private slaughter, cruelty and plunder"). The rules that govern the application of the Constitution beyond U.S. borders have steadily evolved and eroded the understanding of *Eisentrager* that the respondents urge the Court to adopt. Indeed, barely, seven years after *Eisentrager*, in *Reid v. Covert*, 354 U.S. 1 (1957), the Supreme Court abrogated the "strict territoriality" principle underlying *Eisentrager* – the notion that the Constitution extends no further than the borders of U.S. sovereign territory, even with respect to citizens. *See, e.g., In re Ross*, 140 U.S. 453 (1891).

In its recent decision in *Omar*, 2007 U.S. App. Lexis 2891, the D.C. Circuit considered whether the Court had authority to issue a writ of habeas corpus pursuant to the federal habeas statute in respect of the detention of a U.S. citizen in Iraq. In holding that the writ was available to a detainee in Iraq, the Court relied heavily on the distinction between pre-conviction and post-conviction habeas. The Court observed that "challenging extrajudicial detention is among the most fundamental purposes of habeas," and "where, as here, the Executive detains an individual without trial, the risk of unlawful incarceration is at its apex." *Id*. at *18, 19. The Supreme Court's *Rasul* decision relies on similar reasoning in its determination that *Eisentrager* does not preclude the extension of habeas protection to alien detainees in U.S. custody, stating:

> Petitioners in these cases differ from the *Eisentrager* detainees in important respects: They are not nationals of countries at war with the United States, and they deny that they have engaged in or plotted acts of aggression against the United States; they have never been afforded access to any tribunal, much less charged with and convicted of wrongdoing; and for more than two years they have been imprisoned in territory over which the United States exercises exclusive jurisdiction and control.

*Rasul*, 542 U.S. at 476.

These statements suggest a way to reconcile the Supreme Court's apparently divergent decisions in *Eisentrager* and *Rasul*, which is to view them both as decisions, effectively on the merits, as to whether each set of petitioners had received the process that was "due" based on all

relevant circumstances.  As the Court held in *Rasul*, the petitioners in that case were presumed to be innocent civilians who had received no process whatsoever, they were citizens of allied countries and not "enemy aliens."  In those circumstances, the Court held that the petitioners were entitled to the protection of habeas corpus because pre-conviction detention without any ability to challenge the incarceration is "unquestionably" in violation of the laws, treaties or Constitution of the United States.  In contrast, the *Eisentrager* petitioners were convicted war criminals and acknowledged enemy aliens who had received a full military trial.  *See Rasul,* 542 U.S. at 475-76.  Their habeas petition was a collateral challenge to their conviction, a circumstance in which habeas rights are traditionally more circumscribed.  *See Omar*, U.S. App. LEXIS 2891 at * 18.  The present case resembles *Rasul* much more than its does *Eisentrager*. Thus, the Supreme Court's determination in *Eisentrager* that enemy aliens who committed war crimes, had received a military trial, and were making a collateral attack on their continued incarceration, were not entitled to further relief under the habeas statute does not speak at all to the present question before this Court.

Nor can *Eisentrager* and its progeny be cited for the categorical proposition that aliens outside the United States have *no* rights under the Due Process Clause.  There can be no doubt that aliens abroad with no contact with the United States enjoy rights under the Constitution, including due process rights.  Indeed, the entire edifice of the Supreme Court's personal jurisdiction jurisprudence rests on the principle that aliens abroad without contact with the United States cannot be bought before courts in the United States because such an exercise of jurisdiction would offend *the alien's* due process rights.  *See, e.g., Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 108 (1987) (quashing summons against foreign defendant on due process grounds and holding "[t]he Due Process Clause of the Fourteenth Amendment limits the

power of a state court to exert personal jurisdiction over a nonresident defendant"); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) (dismissing action on due process grounds for lack of minimum contacts).[21]  The Supreme Court expressly held that the restriction on the power of the federal courts to hale into court a non-resident alien is grounded in the aliens' personal liberty interest, which is protected by the Constitutional process.  *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) (personal jurisdiction doctrine "represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty").  These opinions simply cannot be squared with a categorical statement that aliens living abroad without contact with the United States have no due process rights.  Courts recognize such rights in making personal jurisdiction decisions virtually every day.

