## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **RUZATULLAH, et al.** | ) |
|  | ) |
|  | ) |
| Petitioners, | ) |
|  | ) |
| v. | )Civil Action No. 06-CV-01707 (GK) |
|  | ) |
| **DONALD RUMSFELD, et al.** | ) |
|  | ) |
|  | ) |
| Respondents. | ) |
|  | ) |

## PETITIONERS' ADDENDUM

Tina Foster
International Justice Network
P.O. Box 610119
Bayside, NY 11361-0119

Tel. (917) 442 9580
Fax.(917) 591 3353

Eric L. Lewis (394643)
Dwight P. Bostwick (427758)
Anne Katherine Toomey (426658)
Baach, Robinson & Lewis PLLC
1201 F Street, NW, Suite 500
Washington, DC 20004

Tel: (202) 833-8900
Fax: (202) 466-5738

## TABLE OF CONTENTS

<u>Document</u>                                                                                                <u>Page</u>

Detainee Treatment Act, Pub. L. No. 109-148, 119 Stat. 2680 ........................................001

Military Commissions Act, Pub. L. No. 109-366 ...........................................................008

Army Regulation 190-8 ..................................................................................................053

Lease of Lands for Coaling and Naval Stations,
U.S.-Cuba, Feb. 23, 1903, T.S. No. 418 .......................................................................070

Lease of Certain Areas for Naval or Coaling Stations,
U.S.-Cuba, July 2, 1903, T.S. No. 426 ..........................................................................072

Treaty Defining Relations with Cuba,
U.S.-Cuba, May 29, 1934, T.S. No. 866.........................................................................074

*Rasul v. Bush, Brief for Respondents on Writ of Certiorari to the
United States Court of Appeals for the District of Columbia* .........................................076

*Ex parte Anderson*, 121 Eng. Rep. 525 (Q.B. 1861) .....................................................141

*R v. Cowle*, 97 Eng. Rep. 587 (K.B. 1759) ...................................................................147

*Ex parte Sekgome*, [1910] 2 K.B. 576 (C.A.) ...............................................................168

*R v. Hastings*, (Sup. Ct. Calcutta 1775) reported in
1 *The Indian Decisions* 1005 (T.A. Venkasa Row ed. 1911) ..........................................200

*R v. Mitter*, (Sup. Ct. Calcutta 1781) reported in
1 *The Indian Decisions* 1008 (T.A. Venkasa Row ed. 1911) ..........................................203

--H.R.2863--

H.R.2863

### One Hundred Ninth Congress

### of the

### United States of America

AT THE FIRST SESSION

Begun and held at the City of Washington on Tuesday,

the fourth day of January, two thousand and five

An Act

Making appropriations for the Department of Defense for the fiscal year ending September 30, 2006, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

# DIVISION A

# DEPARTMENT OF DEFENSE APPROPRIATIONS ACT, 2006

That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the fiscal year ending September 30, 2006, for military functions administered by the Department of Defense and for other purposes, namely:

# TITLE I

# MILITARY PERSONNEL

## Military Personnel, Army

For pay, allowances, individual clothing, subsistence, interest on deposits, gratuities, permanent change of station travel (including all expenses thereof for organizational movements), and expenses of temporary duty travel between permanent duty stations, for members of the Army on active duty, (except members of reserve components provided for elsewhere), cadets, and aviation cadets; for members of the Reserve Officers' Training Corps; and for payments pursuant to section 156 of Public Law 97-377, as amended (42 U.S.C. 402 note), and to the Department of Defense Military Retirement Fund, $28,191,287,000.

## Military Personnel, Navy

For pay, allowances, individual clothing, subsistence, interest on deposits, gratuities, permanent change of station travel (including all expenses thereof for organizational movements), and expenses of temporary duty travel between permanent duty stations, for members of the Navy on active duty (except members of the Reserve provided for elsewhere), midshipmen, and aviation cadets; for members of the Reserve Officers' Training Corps; and for payments pursuant to section 156 of Public Law 97-377, as amended (42 U.S.C. 402 note), and to the Department of Defense Military Retirement Fund, $22,788,101,000.

## Military Personnel, Marine Corps

of Iraq and providing adequate levels of law and order throughout Iraq.

(H) The effectiveness of the Iraqi military and police officer cadres and the chain of command.

(I) The number of United States and coalition advisors needed to support the Iraqi security forces and associated ministries.

(J) An assessment, in a classified annex if necessary, of United States military requirements, including planned force rotations, through the end of calendar year 2006.

SEC. 9011. Supervision and administration costs associated with a construction project funded with appropriations available for operation and maintenance, and executed in direct support of the Global War on Terrorism only in Iraq and Afghanistan, may be obligated at the time a construction contract is awarded: *Provided,* That for the purpose of this section, supervision and administration costs include all in-house Government costs.

SEC. 9012. Amounts appropriated or otherwise made available in this title are designated as making appropriations for contingency operations related to the global war on terrorism pursuant to section 402 of H. Con. Res. 95 (109th Congress), the concurrent resolution on the budget for fiscal year 2006.

### TITLE X--MATTERS RELATING TO DETAINEES

## SEC. 1001. SHORT TITLE.

This title may be cited as the `Detainee Treatment Act of 2005'.

## SEC. 1002. UNIFORM STANDARDS FOR THE INTERROGATION OF PERSONS UNDER THE DETENTION OF THE DEPARTMENT OF DEFENSE.

(a) In General- No person in the custody or under the effective control of the Department of Defense or under detention in a Department of Defense facility shall be subject to any treatment or technique of interrogation not authorized by and listed in the United States Army Field Manual on Intelligence Interrogation.

(b) Applicability- Subsection (a) shall not apply with respect to any person in the custody or under the effective control of the Department of Defense pursuant to a criminal law or immigration law of the United States.

(c) Construction- Nothing in this section shall be construed to affect the rights under the United States Constitution of any person in the custody or under the physical jurisdiction of the United States.

## SEC. 1003. PROHIBITION ON CRUEL, INHUMAN, OR DEGRADING TREATMENT OR PUNISHMENT OF PERSONS UNDER CUSTODY OR CONTROL OF THE UNITED STATES GOVERNMENT.

(a) In General- No individual in the custody or under the physical control of the United States Government, regardless of nationality or physical location, shall be subject to cruel, inhuman, or degrading treatment or punishment.

(b) Construction- Nothing in this section shall be construed to impose any geographical limitation on the applicability of the prohibition against cruel, inhuman, or degrading treatment or punishment under this section.

(c) Limitation on Supersedure- The provisions of this section shall not be superseded, except by a provision of law enacted after the date of the enactment of this Act which specifically repeals,

modifies, or supersedes the provisions of this section.

(d) Cruel, Inhuman, or Degrading Treatment or Punishment Defined- In this section, the term `cruel, inhuman, or degrading treatment or punishment' means the cruel, unusual, and inhumane treatment or punishment prohibited by the Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States, as defined in the United States Reservations, Declarations and Understandings to the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment done at New York, December 10, 1984.

## SEC. 1004. PROTECTION OF UNITED STATES GOVERNMENT PERSONNEL ENGAGED IN AUTHORIZED INTERROGATIONS.

(a) Protection of United States Government Personnel- In any civil action or criminal prosecution against an officer, employee, member of the Armed Forces, or other agent of the United States Government who is a United States person, arising out of the officer, employee, member of the Armed Forces, or other agent's engaging in specific operational practices, that involve detention and interrogation of aliens who the President or his designees have determined are believed to be engaged in or associated with international terrorist activity that poses a serious, continuing threat to the United States, its interests, or its allies, and that were officially authorized and determined to be lawful at the time that they were conducted, it shall be a defense that such officer, employee, member of the Armed Forces, or other agent did not know that the practices were unlawful and a person of ordinary sense and understanding would not know the practices were unlawful. Good faith reliance on advice of counsel should be an important factor, among others, to consider in assessing whether a person of ordinary sense and understanding would have known the practices to be unlawful. Nothing in this section shall be construed to limit or extinguish any defense or protection otherwise available to any person or entity from suit, civil or criminal liability, or damages, or to provide immunity from prosecution for any criminal offense by the proper authorities.

(b) Counsel- The United States Government may provide or employ counsel, and pay counsel fees, court costs, bail, and other expenses incident to the representation of an officer, employee, member of the Armed Forces, or other agent described in subsection (a), with respect to any civil action or criminal prosecution arising out of practices described in that subsection, under the same conditions, and to the same extent, to which such services and payments are authorized under section 1037 of title 10, United States Code.

## SEC. 1005. PROCEDURES FOR STATUS REVIEW OF DETAINEES OUTSIDE THE UNITED STATES.

(a) Submittal of Procedures for Status Review of Detainees at Guantanamo Bay, Cuba, and in Afghanistan and Iraq-

(1) IN GENERAL- Not later than 180 days after the date of the enactment of this Act, the Secretary of Defense shall submit to the Committee on Armed Services and the Committee on the Judiciary of the Senate and the Committee on Armed Services and the Committee on the Judiciary of the House of Representatives a report setting forth--

(A) the procedures of the Combatant Status Review Tribunals and the Administrative Review Boards established by direction of the Secretary of Defense that are in operation at Guantanamo Bay, Cuba, for determining the status of the detainees held at Guantanamo Bay or to provide an annual review to determine the need to continue to detain an alien who is a detainee; and

(B) the procedures in operation in Afghanistan and Iraq for a determination of the status of aliens detained in the custody or under the physical control of the Department of Defense in those countries.

(2) DESIGNATED CIVILIAN OFFICIAL- The procedures submitted to Congress pursuant to

paragraph (1)(A) shall ensure that the official of the Department of Defense who is designated by the President or Secretary of Defense to be the final review authority within the Department of Defense with respect to decisions of any such tribunal or board (referred to as the `Designated Civilian Official') shall be a civilian officer of the Department of Defense holding an office to which appointments are required by law to be made by the President, by and with the advice and consent of the Senate.

(3) CONSIDERATION OF NEW EVIDENCE- The procedures submitted under paragraph (1)(A) shall provide for periodic review of any new evidence that may become available relating to the enemy combatant status of a detainee.

(b) Consideration of Statements Derived With Coercion-

(1) ASSESSMENT- The procedures submitted to Congress pursuant to subsection (a)(1)(A) shall ensure that a Combatant Status Review Tribunal or Administrative Review Board, or any similar or successor administrative tribunal or board, in making a determination of status or disposition of any detainee under such procedures, shall, to the extent practicable, assess--

(A) whether any statement derived from or relating to such detainee was obtained as a result of coercion; and

(B) the probative value (if any) of any such statement.

(2) APPLICABILITY- Paragraph (1) applies with respect to any proceeding beginning on or after the date of the enactment of this Act.

(c) Report on Modification of Procedures- The Secretary of Defense shall submit to the committees specified in subsection (a)(1) a report on any modification of the procedures submitted under subsection (a). Any such report shall be submitted not later than 60 days before the date on which such modification goes into effect.

(d) Annual Report-

(1) REPORT REQUIRED- The Secretary of Defense shall submit to Congress an annual report on the annual review process for aliens in the custody of the Department of Defense outside the United States. Each such report shall be submitted in unclassified form, with a classified annex, if necessary. The report shall be submitted not later than December 31 each year.

(2) ELEMENTS OF REPORT- Each such report shall include the following with respect to the year covered by the report:

(A) The number of detainees whose status was reviewed.

(B) The procedures used at each location.

(e) Judicial Review of Detention of Enemy Combatants-

(1) IN GENERAL- Section 2241 of title 28, United States Code, is amended by adding at the end the following:

`(e) Except as provided in section 1005 of the Detainee Treatment Act of 2005, no court, justice, or judge shall have jurisdiction to hear or consider--

`(1) an application for a writ of habeas corpus filed by or on behalf of an alien detained by the Department of Defense at Guantanamo Bay, Cuba; or

`(2) any other action against the United States or its agents relating to any aspect of the detention by the Department of Defense of an alien at Guantanamo Bay, Cuba, who--

`(A) is currently in military custody; or

`(B) has been determined by the United States Court of Appeals for the District of Columbia Circuit in accordance with the procedures set forth in section 1005(e) of the Detainee Treatment Act of 2005 to have been properly detained as an enemy combatant.'.

(2) REVIEW OF DECISIONS OF COMBATANT STATUS REVIEW TRIBUNALS OF PROPRIETY OF DETENTION-

(A) IN GENERAL- Subject to subparagraphs (B), (C), and (D), the United States Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction to determine the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant.

(B) LIMITATION ON CLAIMS- The jurisdiction of the United States Court of Appeals for the District of Columbia Circuit under this paragraph shall be limited to claims brought by or on behalf of an alien--

(i) who is, at the time a request for review by such court is filed, detained by the Department of Defense at Guantanamo Bay, Cuba; and

(ii) for whom a Combatant Status Review Tribunal has been conducted, pursuant to applicable procedures specified by the Secretary of Defense.

(C) SCOPE OF REVIEW- The jurisdiction of the United States Court of Appeals for the District of Columbia Circuit on any claims with respect to an alien under this paragraph shall be limited to the consideration of--

(i) whether the status determination of the Combatant Status Review Tribunal with regard to such alien was consistent with the standards and procedures specified by the Secretary of Defense for Combatant Status Review Tribunals (including the requirement that the conclusion of the Tribunal be supported by a preponderance of the evidence and allowing a rebuttable presumption in favor of the Government's evidence); and

(ii) to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures to make the determination is consistent with the Constitution and laws of the United States.

(D) TERMINATION ON RELEASE FROM CUSTODY- The jurisdiction of the United States Court of Appeals for the District of Columbia Circuit with respect to the claims of an alien under this paragraph shall cease upon the release of such alien from the custody of the Department of Defense.

(3) REVIEW OF FINAL DECISIONS OF MILITARY COMMISSIONS-

(A) IN GENERAL- Subject to subparagraphs (B), (C), and (D), the United States Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction to determine the validity of any final decision rendered pursuant to Military Commission Order No. 1, dated August 31, 2005 (or any successor military order).

(B) GRANT OF REVIEW- Review under this paragraph--

(i) with respect to a capital case or a case in which the alien was sentenced to a term of imprisonment of 10 years or more, shall be as of right; or

(ii) with respect to any other case, shall be at the discretion of the United States Court of Appeals for the District of Columbia Circuit.

(C) LIMITATION ON APPEALS- The jurisdiction of the United States Court of Appeals for the District of Columbia Circuit under this paragraph shall be limited to an appeal brought

by or on behalf of an alien--

(i) who was, at the time of the proceedings pursuant to the military order referred to in subparagraph (A), detained by the Department of Defense at Guantanamo Bay, Cuba; and

(ii) for whom a final decision has been rendered pursuant to such military order.

(D) SCOPE OF REVIEW- The jurisdiction of the United States Court of Appeals for the District of Columbia Circuit on an appeal of a final decision with respect to an alien under this paragraph shall be limited to the consideration of--

(i) whether the final decision was consistent with the standards and procedures specified in the military order referred to in subparagraph (A); and

(ii) to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures to reach the final decision is consistent with the Constitution and laws of the United States.

(4) RESPONDENT- The Secretary of Defense shall be the named respondent in any appeal to the United States Court of Appeals for the District of Columbia Circuit under this subsection.

(f) Construction- Nothing in this section shall be construed to confer any constitutional right on an alien detained as an enemy combatant outside the United States.

(g) United States Defined- For purposes of this section, the term `United States', when used in a geographic sense, is as defined in section 101(a)(38) of the Immigration and Nationality Act and, in particular, does not include the United States Naval Station, Guantanamo Bay, Cuba.

(h) Effective Date-

(1) IN GENERAL- This section shall take effect on the date of the enactment of this Act.

(2) REVIEW OF COMBATANT STATUS TRIBUNAL AND MILITARY COMMISSION DECISIONS- Paragraphs (2) and (3) of subsection (e) shall apply with respect to any claim whose review is governed by one of such paragraphs and that is pending on or after the date of the enactment of this Act.

## SEC. 1006. TRAINING OF IRAQI FORCES REGARDING TREATMENT OF DETAINEES.

(a) Required Policies-

(1) IN GENERAL- The Secretary of Defense shall ensure that policies are prescribed regarding procedures for military and civilian personnel of the Department of Defense and contractor personnel of the Department of Defense in Iraq that are intended to ensure that members of the Armed Forces, and all persons acting on behalf of the Armed Forces or within facilities of the Armed Forces, ensure that all personnel of Iraqi military forces who are trained by Department of Defense personnel and contractor personnel of the Department of Defense receive training regarding the international obligations and laws applicable to the humane detention of detainees, including protections afforded under the Geneva Conventions and the Convention Against Torture.

(2) ACKNOWLEDGMENT OF TRAINING- The Secretary shall ensure that, for all personnel of the Iraqi Security Forces who are provided training referred to in paragraph (1), there is documented acknowledgment of such training having been provided.

(3) DEADLINE FOR POLICIES TO BE PRESCRIBED- The policies required by paragraph (1) shall be prescribed not later than 180 days after the date of the enactment of this Act.

(b) Army Field Manual-

(1) TRANSLATION- The Secretary of Defense shall provide for the United States Army Field Manual on Intelligence Interrogation to be translated into arabic and any other language the Secretary determines appropriate for use by members of the Iraqi military forces.

(2) DISTRIBUTION- The Secretary of Defense shall provide for such manual, as translated, to be provided to each unit of the Iraqi military forces trained by Department of Defense personnel or contractor personnel of the Department of Defense.

(c) Transmittal of Regulations- Not less than 30 days after the date on which regulations, policies, and orders are first prescribed under subsection (a), the Secretary of Defense shall submit to the Committee on Armed Services of the Senate and the Committee on Armed Services of the House of Representatives copies of such regulations, policies, or orders, together with a report on steps taken to the date of the report to implement this section.

(d) Annual Report- Not less than one year after the date of the enactment of this Act, and annually thereafter, the Secretary of Defense shall submit to the Committee on Armed Services of the Senate and the Committee on Armed Services of the House of Representatives a report on the implementation of this section.

This division may be cited as the `Department of Defense Appropriations Act, 2006'.

# DIVISION B

# EMERGENCY SUPPLEMENTAL APPROPRIATIONS TO ADDRESS HURRICANES IN THE GULF OF MEXICO AND PANDEMIC INFLUENZA, 2006

That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, to address hurricanes in the Gulf of Mexico and pandemic influenza for the fiscal year ending September 30, 2006, and for other purposes, namely:

# TITLE I

# EMERGENCY SUPPLEMENTAL APPROPRIATIONS TO ADDRESS HURRICANES IN THE GULF OF MEXICO

# CHAPTER 1

# DEPARTMENT OF AGRICULTURE

# Executive Operations

# WORKING CAPITAL FUND

For necessary expenses of `Working Capital Fund' related to the consequences of Hurricane Katrina, $35,000,000, to remain available until expended: *Provided,* That the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of H. Con. Res. 95 (109th Congress), the concurrent resolution on the budget for fiscal year 2006.

# Agricultural Research Service

# BUILDINGS AND FACILITIES

For an additional amount for `Buildings and Facilities', $9,200,000, to remain available until

S 3930 ES

109th CONGRESS

2d Session

**S. 3930**

**AN ACT**

To authorize trial by military commission for violations of the law of war, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

# SECTION 1. SHORT TITLE; TABLE OF CONTENTS.

(a) Short Title- This Act may be cited as the `Military Commissions Act of 2006'.

(b) Table of Contents- The table of contents for this Act is as follows:

Sec. 1. Short title; table of contents.

Sec. 2. Construction of Presidential authority to establish military commissions.

Sec. 3. Military commissions.

Sec. 4. Amendments to Uniform Code of Military Justice.

Sec. 5. Treaty obligations not establishing grounds for certain claims.

Sec. 6. Implementation of treaty obligations.

Sec. 7. Habeas corpus matters.

Sec. 8. Revisions to Detainee Treatment Act of 2005 relating to protection of certain United States Government personnel.

Sec. 9. Review of judgments of military commissions.

Sec. 10. Detention covered by review of decisions of Combatant Status Review Tribunals of propriety of detention.

# SEC. 2. CONSTRUCTION OF PRESIDENTIAL AUTHORITY TO ESTABLISH MILITARY COMMISSIONS.

The authority to establish military commissions under chapter 47A of title 10, United States Code, as added by section 3(a), may not be construed to alter or limit the authority of the President under the Constitution of the United States and laws of the United States to establish military commissions for areas declared to be under martial

law or in occupied territories should circumstances so require.

# SEC. 3. MILITARY COMMISSIONS.

(a) Military Commissions-

(1) IN GENERAL- Subtitle A of title 10, United States Code, is amended by inserting after chapter 47 the following new chapter:

# `CHAPTER 47A--MILITARY COMMISSIONS

`Subchapter

--948a

--948h

--948q

--949a

--949s

--950a

--950p

# `SUBCHAPTER I--GENERAL PROVISIONS

`Sec.

`948a. Definitions.

`948b. Military commissions generally.

`948c. Persons subject to military commissions.

`948d. Jurisdiction of military commissions.

`948e. Annual report to congressional committees.

## `Sec. 948a. Definitions

`In this chapter:

`(1) UNLAWFUL ENEMY COMBATANT- (A) The term `unlawful enemy combatant' means--

`(i) a person who has engaged in hostilities or who has purposefully and materially supported hostilities against the United States or its co-belligerents who is not a lawful enemy combatant (including a person who is part of the Taliban, al Qaeda, or associated forces); or

`(ii) a person who, before, on, or after the date of the enactment of the Military Commissions Act of 2006, has been determined to be an unlawful enemy combatant by a Combatant Status Review Tribunal or another competent tribunal established under the authority of the President or the Secretary of Defense.

`(B) CO-BELLIGERENT- In this paragraph, the term `co-belligerent', with respect to the United States, means any State or armed force joining and directly engaged with the United States in hostilities or directly supporting hostilities against a common enemy.

`(2) LAWFUL ENEMY COMBATANT- The term `lawful enemy combatant' means a person who is--

`(A) a member of the regular forces of a State party engaged in hostilities against the United States;

`(B) a member of a militia, volunteer corps, or organized resistance movement belonging to a State party engaged in such hostilities, which are under responsible command, wear a fixed distinctive sign recognizable at a distance, carry their arms openly, and abide by the law of war; or

`(C) a member of a regular armed force who professes allegiance to a government engaged in such hostilities, but not recognized by the United States.

`(3) ALIEN- The term `alien' means a person who is not a citizen of the United States.

`(4) CLASSIFIED INFORMATION- The term `classified information' means the following:

`(A) Any information or material that has been determined by the United States Government pursuant to statute, Executive order, or regulation to require protection against unauthorized disclosure for reasons of national security.

`(B) Any restricted data, as that term is defined in section 11 y. of the Atomic Energy Act of 1954 (42 U.S.C. 2014(y)).

`(5) GENEVA CONVENTIONS- The term `Geneva Conventions' means the international conventions signed at Geneva on August 12, 1949.

`**Sec. 948b. Military commissions generally**

`(a) Purpose- This chapter establishes procedures governing the use of military commissions to try alien unlawful enemy combatants engaged in hostilities against the United States for violations of the law of war and other offenses triable by military commission.

`(b) Authority for Military Commissions Under This Chapter- The President is

authorized to establish military commissions under this chapter for offenses triable by military commission as provided in this chapter.

`(c) Construction of Provisions- The procedures for military commissions set forth in this chapter are based upon the procedures for trial by general courts-martial under chapter 47 of this title (the Uniform Code of Military Justice). Chapter 47 of this title does not, by its terms, apply to trial by military commission except as specifically provided in this chapter. The judicial construction and application of that chapter are not binding on military commissions established under this chapter.

`(d) Inapplicability of Certain Provisions- (1) The following provisions of this title shall not apply to trial by military commission under this chapter:

   `(A) Section 810 (article 10 of the Uniform Code of Military Justice), relating to speedy trial, including any rule of courts-martial relating to speedy trial.

   `(B) Sections 831(a), (b), and (d) (articles 31(a), (b), and (d) of the Uniform Code of Military Justice), relating to compulsory self-incrimination.

   `(C) Section 832 (article 32 of the Uniform Code of Military Justice), relating to pretrial investigation.

`(2) Other provisions of chapter 47 of this title shall apply to trial by military commission under this chapter only to the extent provided by this chapter.

`(e) Treatment of Rulings and Precedents- The findings, holdings, interpretations, and other precedents of military commissions under this chapter may not be introduced or considered in any hearing, trial, or other proceeding of a court-martial convened under chapter 47 of this title. The findings, holdings, interpretations, and other precedents of military commissions under this chapter may not form the basis of any holding, decision, or other determination of a court-martial convened under that chapter.

`(f) Status of Commissions Under Common Article 3- A military commission established under this chapter is a regularly constituted court, affording all the necessary `judicial guarantees which are recognized as indispensable by civilized peoples' for purposes of common Article 3 of the Geneva Conventions.

`(g) Geneva Conventions Not Establishing Source of Rights- No alien unlawful enemy combatant subject to trial by military commission under this chapter may invoke the Geneva Conventions as a source of rights.

`Sec. 948c. Persons subject to military commissions

   `Any alien unlawful enemy combatant is subject to trial by military commission under this chapter.

`Sec. 948d. Jurisdiction of military commissions

   `(a) Jurisdiction- A military commission under this chapter shall have jurisdiction to try any offense made punishable by this chapter or the law of war when committed

011

by an alien unlawful enemy combatant before, on, or after September 11, 2001.

`(b) Lawful Enemy Combatants- Military commissions under this chapter shall not have jurisdiction over lawful enemy combatants. Lawful enemy combatants who violate the law of war are subject to chapter 47 of this title. Courts-martial established under that chapter shall have jurisdiction to try a lawful enemy combatant for any offense made punishable under this chapter.

`(c) Determination of Unlawful Enemy Combatant Status Dispositive- A finding, whether before, on, or after the date of the enactment of the Military Commissions Act of 2006, by a Combatant Status Review Tribunal or another competent tribunal established under the authority of the President or the Secretary of Defense that a person is an unlawful enemy combatant is dispositive for purposes of jurisdiction for trial by military commission under this chapter.

`(d) Punishments- A military commission under this chapter may, under such limitations as the Secretary of Defense may prescribe, adjudge any punishment not forbidden by this chapter, including the penalty of death when authorized under this chapter or the law of war.

## `Sec. 948e. Annual report to congressional committees

`(a) Annual Report Required- Not later than December 31 each year, the Secretary of Defense shall submit to the Committees on Armed Services of the Senate and the House of Representatives a report on any trials conducted by military commissions under this chapter during such year.

`(b) Form- Each report under this section shall be submitted in unclassified form, but may include a classified annex.

# `SUBCHAPTER II--COMPOSITION OF MILITARY COMMISSIONS

`Sec.

`948h. Who may convene military commissions.

`948i. Who may serve on military commissions.

`948j. Military judge of a military commission.

`948k. Detail of trial counsel and defense counsel.

`948l. Detail or employment of reporters and interpreters.

`948m. Number of members; excuse of members; absent and additional members.

## `Sec. 948h. Who may convene military commissions

`Military commissions under this chapter may be convened by the Secretary of Defense or by any officer or official of the United States designated by the Secretary for that purpose.

012

`Sec. 948i. Who may serve on military commissions

`(a) In General- Any commissioned officer of the armed forces on active duty is eligible to serve on a military commission under this chapter.

`(b) Detail of Members- When convening a military commission under this chapter, the convening authority shall detail as members of the commission such members of the armed forces eligible under subsection (a), as in the opinion of the convening authority, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament. No member of an armed force is eligible to serve as a member of a military commission when such member is the accuser or a witness for the prosecution or has acted as an investigator or counsel in the same case.

`(c) Excuse of Members- Before a military commission under this chapter is assembled for the trial of a case, the convening authority may excuse a member from participating in the case.

`Sec. 948j. Military judge of a military commission

`(a) Detail of Military Judge- A military judge shall be detailed to each military commission under this chapter. The Secretary of Defense shall prescribe regulations providing for the manner in which military judges are so detailed to military commissions. The military judge shall preside over each military commission to which he has been detailed.

`(b) Qualifications- A military judge shall be a commissioned officer of the armed forces who is a member of the bar of a Federal court, or a member of the bar of the highest court of a State, and who is certified to be qualified for duty under section 826 of this title (article 26 of the Uniform Code of Military Justice) as a military judge in general courts-martial by the Judge Advocate General of the armed force of which such military judge is a member.

`(c) Ineligibility of Certain Individuals- No person is eligible to act as military judge in a case of a military commission under this chapter if he is the accuser or a witness or has acted as investigator or a counsel in the same case.

`(d) Consultation With Members; Ineligibility To Vote- A military judge detailed to a military commission under this chapter may not consult with the members of the commission except in the presence of the accused (except as otherwise provided in section 949d of this title), trial counsel, and defense counsel, nor may he vote with the members of the commission.

`(e) Other Duties- A commissioned officer who is certified to be qualified for duty as a military judge of a military commission under this chapter may perform such other duties as are assigned to him by or with the approval of the Judge Advocate General of the armed force of which such officer is a member or the designee of such Judge Advocate General.

`(f) Prohibition on Evaluation of Fitness by Convening Authority- The convening

authority of a military commission under this chapter shall not prepare or review any report concerning the effectiveness, fitness, or efficiency of a military judge detailed to the military commission which relates to his performance of duty as a military judge on the military commission.

## `Sec. 948k. Detail of trial counsel and defense counsel

`(a) Detail of Counsel Generally- (1) Trial counsel and military defense counsel shall be detailed for each military commission under this chapter.

`(2) Assistant trial counsel and assistant and associate defense counsel may be detailed for a military commission under this chapter.

`(3) Military defense counsel for a military commission under this chapter shall be detailed as soon as practicable after the swearing of charges against the accused.

`(4) The Secretary of Defense shall prescribe regulations providing for the manner in which trial counsel and military defense counsel are detailed for military commissions under this chapter and for the persons who are authorized to detail such counsel for such commissions.

`(b) Trial Counsel- Subject to subsection (e), trial counsel detailed for a military commission under this chapter must be--

`(1) a judge advocate (as that term is defined in section 801 of this title (article 1 of the Uniform Code of Military Justice) who--

`(A) is a graduate of an accredited law school or is a member of the bar of a Federal court or of the highest court of a State; and

`(B) is certified as competent to perform duties as trial counsel before general courts-martial by the Judge Advocate General of the armed force of which he is a member; or

`(2) a civilian who--

`(A) is a member of the bar of a Federal court or of the highest court of a State; and

`(B) is otherwise qualified to practice before the military commission pursuant to regulations prescribed by the Secretary of Defense.

`(c) Military Defense Counsel- Subject to subsection (e), military defense counsel detailed for a military commission under this chapter must be a judge advocate (as so defined) who is--

`(1) a graduate of an accredited law school or is a member of the bar of a Federal court or of the highest court of a State; and

`(2) certified as competent to perform duties as defense counsel before general courts-martial by the Judge Advocate General of the armed force of which he is a member.

`(d) Chief Prosecutor; Chief Defense Counsel- (1) The Chief Prosecutor in a military commission under this chapter shall meet the requirements set forth in subsection (b)(1).

`(2) The Chief Defense Counsel in a military commission under this chapter shall meet the requirements set forth in subsection (c)(1).

`(e) Ineligibility of Certain Individuals- No person who has acted as an investigator, military judge, or member of a military commission under this chapter in any case may act later as trial counsel or military defense counsel in the same case. No person who has acted for the prosecution before a military commission under this chapter may act later in the same case for the defense, nor may any person who has acted for the defense before a military commission under this chapter act later in the same case for the prosecution.

## `Sec. 948l. Detail or employment of reporters and interpreters

`(a) Court Reporters- Under such regulations as the Secretary of Defense may prescribe, the convening authority of a military commission under this chapter shall detail to or employ for the commission qualified court reporters, who shall make a verbatim recording of the proceedings of and testimony taken before the commission.

`(b) Interpreters- Under such regulations as the Secretary of Defense may prescribe, the convening authority of a military commission under this chapter may detail to or employ for the military commission interpreters who shall interpret for the commission and, as necessary, for trial counsel and defense counsel and for the accused.

`(c) Transcript; Record- The transcript of a military commission under this chapter shall be under the control of the convening authority of the commission, who shall also be responsible for preparing the record of the proceedings.

## `Sec. 948m. Number of members; excuse of members; absent and additional members

`(a) Number of Members- (1) A military commission under this chapter shall, except as provided in paragraph (2), have at least five members.

`(2) In a case in which the accused before a military commission under this chapter may be sentenced to a penalty of death, the military commission shall have the number of members prescribed by section 949m(c) of this title.

`(b) Excuse of Members- No member of a military commission under this chapter may be absent or excused after the military commission has been assembled for the trial of a case unless excused--

`(1) as a result of challenge;

`(2) by the military judge for physical disability or other good cause; or

`(3) by order of the convening authority for good cause.

`(c) Absent and Additional Members- Whenever a military commission under this chapter is reduced below the number of members required by subsection (a), the trial may not proceed unless the convening authority details new members sufficient to provide not less than such number. The trial may proceed with the new members present after the recorded evidence previously introduced before the members has been read to the military commission in the presence of the military judge, the accused (except as provided in section 949d of this title), and counsel for both sides.

# `SUBCHAPTER III--PRE-TRIAL PROCEDURE

`Sec.

`948q. Charges and specifications.

`948r. Compulsory self-incrimination prohibited; treatment of statements obtained by torture and other statements.

`948s. Service of charges.

## `Sec. 948q. Charges and specifications

`(a) Charges and Specifications- Charges and specifications against an accused in a military commission under this chapter shall be signed by a person subject to chapter 47 of this title under oath before a commissioned officer of the armed forces authorized to administer oaths and shall state--

`(1) that the signer has personal knowledge of, or reason to believe, the matters set forth therein; and

`(2) that they are true in fact to the best of the signer's knowledge and belief.

`(b) Notice to Accused- Upon the swearing of the charges and specifications in accordance with subsection (a), the accused shall be informed of the charges against him as soon as practicable.

## `Sec. 948r. Compulsory self-incrimination prohibited; treatment of statements obtained by torture and other statements

`(a) In General- No person shall be required to testify against himself at a proceeding of a military commission under this chapter.

`(b) Exclusion of Statements Obtained by Torture- A statement obtained by use of torture shall not be admissible in a military commission under this chapter, except against a person accused of torture as evidence that the statement was made.

`(c) Statements Obtained Before Enactment of Detainee Treatment Act of 2005- A statement obtained before December 30, 2005 (the date of the enactment of the Defense Treatment Act of 2005) in which the degree of coercion is disputed may be admitted only if the military judge finds that--

`(1) the totality of the circumstances renders the statement reliable and

possessing sufficient probative value; and

`(2) the interests of justice would best be served by admission of the statement into evidence.

`(d) Statements Obtained After Enactment of Detainee Treatment Act of 2005- A statement obtained on or after December 30, 2005 (the date of the enactment of the Defense Treatment Act of 2005) in which the degree of coercion is disputed may be admitted only if the military judge finds that--

`(1) the totality of the circumstances renders the statement reliable and possessing sufficient probative value;

`(2) the interests of justice would best be served by admission of the statement into evidence; and

`(3) the interrogation methods used to obtain the statement do not amount to cruel, inhuman, or degrading treatment prohibited by section 1003 of the Detainee Treatment Act of 2005.

`**Sec. 948s. Service of charges**

`The trial counsel assigned to a case before a military commission under this chapter shall cause to be served upon the accused and military defense counsel a copy of the charges upon which trial is to be had. Such charges shall be served in English and, if appropriate, in another language that the accused understands. Such service shall be made sufficiently in advance of trial to prepare a defense.

`**SUBCHAPTER IV--TRIAL PROCEDURE**

`Sec.

`949a. Rules.

`949b. Unlawfully influencing action of military commission.

`949c. Duties of trial counsel and defense counsel.

`949d. Session

s.

`949e. Continuances.

`949f. Challenges.

`949g. Oaths.

`949h. Former jeopardy.

`949i. Pleas of the accused.

`949j. Opportunity to obtain witnesses and other evidence.

`949k. Defense of lack of mental responsibility.

`949l. Voting and rulings.

`949m. Number of votes required.

`949n. Military commission to announce action.

`949o. Record of trial.

`**Sec. 949a. Rules**

`(a) Procedures and Rules of Evidence- Pretrial, trial, and post-trial procedures, including elements and modes of proof, for cases triable by military commission under this chapter may be prescribed by the Secretary of Defense, in consultation with the Attorney General. Such procedures shall, so far as the Secretary considers practicable or consistent with military or intelligence activities, apply the principles of law and the rules of evidence in trial by general courts-martial. Such procedures and rules of evidence may not be contrary to or inconsistent with this chapter.

`(b) Rules for Military Commission- (1) Notwithstanding any departures from the law and the rules of evidence in trial by general courts-martial authorized by subsection (a), the procedures and rules of evidence in trials by military commission under this chapter shall include the following:

`(A) The accused shall be permitted to present evidence in his defense, to cross-examine the witnesses who testify against him, and to examine and respond to evidence admitted against him on the issue of guilt or innocence and for sentencing, as provided for by this chapter.

`(B) The accused shall be present at all sessions of the military commission (other than those for deliberations or voting), except when excluded under section 949d of this title.

`(C) The accused shall receive the assistance of counsel as provided for by section 948k.

`(D) The accused shall be permitted to represent himself, as provided for by paragraph (3).

`(2) In establishing procedures and rules of evidence for military commission proceedings, the Secretary of Defense may prescribe the following provisions:

`(A) Evidence shall be admissible if the military judge determines that the evidence would have probative value to a reasonable person.

`(B) Evidence shall not be excluded from trial by military commission on the grounds that the evidence was not seized pursuant to a search warrant or other authorization.

`(C) A statement of the accused that is otherwise admissible shall not be excluded from trial by military commission on grounds of alleged coercion or

compulsory self-incrimination so long as the evidence complies with the provisions of section 948r of this title.

`(D) Evidence shall be admitted as authentic so long as--

    `(i) the military judge of the military commission determines that there is sufficient basis to find that the evidence is what it is claimed to be; and

    `(ii) the military judge instructs the members that they may consider any issue as to authentication or identification of evidence in determining the weight, if any, to be given to the evidence.

`(E)(i) Except as provided in clause (ii), hearsay evidence not otherwise admissible under the rules of evidence applicable in trial by general courts-martial may be admitted in a trial by military commission if the proponent of the evidence makes known to the adverse party, sufficiently in advance to provide the adverse party with a fair opportunity to meet the evidence, the intention of the proponent to offer the evidence, and the particulars of the evidence (including information on the general circumstances under which the evidence was obtained). The disclosure of evidence under the preceding sentence is subject to the requirements and limitations applicable to the disclosure of classified information in section 949j(c) of this title.

`(ii) Hearsay evidence not otherwise admissible under the rules of evidence applicable in trial by general courts-martial shall not be admitted in a trial by military commission if the party opposing the admission of the evidence demonstrates that the evidence is unreliable or lacking in probative value.

`(F) The military judge shall exclude any evidence the probative value of which is substantially outweighed--

    `(i) by the danger of unfair prejudice, confusion of the issues, or misleading the commission; or

    `(ii) by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

`(3)(A) The accused in a military commission under this chapter who exercises the right to self-representation under paragraph (1)(D) shall conform his deportment and the conduct of the defense to the rules of evidence, procedure, and decorum applicable to trials by military commission.

`(B) Failure of the accused to conform to the rules described in subparagraph (A) may result in a partial or total revocation by the military judge of the right of self-representation under paragraph (1)(D). In such case, the detailed defense counsel of the accused or an appropriately authorized civilian counsel shall perform the functions necessary for the defense.

`(c) Delegation of Authority To Prescribe Regulations- The Secretary of Defense may delegate the authority of the Secretary to prescribe regulations under this chapter.

`(d) Notification to Congressional Committees of Changes to Procedures- Not later

than 60 days before the date on which any proposed modification of the procedures in effect for military commissions under this chapter goes into effect, the Secretary of Defense shall submit to the Committee on Armed Services of the Senate and the Committee on Armed Services of the House of Representatives a report describing the modification.

## `Sec. 949b. Unlawfully influencing action of military commission

`(a) In General- (1) No authority convening a military commission under this chapter may censure, reprimand, or admonish the military commission, or any member, military judge, or counsel thereof, with respect to the findings or sentence adjudged by the military commission, or with respect to any other exercises of its or his functions in the conduct of the proceedings.

`(2) No person may attempt to coerce or, by any unauthorized means, influence--

`(A) the action of a military commission under this chapter, or any member thereof, in reaching the findings or sentence in any case;

`(B) the action of any convening, approving, or reviewing authority with respect to his judicial acts; or

`(C) the exercise of professional judgment by trial counsel or defense counsel.

`(3) Paragraphs (1) and (2) do not apply with respect to--

`(A) general instructional or informational courses in military justice if such courses are designed solely for the purpose of instructing members of a command in the substantive and procedural aspects of military commissions; or

`(B) statements and instructions given in open proceedings by a military judge or counsel.

`(b) Prohibition on Consideration of Actions on Commission in Evaluation of Fitness- In the preparation of an effectiveness, fitness, or efficiency report or any other report or document used in whole or in part for the purpose of determining whether a commissioned officer of the armed forces is qualified to be advanced in grade, or in determining the assignment or transfer of any such officer or whether any such officer should be retained on active duty, no person may--

`(1) consider or evaluate the performance of duty of any member of a military commission under this chapter; or

`(2) give a less favorable rating or evaluation to any commissioned officer because of the zeal with which such officer, in acting as counsel, represented any accused before a military commission under this chapter.

## `Sec. 949c. Duties of trial counsel and defense counsel

`(a) Trial Counsel- The trial counsel of a military commission under this chapter shall prosecute in the name of the United States.

`(b) Defense Counsel- (1) The accused shall be represented in his defense before a military commission under this chapter as provided in this subsection.

`(2) The accused shall be represented by military counsel detailed under section 948k of this title.

`(3) The accused may be represented by civilian counsel if retained by the accused, but only if such civilian counsel--

   `(A) is a United States citizen;

   `(B) is admitted to the practice of law in a State, district, or possession of the United States or before a Federal court;

   `(C) has not been the subject of any sanction of disciplinary action by any court, bar, or other competent governmental authority for relevant misconduct;

   `(D) has been determined to be eligible for access to classified information that is classified at the level Secret or higher; and

   `(E) has signed a written agreement to comply with all applicable regulations or instructions for counsel, including any rules of court for conduct during the proceedings.

`(4) Civilian defense counsel shall protect any classified information received during the course of representation of the accused in accordance with all applicable law governing the protection of classified information and may not divulge such information to any person not authorized to receive it.

`(5) If the accused is represented by civilian counsel, detailed military counsel shall act as associate counsel.

`(6) The accused is not entitled to be represented by more than one military counsel. However, the person authorized under regulations prescribed under section 948k of this title to detail counsel, in that person's sole discretion, may detail additional military counsel to represent the accused.

`(7) Defense counsel may cross-examine each witness for the prosecution who testifies before a military commission under this chapter.

`Sec. 949d. Sessions

`(a) Sessions Without Presence of Members- (1) At any time after the service of charges which have been referred for trial by military commission under this chapter, the military judge may call the military commission into session without the presence of the members for the purpose of--

   `(A) hearing and determining motions raising defenses or objections which are capable of determination without trial of the issues raised by a plea of not guilty;

   `(B) hearing and ruling upon any matter which may be ruled upon by the military judge under this chapter, whether or not the matter is appropriate for

later consideration or decision by the members;

`(C) if permitted by regulations prescribed by the Secretary of Defense, receiving the pleas of the accused; and

`(D) performing any other procedural function which may be performed by the military judge under this chapter or under rules prescribed pursuant to section 949a of this title and which does not require the presence of the members.

`(2) Except as provided in subsections (c) and (e), any proceedings under paragraph (1) shall--

`(A) be conducted in the presence of the accused, defense counsel, and trial counsel; and

`(B) be made part of the record.

`(b) Proceedings in Presence of Accused- Except as provided in subsections (c) and (e), all proceedings of a military commission under this chapter, including any consultation of the members with the military judge or counsel, shall--

`(1) be in the presence of the accused, defense counsel, and trial counsel; and

`(2) be made a part of the record.

`(c) Deliberation or Vote of Members- When the members of a military commission under this chapter deliberate or vote, only the members may be present.

`(d) Closure of Proceedings- (1) The military judge may close to the public all or part of the proceedings of a military commission under this chapter, but only in accordance with this subsection.

`(2) The military judge may close to the public all or a portion of the proceedings under paragraph (1) only upon making a specific finding that such closure is necessary to--

`(A) protect information the disclosure of which could reasonably be expected to cause damage to the national security, including intelligence or law enforcement sources, methods, or activities; or

`(B) ensure the physical safety of individuals.

`(3) A finding under paragraph (2) may be based upon a presentation, including a presentation ex parte or in camera, by either trial counsel or defense counsel.

`(e) Exclusion of Accused From Certain Proceedings- The military judge may exclude the accused from any portion of a proceeding upon a determination that, after being warned by the military judge, the accused persists in conduct that justifies exclusion from the courtroom--

`(1) to ensure the physical safety of individuals; or

`(2) to prevent disruption of the proceedings by the accused.

`(f) Protection of Classified Information-

`(1) NATIONAL SECURITY PRIVILEGE- (A) Classified information shall be protected and is privileged from disclosure if disclosure would be detrimental to the national security. The rule in the preceding sentence applies to all stages of the proceedings of military commissions under this chapter.

`(B) The privilege referred to in subparagraph (A) may be claimed by the head of the executive or military department or government agency concerned based on a finding by the head of that department or agency that--

`(i) the information is properly classified; and

`(ii) disclosure of the information would be detrimental to the national security.

`(C) A person who may claim the privilege referred to in subparagraph (A) may authorize a representative, witness, or trial counsel to claim the privilege and make the finding described in subparagraph (B) on behalf of such person. The authority of the representative, witness, or trial counsel to do so is presumed in the absence of evidence to the contrary.

`(2) INTRODUCTION OF CLASSIFIED INFORMATION-

`(A) ALTERNATIVES TO DISCLOSURE- To protect classified information from disclosure, the military judge, upon motion of trial counsel, shall authorize, to the extent practicable--

`(i) the deletion of specified items of classified information from documents to be introduced as evidence before the military commission;

`(ii) the substitution of a portion or summary of the information for such classified documents; or

`(iii) the substitution of a statement of relevant facts that the classified information would tend to prove.

`(B) PROTECTION OF SOURCES, METHODS, OR ACTIVITIES- The military judge, upon motion of trial counsel, shall permit trial counsel to introduce otherwise admissible evidence before the military commission, while protecting from disclosure the sources, methods, or activities by which the United States acquired the evidence if the military judge finds that (i) the sources, methods, or activities by which the United States acquired the evidence are classified, and (ii) the evidence is reliable. The military judge may require trial counsel to present to the military commission and the defense, to the extent practicable and consistent with national security, an unclassified summary of the sources, methods, or activities by which the United States acquired the evidence.

`(C) ASSERTION OF NATIONAL SECURITY PRIVILEGE AT TRIAL- During the examination of any witness, trial counsel may object to any question, line

of inquiry, or motion to admit evidence that would require the disclosure of classified information. Following such an objection, the military judge shall take suitable action to safeguard such classified information. Such action may include the review of trial counsel's claim of privilege by the military judge in camera and on an ex parte basis, and the delay of proceedings to permit trial counsel to consult with the department or agency concerned as to whether the national security privilege should be asserted.

`(3) CONSIDERATION OF PRIVILEGE AND RELATED MATERIALS- A claim of privilege under this subsection, and any materials submitted in support thereof, shall, upon request of the Government, be considered by the military judge in camera and shall not be disclosed to the accused.

`(4) ADDITIONAL REGULATIONS- The Secretary of Defense may prescribe additional regulations, consistent with this subsection, for the use and protection of classified information during proceedings of military commissions under this chapter. A report on any regulations so prescribed, or modified, shall be submitted to the Committees on Armed Services of the Senate and the House of Representatives not later than 60 days before the date on which such regulations or modifications, as the case may be, go into effect.

## `Sec. 949e. Continuances

`The military judge in a military commission under this chapter may, for reasonable cause, grant a continuance to any party for such time, and as often, as may appear to be just.

## `Sec. 949f. Challenges

`(a) Challenges Authorized- The military judge and members of a military commission under this chapter may be challenged by the accused or trial counsel for cause stated to the commission. The military judge shall determine the relevance and validity of challenges for cause. The military judge may not receive a challenge to more than one person at a time. Challenges by trial counsel shall ordinarily be presented and decided before those by the accused are offered.

`(b) Peremptory Challenges- Each accused and the trial counsel are entitled to one peremptory challenge. The military judge may not be challenged except for cause.

`(c) Challenges Against Additional Members- Whenever additional members are detailed to a military commission under this chapter, and after any challenges for cause against such additional members are presented and decided, each accused and the trial counsel are entitled to one peremptory challenge against members not previously subject to peremptory challenge.

## `Sec. 949g. Oaths

`(a) In General- (1) Before performing their respective duties in a military commission under this chapter, military judges, members, trial counsel, defense counsel, reporters, and interpreters shall take an oath to perform their duties

faithfully.

`(2) The form of the oath required by paragraph (1), the time and place of the taking thereof, the manner of recording the same, and whether the oath shall be taken for all cases in which duties are to be performed or for a particular case, shall be as prescribed in regulations of the Secretary of Defense. Those regulations may provide that--

`(A) an oath to perform faithfully duties as a military judge, trial counsel, or defense counsel may be taken at any time by any judge advocate or other person certified to be qualified or competent for the duty; and

`(B) if such an oath is taken, such oath need not again be taken at the time the judge advocate or other person is detailed to that duty.

`(b) Witnesses- Each witness before a military commission under this chapter shall be examined on oath.

## `Sec. 949h. Former jeopardy

`(a) In General- No person may, without his consent, be tried by a military commission under this chapter a second time for the same offense.

`(b) Scope of Trial- No proceeding in which the accused has been found guilty by military commission under this chapter upon any charge or specification is a trial in the sense of this section until the finding of guilty has become final after review of the case has been fully completed.

## `Sec. 949i. Pleas of the accused

`(a) Entry of Plea of Not Guilty- If an accused in a military commission under this chapter after a plea of guilty sets up matter inconsistent with the plea, or if it appears that the accused has entered the plea of guilty through lack of understanding of its meaning and effect, or if the accused fails or refuses to plead, a plea of not guilty shall be entered in the record, and the military commission shall proceed as though the accused had pleaded not guilty.

`(b) Finding of Guilt After Guilty Plea- With respect to any charge or specification to which a plea of guilty has been made by the accused in a military commission under this chapter and accepted by the military judge, a finding of guilty of the charge or specification may be entered immediately without a vote. The finding shall constitute the finding of the commission unless the plea of guilty is withdrawn prior to announcement of the sentence, in which event the proceedings shall continue as though the accused had pleaded not guilty.

## `Sec. 949j. Opportunity to obtain witnesses and other evidence

`(a) Right of Defense Counsel- Defense counsel in a military commission under this chapter shall have a reasonable opportunity to obtain witnesses and other evidence as provided in regulations prescribed by the Secretary of Defense.

`(b) Process for Compulsion- Process issued in a military commission under this chapter to compel witnesses to appear and testify and to compel the production of other evidence--

   `(1) shall be similar to that which courts of the United States having criminal jurisdiction may lawfully issue; and

   `(2) shall run to any place where the United States shall have jurisdiction thereof.

`(c) Protection of Classified Information- (1) With respect to the discovery obligations of trial counsel under this section, the military judge, upon motion of trial counsel, shall authorize, to the extent practicable--

   `(A) the deletion of specified items of classified information from documents to be made available to the accused;

   `(B) the substitution of a portion or summary of the information for such classified documents; or

   `(C) the substitution of a statement admitting relevant facts that the classified information would tend to prove.

`(2) The military judge, upon motion of trial counsel, shall authorize trial counsel, in the course of complying with discovery obligations under this section, to protect from disclosure the sources, methods, or activities by which the United States acquired evidence if the military judge finds that the sources, methods, or activities by which the United States acquired such evidence are classified. The military judge may require trial counsel to provide, to the extent practicable, an unclassified summary of the sources, methods, or activities by which the United States acquired such evidence.

`(d) Exculpatory Evidence- (1) As soon as practicable, trial counsel shall disclose to the defense the existence of any evidence known to trial counsel that reasonably tends to exculpate the accused. Where exculpatory evidence is classified, the accused shall be provided with an adequate substitute in accordance with the procedures under subsection (c).

`(2) In this subsection, the term `evidence known to trial counsel', in the case of exculpatory evidence, means exculpatory evidence that the prosecution would be required to disclose in a trial by general court-martial under chapter 47 of this title.

## `Sec. 949k. Defense of lack of mental responsibility

`(a) Affirmative Defense- It is an affirmative defense in a trial by military commission under this chapter that, at the time of the commission of the acts constituting the offense, the accused, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of the acts. Mental disease or defect does not otherwise constitute a defense.

`(b) Burden of Proof- The accused in a military commission under this chapter has

the burden of proving the defense of lack of mental responsibility by clear and convincing evidence.

`(c) Findings Following Assertion of Defense- Whenever lack of mental responsibility of the accused with respect to an offense is properly at issue in a military commission under this chapter, the military judge shall instruct the members of the commission as to the defense of lack of mental responsibility under this section and shall charge them to find the accused--

   `(1) guilty;

   `(2) not guilty; or

   `(3) subject to subsection (d), not guilty by reason of lack of mental responsibility.

`(d) Majority Vote Required for Finding- The accused shall be found not guilty by reason of lack of mental responsibility under subsection (c)(3) only if a majority of the members present at the time the vote is taken determines that the defense of lack of mental responsibility has been established.

`Sec. 949l. Voting and rulings

`(a) Vote by Secret Written Ballot- Voting by members of a military commission under this chapter on the findings and on the sentence shall be by secret written ballot.

`(b) Rulings- (1) The military judge in a military commission under this chapter shall rule upon all questions of law, including the admissibility of evidence and all interlocutory questions arising during the proceedings.

`(2) Any ruling made by the military judge upon a question of law or an interlocutory question (other than the factual issue of mental responsibility of the accused) is conclusive and constitutes the ruling of the military commission. However, a military judge may change his ruling at any time during the trial.

`(c) Instructions Prior to Vote- Before a vote is taken of the findings of a military commission under this chapter, the military judge shall, in the presence of the accused and counsel, instruct the members as to the elements of the offense and charge the members--

   `(1) that the accused must be presumed to be innocent until his guilt is established by legal and competent evidence beyond a reasonable doubt;

   `(2) that in the case being considered, if there is a reasonable doubt as to the guilt of the accused, the doubt must be resolved in favor of the accused and he must be acquitted;

   `(3) that, if there is reasonable doubt as to the degree of guilt, the finding must be in a lower degree as to which there is no reasonable doubt; and

   `(4) that the burden of proof to establish the guilt of the accused beyond a

reasonable doubt is upon the United States.

### `Sec. 949m. Number of votes required

`(a) Conviction- No person may be convicted by a military commission under this chapter of any offense, except as provided in section 949i(b) of this title or by concurrence of two-thirds of the members present at the time the vote is taken.

`(b) Sentences- (1) No person may be sentenced by a military commission to suffer death, except insofar as--

`(A) the penalty of death is expressly authorized under this chapter or the law of war for an offense of which the accused has been found guilty;

`(B) trial counsel expressly sought the penalty of death by filing an appropriate notice in advance of trial;

`(C) the accused is convicted of the offense by the concurrence of all the members present at the time the vote is taken; and

`(D) all the members present at the time the vote is taken concur in the sentence of death.

`(2) No person may be sentenced to life imprisonment, or to confinement for more than 10 years, by a military commission under this chapter except by the concurrence of three-fourths of the members present at the time the vote is taken.

`(3) All other sentences shall be determined by a military commission by the concurrence of two-thirds of the members present at the time the vote is taken.

`(c) Number of Members Required for Penalty of Death- (1) Except as provided in paragraph (2), in a case in which the penalty of death is sought, the number of members of the military commission under this chapter shall be not less than 12.

`(2) In any case described in paragraph (1) in which 12 members are not reasonably available because of physical conditions or military exigencies, the convening authority shall specify a lesser number of members for the military commission (but not fewer than 9 members), and the military commission may be assembled, and the trial held, with not fewer than the number of members so specified. In such a case, the convening authority shall make a detailed written statement, to be appended to the record, stating why a greater number of members were not reasonably available.

### `Sec. 949n. Military commission to announce action

`A military commission under this chapter shall announce its findings and sentence to the parties as soon as determined.

### `Sec. 949o. Record of trial

`(a) Record; Authentication- Each military commission under this chapter shall keep a separate, verbatim, record of the proceedings in each case brought before it, and

the record shall be authenticated by the signature of the military judge. If the record cannot be authenticated by the military judge by reason of his death, disability, or absence, it shall be authenticated by the signature of the trial counsel or by a member of the commission if the trial counsel is unable to authenticate it by reason of his death, disability, or absence. Where appropriate, and as provided in regulations prescribed by the Secretary of Defense, the record of a military commission under this chapter may contain a classified annex.

`(b) Complete Record Required- A complete record of the proceedings and testimony shall be prepared in every military commission under this chapter.

`(c) Provision of Copy to Accused- A copy of the record of the proceedings of the military commission under this chapter shall be given the accused as soon as it is authenticated. If the record contains classified information, or a classified annex, the accused shall be given a redacted version of the record consistent with the requirements of section 949d of this title. Defense counsel shall have access to the unredacted record, as provided in regulations prescribed by the Secretary of Defense.

# `SUBCHAPTER V--SENTENCES

`Sec.

`949s. Cruel or unusual punishments prohibited.

`949t. Maximum limits.

`949u. Execution of confinement.

## `Sec. 949s. Cruel or unusual punishments prohibited

`Punishment by flogging, or by branding, marking, or tattooing on the body, or any other cruel or unusual punishment, may not be adjudged by a military commission under this chapter or inflicted under this chapter upon any person subject to this chapter. The use of irons, single or double, except for the purpose of safe custody, is prohibited under this chapter.

## `Sec. 949t. Maximum limits

`The punishment which a military commission under this chapter may direct for an offense may not exceed such limits as the President or Secretary of Defense may prescribe for that offense.

## `Sec. 949u. Execution of confinement

`(a) In General- Under such regulations as the Secretary of Defense may prescribe, a sentence of confinement adjudged by a military commission under this chapter may be carried into execution by confinement--

`(1) in any place of confinement under the control of any of the armed forces; or

`(2) in any penal or correctional institution under the control of the United States or its allies, or which the United States may be allowed to use.

`(b) Treatment During Confinement by Other Than the Armed Forces- Persons confined under subsection (a)(2) in a penal or correctional institution not under the control of an armed force are subject to the same discipline and treatment as persons confined or committed by the courts of the United States or of the State, District of Columbia, or place in which the institution is situated.

# `SUBCHAPTER VI--POST-TRIAL PROCEDURE AND REVIEW OF MILITARY COMMISSIONS

`Sec.

`950a. Error of law; lesser included offense.

`950b. Review by the convening authority.

`950c. Appellate referral; waiver or withdrawal of appeal.

`950d. Appeal by the United States.

`950e. Rehearings.

`950f. Review by Court of Military Commission Review.

`950g. Review by the United States Court of Appeals for the District of Columbia Circuit and the Supreme Court.

`950h. Appellate counsel.

`950i. Execution of sentence; procedures for execution of sentence of death.

`950j. Finality or proceedings, findings, and sentences.

## `Sec. 950a. Error of law; lesser included offense

`(a) Error of Law- A finding or sentence of a military commission under this chapter may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused.

`(b) Lesser Included Offense- Any reviewing authority with the power to approve or affirm a finding of guilty by a military commission under this chapter may approve or affirm, instead, so much of the finding as includes a lesser included offense.

## `Sec. 950b. Review by the convening authority

`(a) Notice to Convening Authority of Findings and Sentence- The findings and sentence of a military commission under this chapter shall be reported in writing promptly to the convening authority after the announcement of the sentence.

`(b) Submittal of Matters by Accused to Convening Authority- (1) The accused may submit to the convening authority matters for consideration by the convening authority with respect to the findings and the sentence of the military commission under this chapter.

`(2)(A) Except as provided in subparagraph (B), a submittal under paragraph (1) shall be made in writing within 20 days after the accused has been given an authenticated record of trial under section 949o(c) of this title.

`(B) If the accused shows that additional time is required for the accused to make a submittal under paragraph (1), the convening authority may, for good cause, extend the applicable period under subparagraph (A) for not more than an additional 20 days.

`(3) The accused may waive his right to make a submittal to the convening authority under paragraph (1). Such a waiver shall be made in writing and may not be revoked. For the purposes of subsection (c)(2), the time within which the accused may make a submittal under this subsection shall be deemed to have expired upon the submittal of a waiver under this paragraph to the convening authority.

`(c) Action by Convening Authority- (1) The authority under this subsection to modify the findings and sentence of a military commission under this chapter is a matter of the sole discretion and prerogative of the convening authority.

`(2)(A) The convening authority shall take action on the sentence of a military commission under this chapter.

`(B) Subject to regulations prescribed by the Secretary of Defense, action on the sentence under this paragraph may be taken only after consideration of any matters submitted by the accused under subsection (b) or after the time for submitting such matters expires, whichever is earlier.

`(C) In taking action under this paragraph, the convening authority may, in his sole discretion, approve, disapprove, commute, or suspend the sentence in whole or in part. The convening authority may not increase a sentence beyond that which is found by the military commission.

`(3) The convening authority is not required to take action on the findings of a military commission under this chapter. If the convening authority takes action on the findings, the convening authority may, in his sole discretion, may--

   `(A) dismiss any charge or specification by setting aside a finding of guilty thereto; or

   `(B) change a finding of guilty to a charge to a finding of guilty to an offense that is a lesser included offense of the offense stated in the charge.

`(4) The convening authority shall serve on the accused or on defense counsel notice of any action taken by the convening authority under this subsection.

`(d) Order of Revision or Rehearing- (1) Subject to paragraphs (2) and (3), the convening authority of a military commission under this chapter may, in his sole

discretion, order a proceeding in revision or a rehearing.

`(2)(A) Except as provided in subparagraph (B), a proceeding in revision may be ordered by the convening authority if--

    `(i) there is an apparent error or omission in the record; or

    `(ii) the record shows improper or inconsistent action by the military commission with respect to the findings or sentence that can be rectified without material prejudice to the substantial rights of the accused.

`(B) In no case may a proceeding in revision--

    `(i) reconsider a finding of not guilty of a specification or a ruling which amounts to a finding of not guilty;

    `(ii) reconsider a finding of not guilty of any charge, unless there has been a finding of guilty under a specification laid under that charge, which sufficiently alleges a violation; or

    `(iii) increase the severity of the sentence unless the sentence prescribed for the offense is mandatory.

`(3) A rehearing may be ordered by the convening authority if the convening authority disapproves the findings and sentence and states the reasons for disapproval of the findings. If the convening authority disapproves the finding and sentence and does not order a rehearing, the convening authority shall dismiss the charges. A rehearing as to the findings may not be ordered by the convening authority when there is a lack of sufficient evidence in the record to support the findings. A rehearing as to the sentence may be ordered by the convening authority if the convening authority disapproves the sentence.

## `Sec. 950c. Appellate referral; waiver or withdrawal of appeal

`(a) Automatic Referral for Appellate Review- Except as provided under subsection (b), in each case in which the final decision of a military commission (as approved by the convening authority) includes a finding of guilty, the convening authority shall refer the case to the Court of Military Commission Review. Any such referral shall be made in accordance with procedures prescribed under regulations of the Secretary.

`(b) Waiver of Right of Review- (1) In each case subject to appellate review under section 950f of this title, except a case in which the sentence as approved under section 950b of this title extends to death, the accused may file with the convening authority a statement expressly waiving the right of the accused to such review.

`(2) A waiver under paragraph (1) shall be signed by both the accused and a defense counsel.

`(3) A waiver under paragraph (1) must be filed, if at all, within 10 days after notice on the action is served on the accused or on defense counsel under section 950b(c)(4) of this title. The convening authority, for good cause, may extend the period for such filing by not more than 30 days.

`(c) Withdrawal of Appeal- Except in a case in which the sentence as approved under section 950b of this title extends to death, the accused may withdraw an appeal at any time.

`(d) Effect of Waiver or Withdrawal- A waiver of the right to appellate review or the withdrawal of an appeal under this section bars review under section 950f of this title.

## `Sec. 950d. Appeal by the United States

`(a) Interlocutory Appeal- (1) Except as provided in paragraph (2), in a trial by military commission under this chapter, the United States may take an interlocutory appeal to the Court of Military Commission Review of any order or ruling of the military judge that--

`(A) terminates proceedings of the military commission with respect to a charge or specification;

`(B) excludes evidence that is substantial proof of a fact material in the proceeding; or

`(C) relates to a matter under subsection (d), (e), or (f) of section 949d of this title or section 949j(c) of this title.

`(2) The United States may not appeal under paragraph (1) an order or ruling that is, or amounts to, a finding of not guilty by the military commission with respect to a charge or specification.

`(b) Notice of Appeal- The United States shall take an appeal of an order or ruling under subsection (a) by filing a notice of appeal with the military judge within five days after the date of such order or ruling.

`(c) Appeal- An appeal under this section shall be forwarded, by means specified in regulations prescribed the Secretary of Defense, directly to the Court of Military Commission Review. In ruling on an appeal under this section, the Court may act only with respect to matters of law.

`(d) Appeal From Adverse Ruling- The United States may appeal an adverse ruling on an appeal under subsection (c) to the United States Court of Appeals for the District of Columbia Circuit by filing a petition for review in the Court of Appeals within 10 days after the date of such ruling. Review under this subsection shall be at the discretion of the Court of Appeals.

## `Sec. 950e. Rehearings

`(a) Composition of Military Commission for Rehearing- Each rehearing under this chapter shall take place before a military commission under this chapter composed of members who were not members of the military commission which first heard the case.

`(b) Scope of Rehearing- (1) Upon a rehearing--

`(A) the accused may not be tried for any offense of which he was found not guilty by the first military commission; and

`(B) no sentence in excess of or more than the original sentence may be imposed unless--

`(i) the sentence is based upon a finding of guilty of an offense not considered upon the merits in the original proceedings; or

`(ii) the sentence prescribed for the offense is mandatory.

`(2) Upon a rehearing, if the sentence approved after the first military commission was in accordance with a pretrial agreement and the accused at the rehearing changes his plea with respect to the charges or specifications upon which the pretrial agreement was based, or otherwise does not comply with pretrial agreement, the sentence as to those charges or specifications may include any punishment not in excess of that lawfully adjudged at the first military commission.

## `Sec. 950f. Review by Court of Military Commission Review

`(a) Establishment- The Secretary of Defense shall establish a Court of Military Commission Review which shall be composed of one or more panels, and each such panel shall be composed of not less than three appellate military judges. For the purpose of reviewing military commission decisions under this chapter, the court may sit in panels or as a whole in accordance with rules prescribed by the Secretary.

`(b) Appellate Military Judges- The Secretary shall assign appellate military judges to a Court of Military Commission Review. Each appellate military judge shall meet the qualifications for military judges prescribed by section 948j(b) of this title or shall be a civilian with comparable qualifications. No person may be serve as an appellate military judge in any case in which that person acted as a military judge, counsel, or reviewing official.

`(c) Cases To Be Reviewed- The Court of Military Commission Review, in accordance with procedures prescribed under regulations of the Secretary, shall review the record in each case that is referred to the Court by the convening authority under section 950c of this title with respect to any matter of law raised by the accused.

`(d) Scope of Review- In a case reviewed by the Court of Military Commission Review under this section, the Court may act only with respect to matters of law.

## `Sec. 950g. Review by the United States Court of Appeals for the District of Columbia Circuit and the Supreme Court

`(a) Exclusive Appellate Jurisdiction- (1)(A) Except as provided in subparagraph (B), the United States Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction to determine the validity of a final judgment rendered by a military commission (as approved by the convening authority) under this chapter.

`(B) The Court of Appeals may not review the final judgment until all other appeals

under this chapter have been waived or exhausted.

`(2) A petition for review must be filed by the accused in the Court of Appeals not later than 20 days after the date on which--

    `(A) written notice of the final decision of the Court of Military Commission Review is served on the accused or on defense counsel; or

    `(B) the accused submits, in the form prescribed by section 950c of this title, a written notice waiving the right of the accused to review by the Court of Military Commission Review under section 950f of this title.

`(b) Standard for Review- In a case reviewed by it under this section, the Court of Appeals may act only with respect to matters of law.

`(c) Scope of Review- The jurisdiction of the Court of Appeals on an appeal under subsection (a) shall be limited to the consideration of--

    `(1) whether the final decision was consistent with the standards and procedures specified in this chapter; and

    `(2) to the extent applicable, the Constitution and the laws of the United States.

`(d) Supreme Court- The Supreme Court may review by writ of certiorari the final judgment of the Court of Appeals pursuant to section 1257 of title 28.

`Sec. 950h. Appellate counsel

`(a) Appointment- The Secretary of Defense shall, by regulation, establish procedures for the appointment of appellate counsel for the United States and for the accused in military commissions under this chapter. Appellate counsel shall meet the qualifications for counsel appearing before military commissions under this chapter.

`(b) Representation of United States- Appellate counsel appointed under subsection (a)--

    `(1) shall represent the United States in any appeal or review proceeding under this chapter before the Court of Military Commission Review; and

    `(2) may, when requested to do so by the Attorney General in a case arising under this chapter, represent the United States before the United States Court of Appeals for the District of Columbia Circuit or the Supreme Court.

`(c) Representation of Accused- The accused shall be represented by appellate counsel appointed under subsection (a) before the Court of Military Commission Review, the United States Court of Appeals for the District of Columbia Circuit, and the Supreme Court, and by civilian counsel if retained by the accused. Any such civilian counsel shall meet the qualifications under paragraph (3) of section 949c(b) of this title for civilian counsel appearing before military commissions under this chapter and shall be subject to the requirements of paragraph (4) of that section.

`Sec. 950i. Execution of sentence; procedures for execution of sentence of death

`(a) In General- The Secretary of Defense is authorized to carry out a sentence imposed by a military commission under this chapter in accordance with such procedures as the Secretary may prescribe.

`(b) Execution of Sentence of Death Only Upon Approval by the President- If the sentence of a military commission under this chapter extends to death, that part of the sentence providing for death may not be executed until approved by the President. In such a case, the President may commute, remit, or suspend the sentence, or any part thereof, as he sees fit.

`(c) Execution of Sentence of Death Only Upon Final Judgment of Legality of Proceedings- (1) If the sentence of a military commission under this chapter extends to death, the sentence may not be executed until there is a final judgment as to the legality of the proceedings (and with respect to death, approval under subsection (b)).

`(2) A judgment as to legality of proceedings is final for purposes of paragraph (1) when--

`(A) the time for the accused to file a petition for review by the Court of Appeals for the District of Columbia Circuit has expired and the accused has not filed a timely petition for such review and the case is not otherwise under review by that Court; or

`(B) review is completed in accordance with the judgment of the United States Court of Appeals for the District of Columbia Circuit and--

`(i) a petition for a writ of certiorari is not timely filed;

`(ii) such a petition is denied by the Supreme Court; or

`(iii) review is otherwise completed in accordance with the judgment of the Supreme Court.

`(d) Suspension of Sentence- The Secretary of the Defense, or the convening authority acting on the case (if other than the Secretary), may suspend the execution of any sentence or part thereof in the case, except a sentence of death.

## `Sec. 950j. Finality or proceedings, findings, and sentences

`(a) Finality- The appellate review of records of trial provided by this chapter, and the proceedings, findings, and sentences of military commissions as approved, reviewed, or affirmed as required by this chapter, are final and conclusive. Orders publishing the proceedings of military commissions under this chapter are binding upon all departments, courts, agencies, and officers of the United States, except as otherwise provided by the President.

`(b) Provisions of Chapter Sole Basis for Review of Military Commission Procedures and Actions- Except as otherwise provided in this chapter and notwithstanding any other provision of law (including section 2241 of title 28 or any other habeas corpus provision), no court, justice, or judge shall have jurisdiction to hear or consider any

claim or cause of action whatsoever, including any action pending on or filed after the date of the enactment of the Military Commissions Act of 2006, relating to the prosecution, trial, or judgment of a military commission under this chapter, including challenges to the lawfulness of procedures of military commissions under this chapter.

## `SUBCHAPTER VII--PUNITIVE MATTERS

`Sec.

`950p. Statement of substantive offenses.

`950q. Principals.

`950r. Accessory after the fact.

`950s. Conviction of lesser included offense.

`950t. Attempts.

`950u. Solicitation.

`950v. Crimes triable by military commissions.

`950w. Perjury and obstruction of justice; contempt.

### `Sec. 950p. Statement of substantive offenses

`(a) Purpose- The provisions of this subchapter codify offenses that have traditionally been triable by military commissions. This chapter does not establish new crimes that did not exist before its enactment, but rather codifies those crimes for trial by military commission.

`(b) Effect- Because the provisions of this subchapter (including provisions that incorporate definitions in other provisions of law) are declarative of existing law, they do not preclude trial for crimes that occurred before the date of the enactment of this chapter.

### `Sec. 950q. Principals

`Any person is punishable as a principal under this chapter who--

`(1) commits an offense punishable by this chapter, or aids, abets, counsels, commands, or procures its commission;

`(2) causes an act to be done which if directly performed by him would be punishable by this chapter; or

`(3) is a superior commander who, with regard to acts punishable under this chapter, knew, had reason to know, or should have known, that a subordinate was about to commit such acts or had done so and who failed to take the necessary and reasonable measures to prevent such acts or to punish the

perpetrators thereof.

## `Sec. 950r. Accessory after the fact

`Any person subject to this chapter who, knowing that an offense punishable by this chapter has been committed, receives, comforts, or assists the offender in order to hinder or prevent his apprehension, trial, or punishment shall be punished as a military commission under this chapter may direct.

## `Sec. 950s. Conviction of lesser included offense

`An accused may be found guilty of an offense necessarily included in the offense charged or of an attempt to commit either the offense charged or an attempt to commit either the offense charged or an offense necessarily included therein.

## `Sec. 950t. Attempts

`(a) In General- Any person subject to this chapter who attempts to commit any offense punishable by this chapter shall be punished as a military commission under this chapter may direct.

`(b) Scope of Offense- An act, done with specific intent to commit an offense under this chapter, amounting to more than mere preparation and tending, even though failing, to effect its commission, is an attempt to commit that offense.

`(c) Effect of Consummation- Any person subject to this chapter may be convicted of an attempt to commit an offense although it appears on the trial that the offense was consummated.

## `Sec. 950u. Solicitation

`Any person subject to this chapter who solicits or advises another or others to commit one or more substantive offenses triable by military commission under this chapter shall, if the offense solicited or advised is attempted or committed, be punished with the punishment provided for the commission of the offense, but, if the offense solicited or advised is not committed or attempted, he shall be punished as a military commission under this chapter may direct.

## `Sec. 950v. Crimes triable by military commissions

`(a) Definitions and Construction- In this section:

`(1) MILITARY OBJECTIVE- The term `military objective' means--

`(A) combatants; and

`(B) those objects during an armed conflict--

`(i) which, by their nature, location, purpose, or use, effectively contribute to the opposing force's war-fighting or war-sustaining

capability; and

`(ii) the total or partial destruction, capture, or neutralization of which would constitute a definite military advantage to the attacker under the circumstances at the time of the attack.

`(2) PROTECTED PERSON- The term `protected person' means any person entitled to protection under one or more of the Geneva Conventions, including--

`(A) civilians not taking an active part in hostilities;

`(B) military personnel placed hors de combat by sickness, wounds, or detention; and

`(C) military medical or religious personnel.

`(3) PROTECTED PROPERTY- The term `protected property' means property specifically protected by the law of war (such as buildings dedicated to religion, education, art, science or charitable purposes, historic monuments, hospitals, or places where the sick and wounded are collected), if such property is not being used for military purposes or is not otherwise a military objective. Such term includes objects properly identified by one of the distinctive emblems of the Geneva Conventions, but does not include civilian property that is a military objective.

`(4) CONSTRUCTION- The intent specified for an offense under paragraph (1), (2), (3), (4), or (12) of subsection (b) precludes the applicability of such offense with regard to--

`(A) collateral damage; or

`(B) death, damage, or injury incident to a lawful attack.

`(b) Offenses- The following offenses shall be triable by military commission under this chapter at any time without limitation:

`(1) MURDER OF PROTECTED PERSONS- Any person subject to this chapter who intentionally kills one or more protected persons shall be punished by death or such other punishment as a military commission under this chapter may direct.

`(2) ATTACKING CIVILIANS- Any person subject to this chapter who intentionally engages in an attack upon a civilian population as such, or individual civilians not taking active part in hostilities, shall be punished, if death results to one or more of the victims, by death or such other punishment as a military commission under this chapter may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a military commission under this chapter may direct.

`(3) ATTACKING CIVILIAN OBJECTS- Any person subject to this chapter who intentionally engages in an attack upon a civilian object that is not a military objective shall be punished as a military commission under this chapter may direct.

`(4) ATTACKING PROTECTED PROPERTY- Any person subject to this chapter who intentionally engages in an attack upon protected property shall be punished as a military commission under this chapter may direct.

`(5) PILLAGING- Any person subject to this chapter who intentionally and in the absence of military necessity appropriates or seizes property for private or personal use, without the consent of a person with authority to permit such appropriation or seizure, shall be punished as a military commission under this chapter may direct.

`(6) DENYING QUARTER- Any person subject to this chapter who, with effective command or control over subordinate groups, declares, orders, or otherwise indicates to those groups that there shall be no survivors or surrender accepted, with the intent to threaten an adversary or to conduct hostilities such that there would be no survivors or surrender accepted, shall be punished as a military commission under this chapter may direct.

`(7) TAKING HOSTAGES- Any person subject to this chapter who, having knowingly seized or detained one or more persons, threatens to kill, injure, or continue to detain such person or persons with the intent of compelling any nation, person other than the hostage, or group of persons to act or refrain from acting as an explicit or implicit condition for the safety or release of such person or persons, shall be punished, if death results to one or more of the victims, by death or such other punishment as a military commission under this chapter may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a military commission under this chapter may direct.

`(8) EMPLOYING POISON OR SIMILAR WEAPONS- Any person subject to this chapter who intentionally, as a method of warfare, employs a substance or weapon that releases a substance that causes death or serious and lasting damage to health in the ordinary course of events, through its asphyxiating, bacteriological, or toxic properties, shall be punished, if death results to one or more of the victims, by death or such other punishment as a military commission under this chapter may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a military commission under this chapter may direct.

`(9) USING PROTECTED PERSONS AS A SHIELD- Any person subject to this chapter who positions, or otherwise takes advantage of, a protected person with the intent to shield a military objective from attack, or to shield, favor, or impede military operations, shall be punished, if death results to one or more of the victims, by death or such other punishment as a military commission under this chapter may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a military commission under this chapter may direct.

`(10) USING PROTECTED PROPERTY AS A SHIELD- Any person subject to this chapter who positions, or otherwise takes advantage of the location of, protected property with the intent to shield a military objective from attack, or to shield, favor, or impede military operations, shall be punished as a military commission

under this chapter may direct.

`(11) TORTURE-

`(A) OFFENSE- Any person subject to this chapter who commits an act specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control for the purpose of obtaining information or a confession, punishment, intimidation, coercion, or any reason based on discrimination of any kind, shall be punished, if death results to one or more of the victims, by death or such other punishment as a military commission under this chapter may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a military commission under this chapter may direct.

`(B) SEVERE MENTAL PAIN OR SUFFERING DEFINED- In this section, the term `severe mental pain or suffering' has the meaning given that term in section 2340(2) of title 18.

`(12) CRUEL OR INHUMAN TREATMENT-

`(A) OFFENSE- Any person subject to this chapter who commits an act intended to inflict severe or serious physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions), including serious physical abuse, upon another within his custody or control shall be punished, if death results to the victim, by death or such other punishment as a military commission under this chapter may direct, and, if death does not result to the victim, by such punishment, other than death, as a military commission under this chapter may direct.

`(B) DEFINITIONS- In this paragraph:

`(i) The term `serious physical pain or suffering' means bodily injury that involves--

`(I) a substantial risk of death;

`(II) extreme physical pain;

`(III) a burn or physical disfigurement of a serious nature (other than cuts, abrasions, or bruises); or

`(IV) significant loss or impairment of the function of a bodily member, organ, or mental faculty.

`(ii) The term `severe mental pain or suffering' has the meaning given that term in section 2340(2) of title 18.

`(iii) The term `serious mental pain or suffering' has the meaning given the term `severe mental pain or suffering' in section 2340(2) of title 18, except that--

`(I) the term `serious' shall replace the term `severe' where it

appears; and

`(II) as to conduct occurring after the date of the enactment of the Military Commissions Act of 2006, the term `serious and non-transitory mental harm (which need not be prolonged)' shall replace the term `prolonged mental harm' where it appears.

`(13) INTENTIONALLY CAUSING SERIOUS BODILY INJURY-

`(A) OFFENSE- Any person subject to this chapter who intentionally causes serious bodily injury to one or more persons, including lawful combatants, in violation of the law of war shall be punished, if death results to one or more of the victims, by death or such other punishment as a military commission under this chapter may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a military commission under this chapter may direct.

`(B) SERIOUS BODILY INJURY DEFINED- In this paragraph, the term `serious bodily injury' means bodily injury which involves--

`(i) a substantial risk of death;

`(ii) extreme physical pain;

`(iii) protracted and obvious disfigurement; or

`(iv) protracted loss or impairment of the function of a bodily member, organ, or mental faculty.

`(14) MUTILATING OR MAIMING- Any person subject to this chapter who intentionally injures one or more protected persons by disfiguring the person or persons by any mutilation of the person or persons, or by permanently disabling any member, limb, or organ of the body of the person or persons, without any legitimate medical or dental purpose, shall be punished, if death results to one or more of the victims, by death or such other punishment as a military commission under this chapter may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a military commission under this chapter may direct.

`(15) MURDER IN VIOLATION OF THE LAW OF WAR- Any person subject to this chapter who intentionally kills one or more persons, including lawful combatants, in violation of the law of war shall be punished by death or such other punishment as a military commission under this chapter may direct.

`(16) DESTRUCTION OF PROPERTY IN VIOLATION OF THE LAW OF WAR- Any person subject to this chapter who intentionally destroys property belonging to another person in violation of the law of war shall punished as a military commission under this chapter may direct.

`(17) USING TREACHERY OR PERFIDY- Any person subject to this chapter who, after inviting the confidence or belief of one or more persons that they were entitled to, or obliged to accord, protection under the law of war, intentionally

makes use of that confidence or belief in killing, injuring, or capturing such person or persons shall be punished, if death results to one or more of the victims, by death or such other punishment as a military commission under this chapter may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a military commission under this chapter may direct.

`(18) IMPROPERLY USING A FLAG OF TRUCE- Any person subject to this chapter who uses a flag of truce to feign an intention to negotiate, surrender, or otherwise suspend hostilities when there is no such intention shall be punished as a military commission under this chapter may direct.

`(19) IMPROPERLY USING A DISTINCTIVE EMBLEM- Any person subject to this chapter who intentionally uses a distinctive emblem recognized by the law of war for combatant purposes in a manner prohibited by the law of war shall be punished as a military commission under this chapter may direct.

`(20) INTENTIONALLY MISTREATING A DEAD BODY- Any person subject to this chapter who intentionally mistreats the body of a dead person, without justification by legitimate military necessity, shall be punished as a military commission under this chapter may direct.

`(21) RAPE- Any person subject to this chapter who forcibly or with coercion or threat of force wrongfully invades the body of a person by penetrating, however slightly, the anal or genital opening of the victim with any part of the body of the accused, or with any foreign object, shall be punished as a military commission under this chapter may direct.

`(22) SEXUAL ASSAULT OR ABUSE- Any person subject to this chapter who forcibly or with coercion or threat of force engages in sexual contact with one or more persons, or causes one or more persons to engage in sexual contact, shall be punished as a military commission under this chapter may direct.

`(23) HIJACKING OR HAZARDING A VESSEL OR AIRCRAFT- Any person subject to this chapter who intentionally seizes, exercises unauthorized control over, or endangers the safe navigation of a vessel or aircraft that is not a legitimate military objective shall be punished, if death results to one or more of the victims, by death or such other punishment as a military commission under this chapter may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a military commission under this chapter may direct.

`(24) TERRORISM- Any person subject to this chapter who intentionally kills or inflicts great bodily harm on one or more protected persons, or intentionally engages in an act that evinces a wanton disregard for human life, in a manner calculated to influence or affect the conduct of government or civilian population by intimidation or coercion, or to retaliate against government conduct, shall be punished, if death results to one or more of the victims, by death or such other punishment as a military commission under this chapter may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a military commission under this chapter may direct.

`(25) PROVIDING MATERIAL SUPPORT FOR TERRORISM-

`(A) OFFENSE- Any person subject to this chapter who provides material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, an act of terrorism (as set forth in paragraph (24)), or who intentionally provides material support or resources to an international terrorist organization engaged in hostilities against the United States, knowing that such organization has engaged or engages in terrorism (as so set forth), shall be punished as a military commission under this chapter may direct.

`(B) MATERIAL SUPPORT OR RESOURCES DEFINED- In this paragraph, the term `material support or resources' has the meaning given that term in section 2339A(b) of title 18.

`(26) WRONGFULLY AIDING THE ENEMY- Any person subject to this chapter who, in breach of an allegiance or duty to the United States, knowingly and intentionally aids an enemy of the United States, or one of the co-belligerents of the enemy, shall be punished as a military commission under this chapter may direct.

`(27) SPYING- Any person subject to this chapter who with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign power, collects or attempts to collect information by clandestine means or while acting under false pretenses, for the purpose of conveying such information to an enemy of the United States, or one of the co-belligerents of the enemy, shall be punished by death or such other punishment as a military commission under this chapter may direct.

`(28) CONSPIRACY- Any person subject to this chapter who conspires to commit one or more substantive offenses triable by military commission under this chapter, and who knowingly does any overt act to effect the object of the conspiracy, shall be punished, if death results to one or more of the victims, by death or such other punishment as a military commission under this chapter may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a military commission under this chapter may direct.

`Sec. 950w. Perjury and obstruction of justice; contempt

`(a) Perjury and Obstruction of Justice- A military commission under this chapter may try offenses and impose such punishment as the military commission may direct for perjury, false testimony, or obstruction of justice related to military commissions under this chapter.

`(b) Contempt- A military commission under this chapter may punish for contempt any person who uses any menacing word, sign, or gesture in its presence, or who disturbs its proceedings by any riot or disorder.'.

(2) TABLES OF CHAPTERS AMENDMENTS- The tables of chapters at the beginning of subtitle A, and at the beginning of part II of subtitle A, of title 10,

United States Code, are each amended by inserting after the item relating to chapter 47 the following new item:

--948a'.

(b) Submittal of Procedures to Congress- Not later than 90 days after the date of the enactment of this Act, the Secretary of Defense shall submit to the Committees on Armed Services of the Senate and the House of Representatives a report setting forth the procedures for military commissions prescribed under chapter 47A of title 10, United States Code (as added by subsection (a)).

## SEC. 4. AMENDMENTS TO UNIFORM CODE OF MILITARY JUSTICE.

(a) Conforming Amendments- Chapter 47 of title 10, United States Code (the Uniform Code of Military Justice), is amended as follows:

(1) APPLICABILITY TO LAWFUL ENEMY COMBATANTS- Section 802(a) (article 2(a)) is amended by adding at the end the following new paragraph:

`(13) Lawful enemy combatants (as that term is defined in section 948a(2) of this title) who violate the law of war.'.

(2) EXCLUSION OF APPLICABILITY TO CHAPTER 47A COMMISSIONS- Sections 821, 828, 848, 850(a), 904, and 906 (articles 21, 28, 48, 50(a), 104, and 106) are amended by adding at the end the following new sentence: `This section does not apply to a military commission established under chapter 47A of this title.'.

(3) INAPPLICABILITY OF REQUIREMENTS RELATING TO REGULATIONS- Section 836 (article 36) is amended--

(A) in subsection (a), by inserting `, except as provided in chapter 47A of this title,' after `but which may not'; and

(B) in subsection (b), by inserting before the period at the end `, except insofar as applicable to military commissions established under chapter 47A of this title'.

(b) Punitive Article of Conspiracy- Section 881 of title 10, United States Code (article 81 of the Uniform Code of Military Justice), is amended--

(1) by inserting `(a)' before `Any person'; and

(2) by adding at the end the following new subsection:

`(b) Any person subject to this chapter who conspires with any other person to commit an offense under the law of war, and who knowingly does an overt act to effect the object of the conspiracy, shall be punished, if death results to one or more of the victims, by death or such other punishment as a court-martial or military commission may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a court-martial or military commission may direct.'.

# SEC. 5. TREATY OBLIGATIONS NOT ESTABLISHING GROUNDS FOR CERTAIN CLAIMS.

(a) In General- No person may invoke the Geneva Conventions or any protocols thereto in any habeas corpus or other civil action or proceeding to which the United States, or a current or former officer, employee, member of the Armed Forces, or other agent of the United States is a party as a source of rights in any court of the United States or its States or territories.

(b) Geneva Conventions Defined- In this section, the term `Geneva Conventions' means--

(1) the Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, done at Geneva August 12, 1949 (6 UST 3114);

(2) the Convention for the Amelioration of the Condition of the Wounded, Sick, and Shipwrecked Members of the Armed Forces at Sea, done at Geneva August 12, 1949 (6 UST 3217);

(3) the Convention Relative to the Treatment of Prisoners of War, done at Geneva August 12, 1949 (6 UST 3316); and

(4) the Convention Relative to the Protection of Civilian Persons in Time of War, done at Geneva August 12, 1949 (6 UST 3516).

# SEC. 6. IMPLEMENTATION OF TREATY OBLIGATIONS.

(a) Implementation of Treaty Obligations-

(1) IN GENERAL- The acts enumerated in subsection (d) of section 2441 of title 18, United States Code, as added by subsection (b) of this section, and in subsection (c) of this section, constitute violations of common Article 3 of the Geneva Conventions prohibited by United States law.

(2) PROHIBITION ON GRAVE BREACHES- The provisions of section 2441 of title 18, United States Code, as amended by this section, fully satisfy the obligation under Article 129 of the Third Geneva Convention for the United States to provide effective penal sanctions for grave breaches which are encompassed in common Article 3 in the context of an armed conflict not of an international character. No foreign or international source of law shall supply a basis for a rule of decision in the courts of the United States in interpreting the prohibitions enumerated in subsection (d) of such section 2441.

(3) INTERPRETATION BY THE PRESIDENT-

(A) As provided by the Constitution and by this section, the President has the authority for the United States to interpret the meaning and application of the Geneva Conventions and to promulgate higher standards and administrative regulations for violations of treaty obligations which are not

grave breaches of the Geneva Conventions.

(B) The President shall issue interpretations described by subparagraph (A) by Executive Order published in the Federal Register.

(C) Any Executive Order published under this paragraph shall be authoritative (except as to grave breaches of common Article 3) as a matter of United States law, in the same manner as other administrative regulations.

(D) Nothing in this section shall be construed to affect the constitutional functions and responsibilities of Congress and the judicial branch of the United States.

(4) DEFINITIONS- In this subsection:

(A) GENEVA CONVENTIONS- The term `Geneva Conventions' means--

(i) the Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, done at Geneva August 12, 1949 (6 UST 3217);

(ii) the Convention for the Amelioration of the Condition of the Wounded, Sick, and Shipwrecked Members of the Armed Forces at Sea, done at Geneva August 12, 1949 (6 UST 3217);

(iii) the Convention Relative to the Treatment of Prisoners of War, done at Geneva August 12, 1949 (6 UST 3316); and

(iv) the Convention Relative to the Protection of Civilian Persons in Time of War, done at Geneva August 12, 1949 (6 UST 3516).

(B) THIRD GENEVA CONVENTION- The term `Third Geneva Convention' means the international convention referred to in subparagraph (A)(iii).

(b) Revision to War Crimes Offense Under Federal Criminal Code-

(1) IN GENERAL- Section 2441 of title 18, United States Code, is amended--

(A) in subsection (c), by striking paragraph (3) and inserting the following new paragraph (3):

`(3) which constitutes a grave breach of common Article 3 (as defined in subsection (d)) when committed in the context of and in association with an armed conflict not of an international character; or'; and

(B) by adding at the end the following new subsection:

`(d) Common Article 3 Violations-

`(1) PROHIBITED CONDUCT- In subsection (c)(3), the term `grave breach of common Article 3' means any conduct (such conduct constituting a grave breach of common Article 3 of the international conventions done at Geneva August 12,

1949), as follows:

`(A) TORTURE- The act of a person who commits, or conspires or attempts to commit, an act specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control for the purpose of obtaining information or a confession, punishment, intimidation, coercion, or any reason based on discrimination of any kind.

`(B) CRUEL OR INHUMAN TREATMENT- The act of a person who commits, or conspires or attempts to commit, an act intended to inflict severe or serious physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions), including serious physical abuse, upon another within his custody or control.

`(C) PERFORMING BIOLOGICAL EXPERIMENTS- The act of a person who subjects, or conspires or attempts to subject, one or more persons within his custody or physical control to biological experiments without a legitimate medical or dental purpose and in so doing endangers the body or health of such person or persons.

`(D) MURDER- The act of a person who intentionally kills, or conspires or attempts to kill, or kills whether intentionally or unintentionally in the course of committing any other offense under this subsection, one or more persons taking no active part in the hostilities, including those placed out of combat by sickness, wounds, detention, or any other cause.

`(E) MUTILATION OR MAIMING- The act of a person who intentionally injures, or conspires or attempts to injure, or injures whether intentionally or unintentionally in the course of committing any other offense under this subsection, one or more persons taking no active part in the hostilities, including those placed out of combat by sickness, wounds, detention, or any other cause, by disfiguring the person or persons by any mutilation thereof or by permanently disabling any member, limb, or organ of his body, without any legitimate medical or dental purpose.

`(F) INTENTIONALLY CAUSING SERIOUS BODILY INJURY- The act of a person who intentionally causes, or conspires or attempts to cause, serious bodily injury to one or more persons, including lawful combatants, in violation of the law of war.

`(G) RAPE- The act of a person who forcibly or with coercion or threat of force wrongfully invades, or conspires or attempts to invade, the body of a person by penetrating, however slightly, the anal or genital opening of the victim with any part of the body of the accused, or with any foreign object.

`(H) SEXUAL ASSAULT OR ABUSE- The act of a person who forcibly or with coercion or threat of force engages, or conspires or attempts to engage, in sexual contact with one or more persons, or causes, or conspires or attempts to cause, one or more persons to engage in sexual contact.

`(I) TAKING HOSTAGES- The act of a person who, having knowingly seized

or detained one or more persons, threatens to kill, injure, or continue to detain such person or persons with the intent of compelling any nation, person other than the hostage, or group of persons to act or refrain from acting as an explicit or implicit condition for the safety or release of such person or persons.

`(2) DEFINITIONS- In the case of an offense under subsection (a) by reason of subsection (c)(3)--

`(A) the term `severe mental pain or suffering' shall be applied for purposes of paragraphs (1)(A) and (1)(B) in accordance with the meaning given that term in section 2340(2) of this title;

`(B) the term `serious bodily injury' shall be applied for purposes of paragraph (1)(F) in accordance with the meaning given that term in section 113(b)(2) of this title;

`(C) the term `sexual contact' shall be applied for purposes of paragraph (1)(G) in accordance with the meaning given that term in section 2246(3) of this title;

`(D) the term `serious physical pain or suffering' shall be applied for purposes of paragraph (1)(B) as meaning bodily injury that involves--

`(i) a substantial risk of death;

`(ii) extreme physical pain;

`(iii) a burn or physical disfigurement of a serious nature (other than cuts, abrasions, or bruises); or

`(iv) significant loss or impairment of the function of a bodily member, organ, or mental faculty; and

`(E) the term `serious mental pain or suffering' shall be applied for purposes of paragraph (1)(B) in accordance with the meaning given the term `severe mental pain or suffering' (as defined in section 2340(2) of this title), except that--

`(i) the term `serious' shall replace the term `severe' where it appears; and

`(ii) as to conduct occurring after the date of the enactment of the Military Commissions Act of 2006, the term `serious and non-transitory mental harm (which need not be prolonged)' shall replace the term `prolonged mental harm' where it appears.

`(3) INAPPLICABILITY OF CERTAIN PROVISIONS WITH RESPECT TO COLLATERAL DAMAGE OR INCIDENT OF LAWFUL ATTACK- The intent specified for the conduct stated in subparagraphs (D), (E), and (F) or paragraph (1) precludes the applicability of those subparagraphs to an offense under subsection (a) by reasons of subsection (c)(3) with respect to--

`(A) collateral damage; or

`(B) death, damage, or injury incident to a lawful attack.

`(4) INAPPLICABILITY OF TAKING HOSTAGES TO PRISONER EXCHANGE- Paragraph (1)(I) does not apply to an offense under subsection (a) by reason of subsection (c)(3) in the case of a prisoner exchange during wartime.

`(5) DEFINITION OF GRAVE BREACHES- The definitions in this subsection are intended only to define the grave breaches of common Article 3 and not the full scope of United States obligations under that Article.'.

(2) RETROACTIVE APPLICABILITY- The amendments made by this subsection, except as specified in subsection (d)(2)(E) of section 2441 of title 18, United States Code, shall take effect as of November 26, 1997, as if enacted immediately after the amendments made by section 583 of Public Law 105-118 (as amended by section 4002(e)(7) of Public Law 107-273).

(c) Additional Prohibition on Cruel, Inhuman, or Degrading Treatment or Punishment-

(1) IN GENERAL- No individual in the custody or under the physical control of the United States Government, regardless of nationality or physical location, shall be subject to cruel, inhuman, or degrading treatment or punishment.

(2) CRUEL, INHUMAN, OR DEGRADING TREATMENT OR PUNISHMENT DEFINED- In this subsection, the term `cruel, inhuman, or degrading treatment or punishment' means cruel, unusual, and inhumane treatment or punishment prohibited by the Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States, as defined in the United States Reservations, Declarations and Understandings to the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment done at New York, December 10, 1984.

(3) COMPLIANCE- The President shall take action to ensure compliance with this subsection, including through the establishment of administrative rules and procedures.

## SEC. 7. HABEAS CORPUS MATTERS.

(a) In General- Section 2241 of title 28, United States Code, is amended by striking both the subsection (e) added by section 1005(e)(1) of Public Law 109-148 (119 Stat. 2742) and the subsection (e) added by added by section 1405(e)(1) of Public Law 109-163 (119 Stat. 3477) and inserting the following new subsection (e):

`(e)(1) No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

`(2) Except as provided in paragraphs (2) and (3) of section 1005(e) of the Detainee Treatment Act of 2005 (10 U.S.C. 801 note), no court, justice, or judge shall have

jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.'.

(b) Effective Date- The amendment made by subsection (a) shall take effect on the date of the enactment of this Act, and shall apply to all cases, without exception, pending on or after the date of the enactment of this Act which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States since September 11, 2001.

## SEC. 8. REVISIONS TO DETAINEE TREATMENT ACT OF 2005 RELATING TO PROTECTION OF CERTAIN UNITED STATES GOVERNMENT PERSONNEL.

(a) Counsel and Investigations- Section 1004(b) of the Detainee Treatment Act of 2005 (42 U.S.C. 2000dd-1(b)) is amended--

(1) by striking `may provide' and inserting `shall provide';

(2) by inserting `or investigation' after `criminal prosecution'; and

(3) by inserting `whether before United States courts or agencies, foreign courts or agencies, or international courts or agencies,' after `described in that subsection'.

(b) Protection of Personnel- Section 1004 of the Detainee Treatment Act of 2005 (42 U.S.C. 2000dd-1) shall apply with respect to any criminal prosecution that--

(1) relates to the detention and interrogation of aliens described in such section;

(2) is grounded in section 2441(c)(3) of title 18, United States Code; and

(3) relates to actions occurring between September 11, 2001, and December 30, 2005.

## SEC. 9. REVIEW OF JUDGMENTS OF MILITARY COMMISSIONS.

Section 1005(e)(3) of the Detainee Treatment Act of 2005 (title X of Public Law 109-148; 119 Stat. 2740; 10 U.S.C. 801 note) is amended--

(1) in subparagraph (A), by striking `pursuant to Military Commission Order No. 1. dated August 31, 2005 (or any successor military order)' and inserting `by a military commission under chapter 47A of title 10, United States Code';

(2) by striking subparagraph (B) and inserting the following new subparagraph (B):

`(B) GRANT OF REVIEW- Review under this paragraph shall be as of right.';

(3) in subparagraph (C)--

(A) in clause (i)--

    (i) by striking `pursuant to the military order' and inserting `by a military commission'; and

    (ii) by striking `at Guantanamo Bay, Cuba'; and

(B) in clause (ii), by striking `pursuant to such military order' and inserting `by the military commission'; and

(4) in subparagraph (D)(i), by striking `specified in the military order' and inserting `specified for a military commission'.

## SEC. 10. DETENTION COVERED BY REVIEW OF DECISIONS OF COMBATANT STATUS REVIEW TRIBUNALS OF PROPRIETY OF DETENTION.

Section 1005(e)(2)(B)(i) of the Detainee Treatment Act of 2005 (title X of Public Law 109-148; 119 Stat. 2742; 10 U.S.C. 801 note) is amended by striking `the Department of Defense at Guantanamo Bay, Cuba' and inserting `the United States'.

Passed the Senate September 28, 2006.

Attest:

Secretary.

109th CONGRESS

2d Session

**S. 3930**

**AN ACT**

To authorize trial by military commission for violations of the law of war, and for other purposes.

*END*

---

**Army Regulation 190–8**
**OPNAVINST 3461.6**
**AFJI 31-304**
**MCO 3461.1**

Military Police

# Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees

Headquarters
Departments of the Army,
the Navy, the Air Force,
and the Marine Corps
Washington, DC
1 October 1997

## UNCLASSIFIED

Headquarters
Departments Of the Army,
the Navy, the Air Force,
and the Marine Corps
Washington, DC
1 October 1997

*Army Regulation 190–8
*OPNAVINST 3461.6
*AFJI 31–304
*MCO 3461.1

Effective 1 November 1997

Military Police

# Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees

By Order of the Secretary of the Navy:

*TOGO D. WEST, JR.*
*Secretary of the Army*

By Order of the Secretary of the Navy:

J.L. JOHNSON
Admiral, United States Navy
Chief of Naval Operations
Acting

J.S. Mobley
Rear Admiral, United States Navy
Director, Navy Staff

By Order of the Secretary of the Air Force:

RICHARD A. COLEMAN
Colonel, USAF
Chief of Security Police

By Order of the Secretary of the Navy:

LT GENERAL J.L. JONES, USMC
Marine Corps Deputy Chief of Staff
for Plans, Policies and Operations

**History.** This printing publishes a revision of this publication. Because the publication has been extensively revised the changed portions have not been highlighted.

**Summary.** This regulation implements Department Of Defense Directive 2310.1 and establishes policies and planning guidance for the treatment, care, accountability, legal status, and administrative procedures for Enemy Prisoners of War, Civilian Internees, Retained Persons, and Other Detainees. This regulation is a consolidation of Army Regulation 190-8 and Army Regulation 190-57 and incorporates SECNAV Instruction 3461. 3 and Air Force Joint Instruction 31-304. Policy and procedures established herein apply to the services and their capabilities to the extent that they are resourced and organized for enemy prisoner of war operations.

**Applicability.** This is a multi-service regulation. It applies to the Army, Navy, Air Force and Marine Corps and to their Reserve components when lawfully ordered to active duty under the provisions of Title 10 United States Code.

**Proponent and exception authority.** The proponent of this regulation is the Deputy Chief of Staff for Operations and Plans. The proponent has the authority to approve exceptions to this regulation that are consistent with controlling law and regulation. Proponents may delegate the approval authority, in writing, to a division chief within the proponent agency in the grade of colonel or the civilian equivalent.

**Army management control process.** The Regulation contains management control provisions in accordance with AR 11-2, but does not contain checklists for conducting management control. Reviews are used to accomplish assessment of management controls.

**Supplementation.** Army supplementation of this regulation and establishment of command or local forms is prohibited without prior approval from HQDA (DAMO-ODL), WASH DC 20310. Navy, Marine Corps and Air Force supplementation of this regulation is authorized, but is not required. If supplements are issued, major or second echelon commands will furnish one copy of each supplement to their headquarters, as follows: Navy, to the Chief of Naval Operations (N511), 2000 Navy Pentagon, Washington DC 20350-2000, Marine Corps, to the Commandant of the Marine Corps, HQ USMC (POS-10) 2 Navy Annex, Washington DC, 20380-1775 11), and Air Force, to HQ USAF/SPO,

1340 Air Force Pentagon, Washington, DC 20330-1340.

**Suggested improvements.** Users are invited to send comments and suggested improvements through channels as follows: HQDA (DAMO-ODL), WASH DC 20310-0440.

**Distribution.** *Army:* Distribution of this regulation is made in accordance with initial distribution number (IDN) 092120, intended for command levels A, B, C, D, and E for Active Army, Army National Guard, U. S. Army Reserve.
*Navy:* SNDL A (Navy Department); B5 (Coast Guard); (COMDTCOGARD, only) 21A (Fleet Commanders in Chief); 22A (Fleet Commanders); 23 (Force Commanders); 24 (Type Commanders); 26A (Amphibious Groups); 28 (Squadron, Division, and Group Commanders—Ships); 41A (COM-SC); SECNAV/OPNAV Directives Control Office,Washington Navy Yard Bldg 200, 901 M Street SE, Washington DC 20374-5074
*Air Force:* F
*Marine Corps:* PCN 10203324000

---

*This regulation supersedes AR 190-8, 1 June 1982, and rescinds AR 190-57, 4 March 1987. This regulation also rescinds DA Form 5451-R, August 1985; DA Form 5452-R, August 1985; and DA Form 5976, January 1991.

# Contents (Listed by paragraph and page number)

**Chapter 1**
**Introduction,** *page 1*
Purpose • 1–1, *page 1*
References • 1–2, *page 1*
Explanation of abbreviations and terms • 1–3, *page 1*
Responsibilities • 1–4, *page 1*
General protection policy • 1–5, *page 2*
Tribunals • 1–6, *page 2*
The National Prisoner of War Information Center (NPWIC) • 1–7, *page 2*
The Branch PWIC • 1–8, *page 3*
Public Affairs • 1–9, *page 4*

**Chapter 2**
**Beginning of Captivity EPW/RP,** *page 4*
Initial actions upon capture • 2–1, *page 4*
Evacuation and care of EPW and RP • 2–2, *page 5*
Evacuation Policy • 2–3, *page 5*

**Chapter 3**
**Administration and Operation of EPW Internment Facilities,** *page 5*
Establishment • 3–1, *page 5*
EPW internment facilities • 3–2, *page 5*
EPW Facility Management • 3–3, *page 5*
Operation of prisoner of war internment facilities • 3–4, *page 6*
Procedures for prisoner of war correspondence • 3–5, *page 7*
Discipline and security • 3–6, *page 9*
Punitive Jurisdiction • 3–7, *page 10*
Judicial proceedings • 3–8, *page 10*
Loss or damage to property • 3–9, *page 11*
Death and burial • 3–10, *page 11*
Transfer of prisoners of war • 3–11, *page 12*
Repatriation of sick and wounded EPW/RP • 3–12, *page 13*
Repatriation of other EPW/RP • 3–13, *page 14*
Repatriation transfer procedures • 3–14, *page 14*
Retained personnel • 3–15, *page 14*
Complaints and requests to camp commanders • 3–16, *page 15*
EPW/RP safety program • 3–17, *page 15*

**Chapter 4**
**Employment and Compensation for EPWs,** *page 15*

*Section I*
*General Policy and Guidelines, page 15*
General principles • 4–1, *page 15*
Restricted employment • 4–2, *page 15*
Liability to perform labor • 4–3, *page 15*
Authorized work • 4–4, *page 16*
Unauthorized work • 4–5, *page 16*
Decisions on work conditions and safeguards • 4–6, *page 16*
Referrals to HQDA, ODCSOPS • 4–7, *page 16*
Length of workday • 4–8, *page 16*
Rest periods • 4–9, *page 17*
Responsibility for work supervision • 4–10, *page 17*
Work detail leaders and interpreters • 4–11, *page 17*
Task system • 4–12, *page 17*
Employing EPW • 4–13, *page 17*
Paid work • 4–14, *page 17*
Restriction on paid work • 4–15, *page 17*
Rates for paid work • 4–16, *page 17*
Days of paid work per month • 4–17, *page 18*
Unpaid work • 4–18, *page 18*
Sale of articles and repair services • 4–19, *page 18*
Disability compensation • 4–20, *page 18*

Operation of government vehicles • 4–21, *page 18*

*Section II*
*Contract Employment, page 18*
Rules and procedures • 4–22, *page 18*

**Chapter 5**
**Beginning of Internment (CI),** *page 18*
General protection policy—civilian internee • 5–1, *page 18*
Civilian Internee Safety Program • 5–2, *page 19*
Republic of Korea/United States Agreement on processing civilian internees in Korea • 5–3, *page 19*

**Chapter 6**
**Administration and Operation of CI Internment Facilities,** *page 19*
Internment Facility • 6–1, *page 19*
Administrative processing • 6–2, *page 20*
Personal effects • 6–3, *page 20*
Internee Committee • 6–4, *page 21*
Supplies • 6–5, *page 21*
Medical Care and Sanitation • 6–6, *page 22*
Social, Intellectual, and Religious activities • 6–7, *page 22*
Procedures for communications • 6–8, *page 23*
Complaints and requests to camp commanders and protecting power • 6–9, *page 24*
Discipline and security • 6–10, *page 24*
Provisions common to disciplinary and judicial punishments • 6–11, *page 25*
Disciplinary proceedings and punishments • 6–12, *page 25*
Judicial proceedings • 6–13, *page 26*
Death and burial • 6–14, *page 27*
Transfers • 6–15, *page 27*
Release • 6–16, *page 28*

**Chapter 7**
**Employment and Compensation—Civilian Internees,** *page 28*
General • 7–1, *page 28*
Ability to perform labor • 7–2, *page 28*
Authorized work • 7–3, *page 28*
Unauthorized work • 7–4, *page 28*
Working conditions • 7–5, *page 28*
Length of workday • 7–6, *page 28*
Day of rest • 7–7, *page 28*
Paid work • 7–8, *page 28*
Unpaid work • 7–9, *page 28*
Compensation for paid work • 7–10, *page 29*
Disability compensation • 7–11, *page 29*

**Appendixes**

**A.** References, *page 30*

**B.** Internment Serial Number, *page 31*

**Glossary**

**Index**

# Chapter 1
# Introduction

## 1–1. Purpose

*a.* This regulation provides policy, procedures, and responsibilities for the administration, treatment, employment, and compensation of enemy prisoners of war (EPW), retained personnel (RP), civilian internees (CI) and other detainees (OD) in the custody of U.S. Armed Forces. This regulation also establishes procedures for transfer of custody from the United States to another detaining power.

*b.* This regulation implements international law, both customary and codified, relating to EPW, RP, CI, and ODs which includes those persons held during military operations other than war. The principal treaties relevant to this regulation are:

(1) The 1949 Geneva Convention Relative to the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field (GWS).

(2) The 1949 Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea (GWS SEA).

(3) The 1949 Geneva Convention Relative to the Treatment of Prisoners of War (GPW).

(4) The 1949 Geneva Convention Relative to the Protection of Civilian Persons in Time of War (GC), and In the event of conflicts or discrepancies between this regulation and the Geneva Conventions, the provisions of the Geneva Conventions take precedence.

## 1–2. References

Required and related publications and prescribed and referenced forms are listed in appendix A.

## 1–3. Explanation of abbreviations and terms

Abbreviations and special terms used in this regulation are explained in the glossary.

## 1–4. Responsibilities

*a. The Secretaries of the Military Departments.* The Secretaries will—

(1) Develop internal policies and procedures consistent with this regulation in support of the Department of Defense (DOD), EPW/CI and other detainee programs.

(2) Ensure that appropriate training, as required, pursuant to DOD Directive 5100.77 is provided so that the principles of the Geneva Conventions, and the rights and obligations thereunder, are known by members of their service.

(3) Ensure that suspected or alleged violations of the international law of war are promptly reported and investigated per DOD Directive 5100.77.

(4) Conduct a periodic review of the EPW, CI and RP Program and training to ensure compliance with the law of war.

*b. The Secretary of the Army (SA).* The Secretary of the Army is the DOD Executive Agent (EA) for administering the DOD EPW, CI and RP Program. The SA, in coordination with the Assistant Secretary of Defense, International Security Affairs (ASD-ISA), will plan and develop the policy and coordinate the operation of the programs.

*c. The Army Deputy Chief of Staff for Operations and Plans (DCSOPS).* DCSOPS has primary Headquarters, Department of the Army (HQDA) staff responsibility for the EPW, CI and RP programs. The DCSOPS will—

(1) Develop and disseminate policy guidance for the treatment, care, accountability, legal status, and processing of EPW, CI, RP, and ODs.

(2) Report suspected or alleged violations of law committed by or against military personnel or civilians.

(3) Provide HQDA staff supervision for National Prisoner of War Information Center (NPWIC).

(4) Develop plans for the initial assignment and replacement of block internment serial numbers (ISNs) from the NPWIC to the

Branch PWIC and for the assignment of the theater code section of the ISN.

(5) Provide necessary reports, coordination, technical advice, and staff assistance to:

*(a)* The Office of the Secretary of Defense (OSD).

*(b)* The Joint Chiefs of Staff (JCS).

*(c)* The military departments.

*(d)* Unified commands.

*(e)* Department of State and other Federal agencies.

*(f)* The International Committee of the Red Cross (ICRC).

*(g)* Protecting powers.

*d. The Army Judge Advocate General (TJAG).* The TJAG will provide HQDA guidance and advice to commanders on the legal aspects of the EPW, CI and RP program. TJAG will—

(1) Conduct liaison in coordination with the ASA-ISA, the Department of State, the Department of Justice, and other Federal agencies; the JCS; the Defense Intelligence Agency (DIA); the military departments; the ICRC; the Protecting Powers; and other detaining powers, as required.

(2) Provide advice and assistance to commanders on legal aspects of reported violations by EPW, CI, RP, and ODs.

(3) Provide theater guidelines for any EPW, CI and RP claims against the U.S. Government.

(4) Provide guidance regarding GPW Article 5 Tribunals.

*e. Deputy Chief of Staff for Logistics (DCSLOG).* The DCSLOG will ensure logistical resources are available to support EPW operations.

*f. The Assistant Secretary of the Army Financial Management (ASA-FM&C).* The ASA-FM&C will establish the policies and procedures governing entitlement, control, and accounting for pay, allowances, and personal funds for EPW, CI, RP, and ODs per the provisions of the GPW and GC.

*g. Combatant Commanders, Task Force Commanders and Joint Task Force Commanders.* Combatant Commanders, Task Force Commanders and Joint Task Force Commanders have the overall responsibility for the EPW, CI and RP program, operations, and contingency plans in the theater of operation involved to ensure compliance with international law of war. DOD Directive 2310.1 provides that persons captured or detained by the U.S. Military Services shall normally be handed over for safeguarding to U.S. Army Military Police, or to detainee collecting points or other holding facilities and installations operated by U.S. Army Military Police as soon as practical. U.S. Army Military Police have units specifically organized to perform the long-term functions associated with EPW/CI internment. Commanders must ensure the proper force structure is included in any joint operational plans. Commanders at all levels will ensure that all EPW, CI, RP, and ODs are accounted for and humanely treated, and that collection, evacuation, internment, transfers, release, and repatriation operations are conducted per this regulation. Combatant Commanders, Task Force Commanders and Joint Task Force Commanders will—

(1) Provide for an EPW, CI and RP camp liaison and assistance program to ensure the protection of U.S. interests per the Geneva Conventions upon the capture and transfer of EPW, CI, RP, and ODs to a host or other nation.

(2) Plan and procure logistical support to include: transportation, subsistence, personal, organizational and Nuclear, Biological & Chemical (NBC) clothing and equipment items, mail collection and distribution, laundry, and bath for EPW, CI and RP.

(3) Collect and dispose of captured enemy supplies and equipment through theater logistics and Explosive Ordnance Disposal (EOD) channels.

(4) Coordinate for acquisition of real estate, and as required, for planning, design, contracting, and construction of facilities for EPW, CI and RP with the Theater or JTF Engineer.

(5) Establish guidance for the use, transport, and evacuation of EPW, CI, RP, and ODs in logistical support operations.

(6) Identify requirements and allocations for Army Medical units in support of the EPW, CI and RP Program, and ensure that the

1

056

medical annex of OPLANs, OPORDs and contingency plans includes procedures for treatment of EPW, CI, RP, and ODs. Medical support will specifically include:

*(a)* First aid and all sanitary aspects of food service including provisions for potable water, pest management, and entomological support.

*(b)* Preventive medicine.

*(c)* Professional medical services and medical supply.

*(d)* Reviewing, recommending, and coordinating the use and assignment of medically trained EPW, CI, RP and OD personnel and medical material.

*(e)* Establishing policy for medical repatriation of EPW, CI and RP and monitoring the actions of the Mixed Medical Commission.

*h. U. S. Army Criminal Investigation Command (USACIDC).* USACIDC will provide criminal investigative support to EPW, CI and RP Camp Commanders per AR 195-2.

## 1–5. General protection policy

*a.* U.S. policy, relative to the treatment of EPW, CI and RP in the custody of the U.S. Armed Forces, is as follows:

(1) All persons captured, detained, interned, or otherwise held in U.S. Armed Forces custody during the course of conflict will be given humanitarian care and treatment from the moment they fall into the hands of U.S. forces until final release or repatriation.

(2) All persons taken into custody by U.S. forces will be provided with the protections of the GPW until some other legal status is determined by competent authority.

(3) The punishment of EPW, CI and RP known to have, or suspected of having, committed serious offenses will be administered IAW due process of law and under legally constituted authority per the GPW, GC, the Uniform Code of Military Justice and the Manual for Courts Martial.

(4) The inhumane treatment of EPW, CI, RP is prohibited and is not justified by the stress of combat or with deep provocation. Inhumane treatment is a serious and punishable violation under international law and the Uniform Code of Military Justice (UCMJ).

*b.* All prisoners will receive humane treatment without regard to race, nationality, religion, political opinion, sex, or other criteria. The following acts are prohibited: murder, torture, corporal punishment, mutilation, the taking of hostages, sensory deprivation, collective punishments, execution without trial by proper authority, and all cruel and degrading treatment.

*c.* All persons will be respected as human beings. They will be protected against all acts of violence to include rape, forced prostitution, assault and theft, insults, public curiosity, bodily injury, and reprisals of any kind. They will not be subjected to medical or scientific experiments. This list is not exclusive. EPW/RP are to be protected from all threats or acts of violence.

*d.* Photographing, filming, and video taping of individual EPW, CI and RP for other than internal Internment Facility administration or intelligence/counterintelligence purposes is strictly prohibited. No group, wide area or aerial photographs of EPW, CI and RP or facilities will be taken unless approved by the senior Military Police officer in the Internment Facility commander's chain of command.

*e.* A neutral state or an international humanitarian organization, such as the ICRC, may be designated by the U.S. Government as a Protecting Power (PP) to monitor whether protected persons are receiving humane treatment as required by the Geneva Conventions. The text of the Geneva Convention, its annexes, and any special agreements, will be posted in each camp in the language of the EPW, CI and RP.

*f. Medical Personnel.* Retained medical personnel shall receive as a minimum the benefits and protection given to EPW and shall also be granted all facilities necessary to provide for the medical care of EPW. They shall continue to exercise their medical functions for the benefit of EPW, preferably those belonging to the armed forces upon which they depend, within the scope of the military laws and regulations of the United States Armed Forces. They shall be provided with necessary transport and allowed to periodically visit EPW situated in working detachments or in hospitals outside the EPW camp. Although subject to the internal discipline of the camp in which they are retained such personnel may not be compelled to carry out any work other than that concerned with their medical duties. The senior medical officer shall be responsible to the camp military authorities for everything connected with the activities of retained medical personnel.

*g. Religion.*

(1) EPW, and RP will enjoy latitude in the exercise of their religious practices, including attendance at the service of their faith, on condition that they comply with the disciplinary routine prescribed by the military authorities. Adequate space will be provided where religious services may be held.

(2) Military chaplains who fall into the hands of the U.S. and who remain or are retained to assist EPW, and RP, will be allowed to minister to EPW, RP, of the same religion. Chaplains will be allocated among various camps and labor detachments containing EPW, RP, belonging to the same forces, speaking the same language, or practicing the same religion. They will enjoy the necessary facilities, including the means of transport provided in the Geneva Convention, for visiting the EPW, RP, outside their camp. They will be free to correspond, subject to censorship, on matters concerning their religious duties with the ecclesiastical authorities in the country of detention and with international religious organizations. Chaplains shall not be compelled to carry out any work other than their religious duties.

(3) Enemy Prisoners of War, who are ministers of religion, without having officiated as chaplains to their own forces, will be at liberty, whatever their denomination, to minister freely to the members of their faith in U.S. custody. For this purpose, they will receive the same treatment as the chaplains retained by the United States. They are not to be obligated to do any additional work.

(4) If EPW, RP, do not have the assistance of a chaplain or a minister of their faith. A minister belonging to the prisoner's denomination, or in a minister's absence, a qualified layman, will be appointed, at the request of the prisoners, to fill this office. This appointment, subject to approval of the camp commander, will take place with agreement from the religious community of prisoners concerned and, wherever necessary, with approval of the local religious authorities of the same faith. The appointed person will comply with all regulations established by the United States.

## 1–6. Tribunals

*a.* In accordance with Article 5, GPW, if any doubt arises as to whether a person, having committed a belligerent act and been taken into custody by the US Armed Forces, belongs to any of the categories enumerated in Article 4, GPW, such persons shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal.

*b.* A competent tribunal shall determine the status of any person not appearing to be entitled to prisoner of war status who has committed a belligerent act or has engaged in hostile activities in aid of enemy armed forces, and who asserts that he or she is entitled to treatment as a prisoner of war, or concerning whom any doubt of a like nature exists.

*c.* A competent tribunal shall be composed of three commissioned officers, one of whom must be of a field grade. The senior officer shall serve as President of the Tribunal. Another non-voting officer, preferably an officer in the Judge Advocate General Corps, shall serve as the recorder.

*d.* The convening authority shall be a commander exercising general courts-martial convening authority.

*e.* Procedures.

(1) Members of the Tribunal and the recorder shall be sworn. The recorder shall be sworn first by the President of the Tribunal. The recorder will then administer the oath to all voting members of the Tribunal to include the President.

(2) A written record shall be made of proceedings.

(3) Proceedings shall be open except for deliberation and voting by the members and testimony or other matters which would compromise security if held in the open.

(4) Persons whose status is to be determined shall be advised of their rights at the beginning of their hearings.

(5) Persons whose status is to be determined shall be allowed to attend all open sessions and will be provided with an interpreter if necessary.

(6) Persons whose status is to be determined shall be allowed to call witnesses if reasonably available, and to question those witnesses called by the Tribunal. Witnesses shall not be considered reasonably available if, as determined by their commanders, their presence at a hearing would affect combat or support operations. In these cases, written statements, preferably sworn, may be submitted and considered as evidence.

(7) Persons whose status is to be determined have a right to testify or otherwise address the Tribunal.

(8) Persons whose status is to be determined may not be compelled to testify before the Tribunal.

(9) Following the hearing of testimony and the review of documents and other evidence, the Tribunal shall determine the status of the subject of the proceeding in closed session by majority vote. Preponderance of evidence shall be the standard used in reaching this determination.

(10) A written report of the tribunal decision is completed in each case. Possible board determinations are:

(a) EPW.

(b) Recommended RP, entitled to EPW protections, who should be considered for certification as a medical, religious, or volunteer aid society RP.

(c) Innocent civilian who should be immediately returned to his home or released.

(d) Civilian Internee who for reasons of operational security, or probable cause incident to criminal investigation, should be detained.

f. The recorder shall prepare the record of the Tribunal within three work days of the announcement of the tribunal's decision. The record will then be forwarded to the first Staff Judge Advocate in the internment facility's chain of command.

g. Persons who have been determined by a competent tribunal not to be entitled to prisoner of war status may not be executed, imprisoned, or otherwise penalized without further proceedings to determine what acts they have committed and what penalty should be imposed. The record of every Tribunal proceeding resulting in a determination denying EPW status shall be reviewed for legal sufficiency when the record is received at the office of the Staff Judge Advocate for the convening authority.

### 1–7. The National Prisoner of War Information Center (NPWIC)

The NPWIC will—

a. Forward blocks of ISNs to designated Branch PWIC in Theater and CONUS, as required.

b. Obtain and store information concerning EPW, CI and RP and their confiscated personal property. Information will be collected and stored on each EPW, CI, and RP captured and detained by U.S. Armed Forces. This includes those EPW, RP, who were captured by the United States but are in custody of other powers and those who have been released or repatriated. EPW, CI and RP cannot be forced to reveal any information however they are required to provide their name, rank, serial number and date of birth. The Geneva Convention requires the NPWIC to collect and store the following information for EPW, RP:

(1) Complete name.

(2) ISN.

(3) Rank.

(4) Serial number.

(5) Date of birth.

(6) City of birth.

(7) Country of birth.

(8) Name and address of next of kin.

(9) Date of capture.

(10) Place of capture.

(11) Capturing unit.

(12) Circumstances of capture.

(13) Location of confiscated personal property.

(14) Nationality.

(15) General statement of health.

(16) Nation in whose armed services the individual is serving.

(17) Name and address of a person to be notified of the individual's capture.

(18) Address to which correspondence may be sent.

(19) Certificates of death or duly authenticated lists of the dead.

(20) Information showing the exact location of war graves together with particulars of the dead.

(21) Notification of capture.

(22) List of personal articles of value not restored upon repatriation.

c. Obtain and store information concerning CI and ODs who are kept in the custody of U.S. Armed Forces who are subjected to assigned residence, or who were interned and then released. The following information will be collected:

(1) Any particulars that may assist in the individual's identification. This information shall include at least the person's surname, first names, place and date of birth, nationality, last residence and distinguishing characteristics, the first name of the father and the maiden name of the mother, the date, place and nature of the action taken with regard to the individual, the address at which correspondence may be sent and the name and address of the person to be informed.

(2) The individual's personal data for notification of his or her internment, state of health, and changes to this data.

(3) Certificates of death or authenticated lists of the dead and information showing the location of graves.

(4) Authenticated lists of personal valuables left by these protected persons.

(5) Information pertaining to children living in territories occupied by the United States. This will include all data necessary for identifying children whose identity is in doubt.

d. Process all inquiries concerning EPW and RP captured by U.S. Armed Forces.

e. Make reports to the ICRC, the State Department, and other Federal agencies as required.

f. Provide to the adverse party via the ICRC's Central Tracing Agency (CTA) all pertinent information pertaining to EPW, CI, and RP, in custody of the U.S. Armed Forces.

g. Transmit via the CTA/ICRC/PP, all official documents and information on judicial proceedings concerning EPW and RP captured, interned, retained or detained by U.S. Armed Forces.

h. Information and Property Transfers.

(1) In response to an inquiry, the NPWIC will forward all information and documents to the CTA or PP.

(2) Valuables and personal property which can be returned to a released or repatriated person will be forwarded through the CTA or PP.

(3) Valuables and personal property of deceased EPW/RP, which can be released, will be forwarded to the next of kin through the CTA or PP.

i. The ICRC/PP transmits information, documents, and personal effects to the State it represents as follows:

(1) If civilians are concerned, to their countries of origin and/or residence.

(2) If combatants or EPW, CI, and RP are concerned, to their country of origin or to the Power on which they depend.

### 1–8. The Branch PWIC

a. The Branch PWIC functions as the field operations agency for the NPWIC. It is the central agency responsible to maintain information on all EPW, CI and RP and their personal property within an assigned theater of operations or in CONUS.

b. The Branch PWIC serves as the theater repository for information pertaining to:

(1) Accountability of EPW, CI, and RP and implementation of DOD policy.

(2) Providing initial and replacement block ISN assignments to theater EPW, CI and RP processing organizations, and requests replacement ISNs from the NPWIC.

(3) Obtaining and storing information concerning all EPW, CI and RP, in the custody of U.S. Armed Forces, those captured by U.S. Armed Forces and transferred to other powers for internment (either temporarily or permanently), those EPW and RP transferred to CONUS for internment, and EPW, CI and RP released or repatriated. Obtaining and storing information about CI kept in the custody of U.S. Armed Forces within its assigned theater of operations who are subjected to assigned residence, interned, or released. Information required includes:

(a) That which may assist in an individual's identification.

(b) Certificates of death or authenticated lists of the dead.

(c) Information showing the location of war graves, together with particulars of the dead.

(d) Individual personal data, notification of capture, state of health, and changes.

(e) Certificates of death or authenticated lists of the dead and information showing the location of graves.

(f) Authenticated lists of personal valuables left by CI.

(g) Information pertaining to children living in territories occupied by the United States. This will include all data necessary for identifying children whose identity is in doubt.

(4) Processing, storing and maintaining all personal property of escaped or dead EPW/CI/RP or articles of value which were not restored upon repatriation, until final disposition instructions are received from the NPWIC or next higher headquarters.

(5) Processing and replying to all inquiries received from the NPWIC, the chain of command, or other agencies as directed by the NPWIC concerning EPW/CI/RP and other protected persons in the theater of operations that the U.S. is responsible for under the Geneva Convention.

(6) Making regular reports to the NPWIC, the chain of command, and supported internment facilities as required. This will include all pertinent information, official documents and information on judicial proceedings pertaining to EPW/CI/RP in the theater of operations for which the U.S. is responsible under the Geneva Convention.

(7) Valuables and personal property which can be returned to a released or repatriated person are forwarded to the ICRC CTA or Protecting Power, as directed by the NPWIC.

(8) Valuables and personal property of deceased EPW, CI, and RP which can be released, will be forwarded to the next of kin through the NPWIC to the ICRC Central Tracing Agency or Protecting Power.

(9) Confiscated property which cannot be released or returned will be stored until final disposition is determined.

(a) Unclaimed property will be safeguarded by the Branch PWIC until all EPW/CI have been repatriated. If property ownership cannot be determined, said property shall be released through the MP BDE G-4 and SUPCOM to the Defense Reutilization and Marketing Office (DRMO).

(b) Unclaimed money and negotiable instruments will be maintained by the PWIC pending inquiry. Upon completion of all repatriation actions and inquiries, unclaimed money and negotiable instruments will be transferred to the FAO as abandoned property.

(10) Accountability data concerning personal and confiscated property of EPW, CI, and RP transferred to CONUS will be forwarded directly to the PWIC designated to support CONUS operations.

(11) The Branch PWIC is responsible for establishing and enforcing the information requirements that the United States forces will collect on EPW,CI and RP taken or held in the Branch PWIC's area of responsibility. The Branch PWIC will receive its information requirements from the NPWIC.

## 1–9. Public Affairs

In the interest of national security, and the protection of the prisoners from public curiosity, and in adherence to the GPW and GC,

EPW, CI, RP and other detainees will not be photographed as per paragraph 1–5d. Interviews of EPW, CI, RP and other detainees by news media will not be permitted. Requests for media access to EPW, CI, or other detainee internment facilities will be coordinated through the Public Affairs Office, and the Staff Judge Advocate, and approved by the first commander who exercises General Court Martial Convening Authority over the internment facility. Requests for exception to policy will be forwarded through command channels to HQDA (SAPA-PP), Washington, D.C. 20310-4420

# Chapter 2
# Beginning of Captivity EPW/RP

## 2–1. Initial actions upon capture

a. The commanding officer of the capturing unit will ensure that:

(1) All EPW/RP are protected, safeguarded, and accounted for per this regulation. This regulation applies from the time of capture until evacuation to designated internment facilities.

(a) Each EPW/RP will be searched immediately after capture. Use males to search males and females to search female prisoners, when possible. Weapons, ammunition, and equipment or documents with intelligence value will be confiscated and turned over to the nearest intelligence unit. Propaganda and other Psychological Operations (PSYOP) materials will be confiscated, identified by the EPW/RP name and ISN and turned over to the supporting EPW/CI PSYOP unit through intelligence channels. Currency will only be confiscated on the order of a commissioned officer and will be receipted for using DA Form 4137 (Evidence/Property Custody Document). EPW and RP are allowed to retain personal effects such as jewelry, helmets, canteens, protective mask and chemical protective garments, clothing, identification cards and tags, badges of rank and nationality, and Red Cross brassards, articles having personal or sentimental or religious value, and items used for eating except knives and forks.

(b) All prisoners of war and retained persons will, at the time of capture, be tagged using DD Form 2745. They will be searched for concealed weapons and items of intelligence. All equipment, documents, and personal property confiscated during the search must be tagged and administratively accounted for by the capturing unit. Capturing units must provide the: date of capture, location of capture (grid coordinates), capturing unit, and any special circumstances of the capture (how the EPW was captured). The remaining information will be included on the tag as it becomes available.

(c) The DD Form 2745 is perforated in three parts. The form is individually numbered and is constructed of durable, waterproof, tear-resistant material, and has reinforced eye-holes at the top of parts A and C. Part A is attached to the detainee with wire, string, or other type of durable material. Part B is retained by the capturing unit and maintained in the unit's records. Part C is attached to the property confiscated from the detainee, so that it may later be matched to that detainee.

(d) Prisoners may be interrogated in the combat zone. The use of physical or mental torture or any coercion to compel prisoners to provide information is prohibited. Prisoners may voluntarily cooperate with PSYOP personnel in the development, evaluation, or dissemination of PSYOP messages or products. Prisoners may not be threatened, insulted, or exposed to unpleasant or disparate treatment of any kind because of their refusal to answer questions. Interrogations will normally be performed by intelligence or counterintelligence personnel.

(e) Prisoners will be humanely evacuated from the combat zone and into appropriate channels as quickly as possible. Instructions given to prisoners during evacuation from the combat zone will be, if possible, in their own language and as brief as possible. When military necessity requires delay in evacuation beyond a reasonable period of time, health and comfort items will be issued, such as food, potable water, appropriate clothing, shelter, and medical attention. Prisoners will not be unnecessarily exposed to danger while awaiting evacuation. The capturing unit may keep prisoners in the

persons satisfy the requirements for being accorded the status of CI. One of the following two conditions must apply:

(1) Internment has been determined by competent U.S. Military authority to be necessary for imperative reasons of security to the United States Armed Forces in the occupied territory.

(2) Internment has been directed by a properly constituted U.S. military court sitting in the occupied territory as the sentence for conviction of an offense in violation of penal provisions issued by the occupying U.S. Armed Forces.

*c. Order for internment.*

(1) A protected civilian person in occupied territory will be accepted for evacuation to, and/or for internment in, a CI camp only on receipt of one of the following:

*(a)* An internment order for imperative security reasons authenticated by a responsible commissioned officer of the United States Military specifically delegated such authority by the theater commander.

*(b)* An order of an authorized commander approving and ordering into execution a sentence to internment pronounced by a properly constituted U.S. military court sitting in the occupied territory.

(2) The internment order will contain, as a minimum, the following information:

*(a)* The internee's personal data to include full name, home address, and identification document number, if any.

*(b)* A brief statement of the reason for internment.

*(c)* Authentication to include the signature of the authenticating officer over his or her typed name, grade, service number, and organization.

*d.* Compassionate internment. Notwithstanding the provisions of b and c above, requests by the CI for the compassionate internment of their dependent children who are at liberty without parental care in the occupied territory will normally be granted when both parents or the only surviving parent is interned.

*e.* Spies and saboteurs.

(1) As individually determined by the theater commander, protected civilian persons who are detained as alleged spies or saboteurs or as persons under definite suspicion of activities hostile to the security of the United States as an occupying power, will be regarded as having forfeited rights of communication with the outside world under the Geneva Convention (GC) for reasons of military security. Such forfeiture will be viewed as an exceptional and temporary measure. Due to the seriousness of the charges, such persons will not be processed as ordinary CI.

(2) Suspected spies and saboteurs will be afforded the same human rights treatment as the CI, and in case of trial, will be accorded the rights of fair and regular trial prescribed by the GC and by this regulation.

(3) When by the direction of the theater commander, suspected spies and saboteurs rights of communication with the outside world have been restored, their internment in a CI camp may be ordered in accordance with the provisions stated in paragraphs b and c above. When so interned, they will be accorded full CI status and rights and privileges as provided for by these regulations.

(4) At the earliest date consistent with the security of the United States, they will be released and granted full rights and privileges as protected persons under the GC.

*f.* Custodial security. The degree of security and control exercised over the CI will reflect the conditions under which their internment is authorized and directed and will recognize the escape hazards and difficulties of apprehension attendant on the internment of the CI in the occupied territory.

*g.* Appeals and periodic review of security internment cases.

(1) *Appeals.* The CI who are interned for imperative security reasons will be accorded the right to appeal the order directing their internment. Such appeals will be decided with the least possible delay by a board of officers. Appeals will be decided only on the grounds of the existence or nonexistence of imperative security reasons requiring the internment of the protected person.

(2) *Periodic review.* In the case where an appeal has been rejected, the board will review the case at least every 6 months, if possible, to determine whether continued internment is essential to the security of the U.S. Armed Forces.

(3) *Reclassification to assigned residence.* In each CI case reviewed by the board in which continued control is required, the CI will be considered for an assignment to a residence in an area where there is adequate control.

*h. Support of dependents.* The United States will financially support the CI's dependents who are at liberty in the occupied territory and are without adequate means of support or are unable to earn a living.

## 5–2. Civilian Internee Safety Program

*a. Establishment.* A safety program for the CI will be established and administered in accordance with the policies prescribed in AR 385-10 and other pertinent safety directives.

*b. Reports and records.* DA forms and procedures outlined in AR 385-40 will be used in the implementation of the CI safety program. When so used, the letters "CI" will be clearly stamped at the top and bottom of each form. All such forms will be prepared, administered, and maintained separately from those prepared for personnel included under the Army Safety Program.

## 5–3. Republic of Korea/United States Agreement on processing civilian internees in Korea

*a.* On 12 February 1982, the United States and Korea signed The Memorandum of Agreement for the Transfer of the CI. The agreement applies to both the Republic of Korea (ROK) Armed Forces and the United States Armed Forces in Korea (USFK) who handle the CI.

*b.* As a result of this agreement, USFK Regulation 190-6 reflects minor modifications to procedures and forms concerning the processing of CI applicable only to the Korean theater of operations.

## Chapter 6
## Administration and Operation of CI Internment Facilities

### 6–1. Internment Facility

*a. Location.* The theater commander will be responsible for the location of the CI internment facilities within his or her command. The CI retained temporarily in an unhealthy area or where the climate is harmful to their health will be removed to a more suitable place of internment as soon as possible.

*b. Quarters.* Adequate shelters to ensure protection against air bombardments and other hazards of war will be provided and precautions against fire will be taken at each CI camp and branch camp.

(1) All necessary and possible measures will be taken to ensure that CI shall, from the outset of their internment, be accommodated in buildings or quarters which afford every possible safeguard as regards hygiene and health, and provide efficient protection against the rigors of the climate and the effects of war. In no case shall permanent places of internment be placed in unhealthy areas, or in districts the climate of which is injurious to CI.

(2) The premises shall be fully protected from dampness, adequately heated and lighted, in particular between dusk and lights out. The sleeping quarters shall be sufficiently spacious and well ventilated, and the internees shall have suitable bedding and sufficient blankets, account being taken of the climate, and the age, sex and state of health of the internees.

(3) Internees shall have for their use, day and night, sanitary conveniences which conform to the rules of hygiene and are constantly maintained in a state of cleanliness. They shall be provided with sufficient water and soap for their daily personal hygiene and for washing their personal laundry; installations and facilities necessary for this purpose shall be provided. Showers or baths shall also be available. The necessary time shall be set aside for washing and for cleaning.

(4) CI shall be administered and housed separately from EPW/

RP. Except in the case of families, female CI shall be housed in separate quarters and shall be under the direct supervision of women.

*c. Marking.* Whenever military considerations permit, internment facilities will be marked with the letters "CI" placed so as to be clearly visible in the daytime from the air. Only internment facilities for the CI will be so marked.

*d. Organizations and operation.*

(1) The CI internment facilities will be organized and operated, so far as possible, as other military commands.

(2) A U.S. Military commissioned officer will command each CI internment facility.

(3) When possible, the CI will be interned in CI camps according to their nationality, language, and customs. All CI who are nationals of the same country will not be separated merely because they speak different languages.

(4) Complete segregation of female and male CI will be maintained except—

(a) When possible, members of the same family, particularly parents and children, will be lodged together and will have facilities for leading a normal family life.

(b) A parent with children, if single or interned without spouse, will be provided quarters separate from those for single persons.

(c) CI may be searched for security purposes. Female CI may be searched only by female personnel.

## 6–2. Administrative processing

*a.* Military police processing.

(1) Military Police (MP) prisoner of war units officially establish CI status and processes the CI.

(2) Only civilian persons entitled to protected status and that meet the requirements set forth in the GC will be classified as a CI.

(3) Dependent children, who are interned for compassionate reasons with their parents, will not be classified as CI or otherwise processed except as required on DA Form 2674-R (Enemy Prisoner of War/Civilian Internee Strength Report) (RCS CSGP-1583) and DA Form 2663-R. DA Form 2674-R will be reproduced locally on 8 1/2 by 11 inch paper, head to head. A copy for reproduction purposes is located at the back of this regulation. This form is for the use of Army only. Children under the age of twelve are to be identified by the wearing of some form of identity badge or wristband or some other means of identification.

(4) All efforts will be made to take the necessary measures to ensure that children under fifteen, who are orphaned or are separated from their families as a result of the war, are not left to their own resources.

*b.* DA Form 2674-R

(1) General. DA Form 2674-R will be prepared for each CI camp and hospital to which CI are assigned. Preparation will be in accordance with applicable procedures set forth for EPWs. DA Form 2674-R will be reproduced locally on 8 1/2 by 11-inch paper, head to head. A copy for reproduction purposes is located at the back of this regulation. This form is for the use of Army only.

(2) Personnel to be accounted for. All civilians processed and classified as CI and for whom a DA Form 4237-R has been prepared in accordance with paragraph 6-2. of this regulation and dependent children for whom compassionate internment with their CI parents has been approved in accordance with procedures prescribed by the theater commander.

(3) Basic personnel data. References to entries in section B, Remarks, requiring basic personnel data, will be interpreted as follows:

(a) Name. Enter last names and first names, in that order, alphabetically according to section (assigned gains, losses, and so forth) of CI and dependent children.

(b) Internment serial number. Enter complete serial number of this regulation (dependent children are not assigned internment serial numbers (ISNs)).

(c) Grade. Civilian capacity or title, CI only.

(d) Sex. CI and dependent children.

(e) Nationality. CI and dependent children. Enter name of country of which parents claim citizenship.

(f) Occupational skill. Applies only to CI.

(4) Remarks column. On initial entry, enter in the "remarks" column the notation "approved by" (insert appropriate headquarters) on (insert date approved) CI and dependent children.

*c.* Civilian internee personnel record.

(1) DA Form 4237-R will be prepared for each protected civilian processed in an occupied territory as a CI or dependent child.

(2) All pertinent information available or which the CI is willing to give will be entered on the form. If a CI refuses or is unable to give any items of information, a notation will be made in item 36 on DA Form 4237-R. The codes to be used are contained in the Prisoner of War Information System (PWIS) Operator's Manual. Stamp the letters "CI" at the top and bottom of all pages of the form.

(3) All items on DA Form 4237-R are self explanatory except the following entries:

(a) Item 3. Civilian capacity or title (for example, mayor or police chief) if appropriate.

(b) Item 4. Serial number of identification document, if any.

(c) Item 5. Entry of "civilian internee."

(d) Items 19 through 21. Not applicable.

(e) Items 23 through 25. Name of apprehending unit and location, if known.

(f) Item 35. List impounded items from DA Form 1132 (Prisoner's Personal Property List-Personal Deposit Fund) and have the CI sign in the appropriate space verifying the impounded items.

(4) Entries will be typed if possible; otherwise, the form will be printed by hand in BLOCK LETTERS.

(5) Once completed, a copy of the form will accompany the CI to the CI camp. A copy will be furnished to the Branch PWIC monitoring CI activity for the theater commander.

*d. Internment serial number (ISN).* ISNs for each CI will be assigned according to the procedure set forth for EPW. The letters ACI@ will be substituted for AEPW@ e.g. US9AB-0001CL.

*e. DA Form 2677-R (Civilian Internee Identity Card).* Each CI will be issued a completed DA Form 2677-R. Notation thereof will be made under item 36 of DA Form 4237-R. DA Form 2677-R will be reproduced locally on 3- by 5- inch card head to foot. (Copy for local reproduction is located at the back of this regulation.) This form is for the use of Army only. All cards will be weatherproof. The CI will retain their identity cards at all times.

*f. Internment card.* On completion of a DA Form 4237-R, but not later than one week after arrival at a CI camp, each CI must complete two copies of DA Form 2678-R (Civilian Internee Notification of Address). One copy will be addressed to the EPW/CI information organization and the other copy to a relative or next-of-kin. DA Form 2678-R will be reproduced locally on 4- by 6-inch card, printed head to foot. (Copy for local reproduction is located at the back of this regulation.)

*g. DA Form 2663-R.* DA Form 2663-R will be completed in duplicate for each CI and for each interned dependent child. One copy will be retained in the camp at which the CI or dependent child is interned and will accompany internee on transfers; the other copy will be forwarded to the Branch PWIC.

## 6–3. Personal effects

*a.* All personal effects, including money and other valuables, of the CI will be safeguarded. Personal effects are classified according to their disposition.

*b.* The personal effects that detainees are allowed to retain, but are taken from them temporarily for intelligence purposes, will be receipted for and returned as soon as practical. Any national identification card or DA Form 2677-R will not be taken from the CI at any time.

(1) The camp commander may receive personal effects that the CI are permitted to retain, but which they wish stored. Individual receipts will be given to the CI for all items stored in this manner.

(2) Any claim by a CI for compensation for personal effects, money, or valuables stored or impounded by the United States and not returned upon repatriation or any loss alleged to be the fault of

the United States or its agents will be referred to the country to which the CI owes allegiance. In all cases, camp commanders will provide the CI with a statement, signed by a responsible officer, describing the property not returned and the reason. A copy of this statement will be forwarded to the Branch PWIC.

c. An inventory of personal effects that have been impounded will be entered on DA Form 4237-R, item 35. Also, DA Form 1132 will be completed by the CI and signed by the officer in charge or his or her authorized representative and a copy given to the CI.

d. The commanding officer of the camp where the CI is interned will be responsible for storing and safekeeping impounded personal effects. Such property will be marked or otherwise identified and securely bound or packaged. Upon transfer, the CI's impounded property will be delivered to the commanding officer of the receiving facility.

e. Money found in the possession of the CI will be handled according to AR 37-1.

f. Confiscated items of economic value will be receipted to the proper agency. Items of intelligence interest will be brought to the attention of military intelligence personnel immediately and receipted to them.

g. Personal property and documents of importance to the next-of-kin left by a CI who has been released, has died, or has been in an escaped status in excess of 30 days, will be forwarded to the Branch PWIC in sealed parcels. The parcels will be accompanied by statements identifying the CI and listing the contents. All parcels will be receipted for by the authorized losing or gaining facility representative.

h. The theater commander will be responsible for retaining and storing other personal effects, pending final disposition instructions from HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400.

6-4. Internee Committee

a. Election. At each camp and branch camp, CI will be elected by secret written ballot to the Internee Committee. This committee is empowered to represent the camp to the protecting powers, International Committee of the Red Cross, or other authorized relief or aid organizations and U.S. military authorities.

b. Composition. The Internee Committee will consist of not less than two and not more than three elected members. Elections will be held every 6 months or upon the existence of a vacancy. Committee members are eligible for re-election.

c. Approval. Each member of the Internee Committee will be approved by the camp commander prior to assumption of duty. If the camp commander refuses to approve or dismisses an elected member, a notice to that effect with the reasons for refusal or dismissal will be forwarded through channels to the Branch PWIC for transmittal to the protecting power with a copy furnished to NPWIC.

d. Assistants. Each member of the Internee Committee may have an assistant to act as an interpreter. The interpreter must be approved by the camp commander.

e. Duties.

(1) The Internee Committee will be responsible for furthering the physical, spiritual, and intellectual well being of the CI. Members will not be required to perform any other work if it interferes with their duties.

(2) Any mutual assistance organization set up by the CI will be under the jurisdiction of the Internee Committee.

(3) Internee Committee members will be provided with the necessary materials, facilities, and transportation and will be given the freedom required to accomplish their duties. Additional special duties performed by members of an Internee Committee include the following:

(a) Visits to outside labor details.

(b) Checking the management of the canteen and the canteen fund.

(c) The presentation and transmittal of petitions and complaints to the appropriate authorities.

(d) The distribution and disposition of collective relief shipments.

(e) Keeping informed of ongoing and final judicial proceedings instituted against a CI whom they represent.

(f) The delivery of perishable goods to the infirmary when addressed to a CI undergoing disciplinary punishment.

(g) Representing the interest of the CI by ensuring the transport of their community property and luggage that they are unable to take with them on transfers because of baggage weight limitations.

(4) Members of Internee Committees who are transferred will be allowed a reasonable time to acquaint their successors with their duties and related current CI affairs.

f. Communications facilities. Members of the Internee Committee will be accorded postal and telegraphic facilities for communicating with the protecting powers, International Committee of the Red Cross and its delegates, or other relief and aid organizations authorized to assist the CI and U.S. military authorities. Committee members of branch internment camps will be accorded similar facilities for communicating with the Internee Committee of the parent CI camp. These communications will be unlimited and will not be considered as forming a part of the correspondence quota outlined in paragraph 6-8.

6-5. Supplies

a. General.

(1) The CI must provide their own clothing and footwear. Approved items of clothing and equipment, general supplies, subsistence, and fuel will be supplied upon requisition.

(2) Except for work clothing or as circumstance warrant, or climatic conditions required, no replacement clothing will be issued.

(3) Except for hats and other accessories any item of clothing that may be worn as outer garments will be marked as prescribed below:

(a) All shirts, undershirts, blouses, jackets, coats including overcoats and raincoats, and similar articles will be marked with the letters "CI" across the back and on the front of each sleeve between the elbow and shoulder. The letters will be black and 4 inches high. If the clothing or uniforms are of such color that black letters do not contrast well, white will be used.

(b) Trousers, walking shorts, and like items of clothing will be similarly marked with the same letters across the back just below the belt and on the front of both legs just above the knees.

(c) At the discretion of the camp commander, the ISN or other identification marks may be written or stamped on the inside of all CI clothing.

b. Food.

(1) Subsistence for the CI will be issued on the basis of a master CI menu prepared by the theater commander. Preparation of the menu will include the following:

(a) The daily individual food ration will be sufficient in quantity, quality, and variety to maintain the CI in good health and to prevent nutritional deficiencies.

(b) The customary diet of the CI will be considered.

(c) The CI performing physical labor will receive additional food in proportion to the kind of labor performed.

(d) Expectant and nursing mothers and children under 15 years of age will receive additional food in proportion to their physiological needs.

(2) Facilities will be available to the CI for preparing additional food received or procured by them from authorized sources.

c. Miscellaneous.

(1) The issuance of expendable supplies is authorized according to allowances prescribed in Army publications.

(2) Equipment required to support vocational training projects such as gardening, carpentry, tinsmithing, blacksmithing, masonry, repairing shoes and clothing, tailoring, barbering, potting, and farming may be requisitioned through normal supply channels. Subject to restrictions imposed on authorized expenditures from the camp Civilian Internee Fund, camp commanders may purchase locally items of equipment, materials, and supplies needed in the vocational training program that are not available through supply channels.

## 6–6. Medical Care and Sanitation

*a. General.*

(1) Dental, surgical, and medical treatment will be furnished free to the CI.

(2) A medical officer will examine each CI upon arrival at a camp and monthly thereafter. The CI will not be admitted into the general population until medical fitness is determined. These examinations will detect vermin infestation and communicable diseases especially tuberculosis, malaria, and venereal disease. They will also determine the state of health, nutrition, and cleanliness of each CI. During these examinations, each CI will be weighed, and the weight will be recorded on DA Form 2664-R.

(3) Each CI will be immunized or reimmunized as prescribed by theater policy.

*b. CI medical personnel.*

(1) Qualified CI medical personnel will be used as much as possible in medical and hygiene work necessary for the well-being of all CI.

(2) Required Army medical personnel will be provided within the capability of the theater commander.

*c. Medical facilities.* Each CI camp will provide personnel, material, and facilities for adequate routine and emergency dispensary treatment. Patients requiring hospital treatment will be moved, if feasible, to a civilian hospital. The treatment must be as good as that provided for the general population. When civilian hospital facilities are not available or their use is not feasible due to security considerations, U.S. military hospital facilities may be used. Guards for hospitalized CI will be provided, as necessary.

*d. Medical care.*

(1) Medical and dental care, including dentures, spectacles, and other required artificial appliances, will be provided the CI in accordance with AR 40-3.

(2) Each CI will be given an initial radioscopic chest examination. If active disease is found, pulmonary disease consultation is indicated. If no active disease is found, the individual will be followed through routine periodic examinations.

(3) For children up to 14 years of age, a tuberculin skin test (TST) will be administered. No chest x-ray is necessary if the TST is negative. The local medical officer will establish guidance for subsequent tests based on the tuberculosis experience of the population. Routine annual tuberculin testing of children is not warranted unless there is clear-cut evidence of high risk. (See AR 40-26, para 8 f.)

(4) Experimental research will not be conducted on the CI even if the CI agrees to it.

(5) Sick call for the CI desiring medical attention will be held each day. Emergency treatment will be provided at all times.

*e. Blood donations.* At each CI camp and hospital, a list will be maintained according to blood types of CI who have volunteered to furnish blood.

*f. Records and reports*

(1) General. The medical records and forms used for the hospitalization and treatment of U.S. Army personnel and for EPWs will be used for CI. The letters "CI" will be stamped at the top of the form. Medical and dental records will accompany the CI when they are transferred.

(2) Certificate of Work Incurred Injury or Disability. If a CI is injured while working or incurs a disability that may be attributed to work, a DA Form 2675-R will be completed.

(3) Certificate of medical treatment. Each CI who has undergone medical treatment will be given on request an official certificate indicating the nature of his or her illness or injury, and the duration and kind of treatment given. A duplicate of this certificate will be forwarded to the Branch PWIC.

(4) Seriously ill report. When a CI is seriously ill because of injury or disease, the camp or hospital commander will notify the Branch PWIC without delay and provide a brief diagnosis of the case. Follow-up reports, including notification of removal from the seriously ill list, will be submitted each week thereafter during the period the CI remains critical.

*g. Sanitation.*

(1) Hygiene and sanitation measures will conform to those prescribed in AR 40-5 and related regulations. Camp commanders will conduct periodic and detailed sanitary inspections.

(2) A detailed sanitary order meeting the specific needs of each CI camp or branch camp will be published by the CI camp commander. Copies will be reproduced in a language that the CI understands and will be posted in each compound.

(3) Each CI will be provided with sanitary supplies, service, and facilities necessary for their personal cleanliness and sanitation. Separate sanitary facilities will be provided for each sex.

(4) All CI will have at their disposal, day and night, latrine facilities conforming to sanitary rules of the Army.

## 6–7. Social, Intellectual, and Religious activities

*a. General.*

(1) Subject to security considerations and camp discipline, the CI will be encouraged, but not required, to participate in social, intellectual, religious, and recreational activities. Introducing political overtones into or furthering enemy propaganda objectives through these activities will not be tolerated.

(2) Premises and facilities for conducting the activities in (1) above will be made available in each camp, if possible. Required materials and supplies will be requisitioned through normal supply channels.

(3) Carefully selected and qualified civilian nationals and CI may be used for the conducting of activities in (1) above where practical as long as they are closely supervised by U.S. Military personnel.

*b. Visits.*

(1) Official. Duly accredited representatives of the protecting powers and of the International Committee of the Red Cross and other will be permitted to visit and inspect CI camps and other places of internment in the discharge of their official duties. The inspections will be at times previously authorized by the theater commander. Such visits will not be prohibited, nor will their duration and frequency be restricted, except for reasons of imperative military necessity, and then only as a temporary measure. These representatives will be permitted to—

(a) Interview the CI without witnesses, if requested.

(b) Distribute relief supplies and approved materials intended for educational, recreational, or religious purposes, or for assisting the CI in organizing their leisure time within the places of internment. Visiting representatives may not accept from the CI any letters, papers, documents, or articles for delivery.

(2) Social. Near relatives and other persons authorized by the theater commander will be permitted to visit the CI as frequently as possible in accordance with theater regulations. They should be advised that the taking of photographs on or about the facility is prohibited.

(3) Emergency visits by civilian internees. Subject to theater policy, the CI may visit their homes in urgent cases, particularly in cases of death or serious illness of close relatives.

*c. Education.*

(1) The CI education program, as developed for each CI camp, will reflect consideration of the following:

(a) The several educational levels represented in the CI population of the camp.

(b) The establishment of basic courses of instruction to include elementary level reading, writing, geography, mathematics, language, music, art, history, and literature.

(c) The uninterrupted education of dependents residing with their CI parents. This education will reflect to the extent determined feasible by the theater commander, the educational curriculums of the particular country.

(d) The development of vocational training projects with an immediate view of developing skills that may be useful during internment and a longer range view of enabling the CI to learn a useful trade in which they may engage when returned to normal civilian life. Such projects may include, at the discretion of the theater commander, carpentry, tinsmithing, masonry, repairing shoes and clothing, tailoring, barbering, potting, and farming.

063

(2) Equipment required to support the education program will be requisitioned through normal supply channels. At the discretion of the camp commander, items not in supply may be purchased locally and paid for from the camp Civilian Internee Fund provided the items will benefit most CI. The CI personnel employed in the education program will be paid the established rate of pay from the camp Civilian Internee Fund.

*d.* Religion.

(1) CI will enjoy freedom of religion, including attendance at services of their respective faiths held within the internment camps. Wines used for religious purposes will be permitted.

(2) CI who are clergy may minister freely to CI who voluntarily request their ministration. Equitable allocation of CI clergy will be effected among the various camps.

(3) If there is a shortage of CI clergy and the circumstances warrant, the camp commander will provide the CI clergy with the necessary means of transport for visiting the CI in branch camps and hospitals.

(4) The CI clergy will be permitted to correspond on religious matters with the religious authorities in the country of detention and, as far as possible, with the international religious organizations of their faiths. This correspondence will not be considered as forming a part of the quota that may be established in accordance with paragraph 6–8, but will be subject to censorship.

(5) Ordained clergy or a theological student who are not CI may be authorized to enter a camp and conduct religious services. Visits by such personnel will be in accordance with procedures prescribed by the theater commander.

*e.* Recreation.

(1) Recreational activities and facilities, in addition to sports and outdoor games, may include concerts and plays put on by the CI, recorded music, selected motion pictures, and other activities provided by the theater commander.

(2) Special playgrounds will be reserved for dependent children of the CI.

(3) Expenditures from the camp Civilian Internee Fund for the purchase or rental of recreational equipment are authorized.

(4) Appointed delegates of the International Committee of Red Cross are authorized to assist in developing recreational and welfare activities.

## 6–8. Procedures for communications

*a.* Restrictions on numbers and addresses. Procedures for CI correspondence will be in accordance paragraph 3–5. a-f. except that DA Forms 2668-R and 2680-R (Civilian Internee PostCard) will be substituted for DA Forms 2667-R and 2679-R (Civilian Internee Letter) respectively. No restriction will be placed on persons with whom the CI may correspond. DA Form 2679-R will be reproduced on 8 1/2-by 11-inch paper, head to head. DA Form 2680-R will be reproduced on 4-by 6-inch card, head to foot. Copies for local reproduction are located at the back of this regulation. These forms are for the use of Army only.

*b.* Outgoing mail. The following procedures apply to outgoing mail:

(1) Letters and cards will be typed or written legibly in ink. Block printing may be used.

(2) Correspondence will be addressed as follows:

*(a)* Names and addresses will be complete; they will be placed in the spaces designated on the correspondence forms.

*(b)* The return address will be in block print to include the full name, grade, ISN, place and date of birth of the sender, and the name of the camp to which assigned. Instructions for including the APO number or the country in which the camp is located should be issued by local directives.

*(c)* A person at a branch camp will give the parent camp as the return address. The person will be retained on the rosters and local records of the parent camp.

*(d)* The surnames in the address and return address of letters and cards will be underlined.

(3) Each person will be required to date his or her letters and

cards. The name of the month will be written, not shown by a number.

(4) To expedite the handling of mail, CIs will designate the language of their communication.

(5) The date will not be crossed off, written over, or otherwise modified.

(6) Letters and cards will not be numbered consecutively.

(7) The entire letter or card will be written by the same person. If necessary, the address may be written by someone else.

(8) The CI may not write letters for others who are able to do so themselves. A person may be unable to write because of lack of education, accident, or sickness. If so, the camp commander may permit another person to write the message. In these cases, the person doing the writing will countersign the message.

(9) Letters and cards with parts excised, deleted, or otherwise mutilated before being dispatched from the camp will be returned to the person for rewriting.

*c.* Correspondence sent to civilian internees. Instructions on letters and cards that are sent to CI should be communicated by CI to their correspondents.

(1) The name and return address of the sender will be typewritten or hand printed. For letters, the sender's name and address will always appear on the backs of the envelope. The addresser's surname will be underlined.

(2) The name, grade, ISN of the detainee, the name or number of the base camp, and the geographical designation or APO number will be placed in the center lower half of the envelope card. These items are specified by local directives or the camp commander. The entire name of the detainee will be in block print. The address will be placed as near the lower edge of the envelope as possible; the postmark at the top will not be obscured or obliterated.

(3) The term "Civilian Internee Mail" will be placed in the upper left corner on the address side. In the upper right corner the words "Postage Free" must be shown.

*d.* Legal documents. Legal documents, such as wills and deeds, may be enclosed with outgoing correspondence. When it is necessary for a CI to send a legal document, the document and forwarding letter or card may be enclosed in a plain envelope.

*e.* Maps, sketches, or drawings. The CI will not send maps, sketches, or drawings in outgoing correspondence.

*f.* Registered certified, insured, COD, or airmail items. Individuals will not be permitted to mail registered, certified, insured, COD, or airmail items. If registered, certified, insured, or COD mail of either domestic or foreign origin addressed to a detainee is received, it will be refused. The local post office will return them to the sender.

*g.* Postage. Letters and cards to and from the CI will be sent by ordinary mail and postage free.

*h.* Security. Outgoing letters and cards will be secured by using locked boxes or similar means. Only authorized U.S. personnel will handle outgoing mail. Incoming mail may be sorted by the CI when supervised by U.S. personnel.

*i.* Censorship. Censorship of the CI mail will be according to policies established by the theater commander:

(1) Outgoing letters and cards may be examined and read by the camp commander. The camp commander will return outgoing correspondence containing obvious deviations from regulations for rewriting.

(2) Camp commanders will name U.S. military personnel to supervise the opening of all mail pouches containing incoming letters and cards for CI. These items will be carefully examined by the named personnel before delivery to detainees. Those items that arrive without having been censored by appropriate censorship elements will be returned for censorship to the designated censorship elements.

(3) The CI complaints concerning mail delivery will not be directed to censorship elements. These will be directed to—

*(a)* The camp authorities.

*(b)* The responsible major Army commander.

*(c)* HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400.

*(d)* The protecting power.

*j.* Procedures for parcels.

(1) A person may receive individual parcels and collective shipments containing—

  *(a)* Foodstuffs.

  *(b)* Clothing.

  *(c)* Medical supplies.

  *(d)* Articles of religious, educational, or recreational nature.

(2) Books, included in parcels of clothing and foodstuffs, may be confiscated as the camp commander decides.

(3) The CI may send parcels subject to such restrictions as may be deemed necessary by the theater commander with respect to quotas, contents, size, and weight. The CI may send parcels free of charge up to a weight of 5 kilograms per package, or 10 kilograms in the case of articles that cannot be separated (Art 39, Universal Postal Convention).

(4) Parcels received for transferred persons will be forwarded immediately to them.

(5) Nonperishable articles received for persons who have died, escaped, or been released will be forwarded to the Branch PWIC. Perishable items received for deceased or escaped persons will be released to the Internee Committee who will deliver them to the camp infirmary or hospital for the benefit of the CI.

(6) The contents of all incoming parcels will be examined at the camp by a U.S. officer in the presence of the addressee or the named representative. When considered necessary, the camp commander may request that the parcel be examined by the censorship element. The articles in each parcel will be removed. The string, the inner wrappings, the outer container, and any extraneous items found in the parcel will not be turned over to the CI or the named representatives. Examination will be close enough to reveal concealed articles and messages; however, undue destruction of contents of parcels will be avoided.

*k.* Telegrams and telephone calls. The CI may read and receive telegrams. They may not make or receive telephone calls.

(1) Dispatching telegrams will be as follows:

  *(a)* A CI who has not received mail from next-of-kin for 3 months may send a telegram not earlier than one month from the date a previous telegram was sent.

  *(b)* CI who are unable to receive mail from their next-of-kin or send mail to them by ordinary postal routes or who are a great distance from their home will be permitted to send one telegram a month.

  *(c)* The CI who is seriously ill or who has received news of serious illness or death in the family will be permitted to send a telegram. The camp commander will authorize the sending of additional telegrams.

(2) The sending of telegrams as provided for in (1) above will be governed by the following:

  *(a)* The message proper will consist of not more than 15 words.

  *(b)* The cost of sending the telegram will be charged to the personal account of the CI.

  *(c)* Arrangements for messages going to or through enemy-occupied countries will be made with the local International Committee of the Red Cross field director and will be sent through the International Committee of Red Cross, Geneva, Switzerland.

  *(d)* Telegrams will be in the English.

  *(e)* No telegram, except by members of the Internee Committee, will be sent to a Government official or to a protecting power.

  *(f)* Telegrams will be censored according to instructions issued by the chief censor.

*l.* Books. The CI may receive books. Persons or organizations may donate new or unmarked books, singly or in collections, to camp libraries. Books that arrive at camps uncensored will be censored by a representative of the censorship element. Publications (books, magazines, newspapers, and so forth) containing maps may be made available to the CI upon approval by the camp commander, provided they do not contain maps of the territory surrounding the camps.

*m.* Newspapers and magazines. The following may be made available to the CI:

(1) Current newspapers and magazines published in English in the United States and selected by the camp commanders.

(2) Unmarked, unused magazines in English published in the United States and distributed by approved relief or aid organizations received at the discretion of the camp commanders for camp libraries after censorship by the censorship element.

(3) Foreign language newspapers and magazines published in the United States, upon approval of the camp commander and after censorship of individual issues by the censorship element.

(4) Newspapers and magazines published outside the United States, regardless of language, must be approved by the theater commander or HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400.

## 6–9. Complaints and requests to camp commanders and protecting power

*a.* Persons may make complaints or requests to the camp commander, who will try to resolve the complaints and answer the requests. If the CI are not satisfied with the way the commander handles a complaint or request, they may submit it in writing, through channels, to HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400.

*b.* Persons exercising the right to complain to the protecting power about their treatment and camp may do so—

(1) By mail.

(2) In person to the visiting representatives of the protecting power.

(3) Through their Internee Committee.

*c.* Written complaints to the protecting power will be forwarded promptly through HQDA (DAMO-ODL)NPWIC, WASH DC 20310-0400. A separate letter with the comments of the camp commander will be included. Military endorsements will not be placed on any CI communications.

*d.* If a protecting power communicates with a CI camp commander about any matter requiring an answer, the communication and commander=s reply will be forwarded to HQDA (DAMO-ODL) NPWIC, WASH DC 20310-0400, for proper action.

*e.* Any act or allegation of inhumane treatment or other violations of this regulation will be reported to HQDA (DAMO-ODL), WASH DC 20310-0400 as a Serious Incident Report. Reporting instructions in AR 190-40 will be used.

## 6–10. Discipline and security

Measures needed to maintain discipline and security will be set up in each camp and rigidly enforced. Offensive acts against discipline will be dealt with promptly. The camp commander will record disciplinary punishments. The record will be open to inspection by the protecting power.

*a.* Prohibited acts.

(1) Associations on close terms between the CI and U.S. military or civilian personnel.

(2) Exchange of gifts between the CI and U.S. military or civilian personnel.

(3) Setting up of courts by the CI. The CI will not have any disciplinary power or administer any punishment.

*b.* Regulations, orders, and notices. Regulations, orders, and notices on the conduct and activities of the CI will be written in a language the CI can understand. They will be posted in a place within each camp where the CI may read them. They will also be made available to persons who do not have access to posted copies. Additional copies will be given to the Internee Committee. This requirement will also apply to the text of the GC and texts of special agreements concluded under it. Every order and command addressed personally to the CI must be given in a language he or she understands. To protect persons from acts of violence, bodily injury, and threats of reprisals at the hand of fellow internees, a copy of a notice in the internee's language will be posted in every compound.

**NOTICE**

The CI regardless of faith or political belief, who fear that their lives are in danger or that they may suffer physical injury at the hands of other detainees will immediately report the fact personally to any U.S. Army officer of this camp without consulting the Internee Committee. From that time on, the camp command will assure adequate protection to such civilian internees by segregation, transfer, or other means. Civilian internees who mistreat fellow internees will be punished.

Signed (Commanding Officer)

*c.* Courtesies. The normal civilian courtesies will be required of the CI in their relationships with military personnel. U.S. military personnel will be courteous and will extend to the CI the regard due them.

*d.* Flags and political emblems. Flags on which a political enemy emblem or device appears will be seized. The CI will not have any political emblem, insignia, flag, or picture of political leaders. The CI may have pictures of political leaders that appear in magazines, books, and newspapers if the pictures are not removed.

*e.* Security. All security matters connected with the custody and utilization of the CI are the responsibilities of the theater commanders in overseas areas.

**6–11. Provisions common to disciplinary and judicial punishments**
   *a.* General.
   (1) If general laws, regulations, or orders declare acts committed by the CI to be punishable, whereas the same acts are not punishable when committed by persons who are not interned, these acts will only entail disciplinary punishment.
   (2) When possible disciplinary punishment rather than judicial punishment will be used.
   (3) The courts or authorities in passing sentence or awarding disciplinary punishment will consider the fact that the defendant is not a national of the United States. They will be free to reduce the penalty prescribed for the offense with which the CI is charged and will not be obliged to apply the prescribed minimum sentence but may impose a lesser one.
   (4) Punishment will not be inhumane, brutal, or dangerous to the health of the CI The age, sex, and state of health of the CI will be considered.
   (5) Imprisonment in premises without daylight is prohibited.
   (6) The length of time a CI is confined while awaiting a disciplinary hearing or a trial will be deducted from any disciplinary or judicial punishment involving confinement to which he or she may be sentenced and will be taken into account in finding any penalty.
   (7) No CI may be punished more than once for the same offense.
   (8) The CI who has served disciplinary punishment on judicial sentences will not be treated differently from other CI.
   *b.* Confinement benefits. The CI undergoing confinement, whether before or after trial and whether in connection with disciplinary or judicial proceedings, will—
   (1) Be allowed to exercise and stay in the open air at least two hours daily.
   (2) Be allowed to attend daily sick call, receive medical attention as needed, and if necessary be transferred to a hospital.
   (3) Be given enough food to maintain them in as good health as that provided other CI.
   (4) Be permitted to confer with visiting representatives of the protecting power or the ICRC.
   (5) Be permitted to receive spiritual assistance.
   (6) If a minor, be treated with proper regard.
   (7) Be provided with hygienic living conditions.

   (8) Be provided adequate bedding and supplies and facilities necessary for personal cleanliness.
   (9) If a female, be confined in separate quarters from male CI and will be under the immediate supervision of women.

**6–12. Disciplinary proceedings and punishments**
   *a. Authority to order disciplinary punishment.* Without prejudice to the competence of courts and higher authorities, disciplinary punishment may be ordered only by the camp commander.
   *b. Rights of accused prior to imposition of disciplinary punishment.* Prior to imposition of disciplinary punishment, the CI will be:
   (1) Provided precise information regarding the offense of which they are accused.
   (2) Given an opportunity to defend the allegation.
   (3) Permitted to call witnesses and to have, if necessary, the service of a qualified interpreter.
   *c. Authorized disciplinary punishment.* The following disciplinary punishments are authorized:
   (1) Discontinuance of privileges granted over and above the treatment provided for by this regulation.
   (2) Confinement.
   (3) A fine not to exceed one-half of the wages that the CI may receive during a period of not more than 30 days.
   (4) Extra fatigue duties, not exceeding 2 hours daily, in connection with maintaining the internment camp.
   *d. Duration of disciplinary punishment.*
   (1) The duration of any single disciplinary punishment will not exceed 30 consecutive days. The maximum of 30 days will not be exceeded even if the CI is answerable for several breaches of discipline, whether related or not, at the time when punishment is imposed.
   (2) The period elapsing between the pronouncing of the disciplinary punishment and the completion of its execution will not exceed 30 days.
   (3) After imposition of disciplinary punishment on the CI, further discipline will not be imposed on the same CI until at least 3 days have elapsed between the execution of any two of the punishments if the duration on one of the two punishments is 10 days or more.
   *e. Escape and connected offenses.*
   (1) The CI who are recaptured after having escaped or when attempting to escape will be liable to disciplinary punishment with respect to that act only, even if it is a repeated offense.
   (2) The CI punished as a result of escape or attempt to escape may be subjected to special surveillance that does not affect the state of their health, when the punishment is exercised in a CI camp and if it does not violate any of the provisions of this regulation.
   (3) The CI who aid and abet an escape or an attempt to escape, if no injury is done to a person, will be liable to disciplinary punishment only.
   (4) Escape, or attempt to escape, even if it is a repeated offense, will not be deemed an aggravating circumstance in cases where the CI is prosecuted for offenses committed incidental to or during his or her escape or attempt to escape.
   (5) The CI is liable to prosecution for an escape or attempted escape that results in a death or serious bodily injury to another person.
   *f. Confinement pending hearing.*
   (1) The CI accused of an offense for which disciplinary punishment is contemplated will not be confined pending a disciplinary hearing unless it is essential to the interest of camp order and discipline. Its duration will in any case be deducted from any sentence of confinement.
   (2) Any period spent by the CI in confinement awaiting a hearing will be reduced to an absolute minimum. For offenses entailing disciplinary punishment only, it will not exceed 14 days.
   *g. Confinement facilities.* CI confined as disciplinary punishment will undergo their punishment in a CI camp stockade.
   *h. Confinement benefits.* In addition to the benefits provided by paragraph 6-11 b of this regulation, the CI placed in confinement in connection with disciplinary proceedings will be allowed to send and receive letters, cards, and telegrams in accordance with the

provisions of this chapter. Parcels and remittances of money, how-ever, may be withheld from the CI until the completion of the punishment. Parcels will be released to the safekeeping of the Internee Committee. If perishable goods are contained in the parcels, the Internee Committee will give them to the infirmary or hospital.

**6–13. Judicial proceedings**
  *a.* General principles.
  (1) The penal laws of the occupied territory will remain in force, with the exception that they may be repealed or suspended by the United States in cases where they constitute a threat to its security or an obstacle to the application of the GC.
  (2) The United States may subject the population of the occupied territory to provisions that are essential to enable it to fulfill its obligation under the GC, to maintain orderly government of the territory, and to ensure the security of the U.S. Armed Forces.
  (3) The penal provisions enacted by the United States will not come into force before they have been published and brought to the knowledge of the inhabitants in their own language. The effect of penal provisions will not be retroactive.
  (4) The CI may be tried by general court-martial that must sit within the occupied territory. The CI will not be tried before summary or special court-martial.
  (5) No CI will be tried or sentenced for an act that was not forbidden by U.S. law or by international law in force at the time the act was committed.
  (6) No protected person may be punished for an offense he or she has not personally committed.
  (7) No moral or physical coercion will be exerted to induce the CI to admit guilt for any act.
  (8) No CI will be convicted without having had the chance to present a defense with the assistance of a qualified advocate or counsel.
  *b.* Notification of judicial procedures.
  (1) The accused will be promptly notified, in writing in a language they understand, of the charges against them and will be tried as rapidly as possible.
  (2) A notice (in duplicate) of proceedings against the CI will be submitted through channels to HQDA (DAMO-ODL) NPWIC, WASH DC 20310-0400 for transmittal to the protecting power, in cases of charges involving the death penalty or imprisonment for 2 years or more. Upon request, the protecting power will be furnished with information regarding the status of such proceedings. Furthermore, the protecting power will be entitled, on request, to be furnished with all particulars of any other proceedings instituted against the CI.
  (3) The above notice will be sent without delay. The trial will not commence until 3 weeks after the protecting power has been notified.
  (4) The notice will include the following:
  *(a)* Surname and first names; internment serial number; date of birth; and profession, trade, or prior civil capacity of the CI.
  *(b)* Place of internment.
  *(c)* Specification of the charges with penal provisions under which they are brought.
  *(d)* Designation of the court that will hear the case.
  *(e)* Place and date of the first hearing.
  (5) The Internee Committee will be informed of all judicial proceedings against the CI that it represents and of the results of the proceedings.
  (6) The records of trials will be kept by the courts and will be open to inspection by the representatives of the protecting power.
  *c.* Rights and means of defense.
  (1) In each trial by court-martial, the accused will be entitled to assistance by a qualified advocate or counsel of his or her own choice, the calling of witnesses, and if necessary the services of a competent interpreter. The CI will be advised of these rights by the commander concerned in due time before the trial.
  (2) When the accused does not exercise the right to choose an advocate or counsel, notice to that effect will be sent through

HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400, to the protecting power. The protecting power may provide a counsel.
  (3) When the protecting power is not functioning and the accused is faced with a serious charge, the convening authority will provide, subject to consent of the accused, an advocate or counsel.
  (4) Unless the CI freely waives such assistance, an accused will be provided with the assistance of an interpreter both during preliminary investigation and during the hearing in court. The CI will have the right to object to the interpreter provided and to ask for a replacement.
  (5) The defense counsel will be given at least 2 weeks before the opening of the trial and will be granted the necessary facilities to prepare the defense of the accused. The defense counsel will be permitted to visit the accused freely and to interview the accused in private. The defense counsel will also be permitted to confer with any witnesses for the defense including other CI. These privileges will continue until the term of appeal or petition has expired.
  (6) Copies of the charge sheet will be given to the accused and the defense counsel in the language that they understand at least 2 weeks before the trial begins.
  (7) The interpreter, appointed for and sworn by the court, will provide the official translation of all trial proceedings. The interpreter must not be a trial counsel, defense counsel, assistant to either, or witness; nor should he or she have any bias or interest in the case. The interpreter will translate testimony given in the language of the accused into English for the benefit of the court.
  *d.* Participation of protecting power in criminal proceedings. Representatives of the protecting power will be permitted to attend the trial of any CI unless the hearing has to be held secretly as an exceptional measure in the interest of the security of the United States. If a trial is to be held in secret, a notice as to the reasons, the date, and place of the secret trial will be sent to HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400. They will be notified at least three weeks before the opening of the trial to permit timely notification to the protecting power.
  *e.* Notification of judgment and sentence.
  (1) In all cases requiring notification to the protecting power, two copies of the findings, and if applicable the sentence will be forwarded immediately to HQDA, ODCSOPS(DAMO-ODL), NPWIC WASH DC 20310-0400, in the form of a *summary communication* for transmittal to the protecting power. When NPWIC transmits this information to the protecting power, it will include a brief statement of the appellate rights of the accused. Notification as to the decision of the CI to use or waive his or her right to appeal will also be forwarded (in duplicate) to HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400, for transmittal to the protecting power. If the sentence adjudged is death, the information set forth in *g* below, together with one copy of the court-martial record of trial will be forwarded to HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400, for transmittal to the protecting power.
  (2) After final approval of a sentence involving the death penalty or imprisonment for 2 years or more, the following information will be forwarded (in duplicate) to HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400, for transmittal to the protecting power:
  *(a)* A precise wording of the approved finding and sentence.
  *(b)* A summarized report of the evidence.
  *(c)* If applicable, the name of the place where confinement will be served.
  *f.* Appeals in criminal proceedings.
  (1) The convicted CI sentenced to confinement or to punishment other than death will have the right of appeal provided for by the laws applied by the court. In all instances, the CI condemned to death will be permitted to petition for pardon or reprieve. The CI will be fully informed of the right to appeal or petition and of the time within which it must be done.
  (2) When the laws applied by the court make no provision for appeals, the convicted CI will have the right to petition against the finding and sentence to the competent authority of the United States.

(3) Any period allowed for appeal in the case of sentences involving the death penalty or imprisonment of 2 years or more will not begin to run until notification of the judgment has been received by the protecting power.

(4) Courts of Appeal, if at all possible, will sit in the occupied territory.

*g. Death penalty.*

(1) The CI will be informed as soon as possible of all offenses that are punishable by the death sentence under applicable laws. Lists of these offenses will be posted in all camps. Duplicate lists will be given to the Internee Committee.

(2) The death sentence may not be pronounced against the CI who was under 18 years of age at the time of the offense unless the attention of the court has been particularly called to the fact that since the accused is not a national of the United States, he or she is not bound to it by any duty or allegiance.

(3) If the death sentence is pronounced, it will not be executed for at least 6 months from the date when the protecting power received the detailed communication furnished by the United States in regard to trial (e. above) except as provided in (4) below.

(4) The 6-month period after suspension of the death sentence ((3) above) may be reduced in an individual case in circumstances of grave emergency involving an organized threat to the security of the United States. However, the protecting power must always be notified by HQDA (DAMO-ODL) as to the exception to the 6-month waiting period.

*h.* Civil proceedings. In every case where the CI is a party to any civil litigation, the camp commander will if the CI so requests inform the court of his or her detention. The camp commander will, within legal limits, take all necessary steps to prevent the CI from being in any way prejudiced by reason of his or her internment regarding the preparation and conduct of the case or execution of any judgment of the court.

*i.* Confinement pending trial. A pretrial investigation of an offense alleged to have been committed by the CI will be conducted rapidly so that the trial will take place as soon as possible. The CI will not be confined while awaiting trial unless a civilian national of the occupied territory would be so confined if accused of a similar offense. The CI may be confined if it is essential to do so in the interest of camp or national security. However, this confinement will never exceed 3 months.

*j.* Confinement facilities. CI confined as judicial punishment will serve their sentences in an internment facility, assigned by the theater commander, in the occupied territory as long as U.S. authorities can guarantee their protection.

*k.* Confinement benefits. In addition to the benefits stated in paragraph 6-11b, the CI placed in confinement in connection with judicial proceedings will be permitted to receive one relief parcel each month.

## 6–14. Death and burial

*a.* Reference. For general procedures and authorized expenses for the care and disposition of remains, see AR 638-30 and AR 638-40.

*b.* Disposition of wills. When a person has chosen to make a will, the original and two certified copies will be forwarded to the Branch PWIC upon death or at the CI's request.

*c.* Information furnished to camp or hospital commander upon death. When the CI in U.S. custody dies, the attending medical officer will promptly furnish the following to the camp (or hospital) commander, the local provost marshal, or other officers who were charged with the custody of the CI prior to his or her death.

(1) Full name.

(2) ISN.

(3) Date, place, and cause of death.

(4) Statement that in his or her opinion death was, or was not, the result of the CI's own misconduct.

(5) When the cause of death is undetermined, the medical officer will make a statement to that effect.

(6) When the cause of death is finally determined, a supplemental report will be made.

*d.* Notifying the Branch PWIC of a death. The camp or hospital commander or other officer charged with custody of the CI prior to his or her death will notify the local Branch PWIC immediately by telegram of the death. Notification will include all data required in c above. The use of supplemental reports is authorized until requirements have been met.

*e.* Certificate of Death. A copy of DA Form 2669-R is contained in this regulation. For each death, the attending medical officer and the responsible camp commander will complete a DA Form 2669-R. The form will be made out in enough copies to provide the distribution below.

(1) Original—NPWIC.

(2) Copy—Branch PWIC.

(3) Copy—The Surgeon General.

(4) Copy—CI's Personnel File.

(5) If the CI dies in the United States, a copy will be sent to the proper civil authorities responsible for recording deaths in that State.

*f.* Investigating officer's report.

(1) The camp or hospital commander will appoint an officer to investigate and report the following:

*(a)* Each death or serious injury caused, or suspected to have been caused, by guards or sentries, another CI, or any other person.

*(b)* Each suicide or death resulting from unnatural or unknown causes.

(2) The precepts outlined in GC 1949, part IV, section 3, will be used as a guide. (See DA Pam 27-1.)

(3) Military police investigators may be used at the discretion of the camp commander.

*g.* Burial, record of interment, and cremation.

(1) The deceased CI will be buried honorably in a cemetery set up for them according to AR 638-30 and if possible, according to the rites of their religion. Unless unavoidable circumstances require the use of collective (group or mass) graves, the CI will be buried in a separate grave.

(2) Graves Registration Services will record information on burials and graves. A copy of DD Form 551 (Record of Interment) will be forwarded to the Branch PWIC. The United States will care for graves and record of any subsequent moves of the remains.

(3) A body may be cremated only because of imperative hygiene reasons, the CI's religion, or the CI's request for cremation. The reason for cremation of a body will be cited on the death certificate. Ashes will be kept by Graves Registration until proper disposal can be decided according to the instructions of the protecting power.

*h.* Forwarding deceased person's file. The personnel files of a deceased person with all pertinent records will be forwarded to the Branch PWIC.

## 6–15. Transfers

*a.* Authority to transfer. Theater commanders may direct the transfer of the CI, subject to the following conditions:

(1) The CI may not be transferred beyond the borders of the occupied country in which interned except when for material reasons it is impossible to avoid such displacement. The CI thus evacuated will be transferred back to the area from which they were evacuated as soon as hostilities in that area have ceased.

(2) The sick, wounded, or infirmed CI, as well as maternity cases, will not be transferred if the journey would be seriously detrimental to the health of the CI.

(3) If the combat zone draws close to an internment camp, CI may not be transferred unless they can be moved under adequate conditions of safety. However, CI may be moved if they would be exposed to greater risks by remaining than by being transferred.

*b.* Notification of transfer.

(1) The CI to be transferred will be officially advised of their departure and their new postal address in time for them to pack their luggage and notify their next-of-kin. The Internee Committee members to be transferred will be notified in time to acquaint their successors with their duties and related current affairs.

(2) The Branch PWIC and NPWIC will be notified immediately of any CI transferred.

*c.* Treatment during transfer.

(1) Generally, the CI will be transferred under conditions equal to those used for the transfer of personnel of the U.S. Military in the occupied territory. If, as an exceptional measure, the CI must be transferred on foot, only those who are in a fit state of health may be so transferred. The CI will not be exposed to excessive fatigue during transfer by foot.

(2) The sick, wounded, or infirmed CI as well as maternity cases will be evacuated through U.S. military medical channels and will remain in medical channels until they are certified "fit for normal internment" by competent medical authorities.

(3) Potable water and food sufficient in quantity, quality, and variety to maintain them in good health will be provided to the CI during transfer.

(4) Necessary clothing, adequate shelter, and medical attention will be made available.

(5) Suitable precautions will be taken to prevent CI from escaping and to ensure their safety.

*d.* Transfer of personal effects and property.

(1) The CI will be permitted to take with them their personal effects and property. The weight of their baggage may be limited if the conditions of transfer so require, but in no case will it be limited to less than 55 pounds per CI. The personal property that the CI are unable to carry will be forwarded separately.

(2) The mail and parcels addressed to CI who have been transferred will be forwarded to them.

(3) Property, such as that used for religious services, or items donated by welfare agencies will be forwarded as community property. These items are not to be considered a part of the 55 pounds of personal effects and property that each CI is authorized to take.

### 6–16. Release

*a.* General.

(1) Control and accountability of CI will be maintained until the CI is receipted for by a representative of his or her country of residence or a designated protecting power.

(2) After hostilities cease and subject to the provisions of (3) below, CI will be released as soon as the reasons for their internment are determined by the theater commander to no longer exist.

(3) The CI who are eligible for release but have judicial proceedings pending for offenses not exclusively subject to disciplinary punishment will be detained until the close of the proceedings. At the discretion of the theater commander, the CI may be detained until completion of their penalty. The CI previously sentenced to confinement as judicial punishment may be similarly detained. Lists of the CI held under this guidance will be forwarded to the Branch PWIC and NPWIC for transmittal to the protecting power.

*b.* Return of impounded personal effects. Upon release, the CI will be given all articles, moneys, or other valuables impounded during internment and will receive in currency the balance of any credit to their accounts. If the theater commander directs that any impounded currency or articles be withheld, the CI will be given a receipt.

*c.* Cost of transport. The United States will pay the cost of returning the released CI to the places where they were living when interned.

*d.* Medical fitness. The CI will not be admitted into the general population until their medical fitness is determined.

## Chapter 7
## Employment and Compensation—Civilian Internees

### 7–1. General

*a.* Theater commanders may issue, within their respective commands, implementing instructions governing the employment and compensation of the CI consistent with these regulations. Copies of such instructions will be forwarded promptly to ODCSOPS.

*b.* The CI will be employed, so far as possible, in work necessary for the construction, administration, management, and maintenance of the CI camps.

*c.* The CI compensation procedures will be accomplished in accordance with AR 37-1.

### 7–2. Ability to perform labor

*a.* The CI will be required to perform any work consistent with their age and physical condition and in accordance with this regulation.

*b.* The fitness of CI for labor will be determined using the same procedures as those outlined in paragraph 3-4 b.

*c.* The CI under 18 years of age will not be compelled to work.

### 7–3. Authorized work

*a.* Compulsory. The CI may be compelled to perform only the following type of work:

(1) Administrative, maintenance, and domestic work in an internment camp.

(2) Duties connected with the protection of the CI against aerial bombardment or other war risks.

(3) Medical duties if they are professionally and technically qualified.

*b.* Voluntary. Subject to the provisions of paragraph 4-4. and to other restrictions as may be imposed by the theater commander, the CI may volunteer for, but may not be compelled to perform, work of any type without regard to the military character, purpose, or classification of the work. They will be free to terminate such work at any time subject to having labored for 6 weeks and having given an 8-day notice.

### 7–4. Unauthorized work

The criteria for unauthorized work for CI is the same as those found for EPW/RP in paragraph 4-5.

### 7–5. Working conditions

The working conditions for the CI, to include protective clothing, equipment, and safety devices, will be at least as favorable as those prescribed for the civilian population of the occupied territory by the national laws and regulations and as provided for in existing practice. In no case will the working conditions for the CI be inferior to those for the civilian population employed in work of the same nature and in the same district.

### 7–6. Length of workday

*a.* The length of the working day of the CI will not exceed that permitted for civilians in the locality who are employed in the same general type of work. A rest period of not less than 1 hour will be allowed during the workday.

*b.* The length of the workday for CI will be in accordance with paragraph 4-8.

### 7–7. Day of rest

Each CI will be allowed a rest of 24 consecutive hours every week, preferably on Sunday or on the day of rest in his or her country.

### 7–8. Paid work

The following are types of work for which the CI will be compensated:

*a.* Services, including domestic tasks, in connection with administering and maintaining CI camps, branch camps, and hospitals when the CI performs these services permanently.

*b.* Spiritual and medical duties performed by the CI on behalf of their fellow CI.

*c.* Services as members and as assistants to the members of the Internee Committee. These persons will be paid from the camp Civilian Internee Account. If there is no such account, they will be paid the prescribed rate from U.S. Army appropriated funds.

*d.* All types of work that the CI does not have to do but does voluntarily.

LEXSEE 6 BEVANS 1113

U.S. Treaties on LEXIS

CUBA

LEASE OF LANDS FOR COALING AND NAVAL STATIONS

Treaty Series 418

*1903 U.S.T. LEXIS 26; 6 Bevans 1113*

February 16, 1903, Date-Signed; February 23, 1903, Date-Signed

February 23, 1903, Date-In-Force

**STATUS:**
[*1] Agreement signed at Havana February 16, 1903, and at Washington February 23, 1903
Entered into force February 23, 1903
Continued in effect by treaty of May 29, 1934 n1

n1 TS 866, post, p. 1161.

AGREEMENT BETWEEN THE UNITED STATES OF AMERICA AND THE RE-
PUBLIC OF CUBA FOR THE LEASE (SUBJECT TO TERMS TO BE AGREED UPON
BY THE TWO GOVERNMENTS) TO THE UNITED STATES OF LANDS IN CUBA
FOR COALING AND NAVAL STATIONS

**TEXT:**
The United States of America and the Republic of Cuba, being desirous to execute fully the provisions of Article VII of
the Act of Congress approved March second, 1901, n2 and of Article VII of the Appendix to the Constitution of the
Republic of Cuba promulgated on the 20th of May, 1902, which provide:

n2 31 Stat. 898.

"Article VII. To enable the United States to maintain the independence of Cuba, and to protect the people thereof,
as well as for its own defense, the Cuban Government will sell or lease to the United States the lands necessary for coal-
ing or naval stations, at certain specified points, to be agreed [*2] upon with the President of the United States."

have reached an agreement to that end, as follows:

ARTICLE I

The Republic of Cuba hereby leases to the United States, for the time required for the purposes of coaling and naval
stations, the following described areas of land and water situated in the Island of Cuba:

1st. In Guantanamo (see Hydrographic Office Chart 1857).

From a point on the south coast, 4.37 nautical miles to the eastward of Windward Point Light House, a line running
north (true) a distance of 4.25 nautical miles;

From the northern extremity of this line, a line running west (true), a distance of 5.87 nautical miles;

From the western extremity of this last line, a line running southwest (true), 3.31 nautical miles;

From the southwestern extremity of this last line, a line running south (true), to the seacoast.

1903 U.S.T. LEXIS 26, *; 6 Bevans 1113

This lease shall be subject to all the conditions named in Article II of this agreement.

2nd. In Northwestern Cuba (see Hydrographic Office Chart 2036).

In Bahia Honda (see Hydrographic Office Chart 520b).

All that land included in the peninsula containing Cerro del Morrillo and Punta del Carenero situated to the westward of a line running south (true) from  [*3]  the north coast at a distance of thirteen hundred yards east (true) from the crest of Cerro del Morrillo, and all the adjacent waters touching upon the coast line of the above described peninsula and including the estuary south of Punta del Carenero with the control of the headwaters as necessary for sanitary and other purposes.

And in addition all that piece of land and its adjacent waters on the western side of the entrance to Bahia Honda included between the shore line and a line running north and south (true) to low water marks through a point which is west (true) distant one nautical mile from Pta. del Cayman.

ARTICLE II

The grant of the foregoing Article shall include the right to use and occupy the waters adjacent to said areas of land and water, and to improve and deepen the entrances thereto and the anchorages therein, and generally to do any and all things necessary to fit the premises for use as coaling or naval stations only, and for no other purpose.

Vessels engaged in the Cuban trade shall have free passage through the waters included within this grant.

ARTICLE III

While on the one hand the United States recognizes the continuance of the ultimate sovereignty of the Republic [*4]  of Cuba over the above described areas of land and water, on the other hand the Republic of Cuba consents that during the period of the occupation by the United States of said areas under the terms of this agreement the United States shall exercise complete jurisdiction and control over and within said areas with the right to acquire (under conditions to be hereafter agreed upon by the two Governments) for the public purposes of the United States any land or other property therein by purchase or by exercise of eminent domain with full compensation to the owners thereof.

Done in duplicate at Habana, and signed by the President of the Republic of Cuba this sixteenth day of February, 1903.

Signed by the President of the United States the twenty third of February, 1903.

**SIGNATORIES:**
T. ESTRADA PALMA

[SEAL]

THEODORE ROOSEVELT

[SEAL]

LEXSEE 6 BEVANS 1120

U.S. Treaties on LEXIS

CUBA

LEASE OF CERTAIN AREAS FOR NAVAL OR COALING STATIONS

Treaty Series 426

*1903 U.S.T. LEXIS 28; 6 Bevans 1120*

July 2, 1903, Date-Signed

October 6, 1903, Date-In-Force

**STATUS:**
 [*1]  Lease signed at Havana July 2, 1903
Ratified by Cuba August 17, 1903
Approved by the President of the United States October 2, 1903
Ratifications exchanged at Washington October 6, 1903
Entered into force October 6, 1903
Continued in effect by treaty of May 29, 1934 n1

n1 TS 866, post, p. 1161.

[NO LONG-TITLE IN ORIGINAL]

**TEXT:**
The United States of America and the Republic of Cuba, being desirous to conclude the conditions of the lease of areas of land and water for the establishment of naval or coaling stations in Guantanamo and Bahia Honda the Republic of Cuba made to the United States by the Agreement of February 16/23, 1903, n2 in fulfillment of the provisions of Article Seven of the Constitutional Appendix of the Republic of Cuba, have appointed their Plenipotentiaries to that end.

n2 TS 418, *ante*, p. 1113.

The President of the United States of America, HERBERT G. SQUIERS, Envoy Extraordinary and Minister Pleni-potentiary in Havana,

And the President of the Republic of Cuba, JOSE M. GARCIA MONTES, Secretary of  [*2]  Finance, and acting Secretary of State and Justice, who, after communicating to each other their respective full powers, found to be in due form, have agreed upon the following Articles:

ARTICLE I

The United States of America agrees and covenants to pay to the Republic of Cuba the annual sum of two thousand dollars, in gold coin of the United States, as long as the former shall occupy and use said areas of land by virtue of said Agreement.

All private lands and other real property within said areas shall be acquired forthwith by the Republic of Cuba.

The United States of America agrees to furnish to the Republic of Cuba the sums necessary for the purchase of said private lands and properties and such sums shall be accepted by the Republic of Cuba as advance payment on account of rental due by virtue of said Agreement.

1903 U.S.T. LEXIS 28, *; 6 Bevans 1120

## ARTICLE II

The said areas shall be surveyed and their boundaries distinctly marked by permanent fences or inclosures.

The expenses of construction and maintenance of such fences or inclosures shall be borne by the United States.

## ARTICLE III

The United States of America agrees that no person, partnership, or corporation shall be permitted to establish or maintain a commercial, [*3] industrial or other enterprise within said areas.

## ARTICLE IV

Fugitives from justice charged with crimes or misdemeanors amenable to Cuban law, taking refuge within said areas, shall be delivered up by the United States authorities on demand by duly authorized Cuban authorities.

On the other hand the Republic of Cuba agrees that fugitives from justice charged with crimes or misdemeanors amenable to United States law, committed within said areas, taking refuge in Cuban territory, shall on demand, be delivered up to duly authorized United States authorities.

## ARTICLE V

Materials of all kinds, merchandise, stores and munitions of war imported into said areas for exclusive use and consumption therein, shall not be subject to payment of customs duties nor any other fees or charges and the vessels which may carry same shall not be subject to payment of port, tonnage, anchorage or other fees, except in case said vessels shall be discharged without the limits of said areas; and said vessels shall not be discharged without the limits of said areas otherwise than through a regular port of entry of the Republic of Cuba when both cargo and vessel shall be subject to all Cuban Customs laws and regulations [*4] and payment of corresponding duties and fees.

It is further agreed that such materials, merchandise, stores and munitions of war shall not be transported from said areas into Cuban territory.

## ARTICLE VI

Except as provided in the preceding Article vessels entering into or departing from the Bays of Guantanamo and Bahia Honda within the limits of Cuban territory shall be subject exclusively to Cuban laws and authorities and orders emanating from the latter in all that respects port police, Customs or Health, and authorities of the United States shall place no obstacle in the way of entrance and departure of said vessels except in case of a state of war.

## ARTICLE VII

This lease shall be ratified and the ratifications shall be exchanged in the City of Washington within seven months from this date.

In witness whereof, We, the respective Plenipotentiaries, have signed this lease and hereunto affixed our Seals.

Done at Havana, in duplicate in English and Spanish this second day of July nineteen hundred and three.

**SIGNATORIES:**
H. G. SQUIERS

[SEAL]

JOSE M. GARCIA MONTES

[SEAL]

LEXSEE 6 BEVANS 1161

U.S. Treaties on LEXIS

CUBA

RELATIONS WITH CUBA

Treaty Series 866

*1934 U.S.T. LEXIS 74; 6 Bevans 1161*

May 29, 1934, Date-Signed

June 9, 1934, Date-In-Force

**STATUS:**
[*1] Treaty signed at Washington May 29, 1934
Senate advice and consent to ratification May 31, 1934
Ratified by Cuba June 4, 1934
Ratified by the President of the United States June 5, 1934
Ratifications exchanged at Washington June 9, 1934
Entered into force June 9, 1934
Proclaimed by the President of the United States June 9, 1934

[NO LONG-TITLE IN ORIGINAL]

**TEXT:**
The United States of America and the Republic of Cuba, being animated by the desire to fortify the relations of friendship between the two countries and to modify, with this purpose, the relations established between them by the Treaty of Relations signed at Habana, May 22, 1903, n1 have appointed, with this intention, as their Plenipotentiaries:

n1 TS 437, *ante*, p. 1116.

The President of the United States of America; Mr. Cordell Hull, Secretary of State of the United States of America, and Mr. Sumner Welles, Assistant Secretary of State of the United States of America; and

The Provisional President of the Republic of Cuba, Senor Dr. Manuel Marquez Sterling, Ambassador [*2] Extraordinary and Plenipotentiary of the Republic of Cuba to the United States of America;

Who, after having communicated to each other their full powers which were found to be in good and due form, have agreed upon the following articles:

ARTICLE I

The Treaty of Relations which was concluded between the two contracting parties on May 22, 1903, shall cease to be in force, and is abrogated, from the date on which the present Treaty goes into effect.

ARTICLE II

All the acts effected in Cuba by the United States of America during its military occupation of the island, up to May 20, 1902, the date on which the Republic of Cuba was established, have been ratified and held as valid; and all the rights legally acquired by virtue of those acts shall be maintained and protected.

ARTICLE III

1934 U.S.T. LEXIS 74, *; 6 Bevans 1161

Until the two contracting parties agree to the modification or abrogation of the stipulations of the agreement in regard to the lease to the United States of America of lands in Cuba for coaling and naval stations signed by the President of the Republic of Cuba on February 16, 1903, and by the President of the United States of America on the 23d day of the same month and year, n2 the stipulations of that [*3] agreement with regard to the naval station of Guantanamo shall continue in effect. The supplementary agreement in regard to naval or coaling stations signed between the two Governments on July 2, 1903, n3 also shall continue in effect in the same form and on the same conditions with respect to the naval station at Guantanamo. So long as the United States of America shall not abandon the said naval station of Guantanamo or the two Governments shall not agree to a modification of its present limits, the station shall continue to have the territorial area that it now has, with the limits that it has on the date of the signature of the present Treaty.

      n2 TS 418, *ante*, p. 1113.

      n3 TS 426, *ante*, p. 1120.

If at any time in the future a situation should arise that appears to point to an outbreak of contagious disease in the territory of either of the contracting parties, either of the two Governments shall, for its own protection, and without its act being considered unfriendly, exercise freely and at its discretion [*4] the right to suspend communications between those of its ports that it may designate and all or part of the territory of the other party, and for the period that it may consider to be advisable.

ARTICLE V

The present Treaty shall be ratified by the contracting parties in accordance with their respective constitutional methods; and shall go into effect on the date of the exchange of their ratifications, which shall take place in the city of Washington as soon as possible.

IN FAITH WHEREOF, the respective Plenipotentiaries have signed the present Treaty and have affixed their seals hereto.

DONE in duplicate, in the English and Spanish languages, at Washington on the twenty-ninth day of May, one thousand nine hundred and thirty-four.

**SIGNATORIES:**
CORDELL HULL

    [SEAL]

    SUMNER WELLES

    [SEAL]

    M. MARQUEZ STERLING

    [SEAL]

Nos. 03-334 and 03-343

IN THE SUPREME COURT OF THE UNITED STATES

SHAFIQ RASUL, ET AL., PETITIONERS

v.

GEORGE W. BUSH,
PRESIDENT OF THE UNITED STATES, ET AL.

FAWZI KHALID ABDULLAH FAHAD AL ODAH,
ET AL., PETITIONERS

v.

UNITED STATES OF AMERICA, ET AL.

ON WRIT OF CERTIORARI TO THE
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

## BRIEF FOR THE RESPONDENTS

THEODORE B. OLSON
  Solicitor General
    Counsel of Record

PETER D. KEISLER
  Assistant Attorney General

PAUL D. CLEMENT
  Deputy Solicitor General

GREGORY G. KATSAS
  Deputy Assistant Attorney General

WILLIAM H. TAFT IV            GREGORY G. GARRE
  Legal Adviser               DAVID B. SALMONS
  Department of State           Assistants to the Solicitor
  Washington, D.C.  20520-6419    General

                              DOUGLAS N. LETTER
                              ROBERT M. LOEB
                              SHARON SWINGLE
                                Attorneys
                                Department of Justice
                                Washington, D.C.  20530-0001
                                (202) 514-2217

## QUESTION PRESENTED

Whether United States courts lack jurisdiction to consider challenges to the legality of detention of foreign nationals captured abroad in connection with hostilities and incarcerated at the Guantanamo Bay Naval Base, Cuba.

(I)

IN THE SUPREME COURT OF THE UNITED STATES

_____

No. 03-334

SHAFIQ RASUL, ET AL., PETITIONERS

v.

GEORGE W. BUSH,
PRESIDENT OF THE UNITED STATES, ET AL.

_____

No. 03-343

FAWZI KHALID ABDULLAH FAHAD AL ODAH,
ET AL., PETITIONERS

v.

UNITED STATES OF AMERICA, ET AL.

_____

ON WRIT OF CERTIORARI TO THE
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**BRIEF FOR THE RESPONDENTS**

_____

This case arises in the midst of the global armed conflict in which the United States is currently engaged against the al Qaeda terrorist network and its supporters. At issue is whether U.S. courts have jurisdiction to consider challenges to the detention of aliens who were captured abroad in connection with the ongoing combat operations in Afghanistan and determined to be enemy combatants, and who are being detained by the U.S. military to prevent them from rejoining the conflict and for other military purposes at the U.S. Naval Base at Guantanamo Bay, Cuba. Applying the principles recognized by this Court in Johnson v. Eisentrager,

2

339 U.S. 763 (1950), the court of appeals correctly held that U.S. courts lack jurisdiction over such claims.

## STATEMENT

1.  a.  On September 11, 2001, the United States experienced the most deadly and savage foreign attack on civilian lives and property and its commercial and government infrastructure in one day in the Nation's history.  Two jumbo commercial airliners loaded with passengers and jet fuel were hijacked by agents of the al Qaeda terrorist network and launched as missiles in the early morning business hours into two of the largest office buildings in the United States in the heart of New York City; another jumbo airliner was hijacked and flown into the heart of the Department of Defense at the Pentagon; and a fourth jumbo airliner was brought down in Pennsylvania due to efforts of passengers, saving another target presumed to be the U.S. Capitol or the White House. Approximately 3000 people were killed, thousands more were injured, hundreds of millions of dollars of property was destroyed, and the U.S. economy was severely damaged.

In response, the President, acting as Commander in Chief, took action to defend the country and to prevent additional attacks. Congress supported the President's use of "all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist [September 11] attacks * * * or harbored such organizations or persons."  Authorization for Use of Military Force, Pub. L. No. 107-40, §§ 1-2, 115 Stat. 224.  Congress also

3

emphasized that the forces responsible for the September 11th attacks "continue to pose an unusual and extraordinary threat to the national security," and that "the President has authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States." Ibid.

The President dispatched the U.S. armed forces to Afghanistan to seek out and subdue the al Qaeda terrorist network and the Taliban regime that had supported it. During the course of those operations, U.S. and coalition forces have removed the Taliban from power, eliminated the "primary source of support to the terrorists who viciously attacked our Nation on September 11, 2001" and "seriously degraded" al Qaeda's training capability. Office of the White House Press Secretary, Letter from the President to the Speaker of the House of Representatives and the President Pro Tempore of the Senate (Sept. 19, 2003) (<www.whitehouse.gov/news/releases/2003/09/20030919-1.html>). However, "[p]ockets of al Qaeda and Taliban forces remain a threat to United States and coalition forces and to the Afghan government," and "[w]hat is left of both the Taliban and the al Qaeda fighters is being pursued actively and engaged by United States and coalition forces." Ibid.

An American-led force of approximately 11,500 soldiers and a NATO-led force of 5000 remain engaged in active combat operations in Afghanistan. Fighting has intensified in recent months, as al Qaeda and Taliban combatants have continued to launch attacks on

4

U.S. troops, foreign aid workers, and Afghan government officials.[1] At the same time, Osama bin Laden, the leader of al Qaeda, has continued to call on al Qaeda and its supporters to continue their terrorist holy war, or jihad, against the United States, and the United States and other nations have been subject to attacks throughout the world. See, e.g., Tape urges Muslim fight against U.S. (Feb. 2, 2003) (<www.cnn.com/2003/ALLPOLITICS/02/11/powell. binladen/index.html>); see also Transcript of Osama Bin Laden Tape Recording (Feb. 11, 2002) ("[W]e should drag the forces of the enemy into a protracted, weakening, and long fight.").[2]

b.  U.S. and coalition forces have captured or taken control of thousands of individuals in connection with the ongoing hostilities in Afghanistan.  As in virtually every other armed conflict in the Nation's history, the military has determined that many of those individuals should be detained during the conflict as

---

[1] See, e.g., Afghan Attack Follows An Upsurge in Threats: Taliban Role in Question as 12 Are Arrested, Wash. Post, Feb. 24, 2004, at A12; Pakistan to Step Up Border Operations With U.S. Help, Army Preparing Major Assault Against Taliban, al Qaeda, Wash. Post, Feb. 23, 2004, at A14; Ambush Kills Four Afghan Aid Workers, Wash. Post, Feb. 15, 2004, at A24; Barbara Starr, U.S. eyes spring offensive in Afghanistan: Hunt for bin Laden focuses on eastern Afghanistan (Jan. 29, 2004) (<www.cnn.com/2004/WORLD/ asiapcf/01/28/afghanistan.us/index.html>).

[2] In a recently released audiotape, a voice believed to be that of one of Osama bin Laden's top lieutenants stated that "the situation is not stable in Afghanistan," and threatened:  "Bush, fortify your targets, tighten your defense, intensify your security measures, because the fighting Islamic community -- which sent you New York and Washington battalions --has decided to send you one battalion after the other, carrying death and seeking heaven."  Qaeda Tapes Taunt U.S., France (Feb. 24, 2004) (<www.cbsnews.com/stories/2004/01/04/terror/main591217.shtml>).

5

enemy combatants. Such detention serves the vital military objectives of preventing captured combatants from rejoining the conflict and gathering intelligence to further the overall war effort and prevent additional attacks. The military's authority to capture and detain such combatants is both well-established and time-honored. See, e.g., Duncan v. Kahanamoku, 327 U.S. 304, 313-314 (1946); Ex parte Quirin, 317 U.S. 1, 30-31 & n.8 (1942); Hamdi v. Rumsfeld, 316 F.3d 450, 465-466 (4th Cir. 2003), pet. for cert. granted, 124 S. Ct. 981 (2004); 2 L. Oppenheim, International Law 368-369 (H. Lauterpacht ed., 7th ed. 1952); William Winthrop, Military Law and Precedents 788 (2d ed. 1920).

Individuals taken into U.S. control in connection with the ongoing hostilities undergo a multi-step screening process to determine if their detention is necessary. When an individual is captured, commanders in the field, using all available information, make a determination as to whether the individual is an enemy combatant, i.e., whether the individual "is part of or supporting forces hostile to the United States or coalition partners, and engaged in an armed conflict against the United States." Dep't of Defense, Fact Sheet: Guantanamo Detainees (<www.defenselink.mil/

6

news/detainees.html.>) (<u>Guantanamo Detainees</u>).[3]  Individuals who are not enemy combatants are released by the military.

Individuals who are determined to be enemy combatants are sent to a centralized holding in the area of operations where a military screening team reviews all available information with respect to the detainees, including information derived from interviews of the detainee.  That screening team looks at the circumstances of capture, the threat the individual poses, his intelligence value, and with the assistance from other U.S. government officials on the ground, determines whether continued detention is warranted. Detainees whom the U.S. military determines, after conducting this screening process, have a high potential intelligence value or pose a particular threat may be transferred to the U.S. Naval Base at Guantanamo Bay, Cuba.  A general officer reviews the screening team's recommendations.  Any recommendations for transfer for continued detention at Guantanamo are further reviewed by a Department of Defense review panel.  Approximately 10,000 individuals have been screened in Afghanistan and released from U.S. custody.  See <u>Guantanamo Detainees</u>, <u>supra</u>.

c. Only a small fraction of those captured in connection with the current conflict and subjected to this screening process have

_____

[3] Additional information on the military's screening procedures and the Guantanamo detentions is available at <u>Department of Defense, Detainees at Guantanamo Bay</u> (<www.defenselink.mil/news/ detainees.html>); <u>Secretary Rumsfeld Remarks to Greater Miami Chamber of Commerce</u> (Feb. 13, 2004) (<www.defenselink.mil/transcripts/2004/tr20040213-0445.html>); <u>Briefing on Detainee Operations at Guantanamo</u> (Feb. 13, 2004) (www.defenselink.mil/transcripts/2004/tr20040213-0443 .html>).

7

been designated for detention at Guantanamo. Upon their arrival at Guantanamo, detainees are subject to an additional assessment by military commanders regarding the need for their detention. That assessment is based on information obtained from the field, detainee interviews, and intelligence and law enforcement sources. In addition, there is a thorough process in place for determining whether a detainee may be released or transferred to another government, consistent with the interests of national security. That process includes an initial review by a team of interrogators, analysts, behavioral scientists, and regional experts, and a further round of review by the commander of the Southern Command, who forwards a recommendation to an interagency group composed of representatives from, _inter alia_, the Department of Defense, Department of Justice, and Department of State. The recommendation is then reviewed by the Secretary of Defense or his designee. See Guantanamo Detainees, _supra_.[4]

The military is currently detaining about 650 aliens at Guantanamo. They include direct associates of Osama Bin Laden; al Qaeda operatives with specialized training; bodyguards, recruiters, and intelligence operatives for al Qaeda; and Taliban leaders. The

---

[4] In addition to these existing procedures, the Department of Defense has recently announced that it will, on a going-forward basis, establish administrative review boards to review at least annually the need to detain each enemy combatant. Detainees will be afforded an opportunity to appear before the panel and the detainee's foreign government will be able to submit information to the panel. The panel will make an independent recommendation on whether continued detention is appropriate. See Dep't of Defense, News Release (<www.defenselink.mil/releases/2004/nr20040303-0403.html.>)

8

intelligence gathered at Guantanamo has been vital to the ongoing combat operations in Afghanistan and elsewhere around the world, and to efforts to disrupt the al Qaeda terrorist network and prevent additional attacks on the United States and its allies. Among other things, Guantanamo detainees have revealed al Qaeda leadership structures, funding mechanisms, training and selection programs, and potential modes of attack.  In addition, detainees have provided a continuous source of information to confirm other intelligence reports concerning unfolding terrorist plots or other developments in the conflict.  See Guantanamo Detainees, supra.

The President has determined that neither al Qaeda nor Taliban detainees are entitled to prisoner-of-war status under the Geneva Convention Relative to the Treatment of Prisoners of War of August 12, 1949, 75 U.N.T.S. No. 972.  See Guantanamo Detainees, supra; Office of the White House Press Secretary, Fact Sheet, Status of Detainees at Guantanamo (Feb. 7, 2002) (<www.whitehouse.gov/ news/releases/2002/02/20020207-13.html>); note 18, infra.  However, the Department of Defense has made clear that it is treating detainees at Guantanamo humanely and providing them with many privileges similar to those accorded to prisoners of war, including three meals a day that meet Muslim dietary laws, specialized medical care, religious worship privileges, means to send and receive mail, and visits from representatives of the International Red Cross.  See Guantanamo Detainees, supra; C.A. App. 153-154.

The Guantanamo detentions already have been the subject of extensive diplomatic discussions between the Executive and

9

officials of the foreign governments of detainees' home countries.
To date, more than 90 detainees have been released (or designated
for release) from Guantanamo to foreign governments.   In addition,
the President has determined that six detainees are subject to the
Military Order of November 13, 2001, making them eligible for
prosecution by a military commission for violations of the laws of
war.   See Detention, Treatment, and Trial of Certain Non-Citizens
in the War Against Terrorism, 66 Fed. Reg. 57,833 (Nov. 13, 2001).
The United States has charged two of those detainees with
conspiracy to commit war crimes.   See Guantanamo Detainees Charged
With Conspiracy to Commit War Crimes (Feb. 24, 2004)
(<www.dod.mil/news/Feb2004/n02242004_200402246.html>).

    d.   The Guantanamo Naval Base is located on a natural harbor
along the southeast coast of the Republic of Cuba.   The United
States occupies and operates the base pursuant to a Lease Agreement
with Cuba, which was executed in 1903 in the aftermath of the
Spanish-American War.   Lease of Lands for Coaling and Naval
Stations, Feb. 23, 1903, U.S.-Cuba, T.S. No. 418 (6 Bevans 1113)
(1903 Lease Agreement).   The 1903 Lease Agreement was reaffirmed by
a 1934 treaty, which extended the terms of the lease "[u]ntil the
two contracting parties agree to the modification or abrogation of
the stipulations."   Treaty on Relations with Cuba, May 29, 1934,
U.S.-Cuba, art. III, 48 Stat. 1682, 1683, T.S. No. 866.

    Under the 1903 Lease Agreement, "the United States recognizes
the continuance of the ultimate sovereignty of the Republic of Cuba
over the [leased area]," and "Cuba consents that during the period

10

of the occupation by the United States of said areas * * * the
United States shall exercise complete jurisdiction and control over
and within said areas." 1903 Lease Agreement art. III. A
supplemental agreement specifies that the United States agrees to
pay Cuba an annual sum (at that time, $2000) as long as it "shall
occupy and use" Guantanamo under the 1903 Lease Agreement. Lease
of Certain Areas for Naval or Coaling Stations, July 2, 1903, U.S.-
Cuba, art. I, T.S. No. 426 (6 Bevans 1120) (Supplemental Lease).
The Supplemental Lease also states that the United States may not
permit anyone "to establish or maintain a commercial, industrial or
other enterprise" on Guantanamo and establishes other terms and
restrictions governing the United States' occupancy of Guantanamo.
Id., art. III.

2. This litigation involves three actions brought in the
District Court for the District of Columbia against the President,
Secretary of Defense, and other military commanders on behalf of
certain named aliens who were captured overseas in connection with
the fighting in Afghanistan and transferred to Guantanamo.

a. On February 19, 2002, the parents of four British and
Australian nationals at Guantanamo filed a next-friend petition for
habeas corpus on behalf of those detainees. Rasul v. Bush (No. 03-
334). Petitioners Shafiq Rasul and Asif Iqbal were recently
designated for release to the custody of Great Britain (although
they remain at Guantanamo pending release). Petitioner David
Hicks, an Australian, has been designated by the President under
the November 13, 2001 military order. As a result, the Department

11

of Defense may charge Hicks with a violation of the laws of war before a military commission, and Hicks has been permitted to meet with a military counsel, civilian counsel, and a foreign attorney consultant.  The amended petition in Rasul (J.A. 74-101), inter alia, challenges the legality of the aliens' detention, seeks their release, and seeks an order barring interrogations and granting them access to counsel.  J.A. 96-98.

b.  On May 1, 2002, the family members of 12 Kuwaiti nationals detained at Guantanamo filed Al Odah v. United States (No. 03-343).  Although their complaint (see J.A. 14-35) invokes jurisdiction under, inter alia, the habeas statute, the Al Odah petitioners declined to style their suit as a habeas petition and instead purport to challenge the legality of the detainees' detention under the Administrative Procedure Act (APA), 5 U.S.C. 551 et seq., Alien Tort Statute, 28 U.S.C. 1350, and directly under the Fifth Amendment to the Constitution.  They seek, inter alia, an order declaring that the aliens' detention is arbitrary and unlawful, and providing the detainees with access to counsel.  J.A. 34.

c.  On June 10, 2002, the wife of another Guantanamo detainee, Mamdouh Habib, filed a petition for habeas corpus on his behalf. Habib v. Bush (consolidated with Rasul, No. 03-334).  Habib is an Australian national who was initially taken into custody by Pakistani and Egyptian authorities near the border of Afghanistan, and was transferred to the control of the U.S. military.  The habeas petition in Habib (see J.A. 106-127), inter alia, challenges

12

the legality of Habib's detention, seeks his immediate release, and seeks an order enjoining the military from interrogating Habib and granting him access to counsel.  J.A. 121-125.

3.  The government moved to dismiss all three actions for lack of subject-matter jurisdiction.  As the government explained in its motions to dismiss, under the principles recognized by this Court in Johnson v. Eisentrager, supra, U.S. courts lack jurisdiction over claims filed on behalf of the Guantanamo detainees because they are aliens with no connection to the United States, and they are being detained outside of the sovereign territory of the United States.   The district court agreed that "Eisentrager, and its progeny, are controlling" (Pet. App. 48a (citation omitted)), and dismissed for lack of jurisdiction.  Id. at 32a-64a.

4.  The court of appeals affirmed.  Pet. App. 1a-29a.  The court concluded that "the detainees [in this case] are in all relevant respects in the same position as the prisoners in Eisentrager" and thus held that, under the fundamental principles established by this Court in Eisentrager, "the [United States] courts are not open to them."  Id. at 18a.  As the court explained, like the prisoners in Eisentrager, the Guantanamo detainees "too are aliens, they too were captured during military operations, they were in a foreign country when captured, they are now abroad, they are in the custody of the American military, and they have never had any presence in the United States."  Id. at 10a.

13

## SUMMARY OF ARGUMENT

The court of appeals correctly held that U.S. courts lack jurisdiction over challenges to the legality of the detention of aliens captured abroad and detained by the U.S. military at the U.S. Naval Base at Guantanamo Bay, Cuba.

I.  The fundamental jurisdictional question presented in this case is governed by this Court's decision in Johnson v. Eisentrager, 339 U.S. 763 (1950).  In Eisentrager, the Court held that U.S. courts lacked jurisdiction to consider a habeas petition filed on behalf of German nationals who had been seized overseas following the German surrender in World War II, tried by a military commission, and imprisoned at a U.S.-controlled facility in Germany.  The Court concluded that neither the federal habeas statutes nor the Constitution conferred such jurisdiction.  In addition, the Court emphatically rejected the argument that the Fifth Amendment confers rights on aliens held outside the sovereign territory of the United States.  Id. at 784.

Subsequent developments have only reinforced Eisentrager's analytical foundation.  First, Congress has not amended the habeas statutes to confer the jurisdiction that this Court held was absent in Eisentrager and, indeed, did not enact a proposed amendment in the wake of Eisentrager that would have explicitly conferred such jurisdiction.  Second, this Court has repeatedly reaffirmed Eisentrager's constitutional holding that the Fifth Amendment does not apply to aliens abroad.  See, e.g., United States v. Verdugo-Urquidez, 494 U.S. 259 (1990).  Third, the U.S. military has

14

detained thousands of aliens abroad in connection with several conflicts since 1950, but the U.S. courts have not entertained any habeas petition filed on such an alien's behalf.

_Eisentrager_ controls the outcome in this case. The Guantanamo detainees, like the detainees in _Eisentrager_, are aliens who were captured overseas in connection with an armed conflict and have no connection to the United States. In addition, the Guantanamo detainees, like the detainees in _Eisentrager_, are being held by the U.S. military outside the sovereign territory of the United States. It is "undisputed" that Guantanamo is not part of the sovereign United States, Pet. App. 55a (district court), and that conclusion is compelled by the express terms of the Lease Agreements between the United States and Cuba and the Executive Branch's definitive construction of those agreements. Accordingly, U.S. courts lack jurisdiction to consider claims filed on behalf of aliens held at Guantanamo.

II. Petitioners' efforts to recast and evade this Court's decision in _Eisentrager_ are unavailing. _Eisentrager_ is not distinguishable on the ground that the Guantanamo Naval Base is under the control of the United States. _Eisentrager_ itself makes clear that sovereignty, not mere control, is the touchstone of its jurisdictional rule. Thus, even though the U.S. military controlled the Landsberg prison in post-war Germany, the _Eisentrager_ Court held that the alien prisoners in that facility lacked access to our courts because they were outside the sovereign territory of the United States. The same is equally true with

15

respect to the Guantanamo detainees.

Nor did the Court's jurisdictional ruling in <u>Eisentrager</u> turn on the fact that the prisoners were "enemy" aliens. <u>Eisentrager</u> addressed the restrictions on "the privilege of litigation" that apply to "aliens, <u>whether friendly or enemy</u>." 339 U.S. at 777-778 (emphasis added). Moreover, this Court has recognized in subsequent cases that <u>Eisentrager</u> is a seminal decision defining the rights of <u>all</u> aliens abroad, and not just "enemy" aliens. See, <u>e.g.</u>, <u>Zadvydas</u> v. <u>Davis</u>, 533 U.S. 678 (2001). And, in any event, the detainees in this case -- who were captured in connection with the fighting in Afghanistan and who have been determined by the U.S. military to be enemy combatants -- plainly qualify as enemy aliens for any relevant purposes.

Petitioners also are mistaken in arguing that <u>Eisentrager</u>'s jurisdictional holding is conditioned on a threshold inquiry into the legality of an alien's detention under international law. There is no statutory, precedential, or historical basis for this Court to tie the availability of federal jurisdiction to the merits of a detainee's international law claims. That is especially true where, as here, the claims are based on international agreements -- like the Geneva Convention -- that, as <u>Eisentrager</u> recognized, are not privately enforceable in a court and instead are designed for enforcement through political and diplomatic channels.

III. Deviating from the principles recognized in <u>Eisentrager</u> in this case would raise grave constitutional concerns. The Constitution commits to the political branches and, in particular,

16

the President, the responsibility for conducting the Nation's foreign affairs and military operations.  Exercising jurisdiction over claims filed on behalf of aliens held at Guantanamo would place the federal courts in the unprecedented position of micro-managing the Executive's handling of captured enemy combatants from a distant combat zone where American troops are still fighting; require U.S. soldiers to divert their attention from the combat operations overseas; and strike a serious blow to the military's intelligence-gathering operations at Guantanamo.  At the same time, recognizing jurisdiction over petitioners' claims would intrude on Congress's ability to delineate the subject-matter jurisdiction of the federal courts.

IV.   The Guantanamo detentions are the subject of intense diplomatic, congressional, and public consideration.  As this Court observed in <u>Eisentrager</u>, a recognition of the established jurisdictional limits of the U.S. courts does not mean that detainees are without rights.   Rather, the "responsibility for observance and enforcement" of the rights of aliens held abroad under the law of armed conflict "is upon political and military authorities," 339 U.S. at 789 n.14, not the courts.

ARGUMENT

**U.S. COURTS LACK JURISDICTION TO CONSIDER CLAIMS FILED ON BEHALF OF ALIENS CAPTURED ABROAD AND HELD AT GUANTANAMO**

As this Court has repeatedly reaffirmed, "[f]ederal courts are courts of limited jurisdiction.   They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree."  <u>Kokkonen</u> v. <u>Guardian Life Ins. Co. of Am.</u>,

17

511 U.S. 375, 377 (1994) (citations omitted); see also Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 (1982); Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 374 (1978); Marbury v. Madison, 5 U.S. (1 Cranch) 137, 173-180 (1803). In Eisentrager, this Court held that neither the federal habeas statutes nor the Constitution itself supplied jurisdiction over claims filed by aliens who were captured and held abroad by the U.S. military. As both the court of appeals and the district court recognized, Eisentrager thus governs the sole question presented in this case.

## I.  UNDER THE FUNDAMENTAL PRINCIPLES RECOGNIZED IN EISENTRAGER, U.S. COURTS LACK JURISDICTION OVER CLAIMS FILED ON BEHALF OF GUANTANAMO DETAINEES

### A.  In Eisentrager, The Court Held That U.S. Courts Lack Jurisdiction Over Suits Filed By Aliens Detained Abroad

1.  Eisentrager arose from a petition for a writ of habeas corpus filed in the District Court for the District of Columbia by German nationals who had been seized by U.S. armed forces in China after the German surrender in World War II, tried by military commission, and detained at a prison controlled by the U.S. military in Landsberg, Germany. See 339 U.S. at 765-767. The prisoners alleged that their confinement violated the Fifth Amendment and other provisions of the Constitution, as well as the "laws of the United States and provisions of the Geneva Convention governing the treatment of prisoners of war." Id. at 767; see J.A. 136. They asserted jurisdiction under the federal habeas statutes as well as under the Constitution itself. See 49-306, Johnson v.

18

<u>Eisentrager</u>, Br. for Resp. at 6, 9-13, 27-43.

The district court dismissed the habeas petition for lack of jurisdiction, but the court of appeals reversed. <u>Eisentrager</u> v. <u>Forrestal</u>, 174 F.2d 961 (D.C. Cir. 1949). The court of appeals reasoned that "any person who is deprived of his liberty by officials of the United States, acting under purported authority of that Government, and who can show that his confinement is in violation of a prohibition of the Constitution, has a right to the writ." <u>Id</u>. at 963. The court explained that, in its view, "if a person has a right to a writ of habeas corpus, he cannot be deprived of the privilege by an <u>omission</u> in a federal jurisdictional statute," and that, accordingly, jurisdiction exists to entertain a habeas petition filed by such an individual "in some district court by compulsion <u>of the Constitution itself</u>." <u>Id</u>. at 965, 966 (emphases added). The court rejected the notion that the fact that the prisoners were aliens, and that they were captured and confined at all times outside the territory of the United States, in any way altered that conclusion. <u>Ibid</u>.

2. This Court reversed. In an opinion written by Justice Jackson, the Court held that U.S. courts lacked jurisdiction to consider the habeas petition in <u>Eisentrager</u> because the prisoners were aliens who were seized abroad and detained outside the sovereign territory of the United States.

In the first sentence of the Court's decision, the Court framed the basic question before it as "one of jurisdiction of civil courts." <u>Eisentrager</u>, 339 U.S. at 765. In the following

19

pages, the Court repeatedly underscored the fundamental jurisdictional nature of its ruling. The Court referred in broad terms to the Judiciary's "power to act" vis-a-vis military authorities with respect to aliens held abroad, id. at 771; the standing of such individuals "to maintain any action in the courts of the United States," id. at 776; the "standing [of such individuals] to demand access to our courts," id. at 777; and the "capacity and standing to invoke the process of federal courts," id. at 790. Similarly, the Court discussed "the privilege of litigation" in U.S. courts and the use of "litigation [as a] weapon" by aliens held by military authorities. Id. at 777-779.

In resolving that basic jurisdictional issue, the Court recognized that the federal habeas statutes did not grant jurisdiction over a petition filed on behalf of aliens held abroad. As the Court explained, whereas "Congress has directed our courts to entertain" certain actions on behalf of a citizen "regardless of whether he is within the United States or abroad," 339 U.S. at 769 (quoting 8 U.S.C. 903 (1946)), "[n]othing * * * in our statutes" supports the exercise of jurisdiction over a habeas petition filed on behalf of an alien held abroad. Id. at 768. Moreover, the Court continued, "[a]bsence of support from legislative or juridical sources" was "implicit" in the manner in which the court of appeals decided the case by reference to "fundamentals" rather than "to statutes." Ibid. (quoting Eisentrager, 174 F.2d at 963) (emphasis added). The Court thus focused its analysis on the more "fundamental[]" question whether the Constitution somehow

20

guaranteed jurisdiction over the prisoners' claims in the absence of any statute.[5]

The Court also rejected the court of appeals' conclusion that, "although no statutory jurisdiction * * * is given [in this context]," 339 U.S. at 767, aliens held abroad "are entitled, as a constitutional right, to sue in some court of the United States for a writ of habeas corpus," id. at 777. The Court emphasized that aliens are accorded rights under the Constitution and federal law only as a consequence of their presence within the territory of the United States. See id. at 771. Accordingly, the Court explained that the "privilege of litigation" was unavailable to the aliens in Eisentrager because they "at no relevant time were within any territory over which the United States is sovereign, and the scenes of their offense, their capture, their trial and their punishment were all beyond the territorial jurisdiction of any court of the United States." Id. at 777-778. The Court also emphasized that, as aliens held abroad, the prisoners in Eisentrager had no Fifth Amendment rights to invoke. See id. at 781-783.

_____

[5] The Al Odah petitioners suggest (at 28-29) that Eisentrager held only that jurisdiction was not available under one provision of the federal habeas statutes (28 U.S.C. 2243). That is incorrect. The prisoners in Eisentrager specifically argued that jurisdiction was conferred by "[t]he habeas corpus statute (28 U.S.C. §§ 2241-2255)." 49-306 Br. for Resp. at 6 (Summary of Argument); see also id. at 9 (arguing that Section 2241 supplied "jurisdiction to entertain the petition for the writ of habeas corpus in the case at bar"). In holding that the courts lacked jurisdiction, the Court necessarily rejected the prisoners' argument that Section 2241 supplied such jurisdiction.

21

At the same time, the Court stressed the separation-of-powers problems inherent in any exercise of jurisdiction in this uniquely military context.   The Court explained that judicial review of claims filed on behalf of aliens captured by the U.S. military and detained in connection with an armed conflict would directly interfere with the President's authority as Commander in Chief, which "has been deemed, throughout our history, as essential to war-time security." 339 U.S. at 774.  Likewise, the Court observed that "[i]t would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home."  Id. at 779.

3.    Ultimately,   the   Court's   holding   that   it   lacked jurisdiction rested on two considerations that led the Court to reject the idea that the Constitution itself supplied jurisdiction over  the  habeas  petition  at  issue.    First,  the  detainees  in Eisentrager were aliens with no connection to the United States. Second, the detainees were taken into custody overseas and at all times  were  held  outside  the  sovereign  territory  of  the  United States.  As explained in Part I.C, infra, those same considerations compel  the  conclusion  that  U.S.  courts  lack  jurisdiction  over claims filed on behalf of aliens captured abroad in connection with the ongoing fighting in Afghanistan and detained at Guantanamo.

22

**B.   The Analytical Foundation Of <u>Eisentrager</u> Has Only Been Reinforced During The Past Half Century**

In at least three key respects, the force of the Court's decision in <u>Eisentrager</u> has only grown with time.

1.   As explained above, the Court in <u>Eisentrager</u> held that "nothing * * * in our statutes" conferred jurisdiction over the habeas petition at issue.  339 U.S. at 768.  Congress is presumed to be aware of this Court's decisions.  It has legislated in the area of federal habeas jurisdiction on several occasions since 1950.  Yet Congress has never amended the habeas statutes to provide the jurisdiction that this Court held was absent in <u>Eisentrager</u>.  See <u>Lorillard</u> v. <u>Pons</u>, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change"); see also <u>Keene Corp.</u> v. <u>United States</u>, 508 U.S. 200, 212 (1993).

At the same time, the current habeas statute is "very much the same" as the statute in effect at the time of <u>Eisentrager</u>.  Pet. App. 18a; see 49-306 U.S. Br. at 2-3 n.1.  Section 2241 of title 28 has been amended only once since 1950.  In 1966, Congress added subsection (d), which relates to federal jurisdiction over claims filed on behalf of prisoners detained pursuant to state-court convictions.  See 28 U.S.C. 2241 amendments; Act of Sept. 19, 1966, Pub. L. No. 89-590, 80 Stat. 1214.  Although Congress has narrowed federal habeas jurisdiction since 1950 over certain types of claims, see, <u>e.g.</u>, Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 811, it has never <u>broadened</u> habeas

23

jurisdiction to cover the sort of claims at issue in Eisentrager.

There was, however, one failed legislative attempt to create such jurisdiction in the immediate aftermath of Eisentrager. In February 1951, a bill was introduced in Congress "[p]roviding for the increased jurisdiction of Federal courts in regard to the power to issue writs of habeas corpus in cases where officers of the United States are detaining persons in foreign countries, regardless of their status as citizens." H.R. 2812, 82d Cong., 1st Sess. The bill provided "[t]hat the district court of the United States is given jurisdiction to issue writs of habeas corpus inquiring into the legality of any detention by any officer, agent, or employee of the United States, irrespective of whether the detention is in the United States or in any other part of the world, and irrespective of whether the person seeking the writ is a citizen or an alien." Ibid. (emphasis added). The bill was never voted out of committee, much less enacted into law.

Principles of separation of powers and stare decisis strongly counsel against revisiting Eisentrager and revising the habeas statutes in a manner that Congress itself considered and rejected. See Patterson v. McLean Credit Union, 491 U.S. 164, 175 n.1 (1989) ("As we reaffirm today, considerations of stare decisis have added force in statutory cases because Congress may alter what we have done by amending the statute."); id. at 172; accord Hilton v. South Carolina Pub. Ry., 502 U.S. 197, 202 (1991) ("Congress has had almost 30 years in which it could have corrected our decision * * * if it disagreed with it, and has chosen not to do so.").

**100**

24

Since Eisentrager, this Court also has repeatedly emphasized its reluctance to presume that Congress intends a federal statute to have extraterritorial application. As the Court observed in Sale v. Haitian Centers Council, Inc., 509 U.S. 155 (1993), a case involving a challenge to the United States' treatment of Haitian refugees who were intercepted on the high seas and temporarily detained at Guantanamo, "Acts of Congress normally do not have extraterritorial application unless such an intent is clearly manifested," and "[t]hat presumption has special force when we are construing treaty and statutory provisions that may involve foreign and military affairs for which the President has unique responsibility." Id. at 188 (citing United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 319 (1936)). Those decisions bolster the Eisentrager Court's refusal to interpret the federal habeas statutes to confer jurisdiction over challenges by aliens held outside the United States.

2. During the past 50 years, the Court also has repeatedly reaffirmed the principle that the Fifth Amendment does not apply to aliens abroad. Three Terms ago in Zadvydas v. Davis, 533 U.S. 678, 693 (2001), the Court stated that "it is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders." In support of that proposition, the Court cited Eisentrager and United States v. Verdugo-Urquidez, 494 U.S. 259 (1990), with the parenthetical explanation that the "Fifth

25

Amendment's protections do not extend to aliens outside the territorial boundaries" of the United States.  533 U.S. at 693.

In Verdugo-Urquidez, 494 U.S. at 266, the Court held that the Fourth Amendment does not apply extraterritorially to a search or seizure of property owned by a nonresident alien outside the sovereign territory of the United States.  The Court carefully grounded that decision on its precedents recognizing that the Constitution does not extend "wherever the United States Government exercises its power" and, in particular, does not extend to aliens outside the sovereign territory of the United States.  Id. at 269; see id. at 268-271.  In illustrating that principle the Court relied on Eisentrager, which, the Court explained, "rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States."  Id. at 269.  As the Court stressed, Eisentrager's "rejection of extraterritorial application of the Fifth Amendment was emphatic."  Ibid.

The Court in Verdugo-Urquidez also reaffirmed the practical and separation-of-powers concerns underlying Eisentrager.  The Court observed that, "[n]ot only are history and case law against [Verdugo-Urquidez], but as pointed out in [Eisentrager], the result of accepting his claim would have significant and deleterious consequences for the United States in conducting activities beyond its boundaries."  494 U.S. at 273.  As the Court explained, "[t]he United States frequently employs Armed Forces outside this country -- over 200 times in our history -- for the protection of American citizens or national security," and holding that the Constitution

26

applied to aliens abroad "could significantly disrupt the ability of the political branches to respond to foreign situations involving our national interest." Id. at 273-274. Any restrictions on the political branches' conduct of such foreign operations, the Court admonished, "must be imposed by the political branches through diplomatic understanding, treaty, or legislation," and not by the courts. Id. at 275. See also DeMore v. Kim, 123 S. Ct. 1708, 1730 (2003) (citing Eisentrager).

3. The actions of the U.S. armed forces and courts since Eisentrager also have reinforced the basic principles reflected in that decision. In Eisentrager, the Court emphasized that there was no historical practice of U.S. courts exercising jurisdiction over the claims of aliens held by the military outside the territory of the United States. See 339 U.S. at 768-777. Since Eisentrager, this Nation has engaged the armed forces in numerous armed conflicts, including in Korea, Vietnam, Iraq, and Bosnia. The military has captured and detained thousands of aliens abroad in connection with those conflicts. Yet, until the Ninth Circuit's divided panel decision in Gherebi v. Bush, 352 F.3d 1278 (2003) (opinion by Reinhardt, J.), discussed infra, no court had ever recognized jurisdiction over a claim filed on behalf of such a detainee.[6]

---

[6] In its brief in Eisentrager, the government explained that any attempt to exercise habeas jurisdiction over aliens held by the U.S. military in the territory of another country would be inconsistent with the territorial reach of the writ of habeas corpus at common law. See 49-306 U.S. Br. at 33-49. Certainly nothing has changed since Eisentrager that would call into doubt

27

### C.   Under Settled Law, U.S. Courts Lack Jurisdiction Over Claims Filed On Behalf Of Aliens Held At Guantanamo

Both the court of appeals (Pet. App. 18a) and the district court (id. at 62a) below carefully examined Eisentrager and correctly concluded that it applies with full force to the Guantanamo detainees.  First, the Guantanamo detainees, like the detainees in Eisentrager, are aliens with no connection to the United States.  The detainees at issue here are foreign nationals of Australia, Great Britain, and Kuwait.  They were concededly captured in Afghanistan or Pakistan, taken into U.S. custody overseas, and were transferred to Guantanamo. See Al Odah, No. 03-343 (AO), Br. 2; Rasul, No. 03-334 (R.), Br. 3.

Second, the Guantanamo detainees, like the detainees in Eisentrager, are being held by the U.S. military outside the sovereign territory of the United States.  As the district court stated, "[i]t is undisputed, even by the parties, that Guantanamo Bay is not part of the sovereign territory of the United States." Pet. App. 55a.  That conclusion is compelled by the terms of the Lease Agreements pursuant to which the United States occupies Guantanamo, and the Executive Branch's definitive construction of those agreements.  As discussed above, although Cuba "consents" to permit the United States to "exercise complete jurisdiction and control" of the base, the 1903 Lease Agreement explicitly provides that Cuba retains "ultimate sovereignty" over the naval base.  1903 Lease Agreement art. III, supra.

---

the traditional limits on the writ at common law.

**104**

28

The 1903 Lease Agreement was executed in both English and Spanish, and both authoritative texts confirm Cuba's ongoing sovereignty over Guantanamo Bay. The Spanish phrase in Article III for "ultimate sovereignty" is "soberania definitiva." The word "definitiva" belies petitioner's assertion that "ultimate" as used in Article III means only "eventual." Instead, it is defined in Diccionario Salamanca 472 (1996) as "que no admite cambios," or, in English, "not subject to change." Similarly, "ultimate" itself is more naturally defined in this context as "basic, fundamental, original, primitive." Webster's Third New International Dictionary 2479 (1993). As this Court explained in United States v. Percheman, 32 U.S. (7 Pet.) 51, 88 (1833), "[i]f the English and the Spanish parts [of a treaty] can, without violence, be made to agree, that construction which establishes this conformity ought to prevail." Thus, the terms "definitiva" and "ultimate" are equally understood to affirm Cuba's sovereignty over the leased territory.[7]

Other provisions of the Lease Agreements are consistent with the conclusion that Cuba retained sovereignty over Guantanamo. For example, the 1903 Lease Agreement states that the United States only may exercise jurisdiction and control over Guantanamo "during the period of [its] occupation" of Guantanamo. 1903 Lease

---

[7] Furthermore, as noted above, the 1903 Lease Agreement states that "the United States recognizes the continuance of the ultimate sovereignty of the Republic of Cuba over [Guantanamo]." 1903 Lease Agreement art. III (emphasis added). As Judge Graber explained in Gherebi, "the Lease's use of the word 'continuance' denotes the ongoing nature of Cuba's 'ultimate sovereignty' over Guantanamo," and bolsters the conclusion that Cuba retained such sovereignty. 352 F.3d at 1307 (emphasis in original).

29

Agreement art. III (emphasis added).  That language is consistent with the understanding that the United States will not <u>always</u> occupy Guantanamo.[8]  Moreover, the Supplemental Lease imposes conditions on the United States' use of Guantanamo that belie any claim that the United States is <u>sovereign</u> over Guantanamo.  For example, the Supplemental Lease specifies that the United States may not use Guantanamo for "commercial" or "industrial" purposes.  Supplemental Lease, art. III.

As this Court has explained, the "determination of sovereignty over an area is for the legislative and executive departments," and not a question on which a court may second-guess the political branches.  <u>Vermilya-Brown Co.</u> v. <u>Connell</u>, 335 U.S. 377, 380 (1948); cf. <u>Jones</u> v. <u>United States</u>, 137 U.S. 202, 212 (1890) ("Who is the sovereign, <u>de jure</u> or <u>de facto</u>, of a territory is not a judicial, but a political question, the determination of which by the legislative and executive departments of any government conclusively binds the judges, as well as all other officers, citizens and subjects of that government.").  More generally, the Court has acknowledged that the Framers of our Constitution sought to ensure that the Executive "speak[s] for the Nation with one

---

[8] Indeed, in 1996 Congress declared that it is "[t]he policy of the United States * * * [t]o be prepared to enter into negotiations with a democratically elected government in Cuba either to return the United States Naval Base at Guantanamo to Cuba or to renegotiate the present agreement under mutually agreeable terms."  22 U.S.C. 6061(12).

30

voice in dealing with other governments." Crosby v. National Foreign Trade Counsel, 530 U.S. 363, 381 (2000).[9]

In Gherebi v. Bush, 352 F.3d 1278 (2003), a divided panel of the Ninth Circuit held "that, at least for habeas purposes, Guantanamo is a part of the sovereign territory of the United States." 352 F.3d at 1290 (emphasis added). This Court has never distinguished between sovereignty for habeas purposes and sovereignty for all other purposes. Moreover, the judicial recognition of even limited sovereignty in contravention of the Executive's position is problematic. As Judge Graber observed in Gherebi, "[t]he majority today declares that the United States has sovereignty over territory of a foreign state, over the objections of the executive branch," and despite the fact that "both parties to the Guantanamo Lease and its associated treaties -- Cuba and the United States (through the executive branch) -- maintain that Guantanamo is part of Cuba." Id. at 1312. In light of those practical problems and the unambiguous terms of the Lease Agreements, there is no basis for adopting the Ninth Circuit's novel conception of sovereignty.[10]

---

[9] The Executive Branch opinions cited by petitioners (R. Br. 43) are not to the contrary. Indeed, those opinions, which address issues far afield from the question presented here, specifically recognize that the United States' Lease Agreements with Cuba reserve to Cuba the "ultimate sovereignty" over Guantanamo, 35 Op. Att'y Gen. 536, 537 (1929) (quoting Lease Agreement), and that, under those agreements, Guantanamo thus lies "outside the territorial United States," 6 Op. Off. Legal Counsel 236, 238 (1982) (emphasis added).

[10] In Gherebi, the Ninth Circuit (Judge Reinhardt, joined by Senior District Judge Shadur) held that Eisentrager does not

31

\* \* \* \* \*

In short, the same principles on which Eisentrager is grounded compel the conclusion that U.S. courts lack jurisdiction over claims filed on behalf of aliens captured abroad and detained at Guantanamo.

## II.   PETITIONERS' ATTEMPTS TO RELITIGATE AND EVADE EISENTRAGER ARE UNAVAILING

None of the petitioners in this case has suggested that Eisentrager is no longer good law, much less formally requested this Court to revisit the result or reasoning of Eisentrager. Instead, petitioners focus their efforts, first, on renewing the central statutory argument made and rejected in Eisentrager and, second, on attempting to circumvent Eisentrager based on factual distinctions that are of no consequence under Eisentrager's own terms.

---

apply to the Guantanamo detainees either (1) because the United States exercises sovereignty over Guantanamo "at least for habeas purposes," 352 F.3d at 1290, an argument that fails for the reasons discussed above, and that petitioners themselves have not advanced in this case; or (2) because the United States exercises territorial jurisdiction and control over Guantanamo, an argument that fails for the reasons discussed below (Part II.B, infra). Judge Graber dissented in Gherebi, concluding that Eisentrager was controlling. 352 F.3d at 1305. The other lower courts to have considered the issue have agreed with Judge Graber's view. See Pet. App. 18a (D.C. Circuit); id. at 62a (Judge Kollar-Kotelly); Coalition of Clergy v. Bush, 189 F. Supp. 2d 1036, 1046-1050 (C.D. Cal.) (holding that Guantanamo detainees are similar "[i]n all key respects" to the prisoners in Eisentrager), aff'd in part and vacated in part, 310 F.3d 1153, 1164 n.4 (9th Cir. 2002) (observing in dictum "[Eisentrager] well matches the extraordinary circumstances" of the Guantanamo detentions), cert. denied, 123 S. Ct. 2073 (2003); Gherebi v. Bush, 262 F. Supp. 2d 1064, 1066-1067, 1069-1071 (C.D. Cal. 2003) (Eisentrager "compels dismissal" of the petition filed on behalf of a Guantanamo detainee), rev'd, 352 F.3d 1278.

32

## A.    Petitioners' Overarching Statutory Arguments Cannot Be Reconciled With _Eisentrager_

Petitioners first urge a construction of the habeas statutes that essentially ignores, and in any event cannot be reconciled with, this Court's decision in _Eisentrager_.  Petitioners' central submission to this Court is that Congress has "expressly" granted jurisdiction over the claims at issue.  AO Br. 13; see _id_. at 17-25; R. Br. 11-30.  In particular, petitioners argue that "[t]he district court had jurisdiction over the petitions for habeas corpus pursuant to 28 U.S.C. § 2241," which "grants the federal courts power to review Executive detentions 'in violation of the Constitution or laws or treaties of the United States.'"  R. Br. 7 (quoting 28 U.S.C. 2241(c)(3)); see AO Br. 15-17.  That argument was unavailing at the time of _Eisentrager_ and, in the wake of _Eisentrager_ and the statutory history discussed in Part I.B above, the argument is no more availing today.

The _Eisentrager_ Court held that "[n]othing * * * in our statutes" confers jurisdiction over a claim filed on behalf of an alien who "at no relevant time" has been within the sovereign territory of the United States.  339 U.S. at 768.  That holding was necessary to the Court's conclusion that it lacked jurisdiction in _Eisentrager_.  The current version of Section 2241 is the same in all pertinent respects as the statute in effect at the time of _Eisentrager_.  Pet. App. 18a.  Accordingly, Section 2241 cannot confer any jurisdiction today that it did not supply then.  That conclusion is only bolstered by the fact that the one bill that was introduced in the wake of _Eisentrager_ that _would_ have purported to

**109**

33

confer the type of habeas jurisdiction that this Court found absent in <u>Eisentrager</u> languished in committee. See Part I.B, <u>supra</u>.

Petitioners contend that the habeas statute must be read to confer jurisdiction over the claims at issue in this case in order to avoid "serious constitutional problem[s]" under the Fifth Amendment. R. Br. 10 (quoting <u>Zadvydas</u>, 533 U.S. at 692); see <u>id</u>. at 17; see AO Br. 23-24. That argument, too, cannot be reconciled with <u>Eisentrager</u>. As discussed above, this Court rejected the argument that, "although no statutory jurisdiction * * * is given [in this context]," <u>Eisentrager</u>, 339 U.S. at 767, aliens held abroad nonetheless "are entitled, as a constitutional right, to sue in some court of the United States for a writ of <u>habeas corpus</u>," <u>id</u>. at 777. Moreover, to the extent that petitioners argue that the Fifth Amendment should influence the Court's interpretation of the habeas statutes, that argument also was raised and soundly rejected in <u>Eisentrager</u>.

The <u>Eisentrager</u> Court held that the Fifth Amendment -- the provision on which petitioners base their constitutional-avoidance argument -- does not apply extra-territorially to aliens held outside the sovereign United States. See <u>id</u>. at 781-783. This Court has repeatedly affirmed that the "Fifth Amendment's protections do not extend to aliens outside the territorial boundaries" of the United States. <u>Zadvydas</u>, 533 U.S. at 693. Those constitutional protections therefore do not extend across the Florida Strait to Cuba, including the sovereign territory of Cuba

34

that the United States occupies at Guantanamo under the terms of its Lease Agreements with Cuba.

The <u>Rasul</u> petitioners argue (Br. 21) that holding that U.S. courts lack jurisdiction over habeas petitions filed on behalf of aliens held abroad "would raise grave constitutional doubts under the Suspension Clause." See U.S. Const. Art. I, § 9, Cl. 2. That argument is refuted by <u>Eisentrager</u> as well. One of the principal arguments made in <u>Eisentrager</u> was that the Suspension Clause required the courts to exercise jurisdiction (see 49-306 Br. for Resp. at 27-42), and both the court of appeals' decision in <u>Eisentrager</u> (see 174 F.2d at 965-966 & n.20) and the opinion of the dissenting Justices in <u>Eisentrager</u> (see 339 U.S. at 791 n.1, 798) were premised on that erroneous understanding. The Court in <u>Eisentrager</u>, however, rejected the argument that the "prisoners are entitled, as a constitutional right, to sue in some court of the United States for a writ of <u>habeas corpus</u>." <u>Id.</u> at 777.

Nothing in <u>INS</u> v. <u>St. Cyr</u>, 533 U.S. 289 (2001), on which petitioners rely (R. Br. 21-22; AO Br. 18), is to the contrary. <u>St. Cyr</u> holds only that, absent a clear statement from Congress, statutes should be interpreted not to repeal pre-existing habeas corpus jurisdiction in order to avoid raising constitutional problems. See 533 U.S. at 298-303. But there is no constitutional problem to "avoid" here. This Court held in <u>Eisentrager</u> that "[n]othing in the text of the Constitution" extends a right to petition for habeas corpus to aliens abroad, "nor does anything in our statutes." <u>Eisentrager</u>, 339 U.S. at 768. Giving non-resident

35

aliens a right to habeas corpus far from avoiding any constitutional problems would contravene long-settled precedent. See id. at 769, 776-777.    Accordingly, St. Cyr's interpretive principles are inapplicable here.    See 533 U.S. at 299-303.

The more relevant interpretative principle is this Court's warning in Romero v. International Terminal Operating Co., 358 U.S. 354, 370 (1959), about the "discovery of new, revolutionary meaning in reading an old judiciary enactment."    This Court should reject petitioners' invitation to discover a "revolutionary" new component of federal jurisdiction -- the judicial power to review claims filed on behalf of aliens held by the U.S. military abroad in connection with an armed conflict -- that not only never has been recognized in the past but was expressly rejected by this Court more than 50 years ago in Eisentrager.    339 U.S. at 768.[11]

_____

[11] The Al Odah petitioners also suggest that the federal question statute (28 U.S.C. 1331) supplies the jurisdiction that this Court held was absent in Eisentrager, suggesting that "this is a routine APA case in which the federal courts have jurisdiction under section 1331."    See AO Br. 13-15.    That argument fails.    In Eisentrager, the Court stated in broad terms that "[n]othing * * * in our statutes" confers jurisdiction over a claim filed on behalf of an alien who "at no relevant time" has been within the sovereign territory of the United States.    339 U.S. at 768.    It is unimaginable that the Court that reached that fundamental conclusion in Eisentrager would have permitted the same prisoners to invoke the jurisdiction of the U.S. courts if they had simply asserted jurisdiction under the federal question statute (which has been in effect since 1875).    Furthermore, giving effect to petitioners' reading of Section 1331 would mean that U.S. courts would have jurisdiction to entertain a lawsuit filed by an alien anywhere in the world, including on the battlefield in Afghanistan, as long as the action challenges a violation of federal law.    Jurisdictional statutes are subject to the same presumption against extraterritoriality as other statutes.    There is no indication in the text or history of Section 1331 that Congress intended it to apply

112

36

**B.    There Is No Basis For Carving A "Guantanamo Exception" Out Of _Eisentrager_'s Sovereignty-Based Rule**

Although they have conceded that Guantanamo is outside the sovereignty territory of the United States, Pet. App. 55a, petitioners nonetheless argue that _Eisentrager_ is inapplicable on the ground that Guantanamo is "under U.S. jurisdiction and control." See AO Br. 34; see _id._ 34-38; R. Br. 41-46. The panel majority in _Gherebi_ distinguished _Eisentrager_ on similar grounds. See 352 F.3d at 1286-1290. For several reasons, the courts below (see Pet. App. 14a-17a; _id._ at 55a-63a), as well as Judge Graber in _Gherebi_ (see 352 F.3d at 1305-1306), correctly rejected that argument.

1.    To begin with, petitioners' argument cannot be squared with _Eisentrager_'s own terms. As discussed above, _Eisentrager_ makes clear that its jurisdictional holding is based on sovereignty, and not on malleable concepts like de facto control. See Pet. App. 16a; _id._ at 55a; _Gherebi_, 352 F.3d at 1305 ("A straightforward reading of [_Eisentrager_] makes it clear that 'sovereignty' is the touchstone * * * for the exercise of federal courts' jurisdiction.") (Graber, J., dissenting). In particular, in explaining why "the privilege of litigation" did not extend to the aliens in _Eisentrager_, the Court stated that the "prisoners at no relevant time were within any territory over which the United States is sovereign." 339 U.S. at 777-778 (emphasis added).

---

extraterritorially, and any such application would raise serious constitutional concerns in cases, such as this, that challenge the Executive's conduct of foreign affairs.

**113**

37

The Eisentrager Court's treatment of Ex parte Quirin, 317 U.S. 1 (1942), and In re Yamashita, 327 U.S. 1 (1946), underscores that sovereignty, not merely jurisdiction or control, is the key, and that petitioners' efforts to rely on cases like Quirin and Yamashita are misguided. In Quirin and Yamashita, the Court exercised jurisdiction over habeas petitions of enemy aliens (and, in Quirin, an enemy combatant who was presumed to be a U.S. citizen). The Eisentrager Court, however, distinguished those cases on the ground that the aliens were captured and detained within U.S. territory. As the Court noted, Quirin was brought by aliens who were apprehended "in the United States." 339 U.S. at 780. Similarly, the habeas petition in Yamashita was brought by an alien who was captured and detained in the Philippine Islands -- then an insular possession of the United States. As the Court explained, "[b]y reason of our sovereignty at that time over these insular possessions, Yamashita stood much as did Quirin before American courts" -- i.e., he was "within territory of the United States." 339 U.S. at 780 (emphasis added). The dissenters in Eisentrager likewise understood that sovereignty was the key to the Court's distinction of Quirin and Yamashita. See id. at 795 ("Since the Court expressly disavows conflict with the Quirin and Yamashita decisions, it must be relying not on the status of these petitioners as alien enemy belligerents but rather on the fact that they were captured, tried and imprisoned outside our territory."). Eisentrager's treatment of Quirin and Yamashita thus reaffirms that the key to the Court's decision was the prisoners' status as aliens

38

outside U.S. sovereign territory, and demonstrates that petitioners' efforts to rely on Quirin and Yamashita (and habeas petitions filed by citizens) are misguided. See R. Br. 15-16.

2. Similarly, if U.S. jurisdiction or control over foreign territory, and not sovereignty, were the benchmark, then the prisoners in Eisentrager themselves would have been entitled to judicial review of their habeas claims. The Landsberg prison in Germany was unmistakably under the control of the United States when Eisentrager was held there. Indeed, it is hard to imagine that the United States would ever detain military prisoners in a facility over which it lacked control. The Court in Eisentrager noted that the prisoners at issue in Eisentrager were under the custody of the "American Army officer" who was the "Commandant of Landsberg Prison" and it referred to the hundreds of cases -- like Eisentrager -- involving "aliens confined by American military authorities abroad." 339 U.S. at 766, 768 n.1 (emphasis added). Justice Black was even more direct in his dissenting opinion, stating that "[w]e control that part of Germany we occupy." Id. at 797. The United States controls Guantanamo subject to the terms and conditions of its Lease Agreements with Cuba, but -- as this Court made clear in Eisentrager -- in the absence of sovereignty, the exercise of such control does not entitle the aliens held at Guantanamo to the privilege of litigating in U.S. courts.[12]

------

[12] The conclusion that the United States exercised control over the Landsberg military prison is further demonstrated by the instruments governing the allied occupation of Germany. Paragraph 2(i) of the Occupation Statute (C.A. App. 332) explicitly reserved "[c]ontrol" over the "German prisons" to the

39

3.   This Court has recognized that leased U.S. military installations abroad are outside the sovereign territory of the United States, even though such facilities are vital to the conduct of the United States' foreign affairs abroad precisely because they provide an area removed from the sovereign territory of the United States, yet indisputably within the control of U.S. armed forces. In United States v. Spelar, 338 U.S. 217, 219 (1949), the Court held that a U.S. military base leased in Newfoundland was "subject to the sovereignty of another nation," not "to the sovereignty of the United States," and therefore fell within the "foreign country" exception to the Federal Tort Claims Act.   The base in Spelar was governed by "the same executive agreement and leases" as the U.S. military base in Bermuda.   Id. at 218.   This Court in Vermilya-Brown recognized in turn that the United States' rights over the base in Guantanamo are "substantially the same" as its rights over the base in Bermuda.   335 U.S. at 383; see Pet. App. 15a.

4.   Petitioners' reliance on the "Insular Cases" -- in which the Court has recognized that certain constitutional rights or privileges may extend to inhabitants of American territories or insular possessions -- is misplaced.   Guantanamo is not a U.S.

occupying powers.  And the United States, through the U.S. High Commissioner for Germany, exercised exclusive control as an occupying force over the American zone in Germany, including the Landsberg prison.  See Staff of the Senate Comm. on Foreign Relations, 92d Cong., 1st Sess., Documents on Germany, 1944-1970 at 165 (Comm. Print 1971) (Charter of the Allied (Western) High Commission for Germany, para. 3, signed by the Foreign Ministers of France, the United Kingdom, and the United States, June 20, 1949).

40

territory, or even an unincorporated territory like Guam or Puerto Rico. The Constitution gives to Congress the power to recognize and regulate American territories. See U.S. Const. Art. IV, § 3, Cl. 2; Torres v. Puerto Rico, 442 U.S. 465, 469-470 (1979). Congress has exercised that authority and an entire title of the United States Code (Title 48) is devoted to "Territories and Insular Possessions."[13] Guantanamo is not addressed in Title 48 because it is not a U.S. territory or insular possession. It is a leased military base on foreign soil, just like numerous other military bases occupied by the United States around the world. See Spelar, 338 U.S. at 219; Vermilya-Brown, 335 U.S. at 385.

Guantanamo is not comparable to the former Trust Territory of Micronesia. See Pet. App. 16a-17a; 48 U.S.C. 1901 et seq. Quite

---

[13] When Congress recognizes U.S. territories, it carefully delineates the rights and privileges that extend to the residents of such territories. See, e.g., 48 U.S.C. 734 ("statutory laws of the United States not locally inapplicable * * * shall have the same force and effect in Puerto Rico as in the United States"); 48 U.S.C. 737 (stating that "rights, privileges, and immunities" of U.S. citizens shall be respected in Puerto Rico "to the same extent as though Puerto Rico were a State of the Union"); 48 U.S.C. 1421b(l) ("Bill of rights" governing Guam; includes "privilege of the writ of habeas corpus"); 48 U.S.C. 1561 ("Bill of rights" governing Virgin Islands; includes "privilege of the writ of habeas corpus"); 48 U.S.C. 1661, 1662, 1662a (recognizing U.S. sovereignty over Tutuila, Manua, eastern Samoa, and Swains Island; stating that amendments to the constitution of American Samoa, as approved by the Secretary of the Interior pursuant to executive order, and which includes privilege of the writ of habeas corpus, may be made only by Act of Congress); 48 U.S.C. 1801 (historical and statutory notes) (approving Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America and incorporating Constitution of the Northern Mariana Islands which includes privilege of writ of habeas corpus). Congress has not enacted any such legislation with respect to Guantanamo.

41

unlike the Trust Territory of Micronesia, the United States occupies Guantanamo pursuant to a lease that explicitly recognizes that Cuba retains sovereignty over Guantanamo. By contrast, no other sovereign authority existed at the time of the appointment of the United States as administrator of the Micronesia Trust Territory. See Trusteeship Agreement for the Former Japanese Mandated Islands, July 18, 1947, 61 Stat. 3301, T.I.A.S. No. 1665. Likewise, the United States' operation of Guantanamo does not share any of the civilian governmental attributes of its special role with respect to the Trust Territory in Micronesia, and responsibility to "nurture the Trust Territory toward self-government." Gale v. Andrus, 643 F.2d 826, 830 (D.C. Cir. 1980); see 48 U.S.C. 1681(a).[14]

Nor is Guantanamo comparable to the Panama Canal Zone, which, until the United States withdrew from the Zone, was viewed as an unincorporated territory of the United States and was the subject of extensive legislation. See 48 U.S.C. 1301 et seq. (1946). The Fifth Circuit held that Congress had extended some constitutional rights to the Panama Canal Zone, but the exercise of jurisdiction in those cases was based on the fact that Congress had established a U.S. federal district court of the Canal Zone with appellate

---

[14] See, e.g., Proclamation No. 5564, 51 Fed. Reg. 40,399 (1986) (establishing the Northern Mariana Islands as United States territory); J. Res. of Mar. 24, 1976, Pub. L. No. 94-241, 90 Stat. 263 (Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America); Act of Nov. 8, 1977, Pub. L. No. 95-157, 91 Stat. 1265 (establishing a U.S. District Court in the Northern Mariana Islands).

42

review by the Fifth Circuit.  See 22 U.S.C. 3841(a) (repealed).[15]
Obviously there is no analogous district court with jurisdiction
over Guantanamo, nor has Guantanamo ever been treated as an
unincorporated territory of the United States.  Moreover, as Judge
Graber explained in Gherebi, the differences between the language
of the Guantanamo Lease Agreements and the Panama Canal Treaty if
anything only bolster the conclusion that Cuba retained sovereignty
over Guantanamo.  352 F.3d at 1311 (dissenting).[16]

    5.  When the United States is occupying a foreign land for
general military purposes, the Court has held that the occupied
area remains foreign soil and "cannot be regarded, in any
constitutional, legal, or international sense, a part of the
territory of the United States."  Neely v. Henkel, 180 U.S. 109,
119 (1901).  In Neely, this Court considered the military's
occupation and control of Cuba following the Spanish-American War
-- the war that led to the current Guantanamo lease arrangement.
When Neely arose, "the Island of Cuba was 'occupied by' and was

---

    [15] See United States v. Husband R. (Roach), 453 F.2d 1054,
1057 (5th Cir. 1971), cert. denied, 406 U.S. 935 (1972);
Government of the Canal Zone v. Scott, 502 F.2d 566, 568, 570
(5th Cir. 1974); Government of the Canal Zone v. Yanez P.
(Pinto), 590 F.2d 1344, 1351 (5th Cir. 1979).

    [16] Petitioners cite United States v. Lee, 906 F.2d 117 (4th
Cir. 1990) (per curiam), for the proposition that crimes
committed at Guantanamo may be prosecuted in the U.S. courts.
But petitioners overlook that the court in Lee exercised
jurisdiction over an indictment pursuant to 18 U.S.C. 7 (1988),
which extended the criminal law extraterritorially to "crimes
committed outside the jurisdiction of a state or district court."
906 F.2d at 117 n.1 (emphasis added).  That certain laws may
apply extraterritorially to Guantanamo only reinforces the
conclusion that the base lies outside the United States.  See
Pet. App. 14a.

43

'under the control of the United States.'"    180 U.S. at 115.
Moreover, the treaty pursuant to which the United States occupied
Cuba did not place a limit on the term of such occupancy.  Id. at
116 (quoting treaty provisions).  But this Court nonetheless held
that Cuba was "a foreign country or territory," id. at 115
(emphasis in original), and not, "in any * * * sense, a part of the
territory of the United States," id. at 119.

    If the island of Cuba was not U.S. territory when the United
States occupied and controlled it after the Spanish-American War,
then a fortiori Cuba (including Guantanamo) is not U.S. territory
today.  That conclusion is underscored by the terms pursuant to
which the United States leases Guantanamo from Cuba, which place
the United States in an inferior position at Guantanamo than the
one that it occupied with respect to Cuba at the time of Neely.
See also Fleming v. Page, 50 U.S. (9 How.) 603, 614-615 (1850).

C.    The Reasoning Of Eisentrager Is Not Limited To Aliens Who
      Are Acknowledged "Enemy" Aliens

    1.  Petitioners argue that Eisentrager is inapplicable on the
ground that the detainees in this case are not "enemy" aliens.  See
AO Br. 26-27.  The courts below correctly rejected that argument.
Pet. App. 6a-13a; see id. at 51a-55a.  Although the Eisentrager
Court referred to the prisoners as "enemy aliens," its holding did
not depend on the aliens' status as "enemies."  Rather, as
explained above, the key to Eisentrager's constitutional analysis
was the fact that the aliens had no connection at any time to the
sovereign territory of the United States.  Id. at 11a.

44

The _Eisentrager_ Court emphasized that "the privilege of litigation has been extended to aliens, _whether friendly or enemy_, only because permitting their presence in the country implied protection." 339 U.S. at 777-778 (emphasis added). The dissenters in _Eisentrager_ likewise recognized that the Court's decision "inescapably" applied to "any alien who is subject to our occupation government abroad, even if he is neither enemy nor belligerent and even after peace is officially declared." _Id._ at 796 (Black, J., dissenting). And, as discussed above, that reading of _Eisentrager_ is confirmed by this Court's subsequent precedents. See, _e.g._, _Demore_, 123 S. Ct. at 1730; _Zadvydas_, 533 U.S. at 693; _Verdugo-Urquidez_, 494 U.S. at 269; Part I.B, _supra_.

2. In any event, the Guantanamo detainees qualify as "enemy" aliens for purposes of _Eisentrager_ because they were seized in the course of active and ongoing hostilities against United States and coalition forces, and determined by the U.S. military to be enemy combatants. Cf. _United States_ v. _Terry_, 36 CMR 756, 761 (A.B.R. 1965) ("The term 'enemy' applies to any forces engaged in combat against our own forces."), aff'd, 36 CMR 348 (C.M.A. 1966). Nothing in _Eisentrager_ suggests that an "enemy" alien is limited to a national of a country that has formally declared war on the United States. Although _Eisentrager_ noted that under international law all nationals of a belligerent nation become "enemies" of the other upon a declaration of war, see 339 U.S. at 769-773 & n.2, the Court stressed that it did not need to rely on that "fiction" because the detainees were "actual enemies, active in the hostile

**121**

45

service of an enemy power." Id. at 778. The same is true here.[17]

The "enemy" status of aliens captured and detained during war is a quintessential political question on which the courts respect the actions of the political branches. See, e.g., The Three Friends, 166 U.S. 1, 63 (1897); Prize Cases, 67 U.S. (2 Black) 635, 670 (1862). The U.S. military has determined that the Guantanamo detainees are enemy combatants. The President, in his capacity as Commander in Chief, has conclusively determined that the Guantanamo detainees -- both al Qaeda and Taliban -- are not entitled to prisoner-of-war status under the Geneva Conventions. See White House Press Secretary, Fact Sheet, Status of Detainees at Guantanamo, supra.[18] Any effort to look beyond such executive determinations concerning aliens held abroad would conflict with

_____

[17] Any suggestion that Eisentrager applies only to the forces of a nation in a declared war with the United States is erroneous and would have irrational consequences. Those involved in the attack on Pearl Harbor would have been eligible for more favorable treatment than Japanese soldiers captured after Congress had formally declared war. Similarly, although lawful combatants of a nation that had declared war could seek no recourse in our courts, the courts would somehow be more accessible to rogue forces or members of an international terrorist network that does not follow the laws or customs of war. Nothing in Eisentrager requires that bizarre result.

[18] The Geneva Convention reflects criteria that an organization must meet under the laws and customs of war for its members to qualify as lawful combatants eligible for prisoner-of-war status, including that the organization's members must act in accordance with the laws and customs of war. See GPW, art. 4(A)(2). Neither al Qaeda nor the Taliban meet those criteria. See Guantanamo Detainees, supra. In any event, under the laws and customs of war, captured combatants may be detained for the course of the hostilities regardless of whether they are lawful combatants or unlawful combatants. See Quirin, 317 U.S. at 30-31.

46

the rationale of <u>Eisentrager</u>.  See Pet. App. 13a.

### D.  <u>Eisentrager</u> Did Not Bar Jurisdiction Only To Aliens Who Had Been Convicted Of War Crimes

Petitioners attempt to distinguish <u>Eisentrager</u> on the ground that the detainees in that case had been convicted by a military commission.  See AO Br. 27; R. Br. 32-40.  As the district court observed, "[w]hile it is true that the petitioners in <u>Eisentrager</u> had already been convicted by a military commission, the <u>Eisentrager</u> Court did not base its decision on that distinction. Rather, <u>Eisentrager</u> broadly applies to prevent aliens detained outside the sovereign territory of the United States from invoking a petition for a writ of habeas corpus."  Pet. App. 54a (citation omitted).

Moreover, petitioners cannot make a virtue of the relative prematurity of their claims.  Under petitioners' reading of <u>Eisentrager</u>, aliens captured and held abroad would have access to U.S. courts in the earliest stages of their detention, but not after hostilities had ended and the detainees had been convicted of military charges years later.  Nothing in <u>Eisentrager</u> supports, much less compels, that counterintuitive result.  To the contrary, even the dissenters in <u>Eisentrager</u> recognized the profound separation of powers difficulties occasioned by an exercise of judicial jurisdiction "while hostilities are in progress."  339 U.S. at 796 (Black, J. dissenting).  Thus, far from curing the jurisdictional defect that this Court recognized in <u>Eisentrager</u>, the fact that petitioners in this case are being held while active

47

fighting is still ongoing in Afghanistan and elsewhere and before they have been tried or convicted by a military commission, only demonstrates that this litigation implicates political questions that the Constitution leaves to the President as Commander in Chief.[19]

Petitioners' argument also creates a practical anomaly. The vast majority of aliens who are captured overseas by the military in connection with an armed conflict are detained during the course of hostilities without being charged with any war crime and without being tried or punished by a military commission. Such preventative detention is by definition not penal. See Winthrop, supra, at 788 ("Captivity is neither a punishment nor an act of vengeance," but rather "a simple war measure."). The relatively small percentage of aliens who are actually tried and convicted for war crimes often receive severe punishments, including death. Yet, under petitioners' construction of Eisentrager, habeas jurisdiction

---

[19] Petitioners ask the courts to opine on the legality of the President's ongoing military operations and to release individuals who were captured during hostilities and who the military has determined should be detained. Particularly where hostilities remain ongoing, the courts have no jurisdiction, and no judicially-manageable standards, to evaluate or second-guess the conduct of the President and the military. These questions are constitutionally committed to the Executive Branch. That is particularly true where, as here, the President is acting with the full backing of Congress. See Authorization for Use of Military Force, Pub. L. No. 107-40, § 2, 115 Stat. 224; Youngstown Sheet & Tube Co., 343 U.S. at 635-638 (Jackson, J., concurring); see also American Ins. Ass'n v. Garamendi, 123 S. Ct. 2374, 2386-2387 (2003); Dames & Moore v. Regan, 453 U.S. 654, 668-669 (1981). Accordingly, although the courts below did not need to reach the issue, the political question doctrine provides an additional ground for affirming the judgment below.

124

48

would _not_ be available for those aliens who face the most drastic punishments -- including death -- as a result of their capture, and such jurisdiction _would_ be available for the vastly greater number of aliens who are simply detained during the conflict without charge in order to prevent them from returning to the battlefield to aid the enemy.

**E.    The Jurisdiction Of U.S. Courts Does Not Turn On A Threshold Determination As To Whether An Alleged Executive Action Would Violate International Law**

Petitioners argue (R. Br. 23-29, AO Br. 38-41) that jurisdiction must be available because the Guantanamo detentions allegedly violate the United States' international obligations. That is incorrect. The Guantanamo detentions are fully consistent with applicable principles of international law. But more important for present purposes, the availability of habeas jurisdiction does not turn on a threshold inquiry into the merits of a detainee's claims under international or domestic law.

The federal habeas statute has allowed treaty-based international law claims since at least 1867, and the prisoners in _Eisentrager_ themselves raised claims under the Geneva Convention. J.A. 136. Nonetheless, _Eisentrager_ held that the U.S. courts lacked jurisdiction over such claims and further emphasized that the Geneva Convention did not create any privately enforceable rights. 339 U.S. at 789 n.14; see Part IV, _infra_. Indeed, it would have made little sense for the _Eisentrager_ Court to conclude that the same courts that are closed to constitutional claims nonetheless remain open to claims based on international law.

49

Petitioners' reliance (AO Br. 38-39; R. Br. 24-25) on the International Covenant on Civil and Political Rights (ICCPR) is particularly misplaced. The ICCPR -- a multilateral agreement addressing basic civil and political rights -- could not possibly be read to override Eisentrager. As Judge Randolph explained in his concurring opinion below, the ICCPR is a non-self-executing treaty that does not create any privately enforceable rights at all. Pet. App. 22a; Sosa v. Alvarez-Machain, No. 03-339, U.S. Br. at 27 n.8 (03-339 U.S. Br.). Furthermore, by its terms, the ICCPR is inapplicable to conduct by the United States outside its sovereign territory. Article 2, paragraph 1 of the ICCPR provides that "[e]ach State Party to the present Covenant undertakes to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant" (emphasis added). That territorial limitation is reinforced by the rule that "a treaty cannot impose uncontemplated extraterritorial obligations on those who ratify it." Sale, 509 U.S. at 183; see id. at 188.

The same analysis applies with respect to the other sources of international law relied upon by petitioners, including the Geneva Convention itself. See R. Br. 24-25; 03-339 U.S. Br. at 24-31. The Geneva Convention does not create privately enforceable rights, and Congress has never sought to create such rights through implementing legislation. Rather, as this Court recognized in Eisentrager with respect to the 1929 Geneva Convention, the "obvious scheme" of the Geneva Convention is that the

**126**

50

"responsibility for observance and enforcement" of its provisions is "upon political and military authorities." 339 U.S. at 789 n.14; see Pet. App. 22a (explaining that Geneva Convention "is not self-executing") (citing Hamdi, 316 F.3d at 468-469; Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 808-809 (D.C. Cir. 1984) (Bork, J., concurring), cert. denied, 470 U.S. 1003 (1985)); Huynh Thi Anh v. Levi, 586 F.2d 625, 629 (6th Cir. 1978); see also Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 442 (1989); Federal Trade Comm'n v. A.P.W. Paper Co., 328 U.S. 193, 203 (1946).

Petitioners' reliance on Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64 (1804), is similarly misplaced.  In that case, the Court observed "that an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains."  Id. at 118.  The 200-year-old Charming Betsy canon, however, does not provide any basis for overturning Eisentrager's construction of the habeas statutes.  Moreover, it would turn the Charming Betsy canon on its head to use it to expand the jurisdiction of the U.S. courts over the objections of the Executive and despite Congress's decision not to amend the habeas statutes in the wake of Eisentrager.  The Charming Betsy canon is designed to ensure that federal courts avoid interfering in foreign-affairs matters assigned to the political branches.  See McCulloch v. Sociedad Nacional, 372 U.S. 10, 21-22 (1963).  As explained in Part III below, holding that U.S. courts have jurisdiction to entertain claims filed on behalf of aliens detained at Guantanamo would place the federal courts into an unprecedented

127

51

position of reviewing military and foreign affairs decisions that are reserved by the Constitution to the political branches.

**F.    The APA Does Not Confer Jurisdiction Over Petitioners' Claims**

The Al Odah petitioners suggest that jurisdiction is available under the Administrative Procedure Act (APA).    See AO Br. 21-23. The court of appeals correctly rejected that argument.    See Pet. App. 17a-18a.    In Eisentrager, the Court held that aliens held outside the sovereign territory of the United States lack the "privilege of litigation" in our courts.    339 U.S. at 777.    It is true that the claims asserted by the prisoners in Eisentrager were made in the context of a petition for habeas corpus, but as petitioners themselves emphasize, habeas -- not the APA -- is the customary vehicle for challenging an executive detention.    R. Br. 13.    There is no reason to conclude that the Eisentrager Court precluded aliens held abroad from employing the Great Writ to challenge their detention, only to allow them to challenge that detention through the APA.    In other words, petitioners' non-habeas claims, a fortiori, are precluded by Eisentrager.

In any event, there are additional obstacles to petitioners' APA claim.    First, it is well-settled that "[c]hallenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus."    Muhammad v. Close, No. 02-9065, 2004 WL 344163, *1 (U.S. Feb. 25, 2004) (per curiam); see Preiser v. Rodriguez, 411 U.S. 475, 489-490 (1973).    Although the Al Odah petitioners have argued that they are merely challenging the conditions of the detainees' confinement at

52

Guantanamo and not the confinement itself, the district court correctly rejected that contention and reviewed the complaint in Al Odah "as if it were styled as a petition for writ of habeas corpus," Pet. App. 47a; see Gov't C.A. Br. 44-50.  In any event, the question presented by this Court in this case is explicitly addressed to challenges to the "legality of the detention" of aliens at Guantanamo.  124 S. Ct. 534.  Furthermore, because petitioners challenge the conduct of ongoing military operations overseas, their claims are expressly precluded by the APA.  See Pet. App. 27a-29a, 47a n.11; Gov't C.A. Br. 51-55.[20]

## III. DEPARTING FROM EISENTRAGER WOULD RAISE GRAVE SEPARATION-OF-POWERS CONCERNS

Deviating from the principles recognized in Eisentrager would raise grave separation-of-powers concerns with respect both to the military's conduct of an ongoing armed conflict overseas and to Congress's responsibility to delineate the subject-matter jurisdiction of the federal courts.

1.  a. "The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative -- 'the political' – Departments."  Oetjen v. Central Leather Co., 246 U.S. 297, 302 (1918); see Curtiss-Wright, 299 U.S. at 319, 320; Fong Yue Ting v. United States, 149 U.S. 698, 705 (1893).  That

---

[20] The Al Odah petitioners also asserted jurisdiction under 28 U.S.C. 1350.  As Judge Randolph explained in his opinion for the Court (Pet. App. 17a-18a) as well as in his concurring opinion (id. at 19a-29a), Section 1350 does not supply any jurisdiction (or any cause of action) with respect to petitioners' claims that does not otherwise exist in light of the principles discussed above.  See also 03-339 U.S. Br. 46-49.

53

constitutional commitment is at its height when it comes to the Executive's conduct of military operations abroad. See Art. II, § 2, Cl. 1. As this Court observed in Eisentrager, 339 U.S. at 788 (citation omitted): "The first of the enumerated powers of the President is that he shall be Commander-in-Chief of the Army and Navy of the United States. And, of course, grant of war power includes all that is necessary and proper for carrying these powers into execution." See also Quirin, 317 U.S. at 28 ("An important incident to the conduct of war is the adoption of measures by the military command * * * to repel and defeat the enemy."); Fleming, 50 U.S. (9 How.) at 615 (President has authority, inter alia, to "employ [the U.S. armed forces] in the manner he may deem most effectual to harass and conquer and subdue the enemy."); Stewart v. Kahn, 78 U.S. (11 Wall.) 493, 506 (1870).

b. Exercising jurisdiction over habeas actions filed on behalf of the Guantanamo detainees would directly interfere with the Executive's conduct of the military campaign against al Qaeda and its supporters. The detention of captured combatants in order to prevent them from rejoining the enemy during hostilities is a classic and time-honored military practice, and one that falls squarely within the President's authority as Commander in Chief. See Quirin, 317 U.S. at 30-31; p. __, supra.[21] Moreover, collecting

---

[21] In virtually every armed conflict in this country's history, military forces have detained enemy combatants during the course of hostilities and in their immediate aftermath. In the Revolutionary War, U.S. forces detained thousands of British and German citizens as prisoners of war, holding some for years until (or even after) the declaration of peace. See George Lewis

54

and evaluating intelligence from captured combatants about the enemy or its plans of attack is a common sense and critical element of virtually any successful military campaign.

The intelligence-gathering operations at Guantanamo are an integral component of the military's efforts to "repel and defeat the enemy" (Quirin, 317 U.S. at 28) in the ongoing military campaign being waged not only in Afghanistan but around the globe. Any judicial review of the military's operations at Guantanamo would directly intrude on those important intelligence-gathering operations.  Moreover, any judicial demand that the Guantanamo detainees be granted access to counsel to maintain a habeas action would in all likelihood put an end to those operations -- a result that not only would be very damaging to the military's ability to win the war, but no doubt be "highly comforting to enemies of the United States." Eisentrager, 339 U.S. at 779.

c. More generally, exercising jurisdiction over actions filed on behalf of the Guantanamo detainees would thrust the federal courts into the extraordinary role of reviewing the military's

_____

and John Mewha, History of Prisoner of War Utilization by the United States Army 1776-1945, Dep't of the Army Pamphlet No. 20-213, at 3, 7, 9, 12, 19-20 (1955).  During the Civil War, approximately 96,000 prisoners of war were captured and detained by the Union Army; over 50,000 remained in custody at the time of the Confederate surrender. See id. at 41.  In World War I, American forces had custody of approximately 48,000 prisoners of war in France between the 1918 armistice and the treaty of peace in 1920.  See id. at 63.  By the end of World War II, U.S. forces had custody of approximately 2 million enemy combatants.  See id. at 244.  Many of the detainees were not repatriated for several years after the conclusion of hostilities.  See id. at 243-245. During each of these conflicts, only a small fraction of the detainees was prosecuted and punished for war crimes.  The vast majority were simply detained during the conflict.

55

conduct of hostilities overseas, second-guessing the military's determination as to which captured aliens pose a threat to the United States or have strategic intelligence value, and, in practical effect, superintending the Executive's conduct of an armed conflict -- even while American troops are on the ground in Afghanistan and engaged in daily combat operations. That role goes beyond even what the dissenters in Eisentrager were willing to reserve for the courts. See Eisentrager, 339 U.S. at 796 (Black, J. dissenting) ("Active fighting forces must be free to fight while hostilities are in progress.") (emphasis added).

As this Court explained in Eisentrager, litigation of habeas claims filed on behalf of aliens held abroad -- which inevitably would entail individualized challenges to the circumstances of an alien's capture and his affiliation with the enemy -- also would "hamper the war effort and bring aid and comfort to the enemy." 339 U.S. at 779. As the Court explained, "[i]t would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home." Ibid. Eisentrager avoids these grave constitutional problems.

d. The breadth of petitioners' arguments would extend the jurisdiction of U.S. courts to habeas petitions filed on behalf of aliens captured and detained on the battlefield in Afghanistan, or anywhere else in the world. Even petitioners, however, are not

56

willing to accept the logical conclusions of their own claims.  See Pet. 22 n.14 ("[N]othing in the present litigation implies habeas jurisdiction over Bagram Air Force Base in Afghanistan or other bases in the theater of military operations.").  Petitioners seem to recognize that a ruling that the Constitution "follows the flag" for all aliens abroad would impermissibly hamper the Executive's conduct of foreign affairs.  But there is no manageable and defensible basis, other than sovereignty (i.e., the line drawn by this Court in Eisentrager and subsequent cases), for limiting the reach of the arguments that petitioners advance.  Certainly, a "de facto control and jurisdiction" test would serve no limiting function at all, because the U.S. military exercises control over the detainees at Bagram Air Force Base as well -- and would not detain prisoners in a facility that it did not control.

Moreover, drawing an arbitrary legal distinction between aliens held at a facility, such as the Bagram Air Force Base in Afghanistan, which is controlled by the U.S. military and located outside the sovereign territory of the United States, and aliens held at a facility, such as the Guantanamo Naval Base in Cuba, which is controlled by the U.S. military and located outside the sovereign territory of the United States, would create a perverse incentive to detain large numbers of captured combatants in close proximity to the hostilities where both American soldiers and the detainees themselves are more likely to be in harm's way.  Indeed, the Geneva Convention (art. 19, 75 U.N.T.S. 972) itself calls for the movement of prisoners of war "as soon as possible after their

57

capture, to camps situated in an area far enough from the combat zone for them to be out of danger."[22]

2.  Departing from <u>Eisentrager</u> and holding that U.S. courts have jurisdiction over claims filed on behalf of the Guantanamo detainees also would intrude on Congress's authority to delineate the subject-matter jurisdiction of the federal courts, subject to constitutional constraints.  See U.S. Const. Art. III, § 1; see also <u>Snyder</u> v. <u>Harris</u>, 394 U.S. 332, 341-342 (1969) ("If there is a present need to expand the jurisdiction of those courts we cannot overlook the fact that the Constitution specifically vests that power in the Congress, not in the courts."); <u>Fair Assessment in Real Estate Ass'n</u> v. <u>McNary</u>, 454 U.S. 100, 117 (1981) (Brennan, J., joined by Marshall, Stevens, and O'Connor, JJ., concurring in the judgment) ("Subject only to constitutional constraints, it is exclusively Congress' responsibility to determine the jurisdiction of the federal courts.").

To be sure, the Constitution would limit the ability of Congress to extend federal court jurisdiction into areas that interfered with the core executive responsibilities.  But especially when Congress itself has not attempted to confer such jurisdiction, even in response to this Court's clear recognition of the limits of the habeas statute in <u>Eisentrager</u>, the courts are not

---

[22] The importance of detaining captured combatants at a secure facility located outside an active combatant zone is underscored by the prison uprising that occurred in November 2001 at Mazar-e-Shariff, Afghanistan, which resulted in the deaths of scores of captured combatants as well as one U.S. intelligence officer and members of the Northern Alliance.

58

free to extend their statutory jurisdiction of their own accord in
the absence of congressional action.  Congress, moreover, is far
better situated than the courts to weigh the significant foreign
policy and military ramifications of extending federal jurisdiction
over the claims of aliens held abroad and to address the myriad
factors that might enter the equation.[23]

Furthermore, exercising jurisdiction over the actions filed on
behalf of the Guantanamo detainees in this case almost certainly
would lead to the filing of scores if not hundreds of follow-on
actions by the relatives of other aliens held at Guantanamo, as
well as, in all likelihood, actions filed on behalf of aliens held
by the U.S. military abroad at other American-controlled facilities
overseas.  See Eisentrager, 339 U.S. at 768 n.1 (noting that the

---

[23] As the government explained to this Court in the brief
that it filed in Eisentrager:

Whether, and on what conditions, Congress should extend the
same rights to alien enemies outside our territory as are
available to those within may depend upon such factors as
the distance from this country of the foreign places of
confinement, the availability of witnesses and their
amenability to the processes of our courts, the expenses of
transportation, the number of potential applicants for the
writ, the classes of detained enemy aliens, and the extent
of judicial review available abroad, as well as upon our
agreements with other powers, the need for expedition and
finality in the execution of our international undertakings
in punishing war criminals, and the policy demands of the
occupation of enemy areas.  Other factors to be weighed are
whether the remedy shall be available at all times, even
during the height of hostilities on foreign soil; the stage
at which relief should be allowed, e.g., before or after
trial; whether special time and procedural provisions are
appropriate; and the scope of review to be afforded in our
domestic courts.

49-306 U.S. Br. at 70-71 (citation omitted).

59

court had received habeas petitions filed by "over 200 German enemy aliens confined by American military authorities abroad"). There is no indication that Congress, which is traditionally sensitive to the workload of the federal courts, intended to open the federal courts to the inevitable influx of such claims. Indeed, as discussed above, Congress did not enact the amendment proposed in 1951 that would have created such jurisdiction.

## IV. THE GUANTANAMO DETENTIONS ARE SUBJECT TO DIPLOMATIC AND POLITICAL SCRUTINY

1. In Eisentrager, the Court stressed that it was "not holding that these prisoners have no right which the military authorities are bound to respect." 339 U.S. at 789 n.14. The Court recognized that the detainees asserted violations of the Geneva Convention of 1929 concerning "the treatment to be accorded captives." Ibid. However, the Court concluded that the "obvious scheme" of the Geneva Convention is "that responsibility for observance and enforcement of these rights is upon political and military authorities." Ibid. As the Court continued, "[r]ights of alien enemies are vindicated under [the Geneva Convention] only through protests and intervention of protecting powers as the rights of our citizens against foreign governments are vindicated only by Presidential intervention." Ibid.

Such a dynamic not only is available, but is actively engaged with respect to the Guantanamo detainees. The Guantanamo detainees have been the subject of international attention and diplomatic

60

discussions, including at the highest level of state.[24]    For example, U.S. officials have met with Australian officials concerning petitioners Hicks and Habib.    See Australian Minister for Foreign Affairs and Attorney General, Delegation Concludes Successful Talks On David Hicks (July 24, 2003) (www.nationalsecurity.gov.au/ag).    Similar discussions have taken place between U.S. officials and British officials and, as discussed above, the military has recently announced that it is preparing to transfer the British detainees at issue in this case (Rasul and Iqbal) to the custody of the British government.

At the same time, the Department of Defense has announced that, as a general policy, it does not wish to detain individuals once it has determined both that they no longer have potential intelligence value and that their release would not pose a threat to the United States or its allies.    To date, more than 90 aliens have been released from Guantanamo.    Eighty-eight individuals have been released without further custody, and 12 have been transferred

---

[24] See, e.g., Office of the White House Press Secretary, President Bush Arrives In England for Three Day State Visit (Nov. 18, 2003) (noting discussions with the British and with other countries on the treatment of Guantanamo detainees) (<www.whitehouse.gov/news/releases/2003/11/20031118-3.html.); Office of the White House Press Secretary, Remarks by President Bush and Prime Minister Howard of Australia (Oct. 22, 2003) (noting discussions between the President and the Prime Minister of Australia on Guantanamo detainees of Australian nationality) (<www.whitehouse.gov/news/releases/2003/10/20031022-11.html); Office of the White House Press Secretary, Statement on British Detainees (July 18, 2003) (discussing meeting between the President and Prime Minister Blair on "the issue of U.K. nationals detained at Guantanamo Bay") (<www.whitehouse.gov/news/ releases/2003/07>); see also President Bush, Prime Minister Sabah of Kuwait Discuss Middle East (Sept. 10, 2003) (www.whitehouse. gov/news/releases/2003/09/20030910-4.html.)

61

to the custody of their own governments (Saudi Arabia, Spain, and Russia) for further detention or prosecution.[25]  In addition, six detainees have been designated pursuant to the President's military order of November 13, 2001 and several, including petitioner Hicks, have been assigned military attorneys.  As discussed above, two Guantanamo detainees have been charged with conspiracy to commit violations of the laws of war.

2.  The military's detention of captured combatants at Guantanamo, just like the ongoing operations in Afghanistan and

---

[25]  See, e.g., News Release, Dep't of Defense, Transfer of Detainees Complete (Mar. 1, 2004) (seven Russian detainees transferred to Russian government for continued detention) (<www.dod.mil/releases/2004/nr20040301-0389.html>); News Release, Dep't of Defense, Transfer of Detainee Completed (Feb. 25, 2004) (Danish national released) (<www.www.defenselink.mil/releases/ 2004/nr20040225-0365.html>); News Release, Dep't of Defense, Transfer of Detainee Complete (Feb. 13, 2004) (one Spanish-national detainee transferred for continued detention by Spanish Government) (<www.defenselink.mil/releases/2004/nr20040213-0981 .html>); News Release, Dep't of Defense, Transfer of Juvenile Detainees Complete (Jan. 29, 2004) (three juveniles under the age of 16 released to their home country) (<www.defense link.mil/releases/ 2004/nr20040129-0934.html>); News Release, Dep't of Defense, Transfer of Detainees Completed (Nov. 24, 2003) (20 detainees transferred to their countries of origin) (<www.defenselink.mil/ releases/2003/nr20031124-0685.html>); News Release, Dep't of Defense, Transfer of Detainees Completed (July 18, 2003) (27 detainees released to countries of origin) (<www.defenselink.mil/ releases/2003/nr20030718-0207.html>); News Release, Dep't of Defense, Release/Transfer of Detainees Completed (May 16, 2003) (one detainee released, four Saudi detainees transferred to Saudi Government for continued detention) (<www.defenselink.mil/ releases/2003/b05162003_bt338-03 .html>); News Release, Dep't of Defense, Transfer of Detainees Completed (May 9, 2003) (13 detainees transferred for release) (<www.defenselink.mil/releases/2003/b05092003_bt311-03 .html>); News Release, Dep't of Defense, Transfer of Detainees Completed (Oct. 28, 2002) (four detainees released) (<www.defenselink.mil/releases/2002/b10282002_bt550-02.html.>).

138

62

elsewhere around the globe, is subject to congressional inquiry. The President has reported to Congress on the ongoing military operations in Afghanistan, including the Guantanamo detentions. See, e.g., Letter from the President to the Speaker of the House of Representatives and the President Pro Tempore of the Senate, supra. Numerous congressional delegations have visited Guantanamo. And members of Congress have questioned executive officials during congressional hearings and in written questions about the military's operations at Guantanamo.

3.   The Executive's military operations at Guantanamo and, more generally, its efforts to eradicate the al Qaeda terrorist network and prevent additional terrorist attacks are the subject of intense public scrutiny as well. By constitutional design, the political branches are directly accountable to the people for foreign policy decisions made on their watch. See Chicago & So. Air Lines, Inc. v. Waterman S.S Corp., 333 U.S. 103, 111 (1948). In that regard, the political branches occupy an entirely different position in our constitutional system than this Court. As the number of amicus briefs filed in this case underscore, the Guantanamo detentions are subject of intense public interest in this country and, indeed, the international community. The political branches ultimately are accountable for the conduct of the ongoing military campaign against al Qaeda and protecting the Nation from additional attacks. The military operations at Guantanamo are a critical component of the Executive's efforts to accomplish those objectives.

63

## CONCLUSION

The judgment of the court of appeals should be affirmed.

Respectfully submitted.

THEODORE B. OLSON
  Solicitor General

PETER D. KEISLER
  Assistant Attorney General

PAUL D. CLEMENT
  Deputy Solicitor General

GREGORY G. KATSAS
  Deputy Assistant Attorney General

WILLIAM H. TAFT IV          GREGORY G. GARRE
  Legal Adviser             DAVID B. SALMONS
  Department of State         Assistants to the Solicitor
                              General

                            DOUGLAS N. LETTER
                            ROBERT M. LOEB
                            SHARON SWINGLE
MARCH 2004                    Attorneys

# THE

# ENGLISH REPORTS

## VOLUME CXXI

### KING'S BENCH DIVISION

L

CONTAINING

ELLIS AND ELLIS, VOLS. 2 AND 3

BEST AND SMITH, VOLS. 1 AND 2



SOCIAL LAW LIBRARY
1804
BOSTON

WILLIAM GREEN & SONS, EDINBURGH

STEVENS & SONS, LIMITED, LONDON

AGENTS FOR THE UNITED STATES OF AMERICA

THE BOSTON BOOK COMPANY

AGENTS FOR CANADA

THE CANADA LAW BOOK COMPANY

1911

'TEE

HALSBURY,
GEAT BRITAIN

ERSTONE,
AND

Y, G.C.M.G., K.C.
L

AT-LAW

Printed by WILLIAM GREEN & SONS, *Edinburgh*

*November* 1911

a tropical climate are more or less liable, just as persons exposed to the other natural causes to which we have referred are liable to disastrous consequences therefrom. The deceased, in the discharge of his ordinary duties about his ship, became thus affected and so died.

We think, for the reasons we have given, that his death must be considered as having arisen from a "natural cause," and not from "accident," within the meaning of this policy. There must be judgment for the defendants.

Judgment for the defendants.

[487]    EX PARTE ANDERSON (a).    Tuesday, January 15th, 1861.    The superior Courts of common law at Westminster have jurisdiction at common law to issue a writ of habeas corpus ad subjiciendum, to all parts of the dominions of the Crown of England, even to those in which an independent local judicature has been established. Such jurisdiction can be taken away only by express legislative enactment.—Accordingly, this Court granted a writ of habeas corpus directed to certain gaolers and others, in the province of Upper Canada, commanding them to bring up the body of A., a British subject, alleged to be illegally in their custody.

[S. C. 30 L. J. Q. B. 129 ; 3 L. T. 622 ; 7 Jur. N. S. 122 ; 9 W. R. 255.]

Edwin James moved that a writ of habeas corpus ad subjiciendum be issued to the sheriff of the county of York, in Canada, and to the Keeper of the gaol of Toronto in that county, to bring up the body of John Anderson.

The motion was made on the affidavit of Louis Alexis Chamerovzow, of 27, New Broad Street, in the city of London, secretary of The British and Foreign Anti-Slavery Society; which stated that John Anderson, of the city of Toronto, in Her Majesty's province of Canada, a British subject domiciled there, was, as the deponent believed, illegally detained in the criminal gaol of the said city against his will, not having been legally accused, or charged with, or legally tried or sentenced for, the commission of any crime, or of any offence against or recognized by the laws in force in the said province, or in any part of Her Majesty's dominions; and not being otherwise liable to be imprisoned or detained under or by virtue of any such laws: and that, unless a peremptory writ of habeas corpus should immediately [488] issue, the life of the said John Anderson was exposed to the greatest and to immediate danger.

Edwin James, for the writ. The Crown, through the superior Courts of Westminster, has power to issue the prerogative mandatory writ of habeas corpus to any part of the Queen's dominions, and therefore to Canada. Stat. 14 G. 3, c. 83, "An Act for making more effectual provision for the government of the province of Quebec in North America," recites in the preamble that the "countries, territories, and islands in America," dealt with by the Act, were "ceded to His Majesty by the" "treaty of peace, concluded at Paris on 10th February, 1763"; and, by stat. 31 G. 3, c. 31, s. 2, the province of Quebec is divided into two separate provinces called the province of Upper Canada and the province of Lower Canada. [Hill J. I observe that stat. 14 G. 3, c. 83, enacted, by sect. 8, "that in all matters of controversy, relative to property and civil rights, resort" should "be had to the laws of Canada, as the rule for the decision of the same;" and, by sect. 11, that the criminal law of England was to be continued in force in the province.] There can be no doubt but that the writ of habeas corpus may issue to Canada. In delivering the judgment of this Court in *Leonard Watson's Case* (9 A. & E. 731, 782), Lord Denman C.J. said, "The difficult questions that may arise touching the enforcement

(a) In consequence of the decision in this case it has since been enacted, by stat. 25 & 26 Vict. c. 20, s. 1, that no writ of habeas corpus shall issue out of England by authority of any Judge or Court of justice therein, into any colony or foreign dominion of the Crown where Her Majesty has a lawfully established Court or Courts of justice, having authority to grant and issue the said writ, and to insure the due execution thereof throughout such colony or dominion. Sect. 2 provides that the Act shall not affect or interfere with any legally existing right of appeal to Her Majesty in council.

---

*Left margin column (fragmentary):*

E CO.    3 EL. & EL. 484.

ainst the defendants.
), has some bearing on
the other.
Death from sunstroke
ordinary sense of that
e may be. And sun-
s not uncommon. It
e Transactions of the
1858; The American
umbers of The Medical
ase, not accident; still
, river, or lake; which

cy were not limited to
ng the enumeration of
o cover injuries arising
e sunstroke was or was
f the policy, it clearly
far it is to be deemed

). This was an action
a policy of insurance
g then about to proceed
extent of a reasonable
f or in consequence of
, river, or lake; and in
re, in the event of the
months of its occurrence.
uth-west coast of India,
l case) struck down by
ourse of the same day.
of the deceased can be
licy. We are of opinion
ants.

olicy of this nature, so as
or death from accident,
niversal application. At
m "accident" as so used,
We cannot think disease
accidental. Thus disease
icissitudes of climate, or
be accidental; unless at
ces which may give it the
the effects of ordinary
of navigation, a mariner
lental; although if, being
ake to the sea in an open
l death ensued therefrom,
It is true that, in one
natural cause, such as we
h as it is uncertain before-
posed to the same malaria
s thus arising have always
atural causes.

ough the name would at
ir as we are informed, an
o the too intense heat of
themselves to the sun in

in England of foreign laws, are excluded from this case entirely; for Upper Canada is neither a foreign state, nor a colony with any peculiar customs. Here are no mala prohibita by virtue of arbitrary enactments; the relation of master and slave [489] is not recognized as legal: but Acts of Parliament have declared that the law of England, and none other, shall there prevail." No precedent has been discovered of an actual issue of the writ to Canada; but no distinction exists, for this purpose, between that colony and any other part of the dominions of the Crown. In Bac. Abr. tit. Habeas Corpus (B), 2, under the heading, "To what places it may be granted," the law is thus laid down: "It hath been already observed, that the writ of habeas corpus is a prerogative writ, and that therefore, by the common law, it lies to any part of the King's dominions; for the King ought to have an account why any of his subjects are imprisoned, and therefore no answer will satisfy the writ, but to return the cause with paratum habeo corpus, &c. Hence it was holden, that this writ lay to Calais at the time it was subject to the King of England." In delivering the judgment of the Court in Rex v. Cowle (2 Burr. 834, 855), in which case the question was whether this Court had jurisdiction to issue a certiorari to Berwick-upon-Tweed, Lord Mansfield C.J. said, "Writs, not ministerially directed, (sometimes called prerogative writs, because they are supposed to issue on the part of the King,) such as writs of mandamus, prohibition, habeas corpus, certiorari, are restrained by no clause in the constitution given to Berwick: upon a proper case, they may issue to every dominion of the Crown of England. There is no doubt as to the power of this Court; where the place is under the subjection of the Crown of England; the only question is, as to the propriety. To foreign dominions, which belong to a prince who succeeds to the throne of England, this [490] Court has no power to send any writ of any kind. We cannot send a habeas corpus to Scotland or to the Electorate: but to Ireland, the Isle of Man, the Plantations, and, (as since the loss of the Duchy of Normandy, they have been considered as annexed to the Crown, in some respects), to Guernsey and Jersey, we may; and formerly, it lay to Calais; which was a conquest, and yielded to the Crown of England by the treaty of Bretigny." In 1397, a writ of habeas corpus, tested per ipsum regem et concilium in parliamento, was sent to the governor of Calais, to bring up the body of Thomas, Duke of Gloucester, then in custody there, to answer a charge of treason preferred against him by the Duke of Rutland and others (a)[1]. [Crompton J. That was a writ ad respondendum, which is on a different footing from the writ ad subjiciendum.] The following entry in 2 Peere Williams's Rep., p. 74, supports Lord Mansfield's statement, already cited, that the writ may go to the Plantations. "Memorandum, 9th of August, 1722, it was said by the Master of the Rolls to have been determined by the Lords of the Privy Council, upon an appeal to the King in council from the foreign plantations, 1st, that if there be a new and uninhabited country found out by English subjects, as the law is the birthright of every subject, so, wherever they go, they carry their laws with them, and therefore such new found country is to be governed by the laws of England: though, after such country is inhabited by the English, Acts of Parliament made in [491] England, without naming the foreign plantations, will not bind them." These dicta are in accordance with the general law of nations. Thus Vattel lays it down (a)[2] that "when a nation takes possession of a distant country, and settles a colony there, that country, though separated from the principal establishment, or mother country, naturally becomes a part of the state, equally with its ancient possessions. Whenever, therefore, the political laws, or treaties, make no distinction between them, everything said of the territory of a nation must also extend to its colonies." In Campbell v. Hall (1 Cowp. 204, 208, 210) Lord Mansfield C.J. pointed out that it is clear that a country conquered by the British arms becomes subject to the Legislature of Great Britain; though the laws of such a country may be changed by the authority of the Crown. He gave as instances, amongst others, Berwick, Gascony, Guienne, Calais and Minorca. [Cockburn C.J. At the time of the decision in Rex v. Cowle (2 Burr. 834), Berwick was

(a)[1] Rymer's Fœdera, vol. 3, part. 4, p. 135 (Hague edition, 1740). James also stated that he had found the following instances of writs having issued to Calais. A writ of amoveas manus, in 1363; of attachment, from the Court of King's Bench, against the mayor, for disobeying a writ, in 1364; and of inquisition, to inquire into the goods of a felon, in 1374.

(a)[2] Law of Nations, book 1, ch. 18, sect. 210, p. 100 (Chitty's edition, 1834).

| | |
|---|---|
| 3 EL. & EL. 498. | EX PARTE ANDERSON          527 |

Upper Canada
Here are no
ster and slave
d that the law
een discovered
this purpose.
In Bac. Abr.
e granted," the
habeas corpus
iny part of the
iis subjects are
the cause with
o Calais at the
dgment of the
is whether this
Mansfield C.J.
writs, because
of mandamus,
he constitution
ominion of the
irt; where the
estion is, as to
ucceeds to the
iny kind. We
to Ireland, the
'ormandy, they
i Guernsey and
ist, and yielded
writ of habeas
to the governor
custody there,
of Rutland and
is on a different
'eere Williams's
he writ may go
by the Master
ouncil, upon an
t if there be a
the law is the
iws with them,
ws of Parlia-
ament made in
them." These
iays it down (a)²
a colony there,
mother country,
ns. Whenever,
hem, everything
Campbell v. Hall
r that a country
Great Britain;
y of the Crown.
ais and Minorca.
i4), Berwick was
:0). James also
ed to Calais. A
f King's Bench,
, to inquire into

tion, 1834).

not subject to the laws of Scotland. There was, consequently, no superior Court with power to control proceedings instituted there, unless the superior Courts of Westminster had jurisdiction to do so. Blackburn J. In the course of the judgment, Lord Mansfield C.J. says, (2 Burr. 855), "The charter gives them" (the corporation of Berwick) "power to make ordinances with penalties of fine and imprisonment: so as they be reasonable, and not repugnant to the laws, statutes and customs of England. In short, they have no criminal law, but the law of England; and no criminal jurisdic-[492]-tion, but with such a reference to the law of England, as necessarily includes this Court." Can the same be said of Canada? Cockburn C.J. Canada possesses an independent Legislature and an independent judicature. Crompton J. You must make out that we have concurrent jurisdiction with the superior Courts of Canada.] The mere fact that the Crown has granted a local judicature to a colony, with the same jurisdiction, within the colony, that the superior Courts of England have over the whole of the realm, does not, in the absence of express enactment to the contrary, oust the Crown of its right to control the local Courts in the exercise of their jurisdiction. There is a local judicature in Ireland; but, in *Anonymous* (Vent. 357), the Court seemed to be of opinion that a habeas corpus might be sent to Ireland to remove a person taken in execution upon a judgment there. [Hill J. At that time an appeal lay from Ireland to this Court. But appeals from the colonies lie only to the Queen in Council.] There are several instances in which the jurisdiction of the English superior Courts to issue a habeas corpus to the foreign dominions of the Crown has been considered. In *Crawford's Case* (13 Q. B. 613) this Court appears to have thought that the writ, ad subjiciendum, runs at common law to the Isle of Man; at any rate since stat. 5 G. 3, c. 26, by which the island was vested inalienably in the King and his successors, as part of the dominions of the Crown of England. In *Ex parte Lees* (E. B. & E. 828) the Court refused a writ of error to bring up the record of the conviction of the prisoner for a criminal offence, by the Supreme Court of St. Helena, on the ground that the Attorney General's fiat for the writ had not been obtained. Crompton J., however, [493] afterwards granted a writ of habeas corpus in that case. [Crompton J. I granted the writ as ancillary to the writ of error, which the Crown had afterwards allowed to issue. Cockburn C.J. At the time of the argument of the question whether the writ of error ought to be granted, the Court seems to have doubted whether a writ of habeas corpus could issue to St. Helena.] In delivering the judgment of the Court, Lord Campbell C.J. says (E. B. & E. 834), "No precedent" "of any such proceeding" as a writ of error or certiorari "with respect to a dependency like St. Helena, for several centuries, was brought before us; and it was not at all explained in what manner our writs of error, certiorari or habeas corpus would be enforced in such dependencies."] It has been decided that the writ of habeas corpus ad subjiciendum runs to Jersey; *Carus Wilson's Case* (7 Q. B. 984), *Dodd's Case* (2 De G. & J. 510). [Hill J. Suppose that we issue the writ in the present case, and that the parties to whom it is directed refuse to obey it, what remedy should we have?] The writ might then be enforced by attachment. [Hill J. Could we send our own officer to Canada for that purpose?] Yes, if necessary: and the attachment would be valid. The same difficulty, if it be one, would arise in the case of an issue of the writ to Jersey. In the case before the Court the interests of a British subject are vitally affected. The Court will not, therefore, refuse to exercise, in his favour, a jurisdiction warranted by numerous precedents, merely on the ground that there may be difficulty in enforcing the writ, when granted.

[494] The Court (a) retired for consultation. On their return, Cockburn C.J. delivered judgment as follows.

We have considered this matter; and the result of our anxious deliberation is, that we think the writ ought to issue. At the same time, we are sensible of the inconvenience which may result from such a step; and that it may be felt to be inconsistent with that higher degree of colonial independence, both legislative and judicial, which happily exists in modern times. Nevertheless, it is to be observed that, in establishing a local judicature in Canada, our Legislature has not gone so far as expressly to abrogate the right of the superior Courts at Westminster to issue the writ of habeas corpus to that province; which writ, in the absence of any prohibitive enactment, goes

---

(a) Cockburn C.J., Crompton, Hill and Blackburn Js.

528                    MILVAIN *v.* PEREZ                3 EL. & EL. 495.

to all parts of the Queen's dominions.   Lord Coke (*b*), Lord Mansfield (*c*), Blackstone (Commentaries, vol. 3, p. 131) and Bacon's Abridgment (tit. Habeas Corpus (B) 2) all agree that writs of habeas corpus have been and may be issued into all parts of the dominions of the Crown of England, wherever a subject of the Crown is illegally imprisoned or kept in custody.   In addition to these dicta of eminent authorities, we have actual precedents of the issue of the writ, in very modern times, into the Islands of Man, Jersey and St. Helena.   Inasmuch, therefore, as the power of this Court thus to issue the writ has been not merely asserted as matter of doctrine, but carried into effect in practice ; and as the writ has issued even into dominions of the Crown in which there is an independent local judicature ; we think that nothing short of [495] legislative enactment would justify us in refusing to exercise the jurisdiction, when called upon to do so for the protection of the personal liberty of the subject.   It may be that the Imperial Legislature has thought fit to leave the three superior Courts at Westminster the same concurrent jurisdiction in this matter with the colonial Courts that they have inter se.   Both upon authority and upon precedent, we think that the writ ought to go.

. Writ of habeas corpus granted (*a*).

MILVAIN AND ANOTHER *against* PEREZ AND OTHERS.   Friday January 18th, 1861.
        By a charterparty made between plaintiffs, shipowners, and defendants, agents in England for foreign charterers, it was agreed that plaintiffs' ship the B. should proceed to J., and there load in regular turn, in the customary manner, from defendants, a full and complete cargo of coke.   It was further agreed that, as defendants were acting for foreign principals, "all liability of" defendants "in every respect, and as to all matters and things, as well before and during as after the shipping of the said cargo," should "cease as soon as they" had "shipped the cargo."—Defendants having loaded and shipped the agreed cargo, plaintiffs afterwards sued them in this action for not having shipped it in regular turn. Held, that the action would not lie, for that the charterparty limited defendants' liability to the actual shipment of the cargo, and protected them from responsibility for any irregularity or delay in the shipment.

[S. C. 30 L. J. Q. B. 90 ; 3 L. T. 736 ; 7 Jur. N. S. 336 ; 9 W. R. 269.   Referred to, *Bannister* v. *Breslauer*, 1867, L. R. 2 C. P. 500.   Discussed, *Christoffersen* v. *Hansen*, 1872, L. R. 7 Q. B. 514.   Distinguished, *Francesco* v. *Massey*, 1873, L. R. 8 Ex. 103. Referred to, *Kish* v. *Cory*, 1875, L. R. 10 Q. B. 561 ; *French* v. *Gerber*, 1876-7, 1 C. P. D. 742 ; 2 C. P. D. 247 ; *Dunlop* v. *Balfour*, [1892] 1 Q. B. 511.]

    Declaration, upon a charterparty made between plaintiffs and defendants.   The charterparty, [496] which was set out in full, was, so far as is material, as follows.
    "It is this day mutually agreed between Henry Milvain Esquire" (meaning plaintiffs), "owner of the good ship or vessel called The 'Bomarsund,'" "now in the Tyne, and Messieurs Perez, Williams & Bilton " (meaning defendants), "as agents for the charterers, that the said ship, being tight, staunch and strong, and every way fitted for the voyage, shall proceed to Ramsey's Coke Ovens at Jarrow, and there load in regular turn, in the customary manner, from the agents of the said charterers (except in case of riots, strikes, or any other accidents beyond their control, which may prevent or delay her loading), a full and complete cargo of coke ; " "and being so loaded shall therewith proceed to Carthagena for orders to discharge there, at Escombreras or Porman, and there discharge the cargo upon being paid freight." "The vessel to be consigned to the charterers' agents at port of discharge, and to pay

(*b*) See *Calvin's Case*, 7 Rep. 20 a.
(*c*) In *Rex* v. *Cowle*, 2 Burr. 834, 855.
(*a*) The writ was directed to the sheriff of the county of York, in Canada, in Her Majesty's province of British North America, and the keeper of the gaol in the city of Toronto, in the said county ; to the sheriff of the county of Brant, in Canada aforesaid, and to the keeper of the gaol in the town of Brantford, in the said county ; and to all other sheriffs, gaolers, and all constables and others in the said province, having the custody or control of the said John Anderson.

# THE

# ENGLISH  REPORTS

## VOLUME XCVII

### KING'S BENCH DIVISION

### XXVI

CONTAINING

**WILMOT**

BURROW, VOLS. 1, 2 AND 3

SOCIAL·LAW·LIBRARY
1804
BOSTON

WILLIAM  GREEN  &  SONS,  EDINBURGH

STEVENS  &  SONS,  LIMITED,  LONDON

AGENTS FOR THE UNITED STATES OF AMERICA

THE  BOSTON  BOOK  COMPANY

AGENTS FOR CANADA

THE  CANADA  LAW  BOOK  COMPANY

1909

TEE

HALSBURY,
IT BRITAIN

STONE,
)

LINS,

.C.M.G., K.C.,

ESQRS.,

*Printed by* WILLIAM GREEN & SONS, *Edinburgh*

*July* 1909

NOTES o

LIVE

Hono

Knt.,

COUF

HIS

COUN

THE ATTORNEY

[S. C. Ambl. 57
J. &

Sir George D
seised of, or other
estates, in the co
the 20th of Dece
hereditaments, b
lying, and being
elsewhere, with tl
Charles Earl of C
of Lancaster, Job
manors, heredita
inheritance, or fr
purposes in his sε
and to hold all sτ
any estate for an
administrators, u
limited, and appc
appoint all such c
estate of inherita
and heir apparei
without impeachr
that estate, to tl
remainders; and
to the use of the
and for default
every other son
and successively
third, fourth, fif
Downing, success
Barnardiston, of
apparent of his
term of his nati

K. B. XXVI.

the words "being above such an age," are good in an indictment.  And these words are "being then surveyors."

To the 2d objection,—He answered, that the allegation "that they being then surveyors," is sufficient; without specifying when they were so appointed.

To the third objection—That this is in itself an indictable offence; and was so, at the making of 22 C. 2, c. 12.

The Act of 2 & 3 Ph. & M. c. 8, is the first statute that gives a forfeiture for default in this respect.  The 5 Eliz. c. 13, § 8, gives power to the sessions, to proceed to enquire of defaults, and to assess fines for them: (which must be by way of indictment).  In West's Precedents, 2d part, § 218, anno 34 Eliz. there is an indictment for this same offence.

Or, perhaps, the defendant might be out of the jurisdiction of the justices; and if so, the justices could not proceed as the Act directs.

And this is a mandatory statute.

Mr. Vivian, contra.

In support of the 1st and 2d objections—It ought to have been mentioned by whom, and when the surveyors were appointed.

[834] In support of the 3d objection, he cited 2 Hawk. P. C. 211, § 4, where the *1 rule is particularly and expressly laid down.  And 22 C. 2, c. 12, § 9, prescribes a particular method; so also does § 12 of the same statute.  In 7 Rep. 36, (on penal statutes,) it was resolved "that the Act which gives the penalty, ought to be pursued."  Brownl. 106.  *Rex* v. *Marriot*, 1 Show. 398.  *Stephens* v. *Watson*, 1 Salk. 45.  Palm. 388, S. P.  2 Ro. Rep. 299.  Cro. Jac. 643, *Castle's case*.  *Queen* v. *Watson*, cited in 6 Mod. 86.  *Rex* v. *Davyes*, 3 Keb. 34.  *Rex* v. *Sparks*, 3 Mod. 79.

Lord Mansfield—As to the 3d objection—It was an offence indictable before the appointment of the summary remedy prescribed by the Statute of 22 C. 2.  The case of † *Rex* v. *Davis*, M. 28 G. 2, B. R. was of the same kind.  Therefore the summary jurisdiction is ‖ cumulative, (although there is another remedy given,) and does not exclude the common-law remedy.

I do not approve of indicting, where there is another remedy: it carries the appearance of † oppression.  Yet it is not to be understood that we are obliged to quash indictments upon motion, in every case, where they are not to be supported upon a demurrer.

As to the 1st objection—"being" is a sufficient averment.

And the 2d objection has nothing in it.

Mr. Just. Denison concurred.

The rule was therefore discharged.

REX *versus* COWLE.  Tuesday, 3d July, 1759.  Rules to shew cause why a supersedeas should not issue on a certiorari to return all indictments against the defendants, justices of the town of Berwick, discharged.

On shewing cause (upon Tuesday 22d January last) why a supersedeas should not issue, to a certiorari directed to the corporation-justices of Berwick, "to remove an indictment for an assault;" and also on the adverse party's shewing cause (at the same time) against other *2 cross-rules for attachments against the justices to whom the said certiorari was directed, "for refusing to receive or return the said certiorari; and for committing the defendant to prison on his refusal to plead in their Court of Sessions and Gaol-Delivery, after he had offered his certiorari to them, and tendered sufficient and proper security thereupon;—"

[835] It was insisted by Sir Richard Lloyd, Mr. Clayton, and Mr. Selwyn, who were counsel for the corporation-justices (and consequently, argued for the supersedeas, and against the attachments,) that this Court has no jurisdiction over Berwick: where the proceedings are not according to the laws of England, but according to a quite different law.

---

*1  V. ante, 805, the true rule of distinction declared by Lord Mansfield.
†  See it cited at large, ante, 803, 804.
‖  V. ante, 805, accord.
†  V. ante, 804, accord.
*2  See both rules (verbatim) at the end of this case, pa. 864.

Berwick, they said, was formerly part of Scotland, and was ours only by conquest, and remains unincorporated with England, and is governed by its own former laws.

It is in the very same situation as Ireland was, immediately after its being conquered.  V. 8th vol. of State Trials, pa. 346, Prynne's argument in *Lord Maguire's case.*

A conquered country retains its own laws, till others are given by the conquerors.  No certiorari therefore lies, to Berwick.

The proper method would be, to issue a commission, to judge according to their own laws.  So as to Jamaica, Guernsey, Jersey, Sarke, &c.    *[1] 2 Salk. 411, *Blanckard* v. *Galdy.*  Hale's History of the Common-Law, 183, 186, 187, 188, 189.  *Calvin's case,* 7 Rep. 21, 23.

But suppose the King himself to be a party, it may be said "that he may choose his Court."  Yet still it ought to be tried according to the laws of the place where the cause arises.  And Hale, 186, does not contradict this: for he does not say where it shall be tried.

In 11 E. 3, (amongst the records of the Tower) as is asserted in *Calvin's case,* 7 Rep. 23 a. b. there is a commission to the King's justice of Berwick upon Tweed and Scotland, to try according to the laws of the place, "secundum legem et consuetudinem regni Scotiæ."  And as Berwick is in no county, how or where could this matter be tried, if a certiorari should go.

A certiorari is a mandatory writ remedial.  Therefore it can not extend beyond the realm of England.  *Calvin's case* 20 a. is expressly so.  And no certiorari ever did go; so as that there has been any proceeding upon it: perhaps they may have been sent out ex improviso: and nothing further done upon them.

To prove "that Berwick is no part of England," they cited 1 Sid. 381, 462, *Jackson and Crispe* v. *Mayor, &c. of Berwick;* and Godbolt 387, *Cremer and Tookley's case;* [836] where a case is cited, "of debt on an obligation, and the venue laid at Berwick; which was adjudged against the plaintiff; because the Court had not jurisdiction."

Informations indeed were lately granted, for bribery in the election for Berwick; though they never came to any effect.  (*Rex* v. *Watson,* Hil. & Pasch. 1755.)

The Act of 8, 9 W. 3, c. 33, (which perpetuates 5, 6 W. & M. c. 11,) requires the recognizance to be conditioned "to try at the next assizes for the county, where the indictment was found."  But Berwick is no county of England.  2 Show. 365, *Mayor of Berwick's case* declares so, and that the King's writ does not run into Berwick.

Therefore, if this certiorari should be granted, it would occasion a failure of justice.

Lord Mansfield said it was necessary for the Court to know the constitution of Berwick perfectly, and search it to the bottom, before they could give any opinion.  And for that purpose

Both the Court themselves, and likewise the defendant's counsel, desired an opportunity of seeing the charters of that town.

The whole matter was therefore adjourned; that the charters of the Corporation of Berwick might be inspected and produced: which was accordingly afterwards done.  And

The substance of their several charters is as follows—

From the year 1296, (when this town was conquered by Edward the First,) this corporation hath had several charters granted to it by different Kings and Queens of England; particularly one in the reign of Edward 4th; in the introduction to which, it appears "that several charters had been granted to the town of Berwick, by his ancestors, before his reign."  It is to this effect—

*[2] Edward by the grace of God King of England and of France and Lord of Ireland, to all archbishops, bishops, abbots, priors, dukes, earles, barons, justices, sheriffs, ministers, and to all bailiffs and his faithful people, greeting—We have seen the charter of † Edward late King of England our progenitor, made in these words,— Edward by the grace of God King of England and of France and Lord of Ireland, to all archbishops, &c. &c.  We have seen the charter which we lately caused to be made, in [837] these words, Edward by the grace of God King of England and Lord of Ireland, to all archbishops, &c.  It appears to us by inspection of the rolls of the Chancery of *[3] Edward late King of England our grandfather, that our said grandfather

*[1] V. 4 Inst. 286.    *[2] Edw. 4th.    † Edw. 3d.    *[3] Edw. 1st.

caused his charter to be made in these words "Edward by the grace of God King of England, Lord of Ireland and Duke of Aquitain, to all archbishops, bishops, abbots, priors, earls, barons, justices, sheriffs, mayors, ministers, and to all bailiffs, and others his faithful people, greeting: know ye, &c." It makes this town of Berwick a free borough, and the men of it free burgesses: and after granting to them all the liberties and free customs of a free borough for ever, and impowering them to hold guilds and choose a mayor (to be sworn in before the King or before the Chancellor or Treasurer and Barons of Scotland, if the King be not present,) and four bailiffs, this charter goes on as follows (viz.)—"We further grant, that the aforesaid burgesses and their heirs their tenements which they have within the said borough and shall have hereafter, in their last will and testament may freely bequeath to whom they will, without lett of us or our heirs or ministers whatsoever; and that they shall not implead nor be impleaded elsewhere than within the same town or borough before the mayor and bailiffs aforesaid, de aliquibus tenuris intrinsecis transgressionibus aut contractibus intra eundem burgum factis. We grant furthermore (to the aforesaid burgesses) that they have the return of all our writs touching that borough; so that no sheriff nor other bailiff or ministers of ours enter that borough, to do any office there for any thing to that borough belonging, but in default of the mayor and bailiffs of the same borough: and that the said burgesses and their heirs, per brevia nostra de cancellaria Scotiæ, may choose a coroner de seipsis, &c." Then it grants a prison, and several privileges.

"Furthermore we will and grant that the said burgesses shall not be put upon any assizes, juries or recognitions, by reason of their intrinsic tenure, against their wills, out of the aforesaid borough."

This charter of Edward 1st grants two markets, a fair, and sundry other privileges to this corporation; and bears date on the 4th of August anno regni 30mo.

The charter of Edward 3d recites "that the former charter (of Edward 1st) afterwards fell into the hands of Robert A. Brus, when he took the town of Berwick: and was carried away by him;" but Edward 3d by his first charter (dated the 4th June anno regni 10°) exemplifies and confirms it; and by his second charter (dated 28th March anno regni 30mo) which is an inspeximus of his own former charter, he furthermore grants,[838] and confirms as follows—"And because we are so much the more affectioned to our realm of Scotland, for that the said realm, by our well beloved and trusty cousin Edward Baliol late King of the said realm of Scotland, was to us given and granted; and therefore we affect, with a more earnest desire, the honours and advantages as well of the same realm, as of the town of Berwick upon Tweed, which, from the hands of the Scots our enemies (who, at the time that we were employed in the parts of France about the expedition of our wars there, had invaded and taken it,) is by us nearly conquered; we have granted and by this our charter confirmed, for us and our heirs, that our burgesses, of the said town of Berwick their heirs and successors in the same town abiding and resident, have and hold all and singular the liberties above specified, and the same liberties and every of them from henceforth fully enjoy and use; and likewise that the same burgesses their heirs and successors be ruled by the same laws, customs and usages that the burgesses of the same town had and used in the time of Alexander of famous memory late King of Scotland; without impeachment of us or our heirs, justices, escheators, sheriffs, or other our bailiffs or ministers whatsoever; and that the customers, weighers, and all other officers whatsoever that in the same town shall happen to be assigned by us or our heirs, be resident and abiding upon their offices continually, so that by their absence or default merchants upon delivery of their merchandise be not lett nor hindered; and the said customers, weighers, and officers, or burgesses of the same town to give an account for any thing touching the said town, or their offices in the said town, or to answer for any trespasses, debts, covenants, or any contracts made or to be made in the same town, for the which they shall be bound to answer to us or our heirs, shall not be compelled to come elsewhere than before our chamberlain of the same town of Berwick, or our justices thereunto assigned within the said town of Berwick: so that the chamberlain always of the aforesaid town for the time being, for all things touching his office, shall make his account before our Treasurer and Barons of our Exchequer of England, as before this time hath been accustomed."

The charter of Edw. 4th concludes with approving and confirming cartam prædictam (the 2d charter of Edw. 3d) and bears date on the 18th of February anno regni 22mo.

Queen Elizabeth, by letters patent granted to the town of Berwick, dated 4th May anno regni 1mo after mentioning the letters patent of Queen Mary and of King Henry the 8th, and the above charter of Edward the 4th, ratifies and confirms every thing contained in Edward the 4th's charter, H. 8th's and Queen Mary's: which charter of Queen Mary is dated on the 25th of April anno regni [839] primo, and is an inspeximus and confirmation of that of King H. 8th, which charter of H. 8th bears date on the 6th November 2 H. 8, and is an inspeximus and confirmation of the charter of Edward the 4th.

But the charter under which the Corporation of Berwick now claim all their privileges, and which is confirmed to them by * Act of Parliament, is that which was granted them by King James the 1st, dated 30 April anno regni secundo.  The preamble to which, is as follows—

James, &c.  Whereas our borough of Berwick upon Tweed is an ancient and populous borough ; and the burgesses of the said borough, sometimes by the name of mayor, bailiffs, and burgesses of the same borough, and sometimes by other names, have had, used and enjoyed divers liberties, franchises, immunities, customs, pre-eminences, and other hereditaments, as well by divers charters and letters patent of divers our progenitors and predecessors Kings and Queens of England, as also by reason of divers prescriptions and customs used and had within the said borough ; and whereas our well-beloved subjects the now mayor, bailiffs, and burgesses of the borough of Berwick upon Tweed aforesaid have humbly beseeched us "that we would exhibit and extend our Royal grace and bounty to the said mayor, bailiffs, and burgesses on this behalf, and that we will vouchsafe (for the better governing, ruling, and bettering of the said borough) by our letters patent to make, reduce, constitute and create anew the said mayor, bailiffs, and burgesses into one corporate and politic body, by the name of Mayor, Bailiffs, and Burgesses of the Borough of Berwick upon Tweed, with augmentation and additions of certain liberties, privileges, immunities, and franchises, as to us shall seem most expedient ;" we therefore, willing that from henceforth for ever hereafter there be continually had and used one certain and undoubted manner in our said borough, of in and about the keeping of our peace, and for the ruling of the said borough and of our people there inhabiting and of others thither resorting, and that the said borough may be and remain in all future times a borough of peace and quiet, to the fear and terror of evil and the reward and nourishing of good men, and also that our peace and other facts of justice and good government may the better there be kept and done ; and hoping that if the mayor, bailiffs, and burgesses of the said borough and their successors may by our Royal grant enjoy greater and larger dignities, privileges, jurisdictions, liberties, and franchises, then they will think themselves more especially and strongly obliged unto the performance and execution of their best service to us our heirs and successors ; and also at the humble petition, &c. &c.  We [840] have willed, ordained, &c. and by the presents, &c. do will and ordain, &c.

In this charter, amongst many other privileges, are the following: viz. a power to make bye-laws, and to fine or imprison such as break them ; and also these ensuing clauses—

And we will, and for us our heirs and successors do grant to the said mayor, bailiffs, and burgesses and their successors, that they and their successors, from henceforth for ever hereafter, may have and hold, and may be able to have and hold within the said borough, a Court of Pleas, every Tuesday in every second week throughout the year, to be holden before the mayor, bailiffs, and recorder of the said borough for the time being, or before any three of them (whereof we will that the mayor of the said borough for the time being shall be one,) in the guild-hall or toll-booth of the said borough ; and that they may hold, in that Court, by plaints in the same Court to be levied, or otherwise according to the laudable and reasonable customs before used and accustomed in the said borough, all and all manner of pleas, actions, suits, complaints, and demands, as well real as personal and mixed, of all personal trans-gressions whatsoever, with force and arms, and whatsoever other transgressions done, moved, arising, had or committed, or hereafter to be done, moved, had or committed within the said borough, suburbs, liberties, and precincts thereof, and of all and all manner of intrusials, tenures, burgages, lands, tenements, goods, chattles, debts, pleas

---

* 1 & 2 Jac. 1, c. 28.

ck, dated 4th May
and of King Henry
nfirms every thing
: which charter of
nd is an inspeximus
1 bears date on the
charter of Edward

ow claim all their
, is that which was
gni secundo.  The

is an ancient and
nes by the name of
es by other names,
ities, customs, pre-
nd letters patent of
ingland, as also by
said borough; and
sses of the borough
t we would exhibit
t, and burgesses on
uling, and bettering
tte and create anew
olitic body, by the
: upon Tweed, with
ties, and franchises,
rom henceforth for
undoubted manner
d for the ruling of
s thither resorting,
a borough of peace
hing of good men,
ment may the better
id burgesses of the
greater and larger
ey will think them-
e, and execution of
he humble petition,
its, &c. do will and

wing: viz. a power
1 also these ensuing

to the said mayor,
ocessors, from hence-
ave and hold within
nd week throughout
the said borough for
it the mayor of the
or toll-booth of the
in the same Court
able customs before
pleas, actions, suits,
t all personal trans-
transgressions done,
d, had or committed
, and of all and all
chattles, debts, pleas

upon the case, deceits, accounts, covenants, detinues of charters, escripts, muniments, and chattels, the taking and detaining of beasts and cattle, and other contracts whatsoever of whatsoever cause or thing arising or in time to come happening to arise within the said borough, suburbs, liberties, and precincts thereof, to whatsoever sum or value the said transgressions, debts, accounts, covenants, deceits, detinues, or other contracts shall amount; and that such like pleas, plaints, quarrels, suits, and accounts may be there heard and determined before the said mayor, bailiffs, and recorder of the said borough for the time being or any three of them (whereof we will that the mayor of the said borough for the time being shall be one) by such and such like proceedings, ways and means according to the laws and customs of our kingdom of England, or according to the ancient reasonable and laudable customs of the said borough heretofore used and allowed in the said borough, and in as large manner and form as in any Court of Pleas in any city, borough or town corporate within this our kingdom of England or in our said borough of Berwick upon Tweed heretofore hath been used and accustomed or may or ought to be done.  And further we will, and by these presents for us our heirs and successors do grant to the said mayor, bailiffs and burgesses of the said borough and their successors, that they and their successors from time to time in all issuing times [841] may have and may be of force to have the cognizance of all and all manner of pleas, quarrels, plaints, actions, and demands whatsoever as well real as personal and mixed, in what Courts soever of us our heirs and successors moved and begun or to be moved and begun, of whatsoever things, causes and matters happening, arising or growing within the said borough, suburbs, liberties and precincts thereof, as they have been anciently accustomed within the said borough.

Furthermore, we will, and by these presents for us our heirs and successors do grant to the said mayor, bailiffs, and burgesses of the said borough and their successors, that the said mayor, bailiffs, and burgesses of the borough for the time being be not put in assize, juries, attaints or other recognizances, by reason of any intrusials, tenures, or against their wills, without the said borough, and that the said burgesses of the said borough and their successors be not constrained or compelled by us our heirs or successors or our officers or servants of us our heirs or successors, to go or to be sent to war without the said borough and suburbs, liberties, and precincts thereof, but by the special commandment of us our heirs and successors, as before in the said borough hath been lawfully used and accustomed; and that no man may take lodging within the said borough by force or by livery of our marshals of us our heirs or successors.  We have granted, moreover, and by these presents for us our heirs and successors of our special grace and of our certain knowledge and mere motion do grant to the said mayor, bailiffs, and burgesses of the borough and their successors, that they may have the return of all our writs, precepts and process of us our heirs and successors, of whatsoever Courts of us our heirs or successors coming and arising with in the said borough, and the execution of them; so that no sheriff, minister or bailiff for us our heirs or successors shall enter into the said borough, suburbs, liberties, or precincts thereof, to do any office there for any belonging to the said borough, but in default of the mayor and bailiffs of the said borough.  And further, of our special grace and of our certain knowledge and mere motion, we have given and granted and by these presents for us our heirs and successors do give and grant to the said mayor, bailiffs and burgesses of the said borough and their successors, that the said mayor, bailiffs and burgesses of the said borough or any of them, or the Custom-House officers or weighers of us our heirs and successors within the said borough for the time being or any of them, shall not be employed nor shall be compelled to answer for any intrusials, tenures, or transgressions, debts, contracts, accounts, or any other causes or things within the said borough, suburbs, liberties, limits, or precincts thereof done or to be done, elsewhere than within the said [842] borough before the mayor and bailiffs of the said borough and their successors, or before the justices of us our heirs and successors assigned unto it within the said borough and not elsewhere.

And further we will, and by these presents for us our heirs and successors do grant to the said mayor, bailiffs, and burgesses of the said borough and their successors, that the mayor of the said borough for the time being, and the recorder of the said borough for the time being, and such burgesses and aldermen of the said borough who have sustained the office of mayor of the said borough or hereafter shall sustain it,

after they have executed the said office of mayoralty, as long as they shall be burgesses
and aldermen of the borough, and every one of them, may and shall be for ever
hereafter from henceforth, within the said borough and within the suburbs, liberties,
and precincts thereof, our justices for us, our heirs and successors, to keep and pre-
serve and cause to be kept and preserved the peace of us our heirs and successors
within the said borough, liberties and precincts thereof, and also to keep and cause
to be kept all ordinances and statutes for the good of our peace and for the preserva-
tion of the same, and for the quiet ruling and governing our people published within
the said borough, suburbs, liberties and precincts thereof in all their articles according
to the force, form and effect of such ordinances and statutes, and to chastise, correct
and punish all and all manner of persons whatsoever of what estate, degree or condition
soever they shall be, offending against the form of those ordinances and statutes or
any of them within the said borough, suburbs, liberties, and precincts thereof, and
to do that all those within the said borough, suburbs, liberties, and precincts, thereof,
who shall threaten any of our people to hurt their bodies or burn their houses to find
sufficient security before them or any of them for the peace and good behaviour towards
us and our liege people, and if they shall refuse to find such security then to cause them
to be safely kept in the gaol and prison of the said borough until they find such
security ; and that the mayor, recorder and such of the aldermen or burgesses of the
said borough who have at any time borne the office of mayor or hereafter shall bear
it, after they have borne the said office of mayor of the said borough, and as long as
they shall be burgesses or aldermen of that borough, or any three or more of them
(whereof we will that the mayor and recorder of the said borough for the time being
be two) may have from henceforth for ever hereafter full power and authority from
time to time to enquire and determine within the said borough, suburbs, liberties, and
precincts thereof of all and all manner of felonies, murders, homicides, robberies,
assaults, riots, routs, forces, (forcible) entries into lands and tenements, trespasses
against the peace of us our heirs and successors, unlawful conventicles, ambidexters,
conspiracies, contempts, concealments, and [843] also of all misprisions, offences, mis-
deeds, defaults, negligences, causes and articles which do belong or hereafter may be
able to belong to the authority or power of justices or keepers of the peace of us our
heirs or successors, in as ample manner and form as any justices or keepers of the
peace of us our heirs or successors in any of our counties within this our kingdom of
England, by the laws and statutes of the same kingdom, for the offence so done and
committed in the said county as justices of the peace, may be and may be able to hear
and determine.   And also we will, and by these presents for us our heirs and suc-
cessors do grant to the said mayor, bailiffs, and burgesses, of the said borough and
their successors, that the mayor and recorder of the said borough for the time being,
and such like burgesses and aldermen of the said borough who at any time have borne
or hereafter shall bear the office of mayor of the said borough, after that they have
borne the said office, as long as they shall be burgesses and aldermen of the said
borough, or any three or more of them (whereof we will that the mayor and recorder
of the said borough shall be two,) from time to time hereafter may be our justices,
and every one of them from time to time may be justices of us our heirs and successors,
from time to time to deliver the gaol of the said borough of the prisoners being
therein ; and that the coroner for the time being shall make return from time to time,
of all juries, inquisitions, pannels, attachments and indentures by him taken or here-
after to be taken before the said mayor, recorder and the said burgesses or aldermen
of the said borough for the time being or any three or more of them (whereof we will
that the mayor and recorder of the said borough for the time being shall be two,) when
and as often as they will deliver the said gaol of the prisoners being in that gaol ; and
be attending them in all things touching the said gaol delivery, and the command-
ments of the said mayor, recorder and burgesses or aldermen aforesaid for the time
being or any three or more of them (whereof we will that the mayor and recorder of
the said borough be two) shall execute from time to time, in the same manner and
form as any Sheriff of our kingdom of England have accustomed and ought to do,
return, intend and execute (any manner of way) by the laws and statutes of this our
kingdom of England, before the Justices of Gaol Delivery in any the counties of the
said kingdom ; and that the same mayor, recorder and aldermen of the said borough
for the time being or any three or more of them (whereof we will that the mayor and
recorder of the said borough for the time being be two) may have and shall have, and

2 BURR. 843.          2 BURR. 844.          REX *v.* COWLE          593

shall be burgesses
shall be for ever
suburbs, liberties,
to keep and pre-
rs and successors
o keep and cause
l for the preserva-
published within
articles according
o chastise, correct
egree or condition
es and statutes or
incts thereof, and
precincts, thereof,
eir houses to find
behaviour towards
hen to cause them
til they find such
r burgesses of the
reafter shall bear
h, and as long as
or more of them
for the time being
nd authority from
rbs, liberties, and
icides, robberies,
ments, trespasses
cles, ambidexters,
ons, offences, mis-
hereafter may be
e peace of us our
or keepers of the
is our kingdom of
ffence so done and
ay be able to hear
ur heirs and suc-
said borough and
or the time being,
y time have borne
er that they have
rmen of the said
ayor and recorder
y be our justices,
irs and successors,
e prisoners being
from time to time,
im taken or here-
esses or aldermen
n (whereof we will
hall be two,) when
in that gaol; and
nd the command-
esaid for the time
or and recorder of
same manner and
and ought to do,
atutes of this our
e counties of the
the said borough
at the mayor and
nd shall have, and

may erect from henceforth hereafter, a gallows within the said borough, suburbs, liberties, or precincts thereof to hang and execute felons, murderers, and other male-factors within the said borough adjudged to death according [844] to the laws of England; and that the said mayor, recorder, and such like burgesses or aldermen of the said borough who at any time have borne the office of mayor of the same borough or hereafter shall bear it, after that they have borne the said office, as long as they shall be burgesses or aldermen of the said borough or any three or more of them (whereof we will that the mayor and recorder of the said borough for the time being shall be two,) may take and arrest whatsoever felons, thieves or other malefactors within the said borough, suburbs, liberties, and precincts, thereof found or to be found, by themselves or by their ministers or deputies constituted in the said borough; and that they may carry them to the gaol within the said borough, there to be kept in safe custody until by due process of law they shall be delivered, any other ordinance, decree or custom to the contrary notwithstanding. Moreover we have granted and by these presents for us our heirs and successors of our special grace, certain know-ledge and mere motion do grant to the said mayor, bailiffs and burgesses of the said borough and their successors, that they and their successors from henceforth for ever hereafter may have, enjoy, and receive, and may be able and of power to have, enjoy levy and receive, to the proper use and behalf of the said mayor, bailiffs, and burgesses of the said borough and their successors, and all manner of fines, ransoms and amercia-ments whatsoever or for whatsoever trespass or other offence or other matters and causes committed and to be committed within the said borough, suburbs, liberties, and precincts thereof, and all and all manner of fines, issues, amerciaments, forfeitures, profits, and perquisites of the said Court, so to be imposed or forfeited before the said mayor, recorder and bailiffs in the Court of the said borough, and before the said mayor, recorder and the said aldermen of the said borough or any three or more of them as aforesaid as justices of the peace or of our gaol delivery within the said borough, liberties, or precincts thereof, for whatsoever cause or causes coming, happening, arising, or growing, as before hath been used and accustomed in the said borough; and also all and all manner of goods and chattels whatsoever waived, deodands, chattels of felons and fugitives outlawed and to be outlawed, waived and to be waived, condemned and to be condemned, adjudged and to be adjudged, attained, convicted and to be convicted, of fugitives and men in exigents, of all and singular tenants, inhabitants and men resident in the said borough, suburbs, liberties and pre-cincts thereof, from time to time arising, happening and coming; and that it shall be lawful to the said mayor bailiffs and burgesses of the said borough, and their successors, the same fines, issues, amerciaments, forfeitures and profits from time to time to levy and collect, by the proper ministers of the said mayor, bailiffs and burgesses of the said borough, according to the laws and customs of England, or according to the ancient customs of the said borough.

[845] And further, of our abounding special grace and of our certain knowledge and mere motion, we grant and confirm, for us our heirs and successors, to the said mayor, bailiffs and burgesses of the said borough and their successors, all and all manner of lawful liberties, grants, franchises, immunities, privileges, exemptions, quittances, jurisdictions, customs, and free usages, as well by land as by water, as well within as without the said borough, suburbs, liberties, limits and precincts thereof, through our whole land and power, in these our present charters, or in any other charters of our progenitors or predecessors, Kings and Queens of England, expressed or not expressed; and also all and singular such lands, tenements, hereditaments, customs, liberties, privileges, franchises, immunities, quittances, exemptions, and juris-dictions, which the mayor, bailiffs, and burgesses of the said borough, or any of them, by what means or names soever, or by what incorporation soever or pretence of any incorporation, heretofore have had, used, or enjoyed, or ought to have, hold, use or enjoy, to them or their successors for ever, of state of inheritance, by reason or pretext of any charters or letters patent, or of any use, prescription, or custom, or by any other manner, right, or title, heretofore had, used, or accustomed; notwithstanding that any charters aforesaid were carried away and removed from thence, by Robert Bruce King of Scotland, our progenitor; and notwithstanding that the said borough of Berwick hath come into the hands of our progenitors Kings of Scotland, after the said grants of our said progenitors Kings of England; and although the said mayor, bailiffs, and burgesses of the said borough, or their predecessors or burgesses of the

said borough, or any of them, by whatsoever name or names, or by whatsoever incorporation or pretext of any incorporation heretofore known or incorporated or not incorporated, have used or enjoyed, or not used or enjoyed the said liberties, grants, franchises, immunities, privileges, usages, and free customs: and we, of our special grace, all and singular the things above before granted and recited, for us our heirs and successors, to the same mayor, bailiffs and burgesses of the said borough, and their successors, do grant and confirm, and for ever strengthen, by these presents. Wherefore we will, and firmly command, for us our heirs and successors, that the said mayor, bailiffs, and burgesses and their successors may have, hold, use, and enjoy for ever, all liberties, authorities, jurisdictions, franchises, and quittances aforesaid, according to the tenor and effect of these our letters patent, without lett or hindrance of us our heirs and successors, or justices, sheriffs, or other bailiffs or ministers whatsoever, or of any other of them; nulling and forbidding that the same mayor, bailiffs and burgesses, and the men of the said borough, or any of them, or any of the burgesses of the [846] said borough, by reason of the premises or any of them, by us or by our heirs, justices, sheriffs, escheators, or other bailiffs or ministers of us, our heirs or successors whatsoever, be letted, molested or grieved, or in any thing disturbed thereof.

Some other clauses of this charter, (and which were produced by those who supported the rule for the certiorari,) were as follows—

And further of our abundant grace, we will, and by these presents for us, our heirs and successors, do grant to the said mayor, bailiffs, and burgesses, of the said borough and their successors, that the mayor, bailiffs, and burgesses of the borough aforesaid or the greater part of them (whereof we will that the mayor of the said borough for the time being shall be one) shall have and by these presents may have full authority, power, and faculty, of framing, constituting, appointing, ordaining, making, and establishing, from time to time, such like laws, statutes, ordinances, and constitutions which to them or the greater part of them (whereof we will that the mayor for the time being of the said borough shall be one,) in their best discretion shall be thought to be good, profitable, wholesome, honest, and necessary, for the good rule and government of the mayor, and bailiffs, and burgesses aforesaid, and all and singular other burgesses, officers, ministers, artificers, inhabitants, and residents whatsoever within the said borough for the time being.

And that the mayor, bailiffs and burgesses of the borough aforesaid for the time being, or the greater part of them (whereof we will that the mayor of the said borough for the time being be one,) as often as they shall frame, establish or ordain such like laws, institutions, orders, ordinances, and constitutions, in form aforesaid, may and may have power to make, ordain, limit and provide such like pains, punishments, and penalties, by bodily imprisonment or by fines and amerciaments or by either of them, upon and against all offenders against such the laws, institutions, decrees, constitutions, and ordinances, or any of them, as to the said mayor, bailiffs and burgesses for the time being or the greater part of them (whereof we will that the mayor of the said borough for the time being be one) shall be thought fit, necessary and requisite to be done for the observation of the same laws, ordinances, and constitutions; and to levy and have the same fines and amerciaments, to the use and behoof of the aforesaid mayor, bailiffs, and burgesses, of the said borough and their successors, without hindrance of us our heirs or successors, and without any account therefore to be made to us our heirs or successors or ministers of us our heirs [847] or successors: all and singular which laws, ordinances, and constitutions, to be made as aforesaid, we will shall be observed, under the pains therein to be contained; so always that the said laws, ordinances, institutions, constitutions, imprisonments, fines and amerciaments may be reasonable, and not repugnant or contrary to the laws, statutes, customs, or rights of our kingdom of England, or reasonable and laudable prescriptions and customs in the said borough anciently used and accustomed.

There are also several other clauses contained in King James's charter, not pertinent to the present question.

On Friday 25th May last, Sir Richard Lloyd, Mr. Gould, Mr. Yates, and Mr. Selwyn, who were of counsel for superseding the certiorari, argued upon the three following questions.

1st question—Whether Berwick is part of the realm of England.

2d question—Whether it is governed by the laws of England.

3d question—Whether, supposing that it is, it would follow "that a certiorari lies."

First—To prove that Berwick is not part of the territorial realm of England, they cited *Calvin's case*, (6 Jac. 1).   7 Rep. 23, express and *Craw v. Ramsey*, Vaughan, 278, 300.   2 Vent. 4, S. C. and *Carre's case*, cited in 3 Leon. 20, and the statute of 21 H. 8, c. 6, concerning mortuaries, (five or six years before the incorporating Wales with England), § 7, which shews the sense of the Legislature, "That Berwick and Calais were not comprehended within the term realm of England."   So also is 1 Mod. 37, *Crisp's case* v. *Mayor of Berwick;* and Vaughan, 414, concerning process into Wales.

And not being part of the realm of England, it is *[1]* not bound by Act of Parliament, unless named : for which reason, in 1 W. & M. (the Act for Encouraging the Exportation of Corn,) Berwick not being mentioned, a new Act was made, which named it expressly.

Second question—The charters could not make the inhabitants of this conquered place to be subjects of England : and the charter of Ed. 4 directs that they shall be governed by laws received from Alexander King of Scotland.   The charter of 1 Jac. 1, (which was confirmed by Act of Parliament) establishes their old usages ; and gives them a Court of Oyer and Terminer, and a Court of Gaol Delivery, with an express exclusion of all other jurisdictions out of the town of Berwick : but neither this charter nor this Act of Parliament gave them title to the laws of England.

[848] 21 Ed. 1, Parliament roll—*Boyd* v. *Barnaby*, proves that they were governed by the laws of Scotland.   And it appears from 2 Peere Wms. 75, 76, *[2]* that the laws of a conquered country shall hold place, till new ones are given to them by the conqueror.   So also is 1 Salk. 411, *Blankard* v. *Galdy*.   And if they are governed by their own laws, it would be nugatory and fruitless, for this Court to issue a certiorari to them.

Third question—There is no difference between Berwick and Ireland, as to this point : and according to 2 Ventr. 7, a certiorari will not lie to remove an indictment from Ireland.

In Vaughan, 403, 404, it appears that he was of opinion "that the alteration of the jurisdiction in Wales might most probably be wrought by an Act of Parliament not now extant."

A certiorari would not only create delay ; but would occasion an insuperable difficulty of trial : and it would be nugatory to grant one, where the Court cannot proceed upon it ; as in *Dr. Sands's case*, 1 Salk. 145, where it was, for that very reason, denied.

Now all indictable offences are local : therefore, they must be tried † there. And yet no process of this Court would lie there ; nor could the trial be in the adjoining English county, because Berwick is no county in England.   2 Shower, 365, *Mayor of Berwick's case*.   The case of county bridges is the only criminal case, where the trial may be in the adjoining county, upon suggestion : for all the precedents are of civil cases, and those transitory too.   Salk. 651, title Trial, pl. 31, *Way* v. *Yally*. And there is no precedent of any cause removed from Berwick and finally determined here.

Mr. Norton contra—The general question is, "whether a certiorari will lie to Berwick, to remove an indictment found at a general gaol-delivery there, for a misdemeanor."

The case now under consideration requires it, if any can ; since the Judge who is to try the cause is both party and witness.

The answer that has been insisted upon, is "that Berwick is an exempt jurisdiction ; and no certiorari lies thither."

Three objections have been made to this certiorari : (1st.) That Berwick is not part of the realm of England ; (2d.) If it is, yet it is not governed by English laws : (3d.) That if the Court should grant the certiorari, yet they can not proceed upon it.

[849] I premise that this Court hath a general supervision of all inferior jurisdic-

---

*[1] Sed v. 20 G. 2, c. 42, s. 3, which declares and enacts, "that in all cases where England hath been or shall be mentioned in any Act of Parliament, the same has been and shall be deemed to comprehend and include Wales and Berwick."

*[2] It is the third resolution of the Privy Council.

† V. 5, 6 W. and M. c. 11.   8, 9 W. 3, c. 33, (but they only relate to Quarter Sessions).

596                REX *v.* COWLE               2 BURR. 850.

tions in England : and, they may also grant certioraris, before it appears whether they can proceed upon them or not.

Answer to 1st objection—The clause in 20 G. 2, c. 42, § 3, proves clearly " that Berwick is part of the realm of England."

The argument also from their sending members to represent them in Parliament, is irrefragable. And Prynne's Parliamentary Writs prove that Berwick sent members, before the time of Ed. 4.

This Court constantly sends certioraris to the Cinque Ports.

Answer to 2d objection—Their charter of 1 Jac. 1 ties them down, to proceed by the laws of England, in criminal matters. Consequently, this Court will superintend their proceedings under their charters. And their acceptance of a charter which subjects them to the laws of England, renders them liable to this superintendency.

The 3d objection would come more properly, upon the return of the certiorari : the writ ought to be obeyed, and a return made.

Answer to the 3d objection—But however, from the necessity of the case, this matter must be tried in the adjoining county ; like the case of Wales, or of county-bridges : both of which are done by the Court's general power, and to prevent failure of justice.

An indictment is no more local than a real action is : and yet these are tried in Northumberland. And the Militia-Act considers Berwick as being in Northumberland.

Precedents too are not wanting. In 3 Jac. B. R. an information qui tam, &c. on the Statute of Uniformity, was brought up by certiorari ; and process issued. In M. 8 Ann. an information in this Court was granted for an offence in Berwick ; and the rule was made absolute. In 9 G. 1, B. R. there was a mandamus to swear Wilson and three others churchwardens of Berwick. And Berwick is put under the ecclesiastical jurisdiction of the * diocese of Durham, by their charter. In 1754, an indictment against Moscroft and two others, for an assault, was removed hither, from thence, by certiorari : and they appeared and pleaded. In H. and P. 1755, in the contest between Mr. Wilkes and Mr. Watson, informations for bribery were granted : the rules were made absolute.

[850] The affidavits of the facts being read, it appeared that the indictment was for an assault upon the then mayor, who still continues a justice of peace for the borough of Berwick.

Lord Mansfield said, it would be proper to look into the precedents that had been cited ; and they would give their opinion, next term.

Curia advisare vult.

Lord Mansfield now delivered the opinion of the Court, to the following effect.

The objections and arguments that have been urged against this certiorari may be reduced to the following heads.

1st. That this Court has no jurisdiction over the town and borough of Berwick, or any local matters arising there ; because it is not to be deemed part of the realm of England, and the King's writ does not run there : consequently, this Court has no authority to remove a record from thence, by writ of certiorari, for any purpose whatsoever.

2dly. That supposing the Court may, for some purposes, have jurisdiction there, yet the end, for which the certiorari is desired upon the present occasion, can not be attained.

3dly. That though the Court should have authority, and the end be attainable ; yet the ground, upon which the certiorari is applied for, is not sufficient.

As to the first—The best way of considering it, may be, concisely to deduce the condition and constitution of Berwick contrasted with Wales ; to shew that arguments from the case of Wales hold to Berwick, equally at least, in all respects ; in many, à fortiori.

Edward the First conceived the great design of annexing all other parts of the island of Great Britain to the realm of England. The better to effectuate his idea, as time should offer occasion, he maintained " that all the parts thereof, not in his own hands or possession, were holden of his Crown."

The consequence of this doctrine was, that, by the feudal law, supreme jurisdiction resulted to him, in right of his Crown, as Sovereign Lord, in many cases [851]

---

* V. post, p. 857.

it appears whether

roves clearly " that

hem in Parliament,
that Berwick sent

. down, to proceed
: Court will super-
tance of a charter
ble to this super-

1 of the certiorari :

ty of the case, this
Vales, or of county-
l to prevent failure

these are tried in
n Northumberland.
ation qui tam, &c.
und process issued.
ffence in Berwick ;
mandamus to swear
k is put under the
arter.  In 1754, an
us removed hither,
H. and P. 1755, in
s for bribery were

the indictment was
e of peace for the

lents that had been

following effect.
this certiorari may

orough of Berwick,
1 part of the realm
r, this Court has no
i, for any purpose

risdiction there, yet
can not be attained :
end be attainable ;
icient.
isely to deduce the
lew that arguments
respects ; in many,

other parts of the
effectuate his idea,
reof, not in his own

aw, supreme juris-
n many cases [851]

---

which he might lay hold of ; and when the said territories should come into his hands and possession, they would come back as parcel of the realm of England, from which, (by fiction of law at least,) they had been originally severed.

This doctrine was literally true, as to the Counties Palatine of Chester and Durham.

But, (no matter upon what foundation) he maintained that the principality of Wales was holden of the imperial Crown of England : he treated the Prince of Wales as a rebellious vassal ; subdued him, and took possession of the principality.  Where-upon, on the 4th of December in the 9th year of his reign, he issued a *1 commission to enquire " per quas leges et per quas consuetudines ante cessores nostri reges regere consueverant principem Walliæ et barones Walenses Walliæ et pares suos et alios inferiores et eorum pares, &c."

If the principality was feudatory, the conclusion necessarily followed, " that it was under the Government of the King's laws, and the King's Courts, in cases proper for them to interpose :" though (like Counties Palatine) they had peculiar laws and customs, jura regalia, and complete jurisdiction, at home.

There was a writ at the same time issued to all his officers in Wales, " to give information to the commissioners :" and there were fourteen interrogatories specify-ing the points to be inquired into.  The *2 Statute of Rutland refers to this inquiry.  By *2 that statute he does not annex Wales to England, but recites it as a consequence of its coming into his hands—"Divina providentia terram Walliæ, prius nobis jure feodali subjectam, jam in proprietatis nostræ dominium convertit, et coronæ regni Angliæ, tanquam partem corporis ejusdem, annexuit et univit."

The 27 H. 8, c. 26, adheres to the same plan, and recites "that Wales ever hath been incorporated, annexed, united, and subject to and under the imperial Crown of this realm, as a very member, and joint of the same."

Edward the First having succeeded as to Wales, maintained likewise "that Scotland was holden of the Crown of England."

That jurisdiction which resulted to him as superior lord, he often exercised as sitting in this Court—*3 upon a complaint of a burgess of Berwick, against his own commissioners, whom he would not suffer to be tried in the Courts of the King of Scotland—¶1 Upon complaint of a merchant.—‖1 Upon a complaint of M'Duff—¶1 Upon a complaint of Austria claiming the Isle of Man.—‖2 Upon [852] a complaint of the Abbot of Reading—¶ Upon a complaint of the Bishop of Durham claiming the town of Berwick, as belonging to his see.  In the 24th year of his reign, he treated the King of Scotland as a rebellious vassal ; and took Berwick, and the rest of Scotland, into his own hands and possession.  And as this Court exercised that jurisdiction which resulted to the King, in the capacity of superior lord of Scotland ; à fortiori, it did so, when the county came into the King's hands and possession.  Therefore the Court of King's Bench ‡2 actually sat at Roxburgh in Scotland.

*4 While he continued in possession of Scotland, he granted a charter to the town and borough of Berwick, under the Great Seal of England, (though he then had a Great Seal of Scotland).  The charter requires the mayor to be sworn before his Chancellor or Treasurer, and Barons of his Exchequer in Scotland ; and the writ to chuse a coroner is to issue out of his Chancery in Scotland.  He seems to consider the whole country as united into one realm ; for the privileges are given " per totum regnum et potestatem nostram in terra et potestate nostra."

In a few years, Berwick with the rest of Scotland was lost ; and continued so, many years.

‡2 Edward the 3d renounced all pretension to the kingdom of Scotland, in property, or superiority, divisum à regno Angliæ.

---

*1 Rotul' Walliæ, 9. Ed. 1, M. 5.  Leges Walliæ, Hoeli Boni, 518, published by Wotton.

*2 12 Ed. 1.  See it in the 2d vol. of the book of old statutes, intitled " Statu Walliæ."  See also in Hale's Hist. of the Common Law, p. 183, 184, this preamble to it ; and likewise in Vaughan, 400.        *3 Rymer, 2 vol. 596.

¶1 Rymer, 605.        ‖1 21 Ed. 1, Rymer, 606.        ¶1 Rymer, 608.
‖2 Rymer, 2 vol. 615.        ¶ 22 Ed. 1, Rymer, 632,
‡2 Hale's Hist. Common Law, fo. 201.        *4 30 Ed. 1.
‡2 2 Ed. 3, Rymer, 4th vol. 337.

||[1] Edward the 3d procured from K. Ed. Baliol, and the Parliament of Scotland, a grant and cession of Berwick, separate from Scotland, for ever, " et regali dignitati et coronæ ac regno Angliæ perpetuis temporibus annexa, unita, et incorporata." In the 10th year of his reign, he granted to Berwick an exemplification and confirmation of the charter of Ed. 1st.

Berwick was again lost, when Edward the 3d was in France; and retaken after his return: and, in the 30th year of his reign, he gave a new charter, confirming the former, with some additions; particularly, that they should be governed by the laws and usages, which they enjoyed in the time of Alexander late King of Scotland; (who reigned before the competition about that Crown).

Berwick was lost again; and again recovered by Edward the 4th, who confirmed the former charters, by a *[1] charter and †[1] Act of Parliament.

[853] Between this time and the 33d of Hen. 8th (the particular time does not appear, because the returns are lost,) Berwick was summoned, as a borough of England, to send members to Parliament: and they did so, till the Union: and they still continue to send members to the Parliament of Great Britain, by summons, as being parcel of the realm, not under any of their charters, none of which give them such a right. That of E. 4 is an inspeximus of the preceding ones: and the charters of 19th April, 1 H. 8, 25th April, 1 Qu. Mary, 4 May, 1 Qu. Eliz. are confirmatory charters only. None of them give them a right to send members to Parliament: and yet they have sent them, ever since King Henry the 8th's time.

Their present constitution is under letters patent granted in *[2] 2 Jac. 1, which are expressly confirmed by †[2] Act of Parliament. Under these, they act: and they have had no charter since.

Before the Union, Berwick was bound by every English general Act of Parliament, in like manner as Wales was bound: and that was as being part of the realm of England. Where it is particularly named in Acts of Parliament, that is superfluous: and so also is the naming of Wales. If it was not part of England before the Union, it is now no part of Great Britain: for only England and Scotland are united. It is bound by all general laws since the Union.

In general Acts, not applicable to Scotland, and where Scotland is not intended to be included, the method is, by provision, to declare "it does not extend to Scotland." Where provisions are made for that part of Great Britain called England, Wales and Berwick upon Tweed are comprehended under that description.

Wales from the time it came into the hands of Ed. the 1st was deemed to be within the realm, upon the doctrine of having been holden before of his Crown: and in consequence of such tenure, by deductions from the principles of the common law, this Court exercises jurisdiction over matters in Wales given by no Act of Parliament; (for the ||[2] notion of " some old statute that has been lost," depends only upon a loose † imperfect note of Ld. Ch. J. Vaughan's).

Scotland was considered upon the same foot.—This Court exercised the sovereign jurisdiction over it, before it came into the King's hands; and afterwards, at the time when the first charter was granted to Berwick. The chance of war refuted the claim of the rest of Scotland, as belonging to England; and confirmed it, as to Berwick.

But, if Berwick was to be deemed a dominion of the [854] Crown, and no part of the realm of England; it may be under the control and superintendence of the King in this Court.

The constitution given to Berwick by the Crown of England, approved by Parliament, shews it necessarily is so; much stronger than in the case of Counties Palatine or Wales. The people of Berwick have not jura regalia, or a complete jurisdiction within themselves, like a County Palatine: they have no sovereign Courts of the King within themselves, like Wales. They are made a free borough, to hold in burgage, by rent. Such a creature of law must necessarily be collected, as part of a kingdom, and subordinate.

||[1] 6, 7, 8 Ed. 3, Rymer, vol. 4, pa. 536, 590, to 595, 614.
*[1] 22 Ed. 4.          †[1] 22 Ed. 4, c. 8.
*[2] 20th April 2 J. 1.  †[2] 2 Jac. 1, c. 28, (called, in Hawkins's edition, 1 J. 1, c. 28).
||[2] V. Vaughan, 403, 404.
‡ V. Vaughan, 395, the memorandum in the margin.

In the time of King Alexander, they were subject to the Supreme Courts of Scotland. They could have no laws or customs but such as were suitable to the subordinate condition of a borough.

The metamorphosis from a Scotch to an English borough did not make them independent; but only changed the sovereign jurisdiction. They are made a corporation in England; to sue or be sued, in that capacity, in England: to take lands, in that capacity, in England. The burgesses in that capacity are to enjoy many privileges in England: they send representatives to Parliament, by summons, as a borough in England.

This Court alone can judge of their franchises, as a corporation: and who are intitled as members of it; and what are their privileges; and whether they continue to exist, or not: as, if you suppose a question to arise " whether they are dissolved ;" or, " who is mayor, &c." who can judge, but this Court? the charter of James the 1st supposes it: because he commands the Attorney and Solicitor-General to bring no writ of quo warranto for things past. In Hilary term 14, 15 Car. 2, a quo warranto was brought in this Court, against the Mayor, Bailiffs and Burgesses of Berwick; but not proceeded in.

Another part of their constitution, more immediately applicable to the present question, is what relates to pleas of the Crown.

The charter grants them a court leet agreeable to the laws and statutes of England; a commission of peace and oyer and terminer, with the same authority which belongs, or hereafter may belong to justices of the peace in England; and to hear and determine in like manner as justices of peace, by the laws and statutes of England. It grants them a commission of gaol delivery, under which they must proceed by indictment, according to the course of the law [855] of England; as in fact, they always do, and have done in the present case. It grants a gallows, to execute those adjudged to death, according to the law of England.

The charter gives them power to make ordinances with penalties of fine and imprisonment: so as they be reasonable, and not repugnant to the laws, statutes and customs of England. In short, they have no criminal law, but the law of England; and no criminal jurisdiction, but with such a reference to the law of England, as necessarily includes this Court.

Suppose they should adjudge a man to death, for a crime not capital by the law of England. Suppose they indict a man for disobeying an ordinance repugnant to the law of England. Suppose they should indict a man for treason, though the fact would not amount to treason within our laws;—suppose, as justices of the peace, they make illegal orders without any authority, in a summary way; there can be no redress but here: and if this Court could not interpose, they would, under the grant of a limited subordinate authority, be absolute.

Another objection is, " The King's writ does not run there."

That is applicable only to the writ of venire, and other jury process; or perhaps, to original writs which are the commencement of suits between party and party.

When this Court removes, by writ of certiorari, an indictment for a misdemeanor, from Wales, the Welch sheriff is commanded to cause the defendant to appear: and when he has appeared, and issue is joined, there is a suggestion " that the King's writ does not run into Wales." So, the very record which says, " the King's writ does not run," shews many that do.

The reason why a venire does not run to Berwick, is, because they are exempted from being summoned out of the borough, to serve upon juries.

But the charter supposes that other writs ministerially directed, may run: because the return of all writs, precepts and process issuing out of the King's Courts, and the execution thereof, is granted to the mayor, bailiffs, and burgesses, exclusive of any sheriff, minister or bailiffs.

Writs, not ministerially directed, (sometimes called prerogative writs, because they are supposed to issue on the part of the King,) such as writs of mandamus, prohibition, habeas corpus, certiorari, are restrained by no [856] clause in the constitution given to Berwick: upon a proper case, they may issue to every dominion of the Crown of England.

There is no doubt as to the power of this Court; where the place is under the subjection of the Crown of England; the only question is, as to the propriety:

To foreign dominions, which belong to a prince who succeeds to the throne of

England, this Court has no power to send any writ of any kind.   We cannot send a habeas corpus to Scotland, or to the electorate: but to Ireland, the Isle of Man, the plantations, and, as since the loss of the Dutchy of Normandy, they have been considered as annexed to the Crown,*[1] in some respects, to Guernsey and Jersey, we may; and formerly, it lay to Calais; which was a conquest, and yielded to the Crown of England by the treaty of Bretigny.

But notwithstanding the power which the Court have, yet where they cannot judge of the cause, or give relief upon it, they would not think proper to interpose.   Therefore upon imprisonments in Guernsey and Jersey, in Minorca, and in the plantations, I have known complaints to the King in Council, and orders to bail or discharge: but I do not remember an application for a writ of habeas corpus.   Yet cases have formerly happened of persons illegally sent from hence and detained there, where a writ of habeas corpus out of this Court would be the properest and most effectual remedy.

In Cro. Jac. 543 a precedent is cited, in 43 Eliz. of a *[2] habeas corpus to Berwick. I have caused the records to be searched for that case; and the orders of the Court, and return to the writ of habeas corpus are found.   The Court had fined the Mayor and Bailiffs of Berwick 200l. for not returning the ‡ writ: they had also issued an alias habeas corpus.§   Then, the alias habeas corpus not being returned, they ordered the fine to be estreated, and that a pluries habeas corpus should issue, sub pœna 500 merc', returnable immediately before the Chief Justice at his chambers in Serjeant's Inn.   At the same time, they issued an alias attachment against the mayor and bailiffs; and ordered Ld. Willoughby, then Governor of the town of Berwick, to execute it, returnable octabis Hilarii.   The ‖ next day, the estreat of the fine was suspended, upon Henry Brearly's being discharged out of prison, and bailed to appear in this Court, at the octave of S. Hilary, (the return of the attachment against the mayor and bailiffs).

In Hilary term, they are *[3] ordered to return the pluries [857] habeas corpus: and afterwards, the mayor and two of the bailiffs were committed, and examined upon interrogatories, as in contempt; and two of them were †[1] ordered to find bail at the suit of Henry Brearly, before they were discharged.

The return states the charter of Ed. 3d, and that by their laws and customs, the guild had authority to punish for colouring foreigner's goods, or being in partnership with a foreigner, by fine, imprisonment and disfranchising.   They state that Henry Brearly was found guilty of being in partnership with a foreigner, and fined 100l. which he not only refused to pay, but treated them with scandalous and contumelious reproaches.   That they duly committed him to prison, till the fine should be paid: and disfranchised him.

There is an order, the *[4] same Hilary term, stated to be upon the recommendation of the Court, (therefore, I suppose, by consent,) "that the fine of 100l. set upon Brearly by the guild, should be reduced to 10l. and that upon his submission, he should be restored to his freedom:" (but he was to remain disfranchised till he should make his submission).

As to the other prerogative writ, of prohibition—It was taken for granted, in 2 Ro. Abr. 292, "that a prohibition lay, out of this Court to the Consistory Court of Durham, in a matter arising in Berwick:" though the suggestion "that the land out of which the tithes were claimed lay in Scotland and not in Berwick," was holden insufficient.   (How Berwick †[2] came to be part of the diocese of Durham, I have not learned.)

Then, as to writs of mandamus—In Trin. 9 G. 1, a mandamus issued, directed to Sir Geo. Wheeler, to admit and swear four persons elected to be churchwardens of Berwick.

---

*[1]  V. Hale's Hist. Com. Law 184, to 189.
*[2]  For one Browley, as he is there called.
‡  M. 43 Eliz. hab. cor. for Henry Brearley, v. H. 43 Eliz. Rot'lo. 88.
§  Die Jovis prox' post, 15 Sancti Martini.
‖  The former was die Jovis, the latter die Veneris prox' post quinden' Sancti Martini A. 40 Eliz.
*[3]  Die Ven' prox' post octab' Sancti Hil. anno supradicto.
†[1]  Die Sab'ti prox' post oct. Sancti Hil. A. 43 supradicto.
*[4]  Die Jovis prox' post octab' Pur.                    †[2]  V. ante, 489.

Case 1:06-cv-01707-GK    Document 19-3    Filed 03/30/2007    Page 165 of 206

We cannot send
, the Isle of Man,
y, they have been
rnsey and Jersey,
nd yielded to the

they cannot judge
interpose.  There-
in the plantations,
or discharge : but
ases have formerly
:, where a writ of
ectual remedy.

rpus to Berwick.
ers of the Court,
fined the Mayor
d also issued an
ned, they ordered
te, sub pœna 500
bers in Serjeant's
ayor and bailiffs ;
k, to execute it,
e was suspended,
o appear in this
gainst the mayor

] habeas corpus :
d examined upon
find bail at the

and customs, the
g in partnership
tate that Henry
and fined 100l.
nd contumelious
should be paid :

recommendation
set upon Brearly
n, he should be
he should make

for granted, in
sistory Court of
"that the land
ck," was holden
ham, I have not

issued, directed
urchwardens of

38.

quinden' Sancti

te, 489.

---

The Act of 11 G. 1, c. 4, proceeds upon the ground "that a writ of mandamus, out of this Court, lies to Berwick."

The last sort of writ not ministerially directed, is a certiorari.

A certiorari, for a proper purpose, lies to any dominion of the Crown of England. Mr. Just. Dodderidge, in [1] Sir John Carew's case, says "the register makes mention of a certiorari to remove a record taken at Calais."

And there are precedents of certioraris to Berwick, directly.

[858] In Pasch. 3 Jac. 2, an indictment against Scott, Howlettson, and Watson, for a riot, &c. was removed from Berwick, by certiorari ; process issued upon it, out of this Court, against the defendants, to appear. In Michaelmas term following, the indictment was quashed ; and the town clerk of Berwick amerced 5l. for not returning the caption.

In Trinity vacation 1754, two indictments were removed from Berwick, by certiorari : the defendant appeared in this Court and pleaded not guilty.

There is no instance of a doubt ever having been made before the present case, concerning the authority of this Court, to send a writ of certiorari to Berwick. And we are all clearly of opinion, "that the Court, by law, has such power."

Two great authorities are indeed urged, in opposition to this ; they are no less than those of Ld. Ch. Justice Coke, and Ld. Ch. Justice Hale.

Lord Coke, in [*1] Calvin's case, says "that Berwick, is no part of England, nor governed by the laws of England." And Ld. Ch. Justice Hale follows him, and [†2] says "Berwick was sometimes parcel of Scotland ; but was won by conquest by King Edward the First. And afterwards lost by King Edward the Second, and afterwards regained by Edward the Third. It was governed by the laws of Scotland, and their own particular customs ; and not according to the rules of the law of England, further than as by custom it is there admitted." "Yet now," says he, "by charter, they send burgesses to the Parliament of England."

In Calvin's case, there was no question concerning the constitution of Berwick. And we plainly see, by what has passed in the present case, how little was known, even at Berwick itself, concerning its own constitution. What was dropped about it in Calvin's case, was a mere obiter opinion, thrown out by way of argument and example. My Lord Coke was very fond of multiplying precedents and authorities ; and, in order to illustrate his subject, was apt, besides such authorities as were strictly applicable, to cite other cases which were not applicable to the particular question under his judicial consideration. In the case then under judicial consideration, the question was [†1] "whether Robert Calvin the plaintiff, born in Scotland after the descent of the Crown of England to King James the First, was an alien born, and consequently disabled to bring any real or personal action for any lands within the [859] realm of England." But it never was a doubt, "whether a person born in the conquered dominions of a country is subject to the King of the conquering country." And therefore the argument will not hold, from the case of Berwick to the point then in question : neither was the case of [*2] Calais in any sort apposite to it.

As to the laws by which Berwick is governed—

Whatever may be the case (when more particularly inquired into) with regard to their [†3] civil constitution, it appears very sufficiently, that in Pleas of the Crown, Berwick has no other laws by which it is governed, but the laws of England. The statute of 11 G. 2, c. 19, for the more effectual securing the payment of rents and preventing frauds by tenants, supposes this. All the provisions of that Act are extended to Berwick,[†2] by name. Some of these provisions relate to ‖ejectments, which concern civil matters : and they do proceed there by ejectment. But it is manifest that Lord Coke is mistaken in saying, generally, "that Berwick was not

---

[†1] V. Cro. Jac. 484.
[*1] 7 Co. 23 b.
[†2] Hale's Hist. Common Law of England, pa. 184. V. Rot. Parl. 16 R. 2, n. 41, 42.
[†1] Calvin's case, fo. 2 a.
[*2] V. Calvin's case, 22 a.
[†3] V. Fitzherbert's Abridgment, title Obligation, pl. 15.
[‡2] § 1, 11.
‖ § 12, 13.

602                          REX  *v.* COWLE                          2 BURR. 860.

governed by the laws of England." For, in criminal matters, the fact is clearly otherwise.

And Ld. Ch. J. Hale, is as clearly mistaken, in saying "that Berwick sends members to the Parliament of England, by charter." For it is by writ of summons that they send them thither, in consequence of their being a borough. Chester, both county and city, first sent members to Parliament by virtue of an Act of Parliament *1 made in H. the 8th's time.

But though the Court has power by law, to send a writ of certiorari to Berwick, yet it ought not to issue in vain. And therefore we should be satisfied, that the end for which it is prayed be attainable: and the ground sufficient for removing the record, in order to attain that end. The end here avowed is, that the matter may be tried in this Court. And it is objected that there can be no such trial, because the trial must be local, and no jury can come from Berwick.

But the law is clear and uniform, as far back as it can be traced. Where the Court has jurisdiction of the matter, if, from any cause, it cannot be tried in the place, it shall be tried as near as may be. All local matters arising in Wales, triable in this Court, are by the *2 common law, tried by a jury of the next county in England. So, as to the †1 Cinque Ports, the venire facias shall be awarded de vicineto of the next vill, either in the county of Kent, or the county of Sussex. So ‡ it is also as to the isle of Ely : so, § likewise as to Ireland ; a venire was directed to the Sheriff of Salop, as the next English county. So, in parts of England itself where an impartial trial cannot be had in the proper county, it shall be tried in the next: as 5 G. 1, *Rex v. Inhabitants* [860] *of the County of the City of Norwich*, about the county bridge, the trial was in Suffolk.

This is the ancient and general rule, wherever the Court has jurisdiction : and this general rule has often been applied to Berwick.

Edward the First, by an ordinance in Parliament, extended these rules as to complaints against the King of Scotland, that they might be tried in this Court by a jury of Northumberland, or any other county, or before commissioners appointed by the King. There was a precedent applying this rule to Berwick, in 42 Eliz. affirmed upon a writ of error : and the like in 44 Eliz. The like*3 the 20 Car. 2, *Crispe and Jackson v. Mayor and Burgesses of Berwick.* And *The Mayor of Berwick's case,* †2 36 C. 2, lays down as a certain principle, that where a local matter arising at Berwick is tried here, there is to be a suggestion made on the roll, that "breve domini Regis ibi non currit," as it is in Wales. A tipstaff was in that case sent, to take the mayor up.

There are two precedents in the reign of Ja. 2, of informations in this Court for misdemeanors in Berwick : and in Michaelmas, 8 Ann. the °4 Attorney General filed an information here for misdemeanors in Berwick. In Hilary and Easter 1755, this Court after much litigation, granted informations for †3 bribery in Berwick, at the election of their members to Parliament, as being an offence and misdemeanor at the common law : which shews Berwick, in respect of the jurisdiction of this Court "to proceed originally by information for misdemeanors committed there," to be upon the same foot, as any other part of England. And the Court never would have granted those informations, without being satisfied "that they might be tried :" because a defect of power to try, necessarily infers a want of jurisdiction.

There is not one authority to the contrary. And in reason, it would be most absurd : because it would really be putting the place out of the protection of the law ; and there must, in many important cases, be a total failure of trial, and consequently, of justice.

Suppose the office of mayor should be usurped : the usurpation is a crime ; and

---

*1 34 H. 8, c. 13.

*2 19 H. 6, fo. 12 b. pl. 31.

†1 2 Ro. Abr. tit. Trial, letter I, pl. 6, 7, pa. 596, 597.

‡ *Howse v. Bishop of Ely*, Moore, 88.

§ 2 Ro. Abr. 597, pl. 8.

*3 1 Lev. 252.   1 Mod. 36, 37.   1 Sid. 381, 462.   1 Ventr. 58, 90.   Raym. 173. 1 Keb. 414, 676.

†2 2 Shower, 365.

*4 Sir James Montagu.   It was against Robert Mills and George Lindsay.

† V. ante, 849.

2 BURR. 860.

e fact is clearly

it Berwick sends
writ of summons
h. Chester, both
ct of Parliament

orari to Berwick,
fied, that the end
for removing the
ie matter may be
trial, because the

iced. Where the
tried in the place,
les, triable in this
' in England. So,
iineto of the next
is also as to the
e Sheriff of Salop,
an impartial trial
: as 5 G. 1, *Rex* v.
iy bridge, the trial

isdiction : and this

these rules as to
n this Court by a
ners appointed by
i 42 Eliz. affirmed
Car. 2, *Crispe and
ck's case*, †2 36 C. 2,
it Berwick is tried
nini Regis ibi non
the mayor up.
is in this Court for
ey General filed an
Easter 1755, this
in Berwick, at the
nisdemeanor at the
:tion of this Court
l.there," to be upon
never would have
might be tried :"
liction.
i, it would be most
otection of the law ;
, and consequently,

on is a crime ; and

i8, 90.   Raym. 173.

rge Lindsay.

---

2 BURR. 861.          REX *v.* COWLE                603

cannot be tried before the man himself who is accused, or any jurisdiction in the town. Much less could a question, "whether the corporation was dissolved," be tried before themselves. Such questions could not be tried originally before commissioners sent thither by the King : they could be [861] judged in this Court. To try franchises of this kind in any other shape, would not only be contrary to the common law, but to the ‡ Act abolishing the Star-Chamber, and all the statutes there recited.

Suppose au action between the corporation and their own lessee to be depending at Berwick, or any suit instituted there between the corporation and any other person, on a point of property ; they could not judge in their own cause : and if it could not be tried elsewhere, there must be a failure of justice.

Every rule of the common law, which holds in the case of Wales, concludes à fortiori to Berwick ; both as to the jurisdiction of this Court, and the method of trial. Berwick is only a borough ; it has neither jura regalia nor Superior Courts : Wales had both. A small part of the county of Durham is nearer to Berwick than Northumberland is : but at the time of first sending process to the latter, the King's writ did not run to the former, being a County Palatine. So that Northumberland was the nearest English county for the purpose of trial ; as the King's writ did not run to Durham.

†1 The objection made when this matter first came on, appears now to be groundless : "that they proceeded by laws and usages, of which this Court cannot judge." Whereas, their trials as to criminal matters at least, are in the course of the common law, and entirely governed by the laws of England.

Therefore we are all of opinion that these indictments may be tried in this Court, by a jury of the county of Northumberland.

The 3d objection urged against the certiorari, was, that though it should be admitted "that the Court have authority to issue it, and that the end is attainable," yet there is not ground sufficient to take the trial from the ordinary local jurisdiction of Berwick.

Most certainly, the Court ought to be satisfied of the ground, before they send a certiorari for that purpose. The * King has a right to chuse his Court : but upon the application of the defendant, there should be always a reason. †2 The higher the inferior jurisdiction is, and the greater the inconveniences are of removing the cause, the stronger the reason should be : but a doubt, "whether a fair, impartial, or satisfactory trial or judgment can be had there," is a reason to remove from the highest.

In the case of ‖ *Rex* v. *Lewis*, Tr. 12 G. 1, after considering the matter at different times, and looking into precedents ; and there being an affidavit produced, [862] inducing a suspicion "that a fair trial could not be had in Wales ;"—a certiorari was granted to remove the indictment from the Grand Sessions of Anglesea. This suspicion only, being properly verified by affidavit, was in that case holden to be a sufficient reason for removing that indictment from a very high Court.

Let us inquire into the reason alledged in the case now before us, " why there cannot be a fair trial in Berwick."

The defendant in this case swears to his innocence : and he and five more swear "that he cannot have a fair trial, owing to party differences, and great contentions that have lately happened in the borough. That the justices, before whom he is to be tried, warmly supported a motion to disfranchise him for the offence laid in this indictment : which was rejected by a great majority of the burgesses. That the matter of the indictment arose at an assembly of the corporation, in consequence of a violent division which engaged the whole body."

I suppose the magistrates of Berwick may be in the right, and men of the greatest integrity : but they admit a great contention in the borough ; that the matter laid in the indictment arose from a warm dispute at the guild, upon a point of business, which produced a riot and tumult, that broke up the guild in great confusion : that the justices are all of one side upon this point.

---

‡ 16, 17 C. 1, c. 10.
†1 V. ante, p. 835, 836.
* V. *Rex* v. *Inhabitants of Glace*, T. 1769, B. R.
†2 V. post, p. , *Rex* v. *Alderman Plumbe*, P. 1772, 12 G. 3, B. R.
‖ 1 Strange, 704.   [See 4 Burr. 2459.]

Case 1:06-cv-01707-GK    Document 19-3    Filed 03/30/2007    Page 168 of 206

It is not denied that the justices vehemently pressed a motion to disfranchise the defendant for the offence charged in this indictment; which was rejected by a great majority of burgesses.   Whether the motive for rejecting it, was because they thought the defendant innocent, or because they thought the motion premature and too violent, is immaterial.

Robert Selly's affidavit against the certiorari, shews it is considered as a cause against the magistrates, and that his brother ——— who made an affidavit for the defendant, listed as a soldier on that account, and declared he had rather go to the farthest part of the world, than fly in the face of a magistrate.

Upon this occasion, all the justices oppose the certiorari, and have produced affidavits to prove the defendants guilty.——They may be so: and if they are, they ought to be severely punished.   But it is impossible, that under all these circumstances, the trial or judgment at Berwick should be satisfactory.

Every body in the town has already pre-engaged his opinion.   The burgesses have all taken sides: the justices [863] have already declared him so heinously guilty, that he ought to be immediately disfranchised, without waiting for a trial of the indictment.   I dare say they were of that opinion, without prejudice to the man, but from indignation at his guilt: and perhaps very justly; for a man may judge impartially even in his own cause.   However, we must go upon general principles. If a witness in a cause has an interest, though it be small, he must be rejected: or if a juryman has declared his opinion by a former verdict, he may have done it very justly, but yet is liable to be challenged for this cause, on a subsequent trial.   In the present case, it is impossible but that all the persons who would be concerned in trying this matter at Berwick, must be biassed by their preconceived opinions.   I do not speak this, with the least imputation upon the magistrates of Berwick: but it is not fit that they should be judges in their own cause, and after having already gone so far as they have done.

Therefore we are, all of us, of opinion that the rule to shew cause "why writs of supersedeas to these writs of certiorari should not issue," ought to be discharged.

But unless the matter could have been tried here, a certiorari ought not to have gone: nor shall it now be used for delay.   To prevent which, the prosecutors of the certiorari shall engage to appear, and take short notice of trial, and try it at the next assizes for the county of Northumberland.

I have settled the form of a suggestion to be entered upon the roll: which I will give to the Master of the Crown-Office for that purpose.

His Lordship accordingly did so: and

It was as follows——"And because the borough of Berwick is a place where the King's writ of venire facias, to summon a jury to try the said issue, doth not run; and because the burgesses of the said borough, by reason of their privileges, ought not to be put upon any jury to try the said issue out of the said borough; but the said issue ought to be tried by a jury of the county of Northumberland, which is the next adjacent county to the said borough of Berwick; which allegations of the said Henry Cowle are not denied by the said James Barrow, Esq. therefore it is commanded the Sheriff of Northumberland, that he * cause to come, &c."

The rule now made by the Court (in consequence of [864] their present resolution) was afterwards drawn up and entered in these words, viz.

Upon mature deliberation had here in Court, it is ordered by this Court, that the rule made "that the defendants should shew cause why a writ of supersedeas should not issue to the two writs of certiorari lately issued out of this Court, to remove all and singular indictments against the defendants" be discharged.

And the said two writs of certiorari and the returns thereto being now returned and filed in this Court, it is further ordered that the said defendants do immediately appear and plead to the said indictments; and proceed to the trial of the said indictments, at the next assizes to be holden in and for the county of Northumberland. And it is further ordered, that in case the defendants shall make default or neglect to make up the records and proceed to the trial of the said indictments, at the now next assizes to be holden in and for the county of Northumberland, in such case, the

---

* The entry upon the record has a clause of non omittas, (which is always inserted on the Crown side;) viz. "that he do not forbear, by reason of any liberty in his bailiwick, but that he cause to come, &c."

166

prosecutors shall be at liberty to make up the said records, and proceed to the trial of the same at the said next assizes in and for the county of Northumberland.

And as to the application for an attachment, for not returning the said two writs of certiorari.

It was ordered that the rule made, "that Henry Hodgson, William Compton, Fenwick Stowe, William Temple, and Samuel Burn Esquires, should shew cause why a writ of attachment should not issue against them, for their contempt," be discharged.

The indictment was afterwards tried at Newcastle.

REX *versus* BOOTIE.  Wednes. 4th July, 1759.  [See 6 Durn. 630.]  Constable may be indicted for suffering a street-walker to escape out of his custody.

On Tuesday 19th June last, Mr. Ashhurst moved in arrest of judgment, after verdict for the King, upon an indictment against a constable, for a misdemeanor.

The charge in the indictment was, that he, being one of the constables of St. Martin's in the Fields, and being in the execution of his said office, as head of the nightly [865] watch of the said parish, did wilfully and unlawfully suffer Margaret Prince, being a loose, idle, lewd and disorderly person, taken up by Robert Miller, one of the nightly watch of the same parish, between one and two o'clock in the morning, as a common street-walker, &c. to escape out of his custody, before she could be carried before a justice of the peace, to be dealt with by the justice according to law.

The whole indictment was (in substance) thus—that one Robert Miller, being lawfully appointed one of the nightly watchmen of and for the said parish, and being in his office and place as such, performing his duty of a watchman there, at an unseasonable time, i.e. between one and two in the morning, did apprehend and take into his custody one Margaret Prince then and there being a loose, idle, lewd and disorderly person, and a common street-walker, and being then and there behaving herself riotously, and walking the streets there to pick up men, in breach of His Majesty's peace ; and did then and there take, lead and convey the said Margaret Prince in his custody to a certain prison called the watch-house in the said parish, and did there deliver her in custody unto one John Bootie, who then and there was one of the constables of the said parish, and then and there being in the execution of the said office of such constable, as the head of the nightly watch of the said parish ; and did then and there leave and deliver up her the said Margaret Prince in charge with the said John Bootie, so being such constable as aforesaid, and in the execution of his said office as aforesaid, and did then and there charge and request the said John Bootie so being such constable as aforesaid to keep and detain the said Margaret Prince, so being such loose, idle, lewd and disorderly person and a common street-walker walking the streets there to pick up men as aforesaid, in his custody, until the said Margaret Prince could be carried and conveyed in custody before some one of His Majesty's justices assigned to keep the peace in and for the said city and liberty, there to be dealt with by such justice according to law for her said offence and breach of the King's peace : nevertheless the defendant, so being, &c. not regarding the duty of his office, &c. unlawfully and wilfully discharged her out of his custody, before that she had been carried before any justice, &c. and would not keep or detain her in his custody for the purpose aforesaid, but wilfully suffered and permitted her to escape and go at large, &c.

Upon which indictment, the defendant having been tried ; and a verdict found against him ;

Mr. Ashhurst obtained a rule to shew cause why the judgment should not be arrested ; upon the following

[866] Objection—That it is not charged, that the defendant knew that she was a street-walker, &c. as this indictment describes her to be : nor indeed is it positively charged "that she was one." And if she was not liable to be detained by him, he would have subjected himself to an action for false imprisonment, if he had detained her. It ought to have expressly charged "that she was so ; and that she was delivered to him as such."

Mr. Norton and Mr. Stow now shewed cause against arresting the judgment.

1 of 2 DOCUMENTS: ICLR: King's/Queen's Bench Division/1910/Volume 2 /THE KING v. THE EARL OF CREWE. Ex parte SEKGOME. - [1910] 2 K.B. 576

[1910] 2 K.B. 576

**[IN THE COURT OF APPEAL.]**

## THE KING v. THE EARL OF CREWE. Ex parte SEKGOME.

**1910 Jan. 19, 20, 21, 22; April 25.**

**VAUGHAN WILLIAMS, FARWELL, and KENNEDY L.JJ.**

*Habeas Corpus - Foreign Country in which the Crown has Jurisdiction - Protectorate - Foreign Jurisdiction Act, 1890 (53 & 54 Vict. c. 37) - Order in Council - Proclamation - Validity - Arbitrary Arrest - Act of State - Person having Custody of Prisoner - Secretary of State for Colonies - "Foreign Dominion of the Crown" - 16 Car. 1, c. 10, ss. 6, 8 - Habeas Corpus Act, 1862 (25 & 26 Vict. c. 20), s. 1.*

By an Order in Council, dated May 9, 1891, made "in exercise of the powers by the Foreign Jurisdiction Act, 1890, or otherwise in Her Majesty vested," the High Commissioner for South Africa was authorized to exercise in the Bechuanaland Protectorate the powers of Her Majesty, and to do all such things "as are lawful," and to provide by proclamation for the administration of justice and generally for the peace, order, and good government of all persons within the Protectorate, including the prohibition and punishment of all acts tending to disturb the public peace.

One Sekgome, who claimed to be the chief of a native tribe in the Protectorate, was detained in custody at a place within the Protectorate by virtue of a proclamation authorizing his detention, and expressed to have been made by the High Commissioner, under the powers conferred on him by the Order in Council, on the ground that the detention of Sekgome was necessary for the preservation of peace within the Protectorate.

On an application by Sekgome for a writ of habeas corpus to the Secretary of State for the Colonies:-

*Held* (affirming an order of the Divisional Court dismissing the application), that the Protectorate was a foreign country in which His Majesty had jurisdiction within the meaning of the Foreign Jurisdiction Act, 1890; that the proclamation was validly made under the powers conferred by the Order in Council; and that the detention of Sekgome was, therefore, lawful.

*Sprigg v. Sigcau*, [1897] A. C. 238, distinguished.

*Held*, also, by Vaughan Williams and Kennedy L.JJ., that the Protectorate was not a "foreign dominion of the Crown" within s. 1 of the Habeas Corpus Act, 1862.

*Qu're*, whether, in any event, the Secretary of State for the Colonies was a person having the custody of Sekgome to whom a writ of habeas corpus could be issued.

APPEAL from an order of a Divisional Court discharging a rule nisi for a writ of habeas corpus.

By the rule nisi the defendant, the Earl of Crewe, His

*[1910] 2 K.B. 576 Page  577*

Majesty's Secretary of State for the Colonies, was called upon to shew cause why a writ of habeas corpus should not issue directed to him to have the body of one Sekgome before the Court, upon the ground that Sekgome was unlawfully detained in custody at Gaberones, in the Bechuanaland Protectorate, South Africa, under the authority and with the sanction of the defendant.

In an affidavit sworn by the defendant it was stated that the Bechuanaland Protectorate was a foreign country within which His Majesty had power and jurisdiction by treaty, grant, usage, sufferance, or other lawful means, within the meaning of the Foreign Jurisdiction Act, 1890, and the territory of the Protectorate was foreign territory under His Majesty's protection; that it had never been acquired by settlement, or ceded to, or conquered, or annexed by His Majesty or any of his Royal predecessors, nor had His Majesty or any of his Royal predecessors recognized the same as, nor was it, part of his dominions, but he had power and jurisdiction within the same; that Sekgome was lawfully detained under a proclamation of December 5, 1906, by the High Commissioner for South Africa; and that, save in the sense that as Secretary of State having the superintendence on behalf of His Majesty's Government of the exercise of His Majesty's jurisdiction within the Protectorate the defendant was not prepared to advise His Majesty to approve of the policy of revoking the proclamation, Sekgome was not detained by him, nor had he the custody of Sekgome, and that the detention of Sekgome was an act of State for the preservation of the peace of the Protectorate and was not to be questioned by the Court.

The Proclamation of December 5, 1906, was in the following terms:-

"Whereas by an Order in Council of Her late Majesty dated the ninth day of May, 1891, the High Commissioner is empowered to provide for the peace, order, and good government of all persons within the limits of the said Order including the prohibition and punishment of acts tending to disturb the public peace;

"And whereas in that portion of the said limits which is known

*[1910] 2 K.B. 576 Page  578*

as the Bechuanaland Protectorate (hereinafter called the Protectorate) there has recently been a division amongst the tribe known as the Batawana respecting the question whether one Mathibe or one Sekgome is the true chief of the tribe which division was seriously endangering the peace of the tribe;

"And whereas in public and formal meeting of the tribe held in the presence of the Resident Commissioner of the Protectorate it was shown that Mathibe was the rightful chief of the tribe and a vast majority of the tribe accepted Mathibe as their lawful chief;

"And whereas the said Sekgome is at present outside the limits of the Batawana tribe and his return is a danger to the peace of the tribe and is likely to lead to bloodshed and tribal war;

**169**

"And whereas it has been necessary in order to preserve peace and order within the Protectorate to detain Sekgome at a place within the Protectorate distant from the limits of the Batawana tribe, and it is necessary to continue such detention;

"Now therefore in and by virtue of the powers in me vested aforesaid I do hereby declare and make known as follows:-

"1.    All acts done, permitted to be done, or sanctioned by the Resident Commissioner with the approval of the High Commissioner with regard to the detention of the said Sekgome prior to the commencement of the proclamation are hereby declared legal and valid, and no proceedings shall be taken to question the legality or validity of any such acts.

"2.    It shall be lawful for the High Commissioner to order the detention of the said Sekgome during His Majesty's pleasure in any suitable place within the Protectorate, and from time to time to change such place of detention, and also to deport the said Sekgome to any place without the Protectorate where provision shall have been made for his detention in lawful custody.

"3.    A warrant under the hand of the High Commissioner addressed to the Resident Commissioner or any Assistant Commissioner of the Protectorate or to any person having charge of any station within the Protectorate shall be a sufficient authority for the person named in the warrant to detain the said Sekgome, or to convey the said Sekgome to the place named in the warrant,

*[1910] 2 K.B. 576 Page  579*

and to deliver him into such custody as may be named in the said warrant.

"4.    The said Sekgome may at any time during his detention within the Protectorate be removed from any one place of detention to any other place of detention therein by warrant under the hand of the High Commissioner duly addressed to any officer of the Protectorate, and the said Sekgome shall during his detention in any place named in any such warrant as aforesaid be under the lawful custody of the person named in the warrant as well as of the Assistant Commissioner within whose district the place named in the warrant is situated.

"5.    No writ or process whatsoever calling in question the legality of the arrest detention or deportation of the said Sekgome, as the case may be, or any matter connected therewith, shall have any effect within the Protectorate.

"6.    It shall be lawful for any police constable to arrest without warrant the said Sekgome if he shall at any time escape from custody, and any person aiding or attempting to aid the said Sekgome to escape or attempt to escape out of any lawful custody as aforesaid shall be guilty of an offence and shall be liable on conviction thereof to imprisonment with or without hard labour for any term not exceeding two years.

"7.    This Proclamation shall commence and come into operation on the date of its publication in the Gazette."

The material portions of the Order in Council of May 9, 1891, and of certain other proclamations, and the facts relating to the detention of Sekgome are set out in the judgment of Vaughan Williams L.J.

The Divisional Court (Lord Alverstone C.J., Ridley and Darling JJ.) discharged the rule nisi on the grounds (1.) that there were courts of law in the Bechuanaland Protectorate which had jurisdiction to deal with the question of the legality of Sekgome's detention, and that under s. 1 of the Habeas Corpus Act, 1862 (1), the writ of habeas corpus ought therefore not to

> (1)    Habeas Corpus Act, 1862 (25 & 26 Vict. c. 20), s. 1: "No writ of habeas corpus shall issue out of England, by authority of any judge or court of justice therein, into any colony or foreign dominion of the Crown where Her Majesty has a lawfully established court or courts

*[1910] 2 K.B. 576 Page  580*

issue, and (2.) that the defendant was not the custodian of the body of Sekgome. The Court expressed no opinion as to the validity of the Proclamation of December 5, 1906.

*Lush, K.C.*, and *Douglas Knocker*, for the appellant. First, the Proclamation of December 5, 1906, which, according to the contention of the Crown, makes lawful the detention of Sekgome, is invalid. It is a proclamation directed solely to the case of Sekgome, and it purports to authorize his detention without trial during His Majesty's pleasure, and it provides that no writ or process calling in question the legality of his arrest or detention shall have any effect in the Bechuanaland Protectorate. Sekgome is a British subject.

[ *Rowlatt*, for the defendant. It is not admitted that he is a British subject, but for the purpose of this case it is immaterial whether he is or not.]

The proclamation is expressed to have been made by the High Commissioner under the powers conferred upon him by an Order in Council of May 9, 1891, which by art. 2 authorized the High Commissioner, on Her Majesty's behalf, to do all such things in the Bechuanaland Protectorate "as are lawful," and as he may think expedient, subject to instructions from a Secretary of State; and the High Commissioner is by art. 4 empowered to legislate by proclamation for the administration of justice, the raising of revenue, "and generally for the peace, order and good government of all persons" within the Protectorate, "including the prohibition and punishment of acts tending to disturb the public peace." The Proclamation of December 5, 1906, can only be justified if, as was pointed out by Lord Watson in *Sprigg v. Sigcau* (1), the true construction of the Order in Council is that it gives the High Commissioner the powers of "an irresponsible sovereign or a supreme and unfettered Legislature." But the Order in Council has not that effect; it does not confer on the High Commissioner the arbitrary powers of a despot, for his powers are expressly limited to such acts "as are lawful," which means

---

of justice having authority to grant and issue the said writ, and to ensure the due execution thereof throughout such colony or dominion."

(1)    [1897] A. C. 238, at p. 246.

*[1910] 2 K.B. 576 Page  581*

that he is only to have such powers as a constitutional sovereign can exercise or transfer, and the Crown cannot authorize the High Commissioner to declare a particular individual to be an outlaw. By a Proclamation dated June 10, 1891, issued under this Order in Council, elaborate provision was made for the appointment of commissioners and magistrates to hold Courts of law in the Protectorate, and a Proclamation dated September 14, 1906, repealing a similar Proclamation of June 13, 1891, provided in express terms for the steps to be taken for the apprehension or expulsion of persons endangering the peace. There having been that which is equivalent to a constitution granted by these proclamations to the Protectorate, it is not in the power of the High Commissioner, or even of the Crown, to revoke that constitution in the case of one particular person, as is sought to be done in the case of Sekgome by the Proclamation of December 5, 1906: *Campbell v. Hall.* (1) A subsequent proclamation which in the case of an individual overrides all the previous proclamations and is contrary to natural justice is not "lawful" within the meaning of the Order in Council. If the High Commissioner was intended to have these practically unlimited powers, the word "lawful" would not have been used. [They also referred to *Mostyn v. Fabrigas* (2) and *Walker v. Baird.* (3)]

Secondly, it is said, and the Divisional Court has held, that there are Courts in the Protectorate competent to deal with the question of the legality of Sekgome's detention, and that, therefore, s. 1 of the Habeas Corpus Act, 1862, prevents the issue of the writ out of England. There have been several proclamations by the High Commissioner creating Courts of resident commissioners and magistrates and defining their powers and jurisdiction, but an examination of these proclamations fails to shew that there is any Court in the Protectorate which has power to grant habeas corpus, for they are all inferior Courts; and even if there were a Court with that power, an application to it would be fruitless in this case, because the Proclamation of December 5, 1906, expressly provides that no

(1)    (1774) 1 Cowp. 204.

(2)    (1774) 1 Cowp. 161.

(3)    [1892] A. C. 491.

*[1910] 2 K.B. 576 Page  582*

writ questioning the legality of Sekgome's detention shall have any effect within the Protectorate, and although the validity of that proclamation can be questioned in this Court, it would be binding on the local Court. Further, if, as the Crown contends, the Protectorate is foreign territory, it is not "a colony or foreign dominion of the Crown" within s. 1 of the Act of 1862, and, therefore, that Act does not apply to this case; and in any case this application is for the writ to issue, not to a foreign dominion of the Crown, but to the defendant in this country. The contention of the appellant, however, is that Gaberones is not foreign territory, but is part of territory owned by the Crown by virtue of an Order in Council of May 16, 1904.

Thirdly, the application for a habeas corpus addressed to the Earl of Crewe is rightly conceived. The writ lies to a person who really has the authority and control over the detention of the prisoner: *Barnardo v. Ford.* (1) The Earl of Crewe has that authority and control. It is not material that, technically and in point of form, he may not be the employer or principal or superior officer of the person actually detaining the prisoner. It is not essential that the person to whom the writ is addressed should be, either actually or constructively, the custodian of the prisoner; it is sufficient that he should be the person who has the power of determining whether the detention of the prisoner should or should not continue. The theory of the writ is that the sovereign, acting through his judges as he acts in other matters through his ministers, requires information, and communicates his wishes, with regard to the matter of the detention of the prisoner, from and to the person who has in fact control over

that detention: see Bacon's Abridgment, Habeas Corpus B. (6.); *Rex v. Wilkes* (2); *Rex v. Pell.*(3) In *Carus Wilson's Case* (4) the writ was addressed to the Viscount, as well as to the gaoler, of Jersey, though clearly the prisoner was not then in the custody of the Viscount, presumably because the Viscount had authority over the gaoler in regard to the prisoner's detention. The defendant does not allege that he has not power to order the prisoner's release, but sets up the proclamation, which, according

(1)    [1892] A. C. 326.

(2)    (1763) 2 Wils. 151.

(3)    (1674) 3 Keb. 279.

(4)    (1845) 7 Q. B. 984.

*[1910] 2 K.B. 576 Page 583*

to the appellant's contention, was illegal. It is clear that the writ of habeas corpus may be issued in respect of a foreigner detained in this country: *Ex parte Besset* (1); the *Case of the Hottentot Venus*. (2) The writ goes to any part of the dominions of the Crown: *Rex v. Cowle* (3); *Ex parte Anderson* (4); *Crowley's Case*. (5) It may be questionable whether the appellant owes any allegiance to the Crown, but if he owes obedience to the Crown he is entitled to the protection of our law; and the Crown has de facto assumed the power to collect revenue in the Protectorate and to police the country, and has proclaimed that if the laws applicable therein shall be those of Cape Colony. [They also referred to 16 Car. 1, c. 10, s. 6, *Wolfe Tone's Case* (6), *The Earl of Danby's Case* (7), *Reg. v. Barnardo (Tye's Case)* (8), and *Reg. v. Barnardo (Gossage's Case.* (9)]

*Rowlatt* (*Sir W. S. Robson, A.-G.*, with him), for the defendant. A writ of habeas corpus cannot in this case be addressed to the Earl of Crewe, because he is not, as Secretary of State for the Colonies, the superior officer of the person actually having the custody of the prisoner. He is the minister who by the Constitution exercises the function of advising the Crown on colonial matters; but it does not follow from the fact that he holds an office which gives him power to set at work a chain of causes, the ultimate result of which may be the release of the prisoner, that a writ of habeas corpus can be addressed to him as if he were the custodian of the prisoner. The case of Bechuanaland is analogous in this respect to that of a native Indian dependency, the British Resident of which could not be looked upon as the custodian of a prisoner confined there, merely because he could take such action as might probably in the long run procure the prisoner's release. The Earl of Crewe is not the author of, or responsible for, Sekgome's imprisonment. *Carus Wilson's Case* (10) is no authority for addressing the writ in the present case to the Earl of Crewe. In that case it is stated (11) that it was the

(1)    (1844) 6 Q. B. 481.

(2)    (1810) 13 East, 195.

(3)    (1759) 2 Burr. 834.

**173**

(4)    (1861) 3 E. & E. 487; 30 L. J. (Q.B.) 129.

(5)    (1818) 2 Swanst. 1.

(6)    (1798) 27 St. Tr. 613.

(7)    (1682) 11 St. Tr. 831.

(8)    (1889) 23 Q. B. D. 305.

(9)    (1890) 24 Q. B. D. 283.

(10)   7 Q. B. 984.

(11)   7 Q. B. at p. 990.

*[1910] 2 K.B. 576 Page  584*

duty of the Viscount of Jersey, or his deputy, to execute the sentence of the Court, and therefore he was responsible for the imprisonment of the prisoner. The same consideration applies to the case of *Rex v. Pell*. (1) The Secretary of State could advise the Crown to cause the proclamation with regard to Sekgome's detention to be withdrawn, but he could not order it to be withdrawn of his own authority. The fact that he could so advise the Crown does not make him the detainer or responsible for the detention of Sekgome. If he went out to Bechuanaland in person and directed the custodian of the prisoner to deliver him up for production in this country, the custodian might refuse to do so. All kinds of proceedings might be taken against the Secretary of State if he is to be assumed to be responsible for the doing of anything the undoing of which he might, as Secretary of State, procure. The duty of the Secretary of State is an advisory duty as between himself and the Crown only: *Gidley v. Lord Palmerston*. (2) A capias may still be issued for a Crown debt, but it could not be said that, because the Lords of the Treasury could no doubt take such steps as would cause a man taken under such a capias to be released, a habeas corpus could therefore be addressed to them on the ground that the capias was bad.

Secondly, with regard to the alleged invalidity of the Proclamation of December 5, 1906, the Order in Council empowers the High Commissioner to legislate for the Protectorate by proclamation, and all the proclamations made by him, including the Proclamation of December 5, 1906, stand in the position of Acts of Parliament.

[VAUGHAN WILLIAMS L.J. Is it clear that the Proclamation of December 5 can be treated as legislation? It appears in effect to be a proclamation that a particular individual shall not have the benefit of the law as declared by the former proclamations, which by the hypothesis were legislation and still stand good.]

It is analogous to a Bill of Attainder or an Act of Indemnity, such as was passed in the case of Governor Eyre with regard to his action in Jamaica. The High Commissioner is placed in the position of legislator for the Protectorate of Bechuanaland by

(1)    3 Keb. 279.

(2)    (1822) 3 Brod. & B. 275.

*[1910] 2 K.B. 576 Page 585*

virtue of statute. The Foreign Jurisdiction Act, 1890, consolidates previous Acts dealing with the same matter. At common law the Crown had no power of territorial legislation outside the dominions of the Crown. There might be power to make certain laws binding on British subjects abroad, but there was no power to make territorial law outside the Crown's dominions. The object of the statute is to enable the Crown, in cases where by treaty, capitulation, grant, usage, sufferance, or other lawful means the Crown has jurisdiction in a foreign country, to exercise legislative and other territorial jurisdiction therein by putting such a country for that purpose on the same footing as territory in which the Crown has acquired such jurisdiction by cession or conquest, and the position with regard to such territory is that the Crown can legislate by Orders in Council. The Order in Council of May 16, 1904, only affects the ownership of the soil, and has nothing to do with the question of sovereignty. Assuming the Bechuanaland Protectorate to be a foreign country to which the Act of 1890 applies, as to which Lord Crewe's affidavit is conclusive, the Crown is not bound to legislate for it itself, but may set up a Legislature there to perform its functions in that respect. By s. 9 of the Act the Crown may by Order in Council assign to any Court in any British possession, or held under the authority of His Majesty, any jurisdiction, civil or criminal, original or appellate, which may lawfully by Order in Council be assigned to any British Court in any foreign country. There were dicta to the effect that the Crown could not revoke a constitution or legislation once established by it in a colony. Sect. 10 prevents the application of that doctrine in cases within the Act by enacting that an Order in Council made under the Act may be revoked or varied by Order in Council. By s. 11 Orders in Council made in pursuance of the Act are to be laid before both Houses of Parliament and are to have the same effect as if enacted in the Act. Sect. 12 provides (1.) that, if any Order in Council, made in pursuance of the Act as respects any foreign country, is in any respect repugnant to the provisions of an Act of Parliament extending to the subjects of the Crown in that country, or any order or regulation made under the authority of

*[1910] 2 K.B. 576 Page 586*

any such Act or having in that country the force of any such Act, it shall be read subject to that Act, order, or regulation, and shall to the extent of such repugnancy, but not otherwise, be void; but that (2.) an Order in Council made in pursuance of the Act shall not be void on the ground of repugnancy to the law of England, unless it is repugnant to the provisions of some such Act of Parliament, order, or regulation as aforesaid. In *Staples v. The Queen* (1), where there was a petition to the Privy Council in 1898 for leave to appeal by a man convicted in Buluwayo under an Order in Council which provided for the trial of offences by a judge and assessors without a jury, on the ground that Rhodesia was British territory, and that this provision of the Order in Council was repugnant to statutes extending to the subjects of the Crown in that country, the petition was dismissed without any formal judgment being given, but the Court repeatedly said in the course of the arguments that the territory was for this purpose not British, but foreign, and that the Order in Council there in question was therefore valid under the Act of 1890. Art. 2 of the Order in Council of May 9, 1891, gives to the High Commissioner power to exercise the executive powers of the Crown in the Protectorate, and for that purpose to do all such things "as are lawful," which means according to the law which governs all British subjects wherever they may be, such as the law forbidding slavery. It is not contended that that article, if it stood alone, would justify the detention of Sekgome. It would not give power to imprison a man apart from any process of law, but art. 4 empowers the High Commissioner to provide for the administration of justice, and "generally for the peace, order and good government of all persons" in the Protectorate. In dealing with this Order in Council it must be observed that the power of the Crown in a conquered country is not limited to the prerogative rights which the Crown has in this country, but is the power of a conqueror: *Phillips v. Eyre.* (2)

Here the Crown has delegated the power of legislation to the High Commissioner, and the contention for the Crown is that the latter is in the position of an unfettered legislator, except so far as he is expressly

(1)    Unreported.

(2)    (1869) L. R. 4 Q. B. 225; (1870) L. R. 6 Q. B. 1.

fettered by previous statutes, and so far as subsequent statutes may disallow any of his legislation. There is no real danger involved in this, for he is subject to the authority of Parliament, and the Secretary of State can control his action. The power to make laws with the object of securing order, peace, and good government covers the whole sphere of government, and includes power to make provisions dealing with an individual and his rights, so far as may be necessary for that object, even to the extent of his detention without trial, as has been done in the case of Sekgome by the Proclamation of December 5, 1906; for, as was said by Lord Halsbury in *Riel v. The Queen* (1) in construing similar words in s. 2 of the British North America Act, 1871 (34 & 35 Vict. c. 8), "they are words under which the widest departures from criminal procedure as it is known and practised in this country have been authorised in Her Majesty's Indian Empire."

The provision in s. 12 of the Act of 1890 as to Orders in Council, being void for repugnancy, is the only limitation on this power of legislation, and that section must be taken to have superseded the dictum of Lord Mansfield in *Campbell v. Hall* (2) as to the inability of the sovereign to make a change in a conquered country which is "contrary to fundamental principles": see the observations of Willes J. in *Phillips v. Eyre*. (3) *Sprigg v. Sigcau* (4) is not an authority against the contention of the Crown, for the decision in that case proceeded on the ground that the statute in question, the Pondoland Annexation Act, 1894, did not confer the authority of an unfettered Legislature, whereas the argument here is that the Order in Council of May 9, 1891, has that effect.

Thirdly, although the Bechuanaland Protectorate is, it is contended, a foreign country within the meaning of the Foreign Jurisdiction Act, 1890, that does not necessarily prevent the application of the Habeas Corpus Act, 1862. Prima facie the writ of habeas corpus runs in the Crown's dominions. For the purpose of habeas corpus dominion cannot be judged by the same test as it is in the Foreign Jurisdiction Act, 1890.

(1)    (1885) 10 App. Cas. 675, at p. 678.

(2)    1 Cowp. 204.

(3)    L. R. 6 Q. B. at p. 20.

(4)    [1897] A. C. 238.

**176**

Any territory in which the Crown's writ of habeas corpus runs is part of the Crown's dominions for that purpose, and if there were no Court in the particular place competent to issue the writ the old jurisdiction of the King's Bench to do so possibly still exists. The question, therefore, which arises on the Act of 1862 is whether there is a Court in the Protectorate with power to issue the writ. The Divisional Court has rightly held that on the true construction of the proclamations of the High Commissioner creating Courts of law in the Protectorate, and in particular a Proclamation of February 11, 1896, which gave to assistant commissioners and resident magistrates jurisdiction in all civil and criminal suits and proceedings over and against all persons within their districts, there are Courts in the Protectorate which have jurisdiction in habeas corpus. On an application to one of those Courts for the issue of the writ, the Court would have power to deal with the question of the validity of the Proclamation of December 5, 1906, and an appeal would lie from its decision to the Privy Council. In the Courts of a country where there is a subordinate Legislature, as distinguished from an Imperial Legislature, the Courts are bound to inquire into the validity of every enactment of that subordinate Legislature: *Powell v. Apollo Candle Co.* (1); *Reg. v. Burah.* (2)

**Lush, K.C.**, replied.

[The following authorities were also referred to:- *Forester v. Secretary of State for India* (3); *Rickebie's Case* (4); *Picton's Case* (5); Bryce's Constitution of the United States, vol. 1, p. 494; *L'Union St. Jacques de Montreal v. B,lisle* (6); *Dow v. Black* (7); *Ex parte Carew* (8); *Anonymous.*(9)]

Cur. adv. vult.

April 25. VAUGHAN WILLIAMS L.J. read the following judgment:- This is an appeal against an order of the Lord Chief

(1)   (1885) 10 App. Cas. 282.

(2)   (1878) 3 App. Cas. 889.

(3)   (1872) L. R. Ind. Ap. (Sup. Vol.) 10.

(4)   (1642) March, 213.

(5)   (1804-1812) 30 St. Tr. 225, at pp. 746, 865, 946.

(6)   (1874) L. R. 6 P. C. 31.

(7)   (1875) L. R. 6 P. C. 272.

(8)   [1897] A. C. 719.

(9)   (1700) 1 Salk. 350.

*[1910] 2 K.B. 576 Page 589*

Justice, Ridley and Darling JJ., as a Divisional Court of the King's Bench Division, discharging an order of October 29, 1909, calling upon the Earl of Crewe, His Majesty's Secretary of State for the Colonies, to shew cause why a writ of habeas corpus should not issue directed to him to have the body of one Sekgome Letsholathibe, the hereditary chief of the Batawana tribe, before this Court:

The Attorney-General, in the course of his argument, raised various contentions, including the contention that the detention of Sekgome was justified under the terms of a Proclamation by his Excellency the High Commissioner (No. 25, 1906, dated December 5, 1906), and, in answer to this, it was argued by counsel on behalf of Sekgome that this proclamation was invalid and of no effect; but the Lord Chief Justice and the other judges of the King's Bench Division gave no judgment, and expressed no definite opinion, upon this point, and based their judgment in discharging the rule exclusively on two grounds, namely, (1.) on the ground that, under the Habeas Corpus Act of 1862, no habeas could issue out of England by authority of any judge or Court of justice therein into any colony or foreign dominion of the Crown where His Majesty has a lawfully established Court or Courts of justice having authority to grant and issue the said writ, and to ensure the due execution thereof throughout such colony or dominion, and that there was shewn on the affidavits before the Court to be a Court in existence in the Protectorate of British Bechuanaland which has authority to grant and issue a writ of habeas corpus with the consequential right of appeal; (2.) upon the ground that the Secretary of State is not the custodian of the body of Sekgome.

I think it is convenient, before reviewing in any way the judgment of the Divisional Court as based on these two grounds, that I should say something as to the history of this case appearing on the facts proved by the affidavits, and should set forth, sufficiently for their comprehension, the contentions on behalf of the Crown and on behalf of Sekgome, and should not limit myself to such facts only as are relevant to the grounds upon which the decision of the Divisional Court discharging the rule is based.

*[1910] 2 K.B. 576 Page 590*

Sekgome is a native of South Africa who, prior to the year 1906, was for a number of years, during the minority of his nephew, one Mathibe, the acting chief of the tribe of Batawana, a tribe living in the country surrounding Lake Ngami, in the Bechuanaland Protectorate. In December, 1905, a petition was presented by certain members of the tribe to the resident commissioner at Mafeking alleging that Sekgome was not, according to their native laws, the real heir to the chieftainship and asking for his deposition in favour of his nephew Mathibe. The High Commissioner refused to accede to the prayer contained in the petition or to interfere in the matter, but while Sekgome was absent in Kimberley - as the Crown asserts, on his own private business, or, as Sekgome's friends assert, by the orders of the High Commissioner - the tribe rose against him and invited Mathibe to assume the chieftainship. At the same time the adherents of Sekgome sent messages to him to return at once to the tribe, and the High Commissioner, fearing bloodshed and loss of life, not merely among the natives, but also among the white men living in the district, instructed the resident commissioner to proceed to Tsau, the chief village of the tribe, and inquire into the matter. A public inquiry was held on June 11 and 12, 1906, and on the question whether according to the law of the tribe Sekgome or Mathibe was entitled to the chieftainship of the assembled tribesmen the count was largely in favour of Mathibe. Thereupon the resident commissioner, after considering evidence as to the descent of the rivals, publicly stated that he was of opinion that the claim of Mathibe was established, and the High Commissioner, fearing that the return of Sekgome would be attended by bloodshed and loss of life, refused to permit Sekgome to return to the district of the tribe, but Mathibe, who had been forbidden to enter the district, was permitted to return and take up his duties as chief of the tribe. Sekgome, on the other hand, was invited to take up his residence in some other district in South Africa. This Sekgome refused to do, and the High Commissioner made the Proclamation of December 5, 1906, which, after reciting that it has been necessary in order to preserve peace and order within the Protectorate to detain Sekgome, provides inter alia (1.) for indemnification of the resident commissioner

*[1910] 2 K.B. 576 Page 591*

in connection with the detention of Sekgome; (2.) for future detention and deportation of Sekgome by order of the High Commissioner; and (5.) prohibits any process questioning the legality of Sekgome's arrest, detention, or deportation to have effect in the Protectorate. It is under this proclamation that the detention of Sekgome was justified. It is plain on these facts that, if the Court has to deal with the question of the validity of the Proclamation of December 5, 1906, the history of the Protectorate, its legislative and judicial system, will require investigation; but, inasmuch as the King's Bench Division discharged the rule for a habeas on what may be called preliminary objections based, one on the effect of the Act of 1862 as preventing a writ of habeas corpus issuing from England into the Protectorate, and the other based on the address of the writ to Lord Crewe, who is not the custodian of the body of Sekgome, whose body is sought to be brought before the English Courts, I will discuss at once these matters.

The statute of 1862 (25 & 26 Vict. c. 20) recites: "Whereas it is expedient that writs of habeas corpus should not issue out of England into any colony or foreign dominion of the Crown where Her Majesty has a lawfully established court or courts of justice having authority to grant and issue the said writ," (writ of habeas corpus) "and to ensure the due execution thereof throughout such colony or foreign dominion: Be it therefore enacted .... as follows: Sect. 1. No writ of habeas corpus shall issue out of England by authority of any judge or court of justice therein into any colony or foreign dominion of the Crown where Her Majesty has a lawfully established court or courts of justice having authority to grant and issue the said writ and to ensure the due execution thereof throughout such colony or dominion. Sect. 2. Provided that nothing in this Act contained shall affect or interfere with any right of appeal to Her Majesty in Council now by law existing." On the whole I have come to the conclusion that this Act has no effect in the Protectorate as preventing the issue into the Protectorate of a writ of habeas, because, as I construe the Act, it applies only to the territorial dominions of the Crown. Looking at the words of the Act of 1862, I think that the last words of s. 1 - "and to ensure the

*[1910] 2 K.B. 576 Page 592*

due execution thereof throughout such colony or dominion" - are an indication that the Legislature intended by the word "dominion" territorial dominion, and not dominion in the sense of power. Again, I do not think that the words "foreign dominion" in the Act of 1862 mean, or apply to, any country or place out of His Majesty's dominions, which is the sense in which the word "foreign" is used in the Foreign Jurisdiction Act of 1890. In *Ex parte Anderson* (1) no doubt seems to have been entertained as to the power of the Court at Westminster to issue a writ of habeas to go to any place under the subjection of the Crown of England whenever it is suggested to the Court that a subject of the Crown is illegally imprisoned. The only doubt seems to have been as to the propriety of the issuing of such a writ to Canada, a colony where separate jurisdiction has been established. The statute of 1862 seems to have been passed merely for the purpose of abrogating the jurisdiction of the Courts at Westminster in favour of colonial independence by declaring that no writ of habeas shall issue out of England into a colony or foreign dominion where the Crown has a Court of justice having authority to grant and issue such writ and to ensure throughout such colony or dominion due execution thereof. I cannot, therefore, agree that the rule for a habeas should be discharged on this ground.

As to the second preliminary objection on which the discharge of the rule for a habeas was based by the Divisional Court, namely, that Lord Crewe, to whom the rule nisi is addressed, has not the custody of the body of Sekgome, I am by no means satisfied, having regard to the statute 16 Car. 1, c. 10, ss. 6 and 8, that a writ of habeas must necessarily be addressed to the governor of the gaol or gaoler or other the official in command of the gaol, and in that sense having the actual custody of the imprisoned person claiming to be entitled to the protection of the writ of habeas corpus. I am disposed rather to say that the writ may be addressed to any person who has such control over the imprisonment that he could order the release of the prisoner. Lord Alverstone C.J., in dealing with this point, says: "I think this point fails and that in practice and under the recognized

(1)   3 E. & E. 487; 30 L. J. (Q.B.) 129.

rules applicable to habeas corpus the writ should go to the gaoler or custodian of the body that is supposed to be desired to be brought up." Later on he says: "Now I cannot think we should be justified, where there is a proper tribunal to investigate this matter, in sending a writ of habeas corpus to a minister of the Crown because he is responsible for advice given but is not responsible for the actual custody." I understand the Lord Chief Justice to mean by the words "where there is a proper tribunal to investigate this matter" where there is an existing Court having authority to grant and issue a writ of habeas and to ensure the execution thereof in the Protectorate. I am by no means satisfied that there is in the Protectorate such a Court. Later again he says: "In my opinion he (Sekgome) can get his release if by going to a competent Court that Court decides that his detention is unlawful. It seems to us that to come to this Court and ask us to issue to the Secretary of State a writ of habeas corpus on the ground that he in the exercise of his discretion is not prepared to advise His Majesty that the order under which he was detained ought to be done away with would be stretching the law of habeas corpus to an extent to which in my opinion it never has gone." The Chief Justice does not expressly say what his view would have been as to addressing the writ to the Secretary of State if he had come to the conclusion that there was no Court in the Protectorate competent to issue and enforce a writ of habeas.

As I have come to the conclusion, which I shall presently express, that the proclamation under which Sekgome is detained is valid, and that his detention is lawful, it is not necessary for me to determine this point, but even if, as I am inclined to think, a writ could not properly be addressed to the Secretary of State in a case where a writ of habeas could properly be issued in England into the Protectorate, I should, as at present advised, not be prepared to hold that a writ could not be properly addressed to the High Commissioner as having control of the imprisonment of Sekgome, or to the gaoler of the prison in the Protectorate where Sekgome is detained.

With regard to the address of the writ to the gaoler, I regret that the advisers of the Crown refused to consent, on our

suggestion, to the amendment of the writ by the addition of the name of the gaoler, but there may have been good reasons for the refusal, as to which I am not in a position to express an opinion.

Having dealt with these preliminary questions, I will now pass to the discussion of the question of the validity of the proclamation. The first statute to which I will call attention is the Foreign Jurisdiction Act, 1890, which recites: "Whereas by treaty, capitulation, grant, usage, sufferance, and other lawful means, Her Majesty the Queen has jurisdiction within divers foreign countries, and it is expedient to consolidate the Acts relating to the exercise of Her Majesty's jurisdiction out of her dominions: Be it therefore enacted .... as follows: Sect. 1. It is and shall be lawful for Her Majesty the Queen to hold, exercise, and enjoy any jurisdiction which Her Majesty now has or may at any time hereafter have within a foreign country in the same and as ample a manner as if Her Majesty had acquired that jurisdiction by the cession or conquest of territory. Sect. 2. Where a foreign country is not subject to any government from whom Her Majesty might obtain jurisdiction in the manner recited by this Act, Her Majesty shall by virtue of this Act have jurisdiction over Her Majesty's subjects for the time being resident in or resorting to that country, and that jurisdiction shall be jurisdiction of Her Majesty in a foreign country within the meaning of the other provisions of this Act. Sect. 3. Every act and thing done in pursuance of any jurisdiction of Her Majesty in a foreign country shall be as valid as if it had been done according to the local law then in force in that country. Sect. 4. If in any proceeding, civil or criminal, in a court in Her Majesty's dominions, or held under the authority of Her Majesty, any question arises as to the existence or extent of any jurisdiction of Her Majesty in a foreign country a Secretary of State shall on the application of the court send to the court within a reasonable time his decision on the question, and his decision shall for the purposes of the proceeding be final (2.) The court shall send to the Secretary of State, in a document under the seal of the court, or signed by a judge of the court, questions framed so as properly to raise the question, and sufficient answers to those questions shall be returned by the

Secretary of State to the court, and those answers shall, on production thereof, be conclusive evidence of the matters therein contained. Sect. 5. (1.) It shall be lawful for Her Majesty the Queen in Council, if she thinks fit, by order to direct that all or any of the enactments described in the First Schedule to this Act, or any enactments for the time being in force amending or substituted for the same, shall extend, with or without any exceptions, adaptations, or modifications in the order mentioned, to any foreign country in which for the time being Her Majesty has jurisdiction. (2.) Thereupon those enactments shall, to the extent of that jurisdiction, operate as if that country were a British possession, and as if Her Majesty in Council were the Legislature of that possession." Sect. 6 is to the effect that where a person is charged with an offence cognizable by a British Court in a foreign country any person having authority derived from Her Majesty in that behalf may send persons charged with offences for trial to a British possession. "Sect. 8. Where by Order in Council made in pursuance of this Act any British court in a foreign country is authorized to order the removal or deportation of any person from that country, that removal or deportation, and any detention for the purposes thereof, according to the provisions of the Order in Council, shall be as lawful as if the order of the court were to have effect wholly within that country." Sect. 9 gives power to confer on any Court in any British possession any jurisdiction, civil or criminal, original or appellate, which may lawfully by Order in Council be conferred on any British Court in any foreign country. Sect. 11 provides for the laying before Parliament of Orders in Council, which thereupon shall have effect as if enacted in this Act. Sect. 12 avoids Orders in Council for repugnance with the provisions of Acts of Parliament extending to Her Majesty's subjects in protectorates. "Sect. 16. In this Act, - The expression 'foreign country' means any country or place out of Her Majesty's dominions. The expression 'British court in a foreign country' means any British court having jurisdiction out of Her Majesty's dominions in pursuance of an Order in Council whether made under any Act or otherwise. The expression 'jurisdiction' includes power."

*[1910] 2 K.B. 576 Page 596*

I have read the observations of Mr. W. E. Hall upon p. 221 of his book on Foreign Jurisdiction of the British Crown, in which he says that it is doubtful whether this Act, or any of the prior Acts relating to foreign jurisdiction, deal with anything else than a strictly extra-territorial jurisdiction limited to His Majesty's own subjects. I think that the power given by s. 5 of the Act of 1890 to extend the operation of certain repealed enactments in the First Schedule to any foreign country in which for the time being Her Majesty has jurisdiction as if the country were a British possession, and as if Her Majesty in Council were the Legislature of the possession, rather favours the limitation of the statute to Her Majesty's subjects suggested by Mr. Hall; and I think that ss. 2 and 12 recognize this limitation of extra-territorial jurisdiction to Her Majesty's subjects. I think, however, that the interpretation which has been acted upon for so many years in Orders of Council and the proclamations thereunder applying the provisions of the Foreign Jurisdiction Act, 1890, to natives of such foreign countries as well as to British subjects resident in or resorting to such foreign country makes it impossible now to adopt the interpretation suggested by Mr. Hall. Before leaving the consideration of this statute it is as well to consider paragraph 4 of the affidavit of Lord Crewe: "The Bechuanaland Protectorate is a foreign country within which His Majesty has power and jurisdiction by treaty, grant, usage, sufferance, or other lawful means within the meaning of the Foreign Jurisdiction Act, 1890. The territory of the said Protectorate is foreign territory under His Majesty's protection. It has never been acquired by settlement or ceded to or conquered or annexed by His Majesty, or any of his Royal predecessors, nor has His Majesty, or any of his Royal predecessors, recognized the same as, nor is it, part of his dominions, but he has power and jurisdiction within the same." It is also necessary to bear in mind when considering the effect and validity of proclamations that the Act of 1890, while recognizing the authority of the Queen in Council, specifies, in respect of certain subjects, powers which it shall be lawful for the Crown to exercise by Order in Council, and then by s. 11 provides that "every Order in Council made in pursuance of

*[1910] 2 K.B. 576 Page 597*

this Act shall be laid before both Houses of Parliament forthwith after it is made, if Parliament be then in session, and if not, forthwith after the then next session of Parliament, and shall have effect as if it were enacted in this Act"; and then by s. 12 enacts that "(1.) if any Order in Council made in pursuance of this Act as respects any foreign country is in any respect repugnant to the provisions of any Act of Parliament extending to any of Her Majesty's subjects in that country, or repugnant to any order or regulation made under the authority of any such

Act of Parliament, or having in the country the force and effect of any such Act, it shall be read subject to that Act, order, or regulation, and shall to the extent of such repugnancy, but not otherwise, be void. (2.) An Order in Council made in pursuance of this Act shall not be, or be deemed to have been, void on the ground of repugnancy to the law of England unless it is repugnant to the provisions of some such Act of Parliament, order, or regulation as aforesaid." I gather from the words of the Lord Chancellor in *Staples v. The Queen* (1) that the Act of Parliament referred to in s. 12 is an Act of Parliament expressly dealing with Her Majesty's subjects in that country, and not an Act of Parliament such as the Magna Charta, which, of course, does not deal with that country.

I will now deal with the Orders in Council and proclamations so far as material. The Order in Council of May 9, 1891, begins with a recital of the words of the Foreign Jurisdiction Act, 1890 (I may mention, perhaps, here that the whole of Bechuanaland and the Bechuanaland Protectorate were down to 1885 a Protectorate, and then in 1885 part of the Bechuanaland Protectorate was turned into British Bechuanaland, and what was not turned into British Bechuanaland is the part now that is the Protectorate): "Whereas by treaty, grant, usage, sufferance, and other lawful means, Her Majesty has power and jurisdiction in the said territories" (namely, territories limited by the Order which admittedly include the Protectorate); and concludes with these words: "Now therefore Her Majesty by virtue and in exercise of the powers by the Foreign Jurisdiction Act, 1890, or otherwise in Her Majesty vested, is pleased by and with the

(1)    Judicial Committee, 1899, unreported.

*[1910] 2 K.B. 576 Page  598*

advice of her Privy Council to order, and it is hereby ordered as follows:-" Sect. 1 defines the territorial limits of the Order, and s. 2 enacts that "the High Commissioner may on Her Majesty's behalf exercise all powers and jurisdiction which Her Majesty at any time before or after the date of this Order had or may have within the limits of this Order, and to that end may take or cause to be taken all such measures, and may do or cause to be done all such matters and things within the limits of this Order as are lawful, and as in the interest of Her Majesty's service he may think expedient, subject to such instructions as he may from time to time receive from Her Majesty or through a Secretary of State." Much argument was addressed to us by Mr. Lush on the meaning of the word "lawful" in the abovecited section, which, he argued, intended the personal prerogative of the Sovereign. In my opinion "lawful" in this Order in Council means lawful in the sense of consistent with the Foreign Jurisdiction Act, 1890, which, it will be observed, limits to a considerable degree, notably by s. 12, amongst other sections, the power of legislation by proclamation. Then follows s. 3, which enables the High Commissioner to appoint deputy commissioners, resident commissioners, assistant commissioners, judges, magistrates, or other officers and to define their duties, and authorizes such officers to exercise such powers as the High Commissioner may assign to them, subject to the directions of the High Commissioner from time to time; and further provides that the appointment of such officers shall not abridge, alter, or affect the right of the High Commissioner to execute and discharge all the powers by the Act conferred upon him. Sect. 4 enables the High Commissioner "by proclamation" from time to time to "provide for the administration of justice, the raising of revenue, and generally for the peace, order and good government of all persons within the limits of this Order, including the prohibition and punishment of acts tending to disturb the public peace"; and provides that "the High Commissioner in issuing such proclamation shall respect any native laws or customs by which the civil relations of any native chiefs, tribes, or populations under Her Majesty's protection are now regulated, except so far as the same may be incompatible with the due exercise of

*[1910] 2 K.B. 576 Page  599*

Her Majesty's power and jurisdiction." Sect. 5 provides for the proclamation being published in the Gazette and continuing in force until disallowed. Sect. 6 enacts that "Her Majesty may disallow any such proclamation wholly or in part, and may signify such disallowance through a Secretary of State, and upon such disallowance

being publicly notified by the High Commissioner in the Gazette the provisions so disallowed shall, from and after a date to be mentioned in such notification, cease to have effect, but without prejudice to anything theretofore lawfully done thereunder." This section goes to negative permanency in the system of laws accorded to the Protectorate and to exclude the application of the fourth and sixth rules laid down by Lord Mansfield in *Campbell v. Hall*. (1) In fact, however, no such disallowance has been notified in respect of the Proclamation of September 14, 1906, dealing with persons ordered to leave the Protectorate as being dangerous to peace and order, a proclamation which would seem to govern Sekgome's case. Sect. 7 provides for the exercise of jurisdiction under this Order by the Courts of British Bechuanaland, but only to the extent directed by the Governor by proclamation. It is to be noted no such proclamation has, in fact, been made. Sect. 8 provides that jurisdiction exercisable otherwise than under this Order shall remain in force.

I will now deal with the Proclamation of June 10, 1891, which seems to me to provide a complete system for the administration of justice, including the appointment of resident commissioners, assistant commissioners, judges, magistrates, and other officers, with such powers as the High Commissioner may assign, subject to the provisions of the Order. Sect. 1 limits the powers of the resident commissioners to such parts of the territories within the limits of the orders as shall be assigned to them. By s. 3 every resident commissioner is thereby empowered "to exercise jurisdiction in and adjudicate upon all causes, suits, and actions whatsoever, civil or criminal," within the territory assigned to him. Sect. 4 makes it "lawful for any assistant commissioner or magistrate duly appointed for the said territory to hold a court at such place or places as shall be fixed, and to exercise such jurisdiction as

(1)    1 Cowp. at p. 208.

[1910] 2 K.B. 576 Page  600

shall be conferred by law, or defined in and by his commission." Sect. 8 provides that the jurisdiction of the Courts held under this proclamation "shall not extend to any matter in which natives only are concerned unless in the opinion of such court the exercise of such jurisdiction is necessary in the interests of peace or for the prevention or punishment of acts of violence to person or property." Sect. 9 provides that in native cases native law is to be followed. Sect. 10 provides for the appointment of native chiefs to exercise jurisdiction. Sect. 13 provides that legal proceedings, including sentences, judgments, and orders, are to be carried on in open Court. Sect. 16 provides for appeal in all cases from any judgment or decision of any assistant commissioner, magistrate, or inspector of police, having jurisdiction over the matter in dispute. Sect. 18 provides that every resident commissioner shall have full power and authority to review and correct the proceedings of all Courts and officers in the territory assigned to him in all cases and proceedings whatsoever. Sect. 19 provides: "Subject to the foregoing provisions of this proclamation, in all suits, actions, or proceedings, civil or criminal, the law to be administered shall, as nearly as the circumstances of the country will permit, be the same as the law for the time being in force in the Colony of the Cape of Good Hope." It seems to be common ground that in effect proceedings by way of writ of habeas corpus can be taken and enforced by the law of the Colony of the Cape of Good Hope.

By Proclamation dated March 2, 1895, the High Commissioner directed that the rules, orders, and regulations respecting the manner and form of proceeding in civil and criminal cases before the Court of any resident commissioner in the Protectorate should, mutatis mutandis, and so far as the circumstances of the said Protectorate would admit, be the same as those of the Supreme Court of the Colony of the Cape of Good Hope; then, by Proclamation of February 11, 1896, that assistant commissioners and resident magistrates in the Protectorate should have jurisdiction in all civil and criminal suits and proceedings over and against all persons residing within their respective areas of jurisdiction. By the said proclamation (February 11, 1896), it was further provided that all the powers of the Supreme Court

[1910] 2 K.B. 576 Page  601

of the Cape Colony should in the said Protectorate be exercised by the resident commissioner within his area, provided, nevertheless, that no original civil action, suit, or proceeding should be instituted in his Court in the first instance as therein mentioned. The Proclamation of September 14, 1906, after reciting that by the Order of May 9, 1891, the High Commissioner was empowered to provide for the peace, order, and good government of all persons within the limits of the said Order, repeals an Order of June 30, 1891, and provides that the High Commissioner may order any person dangerous to peace and order to leave the Protectorate, and provides for a penalty to be inflicted by a resident commissioner, assistant commissioner, or magistrate in case of failure to comply with the order of the High Commissioner. Sect. 3 provides for such dangerous person being removed from the Protectorate by warrant under the hand of the resident commissioner, and for a severe penalty on conviction in case of return after removal. This proclamation only differs in severity from a similar Proclamation of June 30, 1891, and has never been disallowed in the manner provided by s. 6 of the Order in Council of May 9, 1891. [The Lord Justice then read the Proclamation of December 5, 1906, set out above, and continued:-]

I think I have now detailed sufficiently the statutes, the Orders in Council, and the proclamations relied on by the Crown, which I shall now set forth. The contentions put forward on behalf of the Crown seem to be briefly: 1. That the Act of 1862 prevents the issue of a habeas corpus in the Protectorate because the Bechuanaland Protectorate is, as stated in the affidavit of Lord Crewe, a foreign country within which His Majesty has power and jurisdiction by treaty, grant, usage, sufferance, or other lawful means within the meaning of the Foreign Jurisdiction Act, 1890, and because the Protectorate is, within the meaning of s. 1 of the Habeas Corpus Act, 1862, a foreign dominion of the Crown where His Majesty has a lawfully established Court or Courts of justice having authority to grant and issue a writ of habeas and to ensure the due execution thereof throughout such colony or dominion, and because by s. 1 of the said Act no writ of habeas shall issue out of England

*[1910] 2 K.B. 576 Page 602*

into any colony or foreign dominion. 2. Because the Order in Council of May 9, 1891, is a lawful and valid Order affecting the Bechuanaland Protectorate, and because the proclamations of the High Commissioner from June 10, 1891, down to and inclusive of the Proclamation of December 5, 1906, are lawful and valid proclamations. 3. Because Lord Crewe, to whom the rule nisi is addressed, has not the custody of the body of Sekgome according to the statutes and principles relating to the writ of habeas corpus. 4. Because the arrest and detention of Segkome are acts of State.

As to contention 1, I do not think that the Act of 1862 has any application to the Protectorate, and it does not therefore seem to me that the question as to whether, within the meaning of that Act, there is within the Protectorate a lawfully established Court or Courts of justice of His Majesty having authority to grant and issue a writ of habeas corpus and to ensure the due execution thereof throughout such colony or dominion, arises, but, taking this view, it is convenient here to note that in my opinion, even if the Act of 1862 did apply, there would be considerable difficulty as to the existence of a Court with authority to grant a habeas, for I do not find anything in the statutes, Orders in Council, or proclamations which satisfies me as to the existence of such a Court with such power to ensure due execution of a writ of habeas, and, at all events, the terms of the Proclamation of December 5, 1906, negative the existence of such a Court as far as Sekgome is concerned. I do not forget that s. 7 of the Order in Council of May 9, 1891, provides that "the courts of British Bechuanaland shall have in respect of matters occurring within the limits of this Order the same jurisdiction, civil and criminal, original and appellate, as they respectively possess from time to time, in respect of matters occurring within British Bechuanaland, and the judgments, decrees, orders, and sentences, of any such court made or given in the exercise of the jurisdiction hereby conferred may be enforced and executed, appeals therefrom may be had and prosecuted in the same way as if the judgment, decree, order, or sentence, had been made or given under the ordinary jurisdiction of the court. But the jurisdiction hereby conferred shall only be exercised by such

*[1910] 2 K.B. 576 Page 603*

courts, and in such manner and to such extent as the Governor of British Bechuanaland shall by proclamation from time to time direct." No such proclamation has been issued, as was admitted in argument by Mr. Rowlatt, who said that the Courts of British Bechuanaland have not been empowered to deal with the jurisdiction given

**184**

by clause 7. I do not, however, think it necessary to discuss further the question as to the existence in the Protectorate of a Court having authority to issue a writ of habeas corpus and to ensure the due execution thereof, because, as I have already said, I am of opinion that the Act of 1862 has no application whatsoever to the Protectorate.

As to contention 2 - namely, that the Order in Council of May 9, 1891, is a valid order affecting the Protectorate, and that the proclamations of the High Commissioner from June 10, 1891, down to and inclusive of the Proclamation of December 5, 1906, are lawful and valid proclamations - the Lord Chief Justice, while treating the Order in Council and Proclamations generally as lawful and valid, declines to express any opinion as to the Proclamation of December 5, 1906. I have, however, myself come to the conclusion that the Proclamation of December 5, 1906, is valid, and I think it right to give my reasons. Generally, I may say, I am of opinion that it is impossible for us to say that at the date of the Order in Council of May 9, 1891, the territory, the subject of that Order, was not a foreign country, that is, a country out of Her Majesty's dominions. The territory constituting the Protectorate of Bechuanaland had not been annexed so as to become part of Her Majesty's territorial dominions, and, as stated by Lord Crewe, "the territory of the Bechuanaland Protectorate is foreign territory under His Majesty's protection; it has never been acquired by settlement, or ceded to, or conquered, or annexed, by His Majesty, or any of his Royal predecessors, nor has His Majesty, or any of his Royal predecessors, recognized the same as, nor is it, part of his dominions, but he has power and jurisdiction within the same." The Order in Council of May 9, 1891 (as amended by the Protectorate Order in Council of July 30, 1891), made under the Foreign Jurisdiction Act, 1890, recognized on behalf of Queen Victoria this state of things. Bechuanaland Protectorate is under

*[1910] 2 K.B. 576 Page 604*

His Majesty's dominion in the sense of power and jurisdiction, but is not under his dominion in the sense of territorial dominion. It is to be noted that s. 16 of the Foreign Jurisdiction Act provides that the expression "jurisdiction" includes "power." Assuming, then, the jurisdiction of the High Commissioner to make proclamations, what are the objections to this Proclamation of December 5, 1906? First it is said that this proclamation not only indemnifies the resident commissioner for acts done in connection with the past detention of Sekgome, but also provides for his future detention under a warrant of the High Commissioner without any regard to the Proclamation of September 14, 1906, which sets forth the administrative and judicial procedure to be applied in cases where there are reasonable grounds for believing that the presence of any person within the protectorate is dangerous to its peace, order, or good government, and defines the penalties to be imposed on conviction before a resident commissioner, assistant commissioner, or resident magistrate. It is said that this Proclamation of December 5, 1906, ignores a proclamation which has never been disallowed and is still in full force. This is the objection which has caused me the greatest doubt. If the Proclamation of December 5, 1906, is regarded as legislation it is difficult to see how the Proclamation of December 5 can be reconciled with that of September 14. The Proclamation of December 5 cannot be regarded as a mere indemnity for past acts; it is really a proclamation of the outlawry of a particular person, but I am not prepared to say that such a proclamation is not a proclamation which may be made by the High Commissioner in his discretion for the maintenance of peace, order, and good government of all persons within the limits of the Order of May 9, 1891, s. 4, nor can I say that such an exercise of discretion is taken away by the express provisions for criminal procedure in the Order of September 14, 1906.

As to contention 3, that Lord Crewe, to whom the rule nisi is addressed, has not the custody of the body of Sekgome, I have already stated that I am by no means satisfied that, having regard to the statute 16 Car. 1, c. 10, s. 6 and s. 8, actual custody of the body by the person to whom the writ is addressed is essential to the issue of the writ of habeas.

*[1910] 2 K.B. 576 Page 605*

I have already expressed my doubts as to whether the writ of habeas needs must be addressed to the person having actual custody of the person on whose behalf the writ of habeas is issued out, and have stated my view that such a writ can be properly addressed to the person who has such control that he can order the gaoler to release the prisoner, but it is said that the gaoler in this case is not the gaoler of the King and owes no obe-

dience to the orders of the High Court in England. I do not give much weight to this objection. The judgment of Cockburn C.J. in *Ex parte Anderson* (1) makes it clear that before the statute of 1862 the writ would have run in the colonies and other the King's territorial dominions and in countries conquered by the King, such as Calais, and could have been ordered to issue by the Court of King's Bench in England. This being so, I ask myself why, if the writ of habeas can be issued to the King's territorial dominions, the writ should not be ordered to go to any country or place under the subjection of the Crown of England whenever it is suggested to the Court in England that a subject of the Crown is illegally imprisoned. The very fact that Parliament by the Foreign Jurisdiction Act, 1890, and the earlier Acts dealing with foreign jurisdiction is party to the exercise by the King of extra-territorial jurisdiction shews that the extra-territorial jurisdiction of the King is not a merely personal jurisdiction. It is the King acting with the concurrence of Parliament, and although Cockburn C.J. in *Ex parte Anderson* (2) says "These writs of habeas corpus have been issued and are to be issued into all the dominions of the Crown of England whenever it has been suggested to the Court that a subject of the Crown is illegally imprisoned or illegally kept in custody," it is by no means clear that the Chief Justice meant by dominions territorial dominions as distinguished from dominions where the King with the concurrence of Parliament exercises jurisdiction and, in that sense, dominion. It is plain from the case of *Ex parte Anderson* (1) itself, and from the case of *Carus Wilson* (3), that the Courts in England have not allowed inconvenience which might arise in giving effect to the writ

(1)    3 E. & E. 487; 30 L. J. (Q.B.) 129.

(2)    30 L. J. (Q.B.) at p. 132.

(3)    7 Q. B. at p. 998.

*[1910] 2 K.B. 576 Page  606*

to be a ground for refusing to issue it, or been deterred from ordering the writ to go because of the possibility of disobedience arising from the mode of possession. In the present case the King has every means of enforcing obedience. The Crown, with the concurrence of Parliament, has exercised jurisdiction throughout the Bechuanaland Protectorate and has appointed judges and police officers to execute their judgment, and has established Courts which the Crown contends, I think wrongly, have power to issue a writ of habeas and enforce it; in short, has established laws which the dwellers in the Protectorate, whether natives or mere residents, must obey, and from which they surely must be entitled to receive protection when injured. Is the mere fact of absence of annexation and theoretical possession to deprive the Crown and those who are under the law from the benefits and power of the writ of habeas? But even if it is not essential that the writ of habeas should be addressed to the person having actual custody of the body, and sufficient if the writ is addressed to a person having control of the person having the actual custody of the body, I think that it is Lord Selborne, the High Commissioner, to whom a writ of habeas should be addressed, and not the Colonial Secretary, who has no control over Sekgome's custody, and can only advise.

The fourth contention of the Crown is that the arrest and detention of Sekgome are acts of State which cannot be questioned in the law courts. I am inclined to think that, assuming the Protectorate of Bechuanaland is a country which has never been annexed, this contention is well founded. I am assuming that no act of the Crown has since the creation of the Protectorate constituted a grant to the inhabitants of the Protectorate of a constitution; I assume this because, although the grant to a ceded or conquered country of a complete system of laws may constitute an irrevocable grant of a constitution, yet there is no such grant in the present case, because the Order in Council which provided a system of laws made that provision on the express condition that

Her Majesty might disallow wholly or in part any proclamation, and because the Secretary of State tells us by his affidavit that the Bechuanaland Protectorate has never been acquired by settlement by His Majesty. I do not

*[1910] 2 K.B. 576 Page 607*

think it necessary to express any opinion as to what might be the rights of an Englishman resorting temporarily to the Protectorate in respect of the grant of a writ of habeas, because no such question is raised in the present case, and I have not therefore to consider the effect upon such a question of the first three sections of the Foreign Jurisdiction Act. It is said that Sekgome is a British subject, and it is so sworn in one of the affidavits for the Crown, but he is not a British subject in the sense in which I have just spoken. It may be that an Englishman resorting to the Bechuanaland Protectorate carries the habeas with him, but Sekgome certainly does not. Generally, I think that the result of the Foreign Jurisdiction Act, 1890, and the proclamations thereunder is in respect of the Bechuanaland Protectorate to give His Majesty absolute power, subject to the provisions of any Act of Parliament, to say from time to time what law should be applied in these territories outside His Majesty's dominions, just as if the territory had been the subject of absolute conquest, since in my opinion there has been no annexation and no constitution has been granted. I am of course speaking wholly independently of any international view. The result is that the Foreign Jurisdiction Act, 1890, gave to Her Majesty absolute power to say what law should be applied in these territories outside Her Majesty's dominions as if the territory had been acquired by cession or absolute conquest, or, as Lord Halsbury said during the argument in *Staple's Case* (1), which was a case governed by the Foreign Jurisdiction Act, 1890, "There is no doubt that under such circumstances as these" (namely, where there has been no annexation) "the Queen may make such laws as she pleases."

In conclusion, I have no doubt but that in the Act of 1862 dominion is used in the sense of territorial dominion, nor but that in the Foreign Jurisdiction Act, 1890, when the expression "out of Her Majesty's dominions" is used it means outside Her Majesty's territory. I have no doubt but that at the date of the Order in Council of May 9, 1891, the Protectorate was outside the territorial dominion. I recognize that a country which originally was a foreign country outside the territorial dominions

(1)    Unreported.

*[1910] 2 K.B. 576 Page  608*

of the Crown might in course of time become a part of the territorial dominions of the Crown, and this by the acts of the Crown without any formal act of annexation, especially in a case where the land in question had ceased to be a land in which British subjects were, to use the words of s. 2 of the Foreign Jurisdiction Act, 1890, "British subjects for the time being resident in or resorting to that country," but had become a British settlement by virtue of the extent to which British subjects had permanently settled there with the assent of the Crown, but I do not find any evidence leading to the conclusion that the Bechuanaland Protectorate has ceased to be a foreign country outside the territorial dominions of the crown. I am inclined to think that in a case where the King legislates by proclamation, by virtue of an Act of Parliament, such as the Foreign Jurisdiction Act, 1890, the mere fact of the country not having been annexed, and being extra-territorial, would not prevent the issue by the King's Bench Division, or the judges of the High Court, of a writ of habeas to run in a country governed by a system of laws created under the powers of such an Act of Parliament, especially in a case where the laws thus created apply to British subjects for the time being resident in or resorting to the country in question; but in the present case one has to remember that we are dealing with Orders in Council which, having been "laid before Parliament," have effect as if they had been enacted in the Foreign Jurisdiction Act, 1890, itself, and that the Order in Council of May 9, 1891 (as amended by the Order in Council of July 30, 1891), by ss. 5 and 6 provides for the disallowance of any proclamation wholly or in part, and that the proceedings taken against Sekgome are warranted by the Proclamation of December 5, 1906, which itself, by clause 5, provides that no writ or process calling in question the arrest or detention of Sekgome shall have any effect within the Protectorate. All this

**187**

seems to exclude the application of the fourth and sixth of the propositions laid down by Lord Mansfield in his judgment in *Campbell v. Hall*. (1)

On the whole I think that the effect of these proclamations made under the authority of the Foreign Jurisdiction Act, 1890,

_____

(1)  1 Cowp. at pp. 208, 209.

*[1910] 2 K.B. 576 Page 609*

is to prevent Sekgome obtaining in this country or in the Courts of the Protectorate a writ of habeas, and I am also of opinion that if he were refused in the Courts of the Protectorate a writ of habeas, a hearing, or an application for such a writ, an appeal would lie to the Privy Council; and further that, even if, as suggested by Mr. Hall, the operation of the Foreign Jurisdiction Act, 1890, is so limited to British subjects that it does not authorize so far as natives are concerned the issue of these proclamations, a contention with which I cannot agree, his detention would be justified as an act of State.

I have omitted to mention the contention of Mr. Lush based on the Order in Council of May 16, 1904. This Order in council begins with a recital of the jurisdiction of the King, quoting from the very words of the preamble of the Foreign Jurisdiction Act, 1890. Then follows a recital: "And whereas the chiefs Khama, Sebele, and Bathon have abandoned all rights and jurisdiction in and over a certain portion of their former territories," and then it proceeds to make an order specifically by virtue of and in the exercise of the powers on this behalf by the Act of 1890 or otherwise in His Majesty vested. It is admitted that Crown lands as defined by s. 1 of this Order includes Gaberones, the place where Sekgome is now detained. Sect. 2 vests all rights of His Majesty in or in relation to any Crown lands in the High Commissioner on behalf of His Majesty, and gives the High Commissioner power to make grants or leases of any Crown lands subject to the directions received from one of His Majesty's principal Secretaries of State. Sect. 3 enacts that this Order may be cited as The Bechuanaland Protectorate (Lands) Order in Council, 1904. Mr. Lush argued that the effect of this Order was that these lands were no longer out of His Majesty's dominions within the meaning of s. 16 of the Foreign Jurisdiction Act, 1890, and were annexed by the King by the effect of the provisions of the Order. I cannot agree. I think that the effect of the Order is to leave these Crown lands out of His Majesty's dominions.

This appeal must be dismissed with costs. The idea that there may be an established system of law to which a man owes

*[1910] 2 K.B. 576 Page 610*

obedience, and that at any moment he may be deprived of the protection of that law, is an idea not easily accepted by English lawyers. It would be more congenial to our love as a nation of liberty and justice to act on the eloquent words of Lord Watson in *Sprigg v. Sigcau* (1), but the country in that case was an annexed country under the Pondo Annexation Act, and our single duty is to construe the Foreign Jurisdiction Act, 1890, the Orders in Council, and proclamations made thereunder. It is made less difficult if one remembers that the Protectorate is over a country in which a few dominant civilized men have to control a great multitude of the semi-barbarous.

FARWELL L.J. read the following judgment:- In 1906 a dispute had arisen between the appellant and one Mathibe as to the chieftainship of the Batawana tribe in the Bechuanaland Protectorate, and the High Commissioner, considering the presence of the appellant within the limits of the Batawana tribe to be a danger to the peace of the tribe, and likely to lead to bloodshed and tribal war, caused him to be imprisoned at Gaberones,

a place outside the limits of the tribe, but within the Protectorate, and on December 5, 1906, issued a proc-lamation indemnifying the resident commissioner in respect of the detention, authorizing the High Commis-sioner to continue the detention, and to deport the appellant, and depriving him of all rights of calling in question his arrest, detention, or deportation by any process within the Protectorate. The appellant is still imprisoned at Gaberones.

The appellant obtained a rule nisi calling on Lord Crewe as Secretary of State for the Colonies to shew cause why a writ of habeas corpus should not issue requiring him to produce Sekgome in Court in England, or justify his detention, and he has justified the detention by the powers given to the High Commissioner by Orders in Council under the Foreign Jurisdiction Act, 1890, and in particular by an Order of May 9, 1891; and he further objects that no writ of habeas corpus can issue in this country by reason of the 25 & 26 Vict. c. 20, and also that the Secretary of State is in any case not answerable. The Divisional

(1)    [1897] A. C. 238.

*[1910] 2 K.B. 576 Page 611*

Court has adopted the last two contentions and has not decided the first.

The first contention is one of great importance, as it raises the question of the right of the Crown by Order in Council to create a despotism in the Protectorate, subject only to the provisions of any Act of Parliament ex-tending to His Majesty's subjects in the Protectorate (see s. 12 of the Foreign Jurisdiction Act, 1890) - a proposition that at first sight appears startling. It is, however, necessary to bear in mind the circumstances under which, and the countries to which, such Orders apply, and the real nature of such Orders, which, al-though called Orders in Council, in fact derive all such despotic authority as they possess from the Legislature, and not from the Crown.

The British Protectorate in Bechuanaland commenced in 1884 or 1885 by treaties with the native chiefs and by an Order in Council and Proclamation of 1885. The country was, and is, territory inhabited by natives who outnumber the white population probably by more than a hundred to one. There is no statutory definition of a Protectorate, nor has it received any judicial interpretation, but it is clear that, for the purposes of the Foreign Jurisdiction Acts, it means territory outside the dominions of the Crown, but over which the Crown exercises some jurisdiction; the origin and extent of the word is discussed by Sir John Macdonell in an article "Protec-torate" in the Encyclop'dia Britannica, vol. 32. The Crown has, of course, no jurisdiction over foreign territory except such as it has obtained by treaty, capitulation, grant, usage, sufferance, or other similar means; and when the Crown has obtained such jurisdiction as between itself and the foreign territory, such jurisdiction as between the crown and its own subjects is defined by the Act to be exercisable in the same and as ample a manner as if acquired by the cession or conquest of territory; and s. 11 provides that every Order in Council made in pursuance of the Act shall be laid before both Houses of Parliament forthwith after it is made, "and shall have effect as if it were enacted in this Act." The extent of the jurisdiction of the Crown is stated in Blackstone's Commentaries, vol. 1, p. 108, and in a note to chapter 1 of Forsyth's Cases and Opinions,

*[1910] 2 K.B. 576 Page 612*

p. 12, where a large number of cases are collected. Lord Mansfield says in *Campbell v. Hall* (1), "A country conquered by the British arms becomes a dominion of the King in the right of his Crown; and therefore nec-essarily subject to the Legislature, the Parliament of Great Britain." That is the first of Lord Mansfield's propo-sitions. Then, "The sixth and last proposition is that if the King (and when I say the King I always mean the King

**189**

without the concurrence of Parliament) has a power to alter the old and to introduce new laws in a conquered country, this legislation being subordinate, that is, subordinate to his own authority in Parliament, he cannot make any new change contrary to fundamental principles; he cannot exempt an inhabitant from that particular dominion; as for instance, from the laws of trade, or from the power of Parliament, or give him privileges exclusive of his other subjects; and so in many other instances which might be put." Lord Mansfield's first proposition assumes a proposition which is self-evident, namely, that the Royal jurisdiction may be extended by Act of Parliament. It follows, therefore, that Crown and Parliament together can by enactment make provisions which the Crown alone could not direct, and this is, in my opinion, the solution of the present case. The matters complained of have been done not merely by authority of the Crown, but by authority of Crown and Legislature, for the proclamation under the Order in Council of May 9, 1891, has effect after a date long past as if it were contained in the Order. Clause 5 of the Order says: "Every proclamation of the High Commissioner shall be published in the Gazette, and shall from and after a date to be mentioned in such proclamation, and thereafter until disallowed by Her Majesty or repealed or modified by any subsequent proclamation, have effect as if contained in this Order"; and the Order itself, including the proclamation, is read into the Foreign Jurisdiction Act, 1890, under s. 11 thereof, and has effect as if it had been thereby enacted. It is under these powers of the Crown and Parliament that legislative assemblies in colonies with powers to legislate for peace, order, and good government have been created, and as such assemblies derived

(1)    1 Cowp. at pp. 208, 209.

[1910] 2 K.B. 576 Page 613

their powers from the Imperial Act creating them, and had no powers beyond those given expressly or by implication by such Act, questions arose as to the extent to which such legislative assemblies might disregard the common law and the statutory law of England. It was long ago recognized that such laws were not always expedient or advisable in all cases and in all countries, and accordingly by 28 & 29 Vict. c. 63 it was enacted, by s. 2, "Any colonial law which is or shall be in any respect repugnant to the provisions of any Act of Parliament extending to the Colony to which such law may relate, or repugnant to any order or regulation made under authority of such Act of Parliament, or having in the Colony the force and effect of such Act, shall be read subject to such Act, order or regulation, and shall, to the extent of such repugnancy, but not otherwise, be and remain absolutely void and inoperative." Then s. 3 says: "No colonial law shall be or be deemed to have been void or inoperative on the ground of repugnancy to the law of England, unless the same shall be repugnant to the provisions of some such Act of Parliament, order, or regulation as aforesaid." The Foreign Jurisdiction Act of 1890 follows on the same lines, and s. 12 is in almost identical terms.

The first question then is, What is the true construction of s. 12? It is clear that repugnancy to the law of England is permitted, as is also any repugnancy to statute law not being repugnancy to the provisions of any Act of Parliament extending to His Majesty's subjects "in that country," that is, the country to which the Order in Council relates. Now these words in a colonial Act have received interpretation in the Exchequer Chamber and in the Privy Council. In *Phillips v. Eyre* (1) the Legislature of Jamaica had passed an Act indemnifying Governor Eyre for certain things done by him in suppressing a negro rising; the plaintiff Phillips had been flogged and imprisoned by his orders, and both the Queen's Bench and the Exchequer Chamber held that the Act had deprived the plaintiff of all remedy. Willes J., in giving judgment, says (2): "It was further argued that the Act in question was contrary to the principles of English law, and therefore void. This is a vague expression, and must

(1)    L. R. 4 Q. B. 225; L. R. 6 Q. B. 1.

(2)    L. R. 6 Q. B. at p. 20.

*[1910] 2 K.B. 576 Page  614*

mean either contrary to some positive law of England, or to some principle of natural justice, the violation of which would induce the Court to decline giving effect even to the law of a foreign sovereign State. In the former point of view, it is clear that the repugnancy to English law which avoids a colonial Act means repugnancy to an imperial statute or order made by authority of such statute applicable to the colony by express words or necessary intendment; and that, so far as such repugnancy extends, and no further, the colonial Act is void." He also dealt with the objection that the Act was against natural justice at p. 23. He says: "It was further objected, that the colonial law was contrary to natural justice, as being retrospective in its character, and taking away a right of action once vested, and that for this reason, like a foreign law against natural justice, it could have no extra-territorial force." And, after discussing the matter, he concludes thus at p. 27: "In fine, allowing the general inexpediency of retrospective legislation, it cannot be pronounced naturally or necessarily unjust. There may be occasions and circumstances involving the safety of the State, or even the conduct of individual subjects, the justice of which, prospective laws made for ordinary occasions and the usual exigencies of society for want of prevision fail to meet, and in which the execution of the law as it stood at the time may involve practical public inconvenience and wrong, summum jus summa injuria. Whether the circumstances of the particular case are such as to call for special and exceptional remedy is a question which must in each case involve matter of policy and discretion fit for debate and decision in the Parliament which would have had jurisdiction to deal with the subject-matter by preliminary legislation, and as to which a Court of ordinary municipal law is not commissioned to inquire or adjudicate." This answers Mr. Lush's argument that legislation directed against a particular individual and depriving him of the rights given to all the other inhabitants of the country is contrary to natural justice; if it is necessary for the safety of the State, the freedom and even the life of the individual must be sacrificed to it. The unreported case of *Staples v. The Queen* in the Privy Council disposes of the argument founded on the Habeas Corpus Acts. The Board,

*[1910] 2 K.B. 576 Page  615*

consisting of Lord Halsbury, Lord Hobhouse, Lord Macnaghten, Lord Davey, and Sir Richard Couch, dismissed an application for leave to appeal against a conviction in Buluwayo for theft, by a judge and four assessors, on the ground that the appellant was entitled by Magna Charta to be tried by a jury. Their Lordships say this: "The repugnancy contemplated by the Foreign Jurisdiction Act, 1890, s. 12, must mean repugnancy to a statute or order applied in some special way to British subjects in the foreign country in question. It would be a most unreasonable limit on the Crown's powers of introducing laws fitting to the circumstances of its subjects in a foreign country if it were made impossible to modify any Act of Parliament which prior to the Order in Council might be invoked as applicable to a British subject."

It is true that the words in 16 Car. 1, c. 10, s. 6, are quite general, but the words in s. 12 of the Foreign Jurisdiction Act, 1890, "extending to Her Majesty's subjects in that country," are not satisfied by general words. The words in Magna Charta, "Nullus liber homo," are as general as those in the Habeas Corpus Act, but there are general words in most Acts of Parliament. The meaning of s. 12 is, in my opinion, that words must be used shewing either that the particular territory is included or that all localities are included; e.g., the Slave Trade Act, 1843, s. 1, extends and applies "to British subjects wheresoever residing or being and whether within the dominions of the British Crown or of any foreign country." No colonial Legislature or Order in Council could, in my opinion, abrogate or disregard this Act. It is said that the Habeas Corpus Acts are the bulwarks of liberty in our country, but even in the United Kingdom the Habeas Corpus Acts have been suspended by Act of Parliament when the public safety required. Fifteen instances between 1 William & Mary and 11 & 12 Victoria are given in Forsyth's Cases and Opinions, p. 452, and Magna Charta is as much a bulwark of our liberties as the latter Acts. The truth is that in countries inhabited by native tribes who largely outnumber the white population

such acts, although bulwarks of liberty in the United Kingdom, might, if applied there, well prove the death warrant of the whites. When the State takes the responsibility of Protectorates over such territories, its first duty

*[1910] 2 K.B. 576 Page 616*

is to secure the safety of the white population by whom it occupies the land, and such duty can best be performed by a responsible officer on the spot. There are many objections to the government of such countries from Downing Street, but the governor's position would be impossible if he were to be controlled by the Courts here, acting on principles admirable when applied to an ancient well ordered State, but ruinous when applied to semi-savage tribes. This view is supported by *Riel v. The Queen* (1), and there is nothing contrary to it in *Sprigg v. Sigcau* (2), which turned simply on the construction of a clause in a colonial Act, and Lord Watson's observations (3) are expressly applied "to a colony having a settled system of criminal law and criminal tribunals," a state of things very different from that existing in the Bechuanaland Protectorate.

I am, therefore, of opinion that the Crown by Order in Council (which by s. 11 of the Foreign Jurisdiction Act, 1890, has effect as if it was enacted in that Act) has power to make orders abrogating the Habeas Corpus Acts, either generally or in respect of a particular individual named therein. The ultimate authority for such abrogation is the Act of the Imperial Legislature, although the means adopted are an Order of the King in Council. I have assumed that the appellant's counsel are right in claiming that he is a British subject, so that the Foreign Jurisdiction Act applies to him, and it is therefore unnecessary to consider whether that Act applies or not to any but British subjects. If that Act did not apply, I could not hold that the Crown alone, without any Act of Parliament, could suspend the Habeas Corpus Act, or authorize the acts complained of by the appellant, but I fail to see how any Court can say that the Legislature - that is, the Crown, Lords, and Commons - has not jurisdiction to set up a despotism in any of the dominions of the Crown, or, indeed, in the United Kingdom itself, although the results might be even more disastrous than the attempt in the eighteenth century to tax the American Colonies.

The next question is whether the Order of May 9, 1891, has this effect. This is a question of the construction of that Order,

(1)    10 App. Cas. 675.

(2)    [1897] A. C. 238.

(3)    [1897] A. C. at pp. 246, 247.

*[1910] 2 K.B. 576 Page 617*

and I am of opinion that it has. It is made expressly in exercise of the powers given by the Foreign Jurisdiction Act, and provides that "The High Commissioner may on Her Majesty's behalf exercise all powers and jurisdiction which Her Majesty, at any time before or after the date of this Order, had or may have within the limits of this Order, and to that end may take or cause to be taken all such measures, and may do or cause to be done all such matters and things within the limits of this Order as are lawful, and as in the interest of Her Majesty's service he may think expedient, subject to such instructions as he may from time to time receive from Her Majesty or through a Secretary of State." It is said that the words "as are lawful" limit the construction to matters lawful in this country. In my opinion the meaning is "lawful within the meaning of the Foreign Jurisdiction Act,"

and this brings in s. 12 of that Act. The Proclamation of 1906 is made under clause 4 "for the peace, order and good government of all persons within the limits of the Order," including the prohibition and punishment of acts tending to disturb the public peace. The same words are found in the Canadian Act which was challenged in *Riel's Case* (1), where Lord Halsbury says that "they are apt to authorize the utmost discretion of enactment for the attainment of the objects pointed to. They are words under which the widest departures from criminal procedure as it is known and practised in this country have been authorized in Her Majesty's Indian Empire." I have already pointed out that under clause 5 of the Order the proclamation, after publication in the Gazette, which was done long ago, has effect as if it were contained in the Order, and as the Order has effect as if it were contained in the Act, the proclamation has effect in the same way. I am therefore of opinion that the Crown by virtue of the Act of 1890 had power to authorize and has authorized the detention of the appellant. It was suggested that Gaberones, the place where the appellant is confined, is not within the Protectorate. It is, however, stated to be so in the Proclamation of October 29, 1896, and even if by later proclamations Gaberones has been abandoned by the native chiefs and has become Crown land, it is not in my opinion

(1)    10 App. Cas. at p. 678.

*[1910] 2 K.B. 576 Page  618*

possible for us to hold that such lands have ceased to be protected and have become subject to the Crown in every sense. If this was a question intended to be raised on this application, the fact should have been proved by application by the Divisional Court to the Secretary of State under s. 4, sub-s. 2, of the Foreign Jurisdiction Act, 1890. In the absence of such evidence I think that we are bound to assume that Gaberones still remains a part of the Protectorate.

This disposes of the case, and it is not necessary for me to express an opinion on the other points that have been argued and on which the Divisional Court decided. I must not, however, be taken to assent to the view that there is any Court to which application for a writ of habeas corpus could be made within 25 & 26 Vict. c. 20, or to the view that the Secretary of State would not be the proper person to make a return to a writ of habeas corpus if there had been no Proclamation of December 5, 1906. Where a man who owes obedience to laws imposed by England is imprisoned and kept imprisoned without trial in a place maintained by England, and placed under the control of an officer of the Crown who acts under the orders of the Colonial Office, and who has acted in the particular case with the assent and approval of and is supported by the Colonial Office, I should be slow to conclude that the Secretary of State could not be called on to make a return to the writ. Both points are of great interest and importance, and I express no final opinion on either of them, but on the grounds already stated I am of opinion that this appeal must be dismissed.

KENNEDY L.J. The decision of this appeal appears to me to involve the consideration of five questions. (1.) Is Sekgome a British subject? (2.) Is Gaberones, where Sekgome is confined, part of a foreign dominion of the Crown within the meaning of 25 & 26 Vict. c. 20? (3.) If Gaberones is a part of a foreign dominion of the Crown, has His Majesty in such dominion a lawfully established Court having authority to grant and issue a writ of habeas corpus, and to ensure its due execution throughout such dominion within the meaning of the above-mentioned statute? (4.) Is the Proclamation of his Excellency the High

*[1910] 2 K.B. 576 Page  619*

Commissioner of South Africa dated December 5, 1906, where-under Sekgome was detained and is still detained at Gaberones, (*a*) valid, (*b*) an act of State which is not open to question in the present proceedings in the High court of Justice? (5.) Assuming that a case is made out for the grant and issue of a writ of habeas

corpus directed to the person or persons detaining Sekgome in custody at Gaberones, is His Majesty's Secretary of State for the Colonies such a person?

The first four of the foregoing questions are more or less closely connected with each other, and I shall so consider them; but the fifth is a distinct and independent question. If it must be answered adversely to the appellant his appeal fails, even if on all other points he should be entitled to succeed. I shall deal with it after dealing with the four connected questions.

Upon the first-question, namely, whether Sekgome is or is not a British subject, I think that the latter view is correct. Sekgome was born and has remained a member of a native African tribe called the Batawana tribe, dwelling in a region which has for some years (see Proclamation of March 29, 1899) become officially entitled "The Batawana Native Reserve," near Lake Ngami, within the Bechuanaland Protectorate. Now the features of Protectorates differ greatly, and of this a comparison of the British Protectorates of native principalities in India, the British Protectorate of the Ionian Islands between 1815 and 1864, the Protectorate of the Federated Malay States, and the Bechuanaland Protectorate as constituted by the Orders in Council and proclamation before mentioned, affords ample illustration. Other instances of Protectorates will be found in Wheaton, International Law, 4th ed., pp. 51 to 66. The one common element in Protectorates is the prohibition of all foreign relations except those permitted by the protecting State. Within a Protectorate, the degree and the extent of the exercise by the protecting State of those sovereign powers which Sir Henry Maine has described (International Law, p. 58) as a bundle or collection of powers which may be separated one from another, may and in practice do vary considerably. In this Bechuanaland Protectorate every branch of such government as exists - administrative, executive, and judicial - has been created and is

*[1910] 2 K.B. 576 Page 620*

maintained by Great Britain. What the idea of a Protectorate excludes, and the idea of annexation on the other hand would include, is that absolute ownership which was signified by the word "dominium" in Roman law, and which, though perhaps not quite satisfactorily, is sometimes described as territorial sovereignty. The protected country remains in regard to the protecting State a foreign country; and, this being so, the inhabitants of a Protectorate, whether native born or immigrant settlers, do not by virtue of the relationship between the protecting and the protected State become subjects of the protecting State. As Dr. Lushington said in regard to the inhabitants of the Ionian States, then under a British Protectorate, in his judgment in *The Ionian Ships* (1), "allegiance in the proper sense of the term undoubtedly they do not owe; because allegiance exists only between the Sovereign and his subjects, properly so called, which they are not." A limited obedience the dwellers within a Protectorate do owe, as a sort of equivalent for protection; and in the present case the Orders in Council relating to the Bechuanaland Protectorate and the proclamations of the High Commissioner made thereunder imply the duty of obedience on the part of Sekgome and other persons within the area of the Protectorate to a practically unlimited extent.

I have felt it to be right that I should deal with this question of Sekgome's political status, which was discussed by counsel at considerable length, but in truth it appears to me to have little materiality. In my opinion the mere fact that a person in detention ought to be considered as not being in the strict sense of the term a British subject could not in itself be treated as impairing the jurisdiction of the High Court of Justice to direct the issue of the writ, if it were shewn that his custodian was detaining him within a British dominion and claiming so to detain him in the exercise of powers conferred upon him by British jurisdiction. The remedy obtainable by the writ of habeas corpus is not confined to British subjects. The alien who is detained under a warrant of extradition is entitled to apply for a writ of habeas corpus in order to obtain release; and, subject, of course, to any question which may arise under the

(1)    (1855) 2 Ecc. & Adm. 212, at p. 226.

194

*[1910] 2 K.B. 576 Page 621*

limitations of the statute of 1862 (25 & 26 Vict. c. 20), if Gaberones, where Sekgome is detained, can rightly be held to be within the foreign dominions of the Crown, I do not think that the jurisdiction of the High court of Justice to issue the writ of habeas corpus could be affected in any way by the fact that Sekgome is not a British subject.

But the respondent raises several points which must now be considered: (1.) That if the locality of Sekgome's confinement is within the dominions of the Crown (which the respondent denies), there are lawfully established courts there which have authority to grant and issue a writ of habeas corpus and to ensure its due execution, and therefore the applicant here is barred by the provisions of 25 & 26 Vict. c. 20. (2.) That the place where Sekgome is confined is not within a "dominion" of the Crown, but forms part of a foreign country within which His Majesty has jurisdiction within the meaning of the Foreign Jurisdiction Act, 1890, and therefore is not a place into which a writ of habeas corpus should issue out of England. (3.) That the Proclamation of December 5, 1906, where under Sekgome is detained at Gaberones, is valid and conclusive against the issue of the writ.

With regard to the first of these three points I venture respectfully to dissent from the opinion which was expressed by the Lord Chief Justice of England in the Divisional Court, and which formed one of the two grounds upon which his judgment for the respondent is partly founded. I cannot find in any of the proclamations from the date of the Order in Council of May 9, 1891, down to the Proclamation of December 5, 1906, the creation of any court of justice in which Sekgome could obtain the relief which he seeks here by the issue of a writ of habeas corpus. And seeing that the same authority from which such Courts as exist in the Protectorate derive their origin and all their jurisdiction has by the Proclamation of December 5, 1906 (clause 1), ordained that "all acts done, permitted to be done, or sanctioned by the resident commissioner with the approval of the High Commissioner with regard to the detention of the said Sekgome prior to the commencement of this proclamation are hereby declared legal and valid, and no proceedings shall be taken to question the legality or validity of any such acts," and

*[1910] 2 K.B. 576 Page 622*

(clause 5) "No writ or process whatsoever calling in question the legality of the arrest, detention, or deportation of the said Sekgome, as the case may be, or any matter connected therewith shall have any effect within the Protectorate," I am at a loss to understand how the respondent can be heard to assert in the same breath that this proclamation is valid, and that there is a local Court which has authority to grant and issue a writ of habeas corpus in favour of Sekgome and to ensure its due execution. It is true that the Order in Council of May 9, 1891, does by paragraph 7 grant jurisdiction in respect of matters occurring within the Bechuanaland Protectorate to the courts of British Bechuanaland, but it is, by the same paragraph, to be exercised only if and in such manner and to such extent as the Governor of British Bechuanaland shall by proclamation from time to time direct. In fact, he has never given any such direction.

But then comes the question which is raised in what I have called the respondent's second contention, namely, "Is Gaberones, where Sekgome is incarcerated, a place within His Majesty's dominions? "Now I have not found anywhere, nor shall I attempt to formulate, a definition of "dominions." I think that in its ordinary force - the force which it must be taken to have unless the context or other circumstances necessarily involve a different interpretation - "His Majesty's dominions" means regions over and in which His Majesty has and exercises the whole collection or bundle of separable powers (to borrow the phraseology of Sir Henry Maine) which constitute territorial sovereignty. Possibly, as seems to have been the opinion of the Court at the trial of *Reg. v. Jameson* (1), in regard to the use of the expression in the Foreign Enlistment Act, it may, in a certain context or in connection with a particular subject-matter, properly be interpreted as meaning something less (see the report of the Privy Council, January 27, 1899, in the case of *Staples v. The Queen*, a manuscript copy of which was supplied to this Court at the hearing of this case). But I see no reason to assign to the phrase less than its

ordinary force when it occurs in the Habeas Corpus Act, 1862 (25 & 26 Vict. c. 20), in the preamble of the Foreign Jurisdiction Act, 1890, and in the

(1)    [1896] 2 Q. B. 425.

*[1910] 2 K.B. 576 Page 623*

judgment of the Court of Queen's Bench dealing with the question of the issue of the writ from the common law standpoint in the case of *Ex parte Anderson* (1), which was decided shortly before the Habeas Corpus Act, 1862, and which was, I believe, the cause of the passing of that statute. If this view is correct, the Protectorate of a foreign country in which His Majesty has and exercises power and jurisdiction as a protecting and not as a ruling Sovereign, and which he has never annexed to the possessions of the British Crown, certainly cannot properly be treated as part of His Majesty's dominions. The one and only fact, upon the evidence in the present case, which has presented to my mind any difficulty in so regarding the whole of this Bechuanaland Protec-torate has been this. It appears in the evidence, and is not disputed, that in regard to a portion of that Pro-tectorate, as established in March, 1885, and dealt with by the Order in Council of May 9, 1891, and in the subsequent proclamations made under that Order, the chiefs of the local tribes in 1904 (see the Order in Council of May 16, 1904) "abandoned all rights and jurisdiction in and over" such portion, and the last-mentioned Order defined the lands of which such portion consisted to be "Crown lands" and vested them in the High Commissioner, and that Gaberones, where Sekgome is confined, lies within this area. Further, by proclamations dated respectively February 7, 1905, June 7, 1905, and June 30, 1905, the High Commissioner, acting under the powers conferred upon him by the Order in Council of May 16, 1904, has in fact made grants of certain tracts of these "Crown lands" whilst retaining the district of and about Gaberones as "the Gaberones Crown Reserve." Now I must frankly say that I find it difficult to discern a clear line of practical distinction be-tween such dealing with the lands in and over which the local chiefs have abandoned all rights and jurisdiction and an annexation of those lands by the Crown. But, as Lord Halsbury L.C. observed in the course of the argument of counsel in *Staples v. The Queen*, "I never heard that you can force a Sovereign to take territory"; and not only does the Order in Council of May 16, 1904, itself (clause 4) state "This Order may be cited as 'The

(1)    3 E. & E. 487; 30 L. J. (Q.B.) 129.

*[1910] 2 K.B. 576 Page 624*

Bechuanaland Protectorate (Lands) Order in Council, 1904,'" but the subsequent proclamations relating to these "Crown lands," to which I have referred, designate them in their preambles as certain lands "situate within the Bechuanaland Protectorate" which have been vested in the High Commissioner by the above-mentioned Order in Council. The clear inference from such language is that these Crown lands (which, as I have said, include Gaberones) have not been annexed to His Majesty's dominions, but are treated by the Sovereign as still integral portions of the Protectorate. And the affidavit sworn on December 11, 1909, of Lord Crewe, the Secretary of State for the Colonies, is quite clear and explicit upon this point. In paragraph 3 he describes Sekgome's place of detention as "Gaberones in the Bechuanaland Protectorate." And paragraph 4 runs thus: "The Bechuanaland Protectorate is a foreign country within which His Majesty has power and ju-

**196**

risdiction by treaty, grant, usage, sufferance, or other lawful means within the meaning of the Foreign Juris-diction Act, 1890. The territory of the said Protectorate is foreign territory under His Majesty's protection. It has never been acquired by settlement or ceded to or conquered or annexed by His Majesty or any of his Royal predecessors, nor has His Majesty or any of his Royal predecessors recognized the same as, nor is it, part of his dominions, but he has power and jurisdiction within the same." If this be the true view, as, in my opinion, we ought to hold, and the Bechuanaland Protectorate, including Gaberones, forms no part of His Majesty's do-minions, there is no authority, so far as I am aware, which would justify the issue of the writ of habeas corpus for which the appellant asks. And further, unless, as the appellant's counsel have contended, the Proclamation of December 5, 1906, under which Sekgome is detained, can be shewn to be invalid, because it can be shewn to have been an act beyond and in excess of the powers vested in the High Commissioner by the Order in Council of May 9, 1891, upon which, as appears upon the face of the preamble of the proclamation, it is ex-pressly based, I am of opinion that we have in the evidence before us an act of State, justifying the detention of Sekgome, with which neither this nor any other

*[1910] 2 K.B. 576 Page  625*

Court of law in this country is entitled to interfere. Whether there is any ground upon which the proclamation in question could reasonably be held to be ultra vires, and therefore invalid, I shall consider presently. Assuming, for the moment, that its issue and enforcement were within the powers vested in the High Commissioner by the Order in Council of May 9, 1891, we have, in my view, this position of facts. The Bechuanaland Protectorate is a foreign country within which His Majesty has jurisdiction and power, and the Foreign Jurisdiction Act, 1890, applies to the exercise of that jurisdiction and power. By s. 11 of that Act every Order in Council made in pursuance of that Act, after having been laid forthwith before both Houses of Parliament (it is not suggested by the appellant's counsel that the Order in Council of May 9 was not), acquires statutory validity, subject only to certain provisions in s. 12 as to which it is not contended by the appellant's counsel that they affect the above-mentioned Order in Council itself, though it is, I think, contended that they have some bearing upon the validity of the Proclamation of December 5, 1906.

The only possible question, as it appears to me, in regard to the application of the Foreign Jurisdiction Act, 1890, to the present case arises from the view which appears to have commended itself to that learned and careful jurist, Mr. W. E. Hall (see his Foreign Jurisdiction of the British Crown, pp. 221 and 222), that this Act contemplates jurisdiction over British subjects alone. It is not, I think, necessary for me to refer to his reasoning at length. The language of s. 2, and to some extent also the language of s. 12, sub-s. 1, certainly appear to lend some weight to his opinion. Of course, even so, there is still no question at all if, as the counsel for Sekgome contended, Sekgome is a British subject. But even if he is not, and Mr. Hall's view as to the operation of the Act is correct, I am of opinion that Sekgome as an inhabitant of the Protectorate cannot in this Court successfully impugn the validity of the Order in Council of May 9, 1891. That Order is not based solely upon statutory powers given by the Foreign Jurisdiction Act, 1890. The words of the preamble expressly state otherwise. The preamble recites: "Now therefore Her Majesty by virtue and in exercise of the

*[1910] 2 K.B. 576 Page  626*

powers by the Foreign Jurisdiction Act, 1890, or otherwise in Her Majesty vested, is pleased by and with the advice of her Privy Council to order, and it is hereby ordered as follows:" It appears to me, and, as I gather from pp. 224 and 225 of Mr. Hall's treatise to which I have just referred, it is in accordance with his views, that Her Majesty the Queen in 1891 was, independently of any statutory powers, entitled to legislate as she did by the Order in Council for the good government of the barbarous and unsettled territory which had been since 1885 under her protection.

In assuming a Protectorate the Crown takes to itself powers which, so far as they go, are identical with those which it could have in a conquered country. It can prescribe laws until Parliament chooses to legislate, and it can subject to its administration all persons upon the protected soil. "This," says Mr. Hall (from whose language I have borrowed in the preceding sentence), "is done in those Protectorates where general jurisdiction is claimed." Even if Sekgome is not a British subject, and if the view that the Foreign Jurisdiction Act, 1890, applies only to jurisdiction over British subjects is well founded, the Order in Council of May 9, 1891, has, in my

view, sufficient foundation of validity against him, as an inhabitant of the territory, in the power of the Crown, subject always to parliamentary legislation and to the grant of a permanent Constitution, to legislate by Order in Council for the good government of the Bechuanaland Protectorate.

But then comes the question of the validity of the proclamation itself under and in pursuance of which Sekgome is detained. That depends manifestly upon its being a proclamation which the High Commissioner was authorized to make under the Order in Council of May 9, 1891. It was, as appears by the express terms of the preamble, intended to be made in virtue of the powers vested in the High Commissioner by that Order. What were those powers? There is, in the first place, a wide and general authority given to the High Commissioner by the second clause of the Order. He may on Her Majesty's behalf exercise all powers and jurisdiction which Her Majesty has within the geographical limits of the territory which are set out in the

[1910] 2 K.B. 576 Page 627

Order, and to that end may take or cause to be taken all such measures and do or cause to be done all such matters and things as are lawful and he deems expedient in the interest of Her Majesty's service, subject to instructions he may receive from Her Majesty or through a Secretary of State. But the most important part is the grant of particular powers as to legislation and administrative action which are set out in paragraph 4 of the Order and are particularly referred to in the preamble of the proclamation. The paragraph runs thus: "In the exercise of the powers and authorities hereby conferred upon him the High Commissioner may amongst other things from time to time by proclamation provide for the administration of justice, the raising of revenue, and generally for the peace, order and good government of all persons within the limits of this Order, including the prohibition and punishment of acts tending to disturb the public peace." It would be difficult, I think, to find language more clearly expressing an intention to confide wide discretionary powers, and such a trust lays upon the trustee the duty not to shrink, if the need arises, from availing himself of those powers. They ought to receive, as Lord Halsbury L.C. insisted in delivering the judgment of the Privy Council in *Riel v. The Queen* (1) with respect to powers of the Canadian Parliament to legislate "for peace, order and good government," a liberal interpretation in the sense that they may rightly be held to justify provisions widely differing from those which have been made in this country for the same ends. Such an interpretation is especially just and necessary where, as is the case here, the trustee has to govern a large unsettled territory, peopled by lawless and warlike savages, who outnumber the European inhabitants by more than one hundred to one. Whatever the words "as are lawful" in clause 2 of this Order in Council mean, and they are, I think, inserted on account of s. 12 of the Foreign Jurisdiction Act, 1890, which this proclamation, in my opinion, clearly does not violate, they certainly cannot reasonably be held to limit the action of the High Commissioner to that which is in accordance with the laws in force in the England of to-day for this realm. The Proclamation of December 5, 1906, is, no

(1)    10 App. Cas. 678.

[1910] 2 K.B. 576 Page 628

doubt, in regard to Sekgome, of a stern and drastic nature. It is essentially a "privilegium" - legislation directed against a particular person; and generally, as I hope and believe, such legislation commends itself as little to British legislators as it did to the legislators of ancient Rome, in the best days of the republic. "Vetant leges sacratae, vetant XII tabulae, leges privatis hominibus irrogari: id est enim privilegium. Nemo unquam tulit: nihil est crudelius, nihil perniciosius, nihil, quod minus haec civitas ferre possit": Cicero, Oratio Pro Domo Sua cap. xvii. There is a similar statement in his treatise De Legibus, lib. iii., cap. 19, __ 44. But we have not here to consider the case of a civilized and orderly State, such as modern England or the Rome of Cicero's time, but the administration of a barbarous or, at least, semi-barbarous community. If it be true, as is recited in this proclamation, that, when this proclamation was made, the return of Sekgome to the limits of his tribe was a

danger to the peace of the tribe and likely to lead to bloodshed and tribal war; if, in order to procure peace and order within the Protectorate, it was necessary to detain Sekgome at a place within the Protectorate distant from the limits of his tribe and to continue such detention; nay, if such a view of the facts was at any rate not an unreasonable view for the High Commissioner to take - and of this there is no evidence to justify the slightest doubt - it appears to me to be impossible to deny that this proclamation was a valid proclamation, not ultra vires, but within the scope of the powers and duties entrusted to the High Commissioner by the terms of the Order in Council, to provide for the peace, order, and good government of all persons within the Protectorate, including the prohibition and punishment of acts tending to disturb the public peace. I am, therefore, with due respect, unable to share the doubts which the judges in the Divisional Court have indicated in respect to the validity of this proclamation, or to see what facts relative to its validity remain in question and deserve investigation on a return being made to the writ. I venture to think that we have in this proclamation, made in virtue of the powers vested in its author by the valid Order in council, an act of State which we are bound to respect by refusing to displace the judgment of the Divisional Court

*[1910] 2 K.B. 576 Page  629*

dismissing the appellant's application for the issue of a writ of habeas corpus.

With regard to the single remaining, and quite distinct, point, which formed one of the grounds of the decision of the Divisional Court, I concur in the view which my brethren in that Court took; and that point, if it stood alone, would be sufficient to dispose of this appeal in favour of the respondent. I am of opinion that the Secretary of State for the Colonies is not a person to whom such a writ can properly be directed. It appears to me that, in the case of the executive or administrative superior of the actual custodian of the person in detention who applies for a writ of habeas corpus, it may be right and proper that the writ, if issued, should be directed to him either with or without the inclusion of the actual custodian, if that executive or administrative superior is a person whose authority the custodian must rely upon in order to justify the detention, and to whom obedience must be rendered by the custodian, if he orders a release. I am inclined to think that the High Commissioner, who is the chief executive and administrative official of the territory, is a person to whom in this present case the writ might properly have been directed. But I know of no authority, and certainly I can find no guidance of principle, to justify the appellant's contention that a writ of habeas corpus in this case can properly be directed to His Majesty's Secretary of State for the Colonies, on the ground that, if it approves itself to his conscience and judgment, it is his duty to advise His Majesty himself to give, or to authorize a Secretary of State to give, instructions to the High Commissioner to withdraw the Proclamation of December 5, 1906, and to order Sekgome's release from detention under that proclamation. But I am glad that, for the reasons which I have stated in this judgment, I can concur in the dismissal of this appeal upon other substantial grounds, and not upon this somewhat technical point alone.

*Appeal dismissed.*

Solicitor for appellant: *F. B. Winter.*

Solicitor for defendant: *Solicitor to the Treasury.*

F. O. R.

RYAN, C. J.—We are of opinion, that this case is not distinguishable in principle from the decision in Ramrutton Roy's case. The fraud charged may be more gross, but the degree of fraud is not the question.

*Grant, J.* retained his former opinion upon the question of jurisdiction: but he concurred in thinking that the case was similar in principle to Ramrutton Roy's case, and that that decision being the decision of the majority must govern the present.

*Seton, J.,* concurred with the Chief Justice.

*Plea allowed, each party paying their own costs.*

---

### [206] JURISDICTION (CRIMINAL).

---

REX *v.* WARREN HASTINGS AND OTHERS.

*Hyde's Notes. Nov.* 10*th and* 18*th,* 1775.

Held by Impey, C. J. and Chambers, J. [Lemaistre and Hyde, Jx. diss.] that the Court has no general power to issue writs of *mandamus.*

NEWMAN moved for a writ of mandamus to be directed to the Governor General and Council, to restore John Stewart Esquire to the office of Judge Advocate General and Judge Martial. Mr. Stewart, who was in the Company's Civil Service, had been appointed to the office by the Court of Directors; he also held the appointment of Secretary to Government. To the former he was appointed in February 1771, and to the latter in March 1772. In August 1775, Mr. Stewart, having given offence to Government, was removed from both his offices by a vote of the majority of the Council; and the writ was now moved for to restore him to the former appointment, on the ground that the Governor General and Council had no power or authority to cancel an appointment made by the Court of Directors.

[This case appears to have been argued at length, but there is no note of the argument extant. On a subsequent day, the Court pronounced their judgment, and there being a difference of opinion on the Bench, the Judges delivered their judgments *seriatim.*]

HYDE, J. The sole question, on which it was yesterday determined we
Nov. 18, 1775.    should deliver our opinions, is confined to whether this Court can issue a writ of mandamus. This was part of the argument of both the gentlemen who argued in favour of Mr. Stewart (*Newman* and *Brix*); but they rather took it for granted than laboured the point, because they seemed to think it [207] more incumbent on them to shew that the office for which the writ was prayed was one for which the remedy would be granted in England. Upon this latter point I now purposely omit delivering any opinion; and indeed if the Court determine that they have no power to give the *remedy,* the advocate would labour in vain who should endeavour to prove the *right.* I shall therefore confine my consideration at present to the power of the Court to issue this particular writ; and my opinion is that in a proper case this Court may and ought to issue His Majesty writ of mandamus. I think it clear

1005

the law of England is the law by which His Majesty's British subjects here are to be governed. They are entitled to the full protection of that law; and if they are entitled to the rights which the law of England gives, they must be entitled to all such remedies as are necessary for the recovery of those rights when distrained. The reason given against the rule is, in effect, no other than that the power of issuing a mandamus for such a purpose is not mentioned in the Charter. But I think that argument of no weight, for a reason which invalidates many ingenious arguments,—that it proves too much; for the only suits in which the whole process is pointed out to us, and therefore the only pleas which, according to that argument, we could hold, are actions to recover a debt in money, and actions to recover damages for personal wrong. If the writ be considered, as it formerly was, a prerogative writ, this can afford no objection, because the King's prerogative extends as fully over his subjects here as in any part of his dominions. Neither is it an assumption of an exercise of the King's power by this Court in any manner in which that power is not delegated to them; because this writ, among others, is particularly named in the Charter (a) on some certain proper occasions to be issued by the Court, and if it had been intended that those writs were to be issued [206] for those purposes only, the power would no doubt have been restricted by adding that those writs should be issued to no other persons, and for no other purposes than those expressly mentioned. By the law of England, this writ is now considered as a remedial writ in the case of a person dispossessed of an office, and it gives the best and only adequate remedy,—the possession of the office itself. This is better than giving damages, inasmuch as remedial justice, giving exactly what is lost, is better than vindictive justice, giving what must be in a great measure arbitrary,

*Where particular modes of proceeding are pointed out in the charter, they are to be followed; but where none is specified, the Court should proceed as in like cases in England.*

as compensation for the injury done. I conceive the true construction of the Charter to be, that where particular modes of proceeding are pointed out, they are to be followed; but in cases where no process is pointed out, the Court ought to issue such as the cases require, and such as would be issued in the like cases in England. I consider that the Charter has not been so defective as to leave all injuries but those particularly mentioned without redress, but that it gives a remedy wherever the law of England gives a right. To hold that a man has a right by law, but no remedy by law, is an injustice, which I shall never attribute to the King's Charter. I think, therefore, that in a proper case this Court ought to grant a mandamus.

LEMAISTRE, J. I concur with my brother Hyde, and I conceive that the Court is bound in duty to grant the writ to Mr. Stewart. The 38th clause of the Charter gives power to the Court, generally, to do all such things as shall be found necessary for the administration of justice; and the 13th Geo. III. c. 63, s. 13, gives the Court a similar general power, and also "to do all such other things as shall be found necessary for the due execution of the powers granted by the Charter."

[207] (a) Clause XXI.

1006

201

CHAMBERS, J.  I am sorry upon a point of such importance, and a question of such magnitude, to deliver my opinion so soon ; but there are reasons which [209] make it convenient.  The power of granting prerogative writs can only be given by express words, or it may exist by immemorial usage which implies a prior delegation.  I conceive that we are empowered to grant the writ of *habeas corpus* by the power given to us severally ; and I am of opinion that there is no power granted to the Court of issuing writs of mandamus.

*The power of granting preroga-tive writs can only be given by express words.*

*The Judges sever-ally have the power to grant writs of habeas corpus.*

IMPEY, C. J.  My opinion is founded not only upon the arguments used at the bar, but upon a previous knowledge of the intentions of those to whom His Majesty confided the drawing up of the Charter.  Mr. brother Chambers, in his setting out, made the precise distinction on which my opinion is grounded, the distinction between the ordi-nary and the extraordinary jurisdiction of the Court.  The principal operation of the Act was to enable the King to dissolve the Mayor's Court, and the oyer and terminer, and the Court of Appeal.  I do not wish to retract any act done by the Court.  I think the issuing a writ of *habeas corpus* is right, and I think too that the Court can issue writs of *ne exeat regno*.  There are two writs of that description : and the one issued by the Court of Chancery this Court may issue.  I concur in opinion with my brother Chambers that we have no power to issue this writ of mandamus.

*Distinction be-tween the ordinary and the extraordi-nary jurisdiction of this Court.*

*The Court can issue writs of habeas corpus and ne exeat regno.*

*Writ refused* (a).

[209] (a) An action at law was immediately afterwards instituted by Mr. Stewart against Mr. J. P. Auriol, who had been appointed to the office of Secretary, to recover the sum of Rs. 3,600, as money had and received by Auriol to the use of Stewart, being the salary of the office for the period of two months.  Judgment was given for the Plaintiff by the opinion of the majority.  The Court delivered their opinions *seriatim*.  Hyde, J. was "of opinion for the Defendant."  Lemaistre, J. said :—" This action is brought by Mr. Stewart as being appointed to the office of Secretary to the East India Company at this Presidency, not having resigned nor been duly removed.  In August last, Mr. Stewart by some unguarded expression offended the Governor General and Council, and by a vote of the majority of the Council he was removed from his appointment.  [210] There are other parties to be considered, the Directors and Proprietors.  It is a material question whether the Company shall have the patronage, or whether a majority of the Council, when the Company have appointed a person, may dismiss him without regarding the directions sent out.  I do not think it proved that the late President and Council possessed a right to dismiss at their pleasure without cause.  I am therefore of opinion for the Plaintiff."  Chambers, J. said "The 13 Geo. III. c. 63 gives to the Governor General and Council a right to exercise such power as the late President and Council exercised.  The deposition of Mr. Barwell (one of the Council) proves that the late President and Council did remove when they judged fit.  I am of opinion for the Defendant."  Impey, C. J.  "I do not agree with my brother Hyde that the Court of Directors could take away the power of dismissing: it was a power in the late President and Council, and if they could take it away, they might by the like authority take away all the powers and defeat the Act, I am of opinion for the Plaintiff."  *Judgment for the Plaintiff.*  [Hyde's Notes, 28th and 30th Nov. 1775, and 13th March 1776.  Stewart v. Auriol.]

1007

Morton 210            REX v. RAMGOVIND MITTER, &c. [1781]            [Juris., Crim.

## [210] REX v. RAMGOVIND MITTER AND OTHERS.

### Hyde's Notes. Dec. 14, 1781.

Held, that the powers of the Justices of the K.B. are given to the Justices of this Court severally, and that they can issue writs of *Habeas Corpus* as such Justices thereof severally, but that the Supreme Court as a Court have not such power.

DAVIES, A. G., moved (in open Court, during the Sessions) for a writ of *habeas corpus*, to be directed to the [211] Fouzdar of Chitpoor, to bring up the body of one indicted as a principal on a charge of murder. One of the prisoners, charged as an accessary to the murder, was in the custody of the Sheriff (a).

CHAMBERS, J. This Court has never issued a writ of habeas corpus. We are all of opinion (b), that the Court has not authority to issue the writ. The writ is a prerogative writ, and the general powers of the Court of King's Bench are not given to this Court, but the powers of Justices of the Court of King's Bench at common law, are given severally and respectively to the Judges of this Court; and as (according to Blackstone) the Judges of the King's Bench used to issue writs of habeas corpus severally, we have agreed that we have severally authority to issue the writ, but not jointly as a Court. This was the opinion of Chief Justice, Impey and myself. I believe the opinions of my brothers Lemaistre and Hyde went somewhat further; but the Court never has issued the writ.

HYDE, J. assented that the Court never had issued the writ.

A case in some respects similar to the latter may be here mentioned. Mr. John Babb filed a bill against Colonel O. Morgan for a discovery of all cattle fed by him for the Bengal detachment which Defendant commanded, and for an account of the profits, the complainant having been appointed to the office of Commissary General, to which office the profits in question were alleged to be incident. The cause was heard on evidence. The Court decreed that the Defendant do forthwith pay to the complainant the sum of Rs. 9,603, being the amount of profits made by Defendant in providing and feeding the draft and carriage cattle belonging to the detachment, under his command between the 1st and 15th days of September 1782, and that Defendant pay to complainant the taxed costs of the suit. [Babb v. Morgan, *Chambers' Notes*, 1st December 1788, and 384 February 1789.]—There is another old case in which a question was raised in this Court between Government and its servants. The question related to the right to *Prize money*. The Company filed their bill, for the purpose of trying the right, against one of their officers, Major Balfour, for an account of the booty and plunder obtained by him as his share at the capture of the Fort of Bidjeghur taken by the Company's forces from the Rajah of Banares. The Court (by the opinion of Impey, C. J. and Jones, J. [211] against Hyde J.) decreed in favour of the Company, who recovered Rs. 50,000. [The United Company v. Balfour; and the Cross Cause, *Hyde's Notes*, 22nd and 24th November, 1785.]

[211] (a) The Advocate General had first made an application to the Court to *write a letter* to the Fouzdar, observing that he understood this had been done before, and the Fouzdar was ready to deliver up the prisoner on receiving a letter from the Judge. Chambers and Hyde Js. said that the learned Counsel was misinformed, and that the Judges had never corresponded by letter with any Fouzdar.

(b) It is singular that *all* of the Court should have been of that opinion, as Mr. Justice Hyde, in the preceding case, held that this Court had power to issue writs of *mandamus*.

1008

203



[Mr. Justice Hyde adds this note : " Although the Court has never issued the writ, yet the writs have constantly been argued in open Court, almost as often indeed as otherwise. Sometimes it has been declared that [212] the argument was before the Judge who issued the writ, and that the other Judges only attended as assistants to that Judge : but at other times the arguments have been heard by the Court, without any such declaration. When the returns have not been made before the term, the Court has frequently been moved to make rules to return the writs, and such rules have been granted without any hesitation or doubt, and rules for attachments for not returning writs of habeas corpus have been made on motions in open Court in term time.—particularly in the *Zachariah Khan* and others ".][a]

## CASE OF O'DONNELL AND MACLAREY.

*Hyde's Notes.    July 10, 1782.*

The Court had no authority to try persons charged with piracy and murder on the high seas.

There being no authority in India to try them, the parties were arrested under warrant of Governor General, and sent to England for trial.

O'DONNELL and Maclarey were taken by warrant from Warren Hastings, Esq., Governor-General, and Edward Wheler, Esq., one of the Council, on a charge, on the oath of James Bracey, of the murder of some Malays, names unknown, murdered by men acting under the orders of the prisoners, at sea near the Malay Coast. It was believed also that the prisoners had been guilty of many acts of piracy near the Malay Coast and near the Chinese Coast, or in the river within the empire of China, particularly in taking a Portuguese ship.

Mr. JUSTICE HYDE has this note :—

" It is intended to send O'Donnell and Maclarey to England for trial, be-cause this Court have no authority [213] to try them, and it is generally under-stood that there is no authority in India to try them. Impey, C.J. Chambers and Hyde, Js. knew and approved of the Governor-General's intention to issue this warrant and to send the prisoners to England for trial, unless on examina-tion they could fully answer the charges made against them."

[212] (a) In Re Henrietta Brown (Chambers Notes, 14th Nov. 1792) a motion was made before the full Court, being in term time, for a habeas corpus to bring up the body of H. Brown. This was refused for a reason long ago recognized by the Court,—that although each Judge separately has the same power as a Justice of the Court of K.B., and consequently the power of issuing the writ of habeas corpus, this Court collectively has not the powers of the K.B., nor, as far as appears, the power of granting that writ.

According to the present practice, however, the Court issue writs of habeas corpus, in *term* but in vacation, they are moved before a Judge in Chambers.

S. C.—I. 127

204