# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| RUZATULLAH, *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-CV-01707 (GK) |
| | ) | |
| ROBERT GATES, | ) | |
| Secretary, United States Department of | ) | |
| Defense, *et al.,* | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

## RESPONDENTS' REPLY TO PETITIONERS' REPLY AND OPPOSITION TO RESPONDENTS' MOTION TO DISMISS THE SECOND AMENDED PETITION

Respondents respectfully submit this reply brief in response to Petitioners' Reply and Opposition to Respondents' Motion to Dismiss the Second Amended Petition. In their opening brief, respondents demonstrated that this Court has no jurisdiction to hear the present habeas petition because the petition, filed by two alien enemy combatants detained at Bagram Airfield in Afghanistan, falls squarely within the jurisdiction-limiting provision of the Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-366, 120 Stat. 2600 (2006). Respondents also demonstrated that petitioners do not have a constitutional right to habeas relief because under *Johnson v. Eisentrager*, 339 U.S. 763 (1950), aliens detained abroad, such as petitioners, who have no significant voluntary connections with this country, cannot invoke protections under the Constitution.

Subsequent to respondents' motion to dismiss, the Court of Appeals for the District of Columbia Circuit decided *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir.), *cert. denied*, 127 S.Ct. 1478 (2007), which removes all doubt that the MCA divests federal courts of jurisdiction to review petitions for writs of habeas corpus filed by aliens captured abroad and detained as enemy

Dockets.Justia.com

combatants in an overseas military base.  Finding *Eisentrager* to be the "controlling precedent" on the constitutional question, *id.* at 991, the Court of Appeals also held that the MCA does not violate the Suspension Clause because "[p]recedent in [the D.C. Circuit] and the Supreme Court holds that the Constitution does not confer rights on aliens without property or presence within the United States."  *Id.*

In response, petitioners argue that the MCA is inapplicable to them because they have not properly been determined to be enemy combatants by a "competent tribunal" as they erroneously contend is required by the MCA, and that at a minimum, they are entitled to discovery on that jurisdictional question.  They also argue that *Boumediene* – which is now the settled law of this Circuit – is wrongly decided because it conflicts with the earlier-decided decision in *Rasul v. Bush*, 542 U.S. 466 (2004).

As discussed below, the concept of "competent tribunal" is irrelevant to the jurisdictional inquiry here because the plain language of the MCA's jurisdiction-limiting provision requires for its application only that the United States has determined petitioners to be enemy combatants. The record is clear that that predicate for the statute's application has been met here.  No discovery is necessary, much less any need for this Court to examine military decisions made in the theater of active military operations.  Moreover, despite petitioners' arguments to the contrary, this Court must follow the controlling Circuit precedent of *Boumediene*.

**ARGUMENT**

I.    **UNDER THE MCA, THIS COURT HAS NO SUBJECT MATTER
       JURISDICTION TO REVIEW THE PRESENT PETITION**

     **A.    The MCA's Jurisdiction-Limiting Provision Applies As Long As the
         Alien Habeas Petitioner is "Determined By the United States" To
         Have Been Properly Detained As An Enemy Combatant**.

     In their opening brief, respondents demonstrated that this Court has no jurisdiction in this

case because § 7 of the MCA provides that "[n]o court, justice, or judge shall have jurisdiction to

hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien

detained by the United States who has been determined by the United States to have been

properly detained as an enemy combatant or is awaiting such determination."  MCA § 7(a).[1]

Through the declaration of Colonel James W. Gray, respondents established that the Department

of Defense ("DoD") has determined petitioners to be enemy combatants and is detaining them as

such.  *See* Gray Decl., ¶ 5 (dkt. #15).  As a matter of background, respondents also described the

review process in Afghanistan for determining a detainee's enemy combatant status, which

includes review by what is known as the Enemy Combatant Review Board ("ECRB").  *See*

Respondents' Mot. to Dismiss 2d Amended Pet. at 6-7 (dkt. #15); *see also* Miller Decl., ¶¶ 10-12

(dkt. # 6).

     In response, petitioners argue that § 7 is inapplicable here because, they say, its

---

[1]  As respondents further showed (Respondents' Mot. to Dismiss 2d Amended Pet. at 9-
10), the MCA's jurisdiction-limiting provision extends not only to purely habeas claims, but also
to all cases "which relate to any aspect of the detention, transfer, treatment, trial, or conditions of
detention of an alien detained by the United States since September 11, 2001."  MCA § 7(b).
Thus, this Court similarly has no jurisdiction over petitioners' conditions of confinement claims.
*See Paracha v. Gates*, Nos. 05-5194, 05-5211, 05-5333 (D.C. Cir. April 9, 2007) (ordering the
dismissal of  Guantanamo detainee's motion relating to conditions of his confinement because
the district court lacks jurisdiction to consider these claims under 28 U.S.C. § 2241(e)) (attached
as Exhibit 1).

application depends upon whether petitioners' enemy combatant status was determined by a "competent tribunal," *see* Pet. Opp. at 16, and, they further contend, the ECRB is not such a tribunal.  As discussed below, petitioners' arguments have no merit.

