RUZATULLAH V. GATES, Civil Action No. 06 CV 01707 (GK)

# EXHIBIT 3
## Of Petitioner Ruzatullah's Opposition to Respondents' Supplemental Motion to Dismiss

## DECLARATION OF MATTHEW C. WAXMAN

I, Matthew C. Waxman, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1. I am the Deputy Assistant Secretary of Defense for Detainee Affairs in the Department of Defense ("DoD"). My office is organized under the office of the Under Secretary of Defense for Policy. The office of Detainee Affairs, which I supervise, is responsible for providing policy advice to the Under Secretary of Defense on matters regarding detainees in DoD control. I have served in this position since August of 2004. The following statements provide a general overview of the process of transferring a detainee in DoD control at the United States Naval Base at Guantanamo Bay, Cuba ("GTMO") to the control of a foreign government. These statements are not intended to be an exhaustive description of all of the steps that might be undertaken in particular cases but do reflect United States policy and practices with respect to transfers of detainees from GTMO. I make these statements based upon my personal knowledge and upon information made available to me in the performance of my official duties. This declaration replaces my prior two declarations (dated March 8, 2005 and March 16, 2005) submitted in connection with various habeas petitions pending in this Court.

2. One of DoD's current missions is to use all necessary and appropriate force to defeat the al Qaeda terrorist network and its supporters. In the course of that campaign – which remains ongoing – the United States and its allies have captured thousands of individuals overseas, virtually all of whom are foreign nationals. Through a screening and evaluation process, DoD determines whether the individuals should be detained during the conflict as enemy combatants. Approximately 520 of the foreign nationals are being held by DoD at GTMO.

3. It is appropriate for DoD to detain these enemy combatants as long as hostilities are ongoing. Nonetheless, DoD has no interest in detaining enemy combatants longer than

necessary. Accordingly, DoD is conducting at least annual reviews of each GTMO detainee to determine whether continued detention is warranted based on factors such as whether the detainee continues to pose a threat to the United States and its allies. Where continued detention is deemed no longer necessary, a detainee may be transferred to the control of another government for release. Furthermore, the United States also transfers GTMO detainees, under appropriate circumstances, to the control of other governments for continued detention, investigation, and/or prosecution when those governments are willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not continue to pose a threat to the United States and its allies. Such governments can include the government of a detainee's home country, or a country other than the detainee's home country that may have a law enforcement, prosecution, or other interest in the detainee. Transfers of detainees are and have been made in accordance with the policy and process outlined herein, rather than to thwart the actual or putative jurisdiction of any court.

4. As of today, 234 detainees have been transferred by the DoD from GTMO, with 167 transferred for release, and 67 transferred to the control of their home governments for further detention, investigation and/or prosecution, as appropriate. Of those 67 detainees who have been transferred to the control of other governments for further detention, investigation and/or prosecution, 29 were transferred to Pakistan, 9 to the United Kingdom, 7 to Russia, 5 to Morocco, 6 to France, 4 to Saudi Arabia, 2 to Belgium, 1 to Denmark, 1 to Spain, 1 to Sweden, 1 to Kuwait, and 1 to Australia. These 234 transfers have occurred over a time span beginning in October 2002.

5. When the DoD transfers GTMO detainees to the control of other governments for continued detention, investigation, and/or prosecution, the DoD does so after dialogue with the

- 2 -

receiving government. Such dialogue may be initiated by the receiving government or may be initiated by the United States. In either situation, the purpose of the dialogue is to ascertain or establish what measures the receiving government intends to take pursuant to its own domestic laws and independent determinations that will ensure that the detainee will not pose a continuing threat to the United States and its allies. In all such cases of transfer for continued detention, investigation, and/or prosecution, as appropriate, as well as situations in which the detainee is transferred for release, the detainee is transferred entirely to the custody and control of the other government, and once transferred, is no longer in the custody and control of the United States; the individual is detained, if at all, by the foreign government pursuant to its own laws and not on behalf of the United States. When detainees are transferred to the custody or control of their home governments, it is frequently the case that the home government takes the detainee into its custody, at least for an initial period. In some cases, the home government has subsequently released the detainee, sometimes after a period of questioning or investigation, while in other cases, the detainees have remained in confinement or subject to other restrictions in their home countries for various reasons based on the determinations and laws of the home government. Of the 67 GTMO detainees transferred by the DoD to the control of their home countries, most have subsequently been released from detention.

6. Once a DoD transfer of a GTMO detainee is proposed, including for possible detention, investigation and/or prosecution, the views of interested United States Government agencies are considered. For such a transfer, it is the policy of the United States, consistent with Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, not to repatriate or transfer individuals to other countries where it believes it is more likely than not that they will be tortured. Therefore, if a transfer is deemed

- 3 -

appropriate, a process is undertaken, typically involving the Department of State, in which appropriate assurances regarding the detainee's treatment are sought from the country to whom the transfer of the detainee is proposed. The accompanying Declaration of Pierre-Richard Prosper accurately and completely describes that process to the best of my information and belief.

7. The ultimate decision to transfer a detainee to the control of another government is made with the involvement of senior United States Government officials. The Secretary of Defense or his designee ultimately approves a transfer deemed to be appropriate. (In June 2004, the Secretary of the Navy was appointed the designated civilian official to operate the annual review process that assesses whether each detainee held by the DoD at GTMO should be released, transferred, or continued in detention at GTMO. The Secretary of the Navy will make the final decision in this process after considering the recommendation of the review board and input from other United States Government agencies.) Decisions on transfer are made on a case-by-case basis, taking into account the particular circumstances of the transfer, the country, and the detainee concerned, as well as any assurances received from the receiving government. If a case were to arise in which the assurances obtained from the receiving government are not sufficient when balanced against treatment concerns, the United States would not transfer a detainee to the control of that government unless the concerns were satisfactorily resolved. Circumstances have arisen in the past where the Department of Defense elected not to transfer detainees to their country of origin because of torture concerns.

8. As noted in the Declaration of Pierre-Richard Prosper, transfers of detainees are extremely sensitive matters that involve diplomatic relations with other countries, as well as the law enforcement and intelligence interests of other countries. Requiring the United States to

unilaterally disclose information about proposed transfers and negotiations outside of appropriate executive branch agencies could adversely affect the relationship of the United States with other countries and impede our country's ability to obtain vital cooperation from concerned governments with respect to military, law enforcement, and intelligence efforts, including with respect to our joint efforts in the war on terrorism. Judicial review, including the possible overturning of decisions to transfer and even delays in transfers occasioned by review and possible appeals, could lead to similar harm and could negatively affect our ability to succeed in the war on terrorism.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 2, 2005.

Matthew C. Waxman