Although respondents rely on *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), they ignore the key opinion from that case.  Justice Kennedy, whose concurrence made up the majority, wrote a persuasive opinion about the applicability of constitutional rights to aliens abroad.  *Id.* at 277.  He did not embrace the analysis, or the reading of *Eisentrager*, outlined in the principal opinion.  Instead, he relied entirely on the approach adopted by Justice Harlan in his concurrence in *Reid v. Covert,* 354 U.S. 1 (1957), and applied it to the case of an alien seeking constitutional protections against unreasonable searches and seizures in Mexico.  *Verdugo-*

---

[21]  Indeed, in light of *Asahi* and *Helicopteros*, the Court of Appeals' statement that "the Supreme Court has long held that non-resident aliens who have insufficient contacts with the United States are not entitled to" due process. *Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004), cannot be taken at face value. If anything, the law is precisely the reverse. Non-resident aliens who lack sufficient contacts with the United States have every right to assert due process as a bar to a suit against them.

In any event, the *Jifry* decision, and the cases on which it relies, including *People's Mojahedin Org. of Iran v. Dep't of State*, 327 F.3d, 1238 (D.C. Cir. 2003) and *People's Mojahedin Org. of Iran v. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999), were decided without the benefit of the Supreme Court's decision in *Rasul v. Bush*, 542 U.S. 466 (2004), which was decided days after *Jifry*, and, as explained below, rejects the D.C. Circuit's understanding of the applicable standard.

*Urquidez*, 494 U.S. at 277-78.  That approach permits the Court to evaluate, on a case by case basis, whether a particular constitutional right should apply to a particular factual context. Although Justice Kennedy concluded that the defendant in *Verdugo-Urquidez* had received all the process he was "due," *id.* at 278, his application of Justice Harlan's *Reid* standard is critical and is reflected in the Supreme Court's recent Guantánamo jurisprudence.

In *Rasul*, the Supreme Court cited Justice Kennedy's concurrence in *Verdugo-Urquidez* with approval, and a clear majority of the Supreme Court adopted Justice Harlan's test from *Reid. Id.* at 484 n.15.  Moreover, in his concurrence in *Rasul*, Justice Kennedy explained that now even *Eisentrager* itself cannot be understood to articulate a categorical bar: "A necessary corollary of *Eisentrager* is that there are circumstances in which the courts maintain the power and the responsibility to protect persons from unlawful detention even where military affairs are implicated." *Id.* at 487.  Accordingly, no matter how definitive *Eisentrager* may have appeared when it was decided, as the Supreme Court now understands it, *Eisentrager* must now be read as one particular application of the principle that Justice Harlan enunciated in *Reid* to the specific facts of the *Eisentrager* petitioners.   Like *Rasul*, the instant case arises from facts so dissimilar from *Eisentrager* as to render that decision of no persuasive precedential value.

In this case, as in *Rasul,* petitioners should be afforded due process rights under the habeas statute or the Constitution.   As Ruzatullah and Rohullah have alleged – and as respondents' proffered lease demonstrates – Bagram is under the exclusive control and jurisdiction of the United States. Neither Ruzatullah nor Rohullah is an enemy alien.  Both are civilian citizens of an allied nation.   They have each been arbitrarily detained, essentially *incommunicado*, without counsel or a representative, without notice of the basis of their confinement or charges against them, and they have been repeatedly and illegally interrogated.

Under such circumstances the question is not *whether* they are entitled to due process, *see Rasul*, 542 U.S. at 484 n.15, but *what* process they are due. *Cf. Hamdi*, 542 U.S. at 534 (some process required where U.S. military "*continue[s]* to hold those who have been detained" (emphasis in original)). At a bare minimum, due process requires that petitioners receive meaningful notice (including of the basis of their detention), a hearing before a neutral decisionmaker with the power actually to determine their status, and some opportunity to rebut respondents' evidence for holding them, if any. *See id.* at 533 (citing cases that hold that due process requires meaningful notice and a hearing before neutral judge). These "bare bones" procedures – which have not been complied with here – are the "essential constitutional promises" of due process. *Id.*

## CONCLUSION

WHEREFORE, for the reasons stated above, petitioners respectfully request that respondents' motion to dismiss be denied and that the Court issue the requested writ of habeas corpus.

## ORAL ARGUMENT REQUESTED

In view of the complicated and important issues raised, petitioners respectfully request oral argument of this matter.

Respectfully submitted,

/s/ Tina M. Foster
Tina Foster
International Justice Network
P.O. Box 610119
Bayside, NY 11361-0119

Tel. (917) 442 9580
Fax.(917) 591 3353

March 30, 2007

/s/A. Katherine Toomey
Eric L. Lewis (394643)
Dwight P. Bostwick (427758)
Anne Katherine Toomey (426658)
Baach, Robinson & Lewis PLLC
1201 F Street, NW, Suite 500
Washington, DC 20004

Tel: (202) 833-8900
Fax: (202) 466-5738