1.    **The Concept of "Competent Tribunal" Is Irrelevant to the Application of the MCA's Jurisdiction-Limiting Provision.**

Although petitioners devote significant energy to define the term "competent tribunal," that term is irrelevant to the application of § 7, which requires only that the habeas petitioner be "determined by the United States" to have been properly detained as an enemy combatant or to be awaiting such a determination.  References to determination by a "competent tribunal," in contrast, are in § 3 of the MCA, which concerns the trial of unlawful enemy combatants by military commissions for war crimes.  Specifically, the term appears in the subsection defining an "unlawful enemy combatant," which is:

> (i) a person who has engaged in hostilities or who has purposefully and materially supported hostilities against the United States or its co-belligerents who is not a lawful enemy combatant (including a person who is part of the Taliban, al Qaeda, or associated forces); or
>
> (ii) a person who, before, on, or after the date of the enactment of the Military Commissions Act of 2006, has been determined to be an unlawful enemy combatant by a Combatant Status Review Tribunal ["CSRT"] or another competent tribunal established under the authority of the President or the Secretary of Defense.

10 U.S.C. § 948a(1).[2]  Section 3 then provides that "a finding by a  ["CSRT"] or another

_____

[2]  Petitioners' characterization (*see* Pet. Opp. at 14) of the MCA as mandating only 2 procedures through which the United States can determine that a detainee is an enemy combatant—*i.e.,* those at Guantanamo are to receive a CSRT whereas those detained elsewhere such as Bagram are to be reviewed by a "competent tribunal"—is belied by this definition of "unlawful enemy combatant."  The United States may determine that an alien meets the definition of subsection (i) without having conducted a CSRT or review by a "competent tribunal."

4

competent tribunal established under the authority of the President or the Secretary of Defense

that a person is an unlawful enemy combatant is dispositive for purposes of jurisdiction for trial

by military commission under this chapter."  10 U.S.C. § 948d(c).  The issue before this Court is

not whether petitioners may be tried by a military commission for war crimes under § 3; rather,

the issue is whether the habeas petitioners have been "determined by the United States" to be

enemy combatants.  Thus, whether the ECRB is a "competent tribunal" within the meaning of

§ 3 is irrelevant to a determination of whether this Court can exercise jurisdiction to hear this

habeas petition under § 7.

>     **2.    Army Regulation 190-8 Is Inapplicable to the United States'**
>            **Determination of An Alien Detainee's Enemy Combatant Status**.

In arguing that an ECRB is not a "competent tribunal" within the meaning of MCA § 3,

petitioners cite to Army Regulation 190-8, which implements the Geneva Conventions, *see* AR

190-8 § 1-1(b).  That regulation does not govern this situation.  The term "competent tribunal" as

used in that regulation refers to tribunals constituted to adjudicate prisoner-of-war ("POW")

status under Article 5 of the 1949 Geneva Convention if there is doubt as to whether the detainee

is entitled to POW status.[3]  *See* AR 190-8, § 1-6.[4]  Although the Supreme Court left open in

---

[3]  Notably, Army Regulation 190-8 does not purport to provide an all-inclusive definition
of an Article 5 tribunal under the Third Geneva Convention.

[4]  AR 190-8, § 1-6 provides:

> In accordance with Article 5, GPW  [the 1949 Geneva Convention
> Relative to the Treatment of Prisoners of War], if any doubt arises
> as to whether a person, having committed a belligerent act and
> been taken into custody by the US Armed Forces, belongs to any of
> the categories enumerated in Article 4, GPW, such persons shall
> enjoy the protection of the present Convention until such times as
> their status has been determined by a competent tribunal.

*Hamdan v. Bush*, 126 S.Ct. 1749, 2795 n. 61 (2006), whether Article 5 of the 1949 Geneva Convention applies to the armed conflict with al Qaeda, there is no doubt that petitioners are not prisoners of war. The President had already determined that Taliban or al Qaeda detainees do not qualify as prisoners of war under Article 4 of the 1949 Geneva Convention. *See* Memo. for the Vice President, et al. From President, Re:  Humane Treatment of al Qaeda and Taliban Detainees at 2 (Feb. 7, 2002), attached as Exhibit 2. That determination is unquestionably correct because these fighters (and indeed, their associated forces) fail to carry arms openly, wear uniforms, have a fixed distinctive sign recognizable at a distance, or conduct their operations in accordance with the laws and customs of war. *See* 1949 Geneva Convention, Art. 4 (defining prisoners of war and those who would be treated as prisoners of war). Moreover, subsection 1-5(a)(2) of Army Regulation 190-8 provides that prisoners receive the protections of the Convention only "until some other legal status is determined by *competent authority*" (emphasis added), and, as the D.C. Circuit has held, the President, in making his decisions regarding the POW status of al Qaeda and Taliban detainees, is such an authority. *Hamdan v. Rumsfeld*, 415 F.3d 33, 43 (D.C. Cir. 2005), *reversed on other ground*, 126 S. Ct. 2749 (2006).

In any event, in enacting the MCA as a response to *Hamdan*, Congress made clear that the Geneva Conventions are not judicially enforceable by private individuals. Section 5(a) of the MCA provides that "no person may invoke the Geneva Conventions or any protocols thereto in any habeas corpus or other civil action or proceeding to which the United States . . . is a party as a source of rights in any court of the United States."

Although petitioners argue that § 5(a) is not retroactive (*see* Pet. Opp. at 30 n.15), there is no issue of retroactivity. The law, settled since even before the MCA's enactment, is that treaties, such as the Geneva Conventions, are presumed not to create individually enforceable

rights.  It has long been recognized that a treaty "is primarily a compact between independent

nations," *Head Money Cases*, 112 U.S. 580, 597 (1884), and absent a clear contrary intent, a

treaty "depends for the enforcement of its provisions on the interest and the honor of the

governments which are parties to it."  *Id.*; *see also Whitney v. Robertson*, 124 U.S. 190, 194-195

(1888); *Committee of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 937

(D.C. Cir. 1988).  If a treaty is violated, this "becomes the subject of international negotiations

and reclamation," not the subject of a lawsuit.  *Head Money Cases*, 112 U.S. at 597.  And "[i]t is

obvious that with all this the judicial courts have nothing to do and can give no redress."  *Id.*; *see*

*also Holmes v. Laird*, 459 F.2d 1211, 1213, 1222 (D.C. Cir. 1972) (denying U.S. soldiers' claims

that because the NATO Status of Forces Agreement granted individual members of the armed

forces specific rights, a federal court could adjudicate a claim based upon those treaty rights;

holding that "the corrective machinery specified in the treaty itself is nonjudicial").  Section 5 of

the MCA simply provides a clear statement of Congress' intent to continue to follow the norm

with respect to treaties, which is to limit enforcement of a treaty to diplomatic and non-judicial

processes.  Accordingly, Army Regulation 190-8, which implements the Geneva Conventions,

cannot lend petitioners any support in this case.

>        3.       **DoD Has Satisfied the DTA's Requirement That It Reports to**
>                 **Congress the Procedures in Operation in Afghanistan for**
>                 **Determining Alien Detainees' Enemy Combatant Status.**

Although conceding that "[u]ndoubtedly, Congress granted the DoD broad latitude in

developing the procedures in question," Pet. Opp. at 22, petitioners accuse DoD of "fail[ing] to

comply with even the *de minimis* procedural requirement that Congress placed upon it – to report

back concerning the procedures in place" in Afghanistan for determining enemy combatant

status, *id.* at 22-23.  This contention has nothing to do with the MCA's jurisdiction-limiting

aspects, but even if it did, petitioners' accusation would be unfounded.

Section 1005(a)(1)(B) of the DTA requires the Secretary of Defense to submit to Congress: "the procedures in operation in Afghanistan and Iraq for a determination of the status of aliens detained in the custody or under the physical control of the Department of Defense in those countries."[5]  DoD submitted such a report on August 10, 2006.[6]  The unclassified enclosure of the report is attached hereto as Exhibit 3.  The relevant procedures set forth in that report were fully discussed in respondents' motion to dismiss and in the Miller Declaration, *see* Miler Decl. ¶¶ 10-12.  Those procedures include the authority of the detaining combatant commander to convene, at his discretion, a "panel of commissioned officers to review the available evidence and reach a recommended determination."  *See* Ex. 3 at 3; Miller Decl. ¶ 11.  As explained in the Miller declaration, the Commanding General convened such a panel, the ECRB, at Bagram.  *See* Miller Decl. ¶ 12.  Thus, to the extent petitioners argue that the ECRB is somehow unlawful because DoD allegedly withheld it and other procedures from Congress, the argument is without any foundation.

> **4.     Petitioners Are Not Entitled to Discovery Regarding the Combatant Status Review Procedures in Afghanistan Nor the United States' Determination of Their Enemy Combatant Status**.

Petitioners also seek discovery regarding this Court's jurisdiction for several purported reasons.  First, because respondents have introduced extrinsic facts relevant to the jurisdictional

---

[5]  Section 1005(d) of the DTA further requires the Secretary to submit, not later than December 31 each year, an annual report on the review process for aliens in DoD custody outside the United States.  DoD plans to submit its first annual report by the end of this year.

[6]  Although the DTA requires that a report be submitted not later than 180 days after the December 30, 2005 enactment of the DTA, DoD received a 60 day extension from Congress to submit the report.

inquiry, and because this Court "cannot convert a motion to dismiss for want of jurisdiction into a summary judgment proceeding through consideration of matters outside the pleadings," petitioners contend that they must be allowed discovery as to those extra-pleading matters. *See* Pet. Opp. at 14. Second, petitioners assert that the jurisdictional issue here requires an examination of the United States' determination of petitioners' combatant status and the process that the petitioners actually received, which in turn, petitioners say, requires discovery. *Id.* at 15. Third, petitioners argue that there are factual disputes as to the degree of the United States' control over Bagram Airfield as compared to Guantanamo Bay, and thus, that they are entitled to discovery on that and other issues discussed in the declarations of Colonels Gray and Miller. *See id.* at 26 n. 12.

Petitioners' arguments are without merit and no discovery is warranted. Contrary to petitioners' suggestion, this Court would be able to consider extra-pleading materials in reviewing a Rule 12(b)(1) motion. As the D.C. Circuit has explained, one of the "important distinctions between a dismissal pursuant to subdivision b(1) and one under b(6) ... [is that under b(1) ] the court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction to hear the action." *Wilderness Soc. v. Griles*, 824 F.2d 4, 16 n. 10 (D.C. Cir. 1987) (quoting 2A J. Moore & J. Lucas, Moore's Federal Practice, ¶ 12.07(2.-1), at 12-45-46 (1986)). In other words, "although a Rule 12(b)(1) motion cannot be converted into a motion for summary judgment as a Rule 12(b)(6) motion can, *see* Fed. R. Civ. P. 12(b), a district court can assure that appropriate extra-pleading materials are consulted in determining the threshold jurisdictional issue." *Id.* Thus, "'where necessary, the court may consider the complaint supplemented by undisputed facts

evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (quoting *Herbert v. Nat'l Acad. of Scis.,* 974 F.2d 192, 197 (D.C. Cir.1992)).

Moreover, the D.C. Circuit has held that "[a] plaintiff has no right to discovery in opposing a motion under 12(b)(1)," *Haase v. Sessions*, 835 F. 2d 902, 908 (D. C. Cir. 1987), and the Supreme Court has also held that "'[a] habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course.'" *Bracy v. Gramley*, 520 U.S. 899, 904 (1997) (quoting *Harris v. Nelson*, 394 U.S. 286, 295 (1969)).  While the court may nevertheless grant discovery to resolve factual disputes necessary to determining the court's habeas jurisdiction, discovery is inappropriate where, as here, petitioners have no basis for disputing the respondents' jurisdictional showing.  *Cf. Coalition for Underground Expansion*, 333 F.3d at 198 (rejecting plaintiffs' argument that the district court erred in considering a declaration submitted by the defendant on a Rule 12(b)(1) motion without affording the plaintiff an opportunity for discovery, where plaintiff has made no factual allegations which, if substantiated, would establish jurisdiction); *Rich v. Calderon*, 187 F.3d 1064, 1068 (9th Cir. 1999) (in a habeas case, "discovery is available only in the discretion of the court and for good cause shown."); Rule 6(a) of the Rules Governing Section 2254 Cases[7] (requiring leave of court for good cause shown before discovery may be conducted in habeas case by state prisoners).

Here, petitioners have failed to establish good cause for jurisdictional discovery.  There is

---

[7] Whether or not the Rules Governing Section 2254 Cases actually apply here, the limitation of discovery in such cases is instructive at least by analogy.

no basis for discovery because this Court clearly lacks jurisdiction under the MCA and

*Boumediene*. *Cf. Hicks v. Bush*, No. 02-CV-0299 (CKK), 2007 WL 902303 at *5 (D.D.C. Mar.

23, 2007) ("In *Boumediene*, the D.C. Circuit clearly held that Congress intended to deprive the

federal district courts of jurisdiction over 'all cases, without exception, pending on or after the

date of the enactment of [the MCA] which relate to any aspect of the detention, transfer,

treatment, trial or conditions of detention of an alien detained by the United States since

September 11, 2001,' and that Congress did so constitutionally . . . . As such, this Court lacks

jurisdiction to review Petitioner's habeas petition.").  As discussed before, the only factual

question relevant to this Court's jurisdiction here is whether petitioners have been "determined

by the United States to have been properly detained as [] enemy combatant[s]."  MCA § 7.  The

plain language of § 7 indicates that the determination of enemy combatant status (and whether an

alien is properly detained pursuant to that determination) is for the United States alone to make.

Indeed, any determination that a detainee is an enemy combatant is also a determination that the

detainee is "properly detained as an enemy combatant" because it is  established that all enemy

combatants may be properly detained during armed conflict.  *See Hamdi*, 542 U.S. at 520-21; *Ex*

*parte Quirin*, 317 U.S. 1 (1942).  Accordingly, once respondents have shown that the United

States has determined petitioners to be enemy combatants, there is no basis for petitioners to

dispute that fact, and the jurisdictional inquiry is at an end.

 Nevertheless, petitioners argue that they are entitled to examine whether the United

States' determination of their enemy combatant status was properly made.  But § 7 does not say

that the jurisdictional bar applies only where the alien has been "properly determined" to be an

enemy combatant.  To the extent petitioners seek to re-write the statute along those lines, they

11

would make the jurisdiction-limiting provision applicable only after the normal habeas inquiry,

and thus render § 7 entirely ineffective.  In other words, while § 7 plainly provides that this Court

has no jurisdiction to hear a habeas petition challenging the legality of an alien enemy

combatant's detention (or any aspect of the enemy combatant's detention), petitioners' revision

of the statute would require this Court to address whether their detention is based on a proper

determination of their enemy combatant status.  Essentially, petitioners are seeking the same

relief as would be available if Congress never enacted § 7.  That they cannot do.

As for the alleged "factual dispute" regarding the United States' control over Bagram, the

manufacture of such a dispute by petitioners would not entitle them to discovery even if the legal

impediments just addressed did not bar it.  As discussed in detail in the next sections, the degree

of United States' control over Bagram is irrelevant to the jurisdictional inquiry here because as a

statutory matter, application of § 7 of the MCA does not depend on where the alien enemy

combatant is held by the United States.  As a constitutional matter, the D.C. Circuit has also held

that § 7 does not violate the Suspension Clause when applied to aliens outside the sovereign

territory of the United States.

Finally, it is worth noting that the type of discovery petitioners propose would intrude on

the military operations in Afghanistan and entail the very type of litigation found inconceivable

by the Supreme Court in *Eisentrager*, 339 U.S. at 779.  As Judge Hogan aptly noted recently

when dismissing a suit by former detainees in Afghanistan and Iraq against U.S. government

officials:

> The discovery process alone risks aiding our enemies by affording
> them a mechanism to obtain what information they could about
> military affairs and disrupt command missions by wresting

officials from the battlefield to answer compelled deposition and
other discovery inquiries about the military's interrogation and
detention policies, practices, and procedures.

*In re Iraq and Afghanistan Detainees Litigation*, No. 06-0145, – F. Supp. 2d –, 2007 WL

926145, *15 (D.D.C. March 27, 2007).

In sum, petitioners are not entitled to discovery.

**B.    The Degree of the United States' Control Over Bagram Airfield Does
Not Affect the Interpretation of the Habeas Statute Both Before and
After the Statute's Amendment.**

In their opening brief, respondents showed that even had Congress not amended the

federal habeas statute, the logic of the Supreme Court's decision in *Rasul*, would not extend to

Bagram.  *See* Respondents' Mot. to Dismiss 2d Amended Pet. at 11-12.  Unlike Cuba, which has

expressly consented to the United States' "complete jurisdiction and control" over Guantanamo,

*see Rasul*, 542 U.S. at 471, the Government of Afghanistan has made no similar concession

regarding Bagram.  In response, petitioners maintain that *Rasul* is controlling on the statutory

question because the United States' control over Bagram Airfield is similar, if not greater, than

its control over Guantanamo.  *See* Pet. Opp. at 23-31.  According to petitioners, as to both

Bagram and Guantanamo, the host nation exercises no legal jurisdiction over the base, nor has

the host nation entered into a Status of Force Agreement ("SOFA") with the United States.

Petitioners are wrong.  First, their arguments rest on the false premise that the MCA's

jurisdiction-limiting provision is inapplicable to them because they allegedly have not been

determined by the United States to be properly detained as enemy combatants.  In fact, the United

States has made such a determination, and the plain language of the amended habeas statute

precludes this Court's jurisdiction, wherever petitioners may be detained.  *See* MCA § 7.  Given

that the MCA clearly applies here and that it is also intended to overrule *Rasul* even as to

Guantanamo, this Court need not, and should not, reach the issue of the United States' control

over Bagram, nor can petitioners advance their case by arguing that Bagram is just like

Guantanamo.

Second, even if the United States had not determined petitioners to be enemy combatants,

the pre-amended habeas statute was not intended to be, nor has it ever been, extended beyond the

United States, except in the unique circumstance of Guantanamo.  Bagram is not like

Guantanamo, however, other than that neither is a sovereign territory of the United States.  The

United States' presence at Bagram Airfield is necessitated by the war against al Qaeda, the

Taliban, and their affiliates and supporters.  *See* Miller Decl. ¶ 4; Letter from the President to the

Speaker of the House of Representatives and the President Pro Tempore of the Senate (Sept. 19,

2003), *available at* http://www.whitehouse.gov/news/releases/2003/09/20030919-1.html.  The

United States began combat efforts in Afghanistan in October 2001, and the military continues to

fight in this area.  As a result of the United States' presence in the area, and contrary to

petitioners' representation, the United States did execute a SOFA in 2002 with the Government

of Afghanistan regarding the United States' activities in Afghanistan, including Bagram Airfield.

*See* Diplomatic Note 202, attached hereto as Exhibit 4.  The agreement, effected through an

exchange of diplomatic notes, recognizes that United States personnel "may be present in

Afghanistan in connection with cooperative efforts in response to terrorism, humanitarian and

civic assistance, military training and exercises, and other activities."  *Id.* at 1. The agreement

further ensures, among other things, that such personnel be accorded a status equivalent to that

accorded to American embassy administrative and technical staff.  *See id.*  Importantly, under the

14

SOFA, the United States' jurisdiction in Afghanistan extends only to U.S. personnel:

> The Government of Afghanistan recognizes the particular importance of disciplinary control by United States military authorities over United States personnel and, therefore, Afghanistan authorizes the United States Government to exercise criminal jurisdiction over United States personnel. The Government of Afghanistan and the Government of the United States of America confirm that such personnel may not be surrendered to, or otherwise transferred to, the custody of an international tribunal or any other entity or state without the express consent of the Government of the United States.

*Id* at 3. In other words, common crimes committed by Afghan citizens at Bagram would be prosecuted by the Government of Afghanistan, not the United States, and the Government of Afghanistan in that respect has legal jurisdiction over Bagram.

The lease agreement between the two governments regarding Bagram Airfield is not to the contrary. Far from granting the United States "complete jurisdiction and control" as is the case in Guantanamo, the Bagram lease is silent about U.S. jurisdiction over the Airfield. While the lease speaks in terms of "exclusive use" and "exclusive, peaceable, undisturbed and uninterrupted possession" of the premises and gives the United States the right to assign the lease, Miller Decl. Ex., 1 at ¶¶ 1, 9, that is no different from an ordinary commercial lease. The lease simply does not give the United States jurisdiction over the Airfield because the issue of jurisdiction is governed by the SOFA. What the lease does warrant is that the Government of Afghanistan "is the sole owner of the Premises and/or has the right, without any restrictions, to grant the use of the Premises" to the United States. *See* Miller Decl., Ex. 1 at ¶ 8. Indeed, consistent with that ownership, the Government of Afghanistan agrees that all claims arising out of the United States' possession of the premises may be directed to the Government of

Afghanistan for processing and payment, if any.  *See id.*

As for petitioners' protestation that "Bagram is not a battlefield and the United States does not treat Bagram as a temporary, battlefield facility," Pet. Opp. at 27, it is indisputable that Bagram is located in a theater of active military operations, even if the Airfield itself is secured by U.S. and multinational forces.[8]  That petitioners and other enemy combatants captured in Afghanistan (and allegedly elsewhere) have been detained there long term is due to the fact that the war is on-going and the detention is necessary for reasons of military necessity.   As explained in Colonel Miller's declaration,

> The detention of these enemy combatants [at Bagram] prevents them from returning to the battlefield and engaging in further armed attacks against innocent civilians and U.S. and coalition forces.  Detention also serves as a deterrent against future attacks by denying the enemy the fighters needed to conduct war. Interrogations during detention enable the United States to gather important intelligence to prevent future attacks.

*See* Miller Decl.  ¶ 8; *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 531 (2004) (noting the "weighty and sensitive governmental interests in ensuring that those who have in fact fought with the enemy during a war do not return to battle against the United States;" and "[t]he purpose of detention is to prevent captured individuals from returning to the field of battle and taking up arms once again").

In any event, as the Supreme Court recognized in *Hamdi*, the detention of enemy

---

[8]  *But see* Abdul Waheed Wafa, New York Times, Feb. 27, 2007, *Cheney Unhurt After Bombing in Afghanistan* (reporting explosion by suicide bomber outside the main gate of Bagram Airfield, killing several American and coalition solders and injuring several others).

combatants during an armed conflict is a necessary attribute and by-product of war.[9]  *See* 542

U.S. at 518-19.  It is simply inconceivable that Congress ever intended to thrust federal courts

into the extraordinary role of reviewing the military's conduct of hostilities overseas, second-

guessing the military's determination as to which captured aliens pose a threat to the United

States or have strategic intelligence value, and in practical effect, superintending the Executive

conduct of an armed conflict – even while American troops are on the ground engaged in daily

combatant operations.  Put differently, the habeas statute, even before its amendment, was not

intended to reach aliens detained by the United States anywhere in the world during active

hostilities.  The MCA now makes absolutely clear that Congress has no such intention, and

clarifies that habeas statute is not intend for the judiciary to exercise jurisdiction in such

circumstances.

       In sum, even if petitioners had not been determined by the United States to be enemy

combatants, the habeas statute's territorial reach would not extend to Bagram under *Rasul*.

---

[9]  Indeed, in World War I, American forces had custody of approximately 48,000 prisoners of war in France between the 1918 armistice and the treaty of peace in 1920.  *See* George Lewis and John Mewha, *History of Prisoner of War Utilization by the United States Army 1776-1945*, Dep't of the Army Pamphlet No. 20-213 at 63.  By the end of World War II, U.S. forces had custody of approximately 2 million enemy combatants.  *See id.* at 244.  Many of the detainees were not repatriated for several years after the conclusion of the hostilities.  *See id.* at 243-245.  And as to both World Wars, only a small fraction of the detainees was prosecuted and punished for war crimes, while the vast majority were simply detained during the conflict.

## II.    PETITIONERS CANNOT INVOKE PROTECTIONS UNDER THE CONSTITUTION

### A.    *Boumediene* Confirms that Petitioners Have No Habeas Rights Protected by the Constitution.

Petitioners next argue that they are entitled to habeas relief under the common law as protected by the Constitution, contending that *Rasul* is controlling on the constitutional question as well, as opposed to *Eisentrager*.  That argument, however, is foreclosed by *Boumediene*. *Boumediene* holds that § 7 of MCA, as applied to aliens captured abroad and detained as enemy combatants in an overseas military base outside the sovereign territory of the United States, does not violate the Suspension Clause of the Constitution.  476 F.3d at 988-992.  This is so not only because "the writ in 1789 would not have been available to aliens held at an overseas military base leased from a foreign government," *id.* at 990-91, but also because "[p]recedent in [the D.C. Circuit] and the Supreme Court holds that the Constitution does not confer rights on aliens without property or presence within the United States," *id.* at 991.

Specifically, the Court of Appeals recognized *Eisentrager* to be the "controlling precedent," *id.*, and found that any distinction between the naval base at Guantanamo Bay and the prison in Landsberg, Germany, where the petitioners in *Eisentrager* were held, was immaterial to the application of the Suspension Clause because "[t]he text of the lease and decisions of circuit courts and the Supreme Court all make clear that Cuba—not the United States—has sovereignty over Guantanamo Bay."  *Id.*  As for *Rasul*, the Court of Appeals noted that "'[n]ot one of the cases mentioned in *Rasul* held that an alien captured abroad and detained outside the United States—or in 'territory over which the United States exercises exclusive jurisdiction and control,' *Rasul*, 542 U.S. at 475—had a common law . . .  right to the writ of

habeas corpus.'" *Id.* at 990 (quoting *Hamdan v. Rumsfeld*, No. 04-1519, 2006 WL 3625015, at

*7 (D.D.C. Dec. 13, 2006) (Robertson, J.)).  "[T]he observation about common law habeas in

*Rasul*," the Court of Appeals noted, "referred to the practice in England, and "[e]ven if there

were such a thing as common law jurisdiction in the federal courts, § 2241(e)(1) quite clearly

eliminates all 'jurisdiction to hear or consider an application for a writ of habeas corpus' by a

detainee, whatever the source of that jurisdiction." *Id.* at 988 n. 5 (quoting 28 U.S.C.

§ 2241(e)(1)).

    Here, petitioners concede that Bagram is not a sovereign territory of the United States[10]

(*see* Pet. Opp. at 34), but nevertheless insist that they are entitled to invoke protections under the

Suspension Clause.  According to petitioners, *Boumediene* is wrongly decided.  *See* Pet. Opp. at

11, 31 n.17.  This Court, however, must follow controlling Circuit precedent, as Judge Hogan

recently did in *In re Iraq and Afghanistan Detainees Litigation*, No. 06-0145, – F. Supp. 2d –,

2007 WL 926145, *9 (D.D.C. March 27, 2007), when dismissing damage claims against DoD

officials by foreign nationals previously detained at Bagram and in military facilities in Iraq.  As

Judge Hogan held, these aliens have no constitutional rights, and the D.C. Circuit's decision in

*Boumediene* "removes any doubt about whether this Circuit views the Constitution as conferring

any rights on nonresident aliens detained abroad."  *Id.*  *Boumediene* is the law of the Circuit, and

this Court is bound by it.  *Cf. Save Our Cumberland Mountains, Inc. v. Hodel*, 826 F.2d 43, 49

(D.C. Cir. 1987) ( "[w]hether or not [a prior case's] position on this point is correct . . . this panel

---

    [10]  Indeed, petitioners cannot contend otherwise, because "'the determination of
sovereignty over an area,' the Supreme Court has held, 'is for the legislative and executive
departments.'" *Boumediene*, 476 F.3d at 992 (quoting *Vermilya-Brown Co. v. Connell,* 335 U.S.
377, 380 (1948)); *accord In re Iraq and Afghanistan Detainees Litigation*, No. 06-0145, – F.
Supp. 2d –, 2007 WL 926145, *12 (D.D.C. March 27, 2007) .

is bound by that position as the law of the circuit"), *vacated in part on other grounds*, 857 F.2d 1516 (D.C. Cir. 1988).

The D.C. Circuit's decision in *Omar v. Harvey*, 479 F.3d 1 (2007), relied on by petitioners, is not to the contrary.  In that case, the Court of Appeals held that the district court has jurisdiction over a habeas petition filed on behalf of a U.S. citizen being held in Iraq by U.S. forces acting as part of the Multi-National Force–Iraq ("MNF-I") and who had not been charged or convicted by a non-U.S. court.[11]  *Omar* does not involve application of the MCA's jurisdiction-limiting provision because the habeas petitioner there is a U.S. citizen, and as the Supreme Court long ago noted in *Eisentrager*, "[c]itizenship as a head of jurisdiction and a ground of protection was old when Paul invoked it in his appeal to Caesar."  339 U.S. at 770. Petitioners here, of course, are not United States citizens.

**B.     Petitioners Have No Due Process Rights That Would Entitle them to Challenge the Procedures Used to Determine Their Enemy Combatant Status**.

Given that petitioners have no constitutional rights, this Court need not address whether the enemy combatant status review procedures available in Afghanistan meet constitutional Due Process requirements or whether they constitute an alternative adequate remedy for purposes of the Suspension Clause.  Although petitioners complain about the lack of judicial review of the United States' determination of their enemy combatant status, there is also no constitutional impediment for Congress to limit judicial review in that fashion.  *See* U.S. Const. Art. III, § 1;

---

[11]     *Compare Omar with Munaf v. Geren*, No. 06-5324, (D.C. Cir. Apr. 6, 2007) (district court has no power or authority to hear habeas petition by a U.S. citizen held in Iraq by U.S. forces acting as part of MNF-I because the habeas petitioner has been convicted by an Iraqi criminal court).

*see also Snyder v. Harris*, 394 U.S. 332, 341-342 (1969) ("If there is a present need to expand the jurisdiction of those courts we cannot overlook the fact that the Constitution specifically vests that power in the Congress, not in the courts."); *Fair Assessment in Real Estate Ass'n v. McNary*, 454 U.S. 100, 117 (1981) (Brennan, J., joined by Marshall, Stevens, and O'Connor, JJ., concurring in the judgment) ("it is exclusively Congress' responsibility to determine the jurisdiction of the federal courts").  Congress, moreover, is far better situated than the courts to weigh the significant foreign policy and military ramifications of extending federal jurisdiction over claims of aliens held abroad and to address the myriad of factors that might enter the equation.  In enacting the MCA, Congress decided not to grant judicial review to every alien enemy combatant detained by the United States, and did not limit the jurisdictional provisions of that statute to those who have received CSRTs.[12]  That judgment is not reviewable by this Court in this case.

---

[12]  *Cf.* 152 Cong. Rec. S10270-71 (daily ed. September 27, 2006) (statement of Sen. Kyl)("Because the military, in response to criticism of Guantanamo, started giving everyone at Guantanamo a CSRT hearing, these critics contend, it should be compelled to do so for all future detainees, and for all future wars. . . . This the Armed Services committees and this Congress declined to do.  Aside from the fact that these detainees, aliens all, are not entitled to CSRTs or any Article 5 type hearing under the Geneva Convention, it would be absurdly impractical to require the military to provide such hearings in all future conflicts.  Consider, for example, the case of World War II.  As I mentioned earlier, the United states detained over 2,000,000 enemy combatants during that conflict.  How on earth could we possibly expect the military to conduct CSRTs for 2 million people?  And how could the DC Circuit be expected to handle 2 million appeals from CSRTs, even under the de minims facial challenge authorized by the DTA?  It is simply inconceivable.").

## CONCLUSION

For the foregoing reasons, this Court should dismiss this petition for want of jurisdiction.


Dated: April 20, 2007                    Respectfully submitted,

                                         PETER D. KEISLER
                                         Assistant Attorney General

                                         DOUGLAS N. LETTER
                                         Terrorism Litigation Counsel

                                         ___/s/___Jean Lin_____
                                         JOSEPH H. HUNT (D.C. Bar No. 431134)
                                         VINCENT M. GARVEY (D.C. Bar No. 127191)
                                         JUDRY L. SUBAR (D.C. Bar No. 347518)
                                         JEAN LIN
                                         Attorneys
                                         United States Department of Justice
                                         Civil Division, Federal Programs Branch
                                         20 Massachusetts Ave., N.W.
                                         Washington, DC  20530
                                         Tel:  (202) 514-3716
                                         Fax:  (202) 616-8470
                                         Attorneys for Respondents